IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF ARKANSAS
WESTERN DIVISION

**TERRY HOBBS**

      **Plaintiff,**

**v.**                            **Case No. 4:09CV00008 BSM**

**NATALIE PASDAR, Individually, and
NATALIE PASDAR,
EMILY ROBISON, and
MARTHA MAGUIRE (formerly SEIDEL) d/b/a DIXIE
CHICKS,**

      **Defendants.**

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
## FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Terry Hobbs, pursuant to Federal Rules of Civil Procedure Rule 56, and

Local Rules 7.2 and 56.1 for his Brief in Support of Motion for Summary Judgment

respectfully states:

# I. INTRODUCTION

At issue in this proceeding are statements made by Defendant Natalie Pasdar

("Pasdar") made in a letter posted on the Dixie Chicks' web page and a similar letter

posted on Pasdar's My Space page, as well as statements made in a rally in Little Rock

Arkansas in December of 2007. Plaintiff contends that the statements of defendant

Pasdar are defamatory in that they amount to a false accusation that Terry Hobbs

committed the brutal and infamous murder of three eight year old boys which occurred in

West Memphis, Arkansas in 1993. Defendants contend that for purposes of application

of the law of defamation to this case, that Terry Hobbs is a public figure. For the reasons

stated below, Terry Hobbs is not a general purpose public figure, a limited purpose public figure or an involuntary public figure.

## II. APPLICABLE LAW

### A. *New York Times v. Sullivan.*

Among the issues in this case is a question of accommodating the competing values of the free speech guarantee of the First Amendment and the right of individuals who are defamed to seek compensation. The United States Supreme Court addressed this issue in the landmark case of *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710 (1964), holding that public officials could not recover for defamation absent proof by clear and convincing evidence that such defamation was undertaken with "actual malice". The Supreme Court extended the rule in *New York Times v. Sullivan* to "public figures" in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975 (1967).

In *Rosenbloom v. Metromedia, Inc.*,403 U.S. 29, 91 S.Ct. 1811 (1971), a plurality of the Supreme Court extended the "actual malice" requirement to defamation cases involving matters of "public concern". The rule set forth in *Rosenbloom* did not command a majority of the Court; in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997 (1974), the Court re-examined the actual malice standard set forth in *New York Times v. Sullivan*, and announced the rule that is applicable in this case. "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 413 U.S. at 347. This case presents a question as to whether Plaintiff Terry Hobbs is a private figure who can prevail in a defamation case by proving negligence as provided by Arkansas law, or whether he must

prove actual malice in order to recover compensatory damages[1], as is required for public figures under the rule of *New York Times v. Sullivan* and its progeny.

## B. Defining "public figure".

The starting place for defining who is or is not a public figure for purposes of the law of defamation is the rationale of the Supreme Court in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975 (1967) and *Gertz v. Robert Welch, Inc.*, 418 U.S. 423, 94 S.Ct. 2997 (1974), the cases which gave rise to the concept of public and private figures. *Curtis Publishing Co. v. Butts* and its companion case *Associated Press v. Walker,* involved defamation cases in which the plaintiff was not a public official. Wally Butts was the athletic director at the University of Georgia, whose official position was with the Georgia Athletic Association, a private corporation, rather than with the State of Georgia. A story appeared in the *Saturday Evening Post* which alleged that Butts had shared information with Alabama coach Paul "Bear" Bryant in order to fix a football game between the two schools. The Court noted that in common law libel cases, courts had "investigated the plaintiff's position to determine whether he has a legitimate call on the court for protection in light his prior activities and means of self-defense." 388 U.S. at 154.

Edwin Walker was a retired general who was described in an Associated Press article as having taken command of a violent protest and led a charge against United States marshals during the integration of the University of Mississippi in 1962. Walker disputed specifics related to his role in the clash, but in the days prior to the violent

---

[1] The plaintiff must prove "actual malice" in order to recover punitive damages in a defamation case. *Gertz v. Robert Welch, Inc.* 418 U.S. 423, 348-350, 94 S. Ct. 2997 (1974). *Gertz* is discussed in detail below.

protest, he had made statements in print and electronic media in Dallas, Shreveport, New

Orleans and Jackson which urged defiance of federal court orders. 388 U.S. at 159.

The Court found that Butts, by virtue of his position alone, and Walker, by such

"purposeful activity amounting to a thrusting of his personality into the vortex of a public

controversy" were both public figures. 388 U.S. at 154-155. Because they were public

figures, "both commanded sufficient continuing public interest and had sufficient access

to the means of counterargument to be able to expose through discussion the falsehood

and fallacies of the defamatory statements." 388 U.S. at 155. In that they had the means

to defend themselves from the charges, an enhanced level of proof to maintain a

defamation case was justified. Chief Justice Warren, concurring with the opinion of the

Court, stated:

> This blending of positions and power has also occurred in the case of
> individuals so that many who do not hold public office at the moment are
> nevertheless intimately involved in the resolution of important public
> questions or, by reason of their fame, shape events in areas of concern to
> society at large. Viewed in this context, then, it is plain that although they
> are not subject to the constraints of the political process, 'public figures,'
> like 'public officials, often play an influential role in ordering society.
> And surely as a class these 'public figures' has as ready access as 'public
> officials' to mass media of communications, both to influence policy and
> to counter criticism of their views and activities. 388 U.S. at 163-164.

Thus, although the Court was divided on these issues in *Rosenbloom v. Metromedia, Inc.*,

403 U.S. 29, 91 S.Ct. 1811 (1971), the framework for *Gertz v. Robert Welch, Inc.*, had

already been established in *Curtis Publishing Co. v. Butts.*

Elmer Gertz was a lawyer for a plaintiff whose son had been killed by a police

officer in the City of Chicago. The officer was subsequently convicted of second degree

murder. The John Birch Society came to the officer's defense, and published an article

which accused Gertz of orchestrating the charges against the officer and labeled him a

4

"Leninist" among other statements which were alleged to be defamatory. Although Gertz prevailed at trial, the District Court concluded that the rule of *New York Times v. Sullivan* prohibited damages even though Gertz was not a public official or public figure.

The Supreme Court, in reversing the District Court, found that in order to balance the competing First Amendment issue with the right of persons who are defamed to bring suit for damages, it was necessary to "distinguish among defamation plaintiffs." 418 U.S. at 344. The Court then noted that the "first remedy" of any victim in a defamation case is self-help using "available opportunities to contradict the lie" and thereby minimize the harm done to reputation. The Court offered the following rationale: "Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater." 418 U.S. at 344.

By holding public office, an individual accepts the consequences of closer public scrutiny because the public's interest extends to anything which might touch on an official's fitness for office, therefore public officials voluntarily assumes the risk that they might be defamed. With respect to public figures the Court stated:

> For the most part those who have attained this status [that of a public figure] have assumed roles of special prominence in the affairs of society. Some occupy positions of such power and influence that they are deemed public figures for all purposes. More commonly, those classed as public figures have thrust themselves to the forefront of a particular public controversy in order to influence the resolution of the issues involved. In either event, they invite attention and comment. Even if the foregoing generalities do not obtain in every instance, the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to increased risk of injury from

5

defamatory falsehoods concerning them. No such assumption is justified with respect to a private individual. He has not accepted a prominent role in ordering society. He has relinquished no part of his interest in protecting his own good name, and consequently he has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood. Thus, private individuals are not only more vulnerable to injury than public officials and publics figures; they are more deserving of recovery. 418 U.S. at 345 [citations omitted]

In *Gertz*, the Supreme Court established a framework under which public officials and public figures would have to meet the higher burden of proof mandated by *New York Times v. Sullivan*, but that defamation plaintiffs who are not public officials or public figures could recover damages to reputation by proving the falsehood of the statement and that the person who made the statement was negligent with respect to its falsity.

## C. Holding the line established by *Gertz*.

The Supreme Court has directly addressed the question of defining who is a public figure three times since its decision in *Gertz*. In each instance the Supreme Court reversed a lower court ruling that a plaintiff was a public figure and rejected a broad definition of the term public figure in favor of a definition of public figure narrowly focused on the reasons that formed the basis for the Court's decision in *Gertz*.[2]

In *Time, Inc. v. Firestone*, 424 U. S. 448, 96 S.Ct. 958 (1976), the Supreme Court reversed a lower court finding that Mary Alice Firestone, a prominent society heiress, was not a pubic figure for purposes of an allegedly defamatory article about Firestone's divorce which appeared in *Time* magazine. The Court found that despite Firestone's social status, that she "did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society" and that "she did not thrust herself to the

---

[2] Rodney A. Smolla, *Law of Defamation*, Section 2.08, at 2-23: "In the aftermath of *Gertz* the Supreme Court undertook a series of refinements of the "limited" public figure, consistently give the term an application more restricted in scope that the simple word "public" might suggest as a matter of popular colloquial usage."

forefront of any particular public controversy in order to influence the resolution of the issues involved in it." 424 U.S. at 453. Although the divorce proceedings where a matter of public record and public interest and had received significant media attention, the Supreme Court found that the proceedings were not a "public controversy" for purposes of determining whether Mary Alice Firestone was a public figure. 424 U.S. at 454. The Court stated that she had not freely publicized the details of her married life, rather she had been compelled to go to court by the state in order to obtain a divorce. Resort to the judicial process is not seen by the Court as a voluntary act which invited publicity. 424 U.S. at 454. "Her actions, both in instituting the litigation and in its conduct, were quite different from those of General Walker in *Curtis Publishing Co.* [citation omitted] She assumed no 'special prominence' in the resolution of public questions." 424 U.S. at 454-455. She was not found to be a public figure despite the fact that she had a few press conferences during the divorce proceedings. "Such interviews should have had no effect upon the merits of the legal dispute" therefore she was not attempting to influence the resolution of the questions involved in the divorce. 424 U.S. at 454, FN3.

*Hutchinson v. Proxmire*, 443 U.S. 111, 98 S.Ct. 2675, involved a research scientist who filed a defamation suit after being listed as a "Golden Fleece Award" winner by Senator William Proxmire as a result of using federal research dollars to study why monkeys clench their jaws. Despite the fact that taxpayer funds were used for the research and the news of the successful application for federal funds appeared in local newspapers, the Court found that Hutchinson was not a public figure. Hutchinson, although he applied for public funds and the grants were publicized in the press "did not thrust himself or his views into public controversy to influence others." 443 U.S. at 135.

7

Although the defendants identified a general concern about public expenditures at the "public controversy", the Court found that "Hutchinson at no time assumed any role of public prominence in the broad question of concern about expenditures."

Furthermore, the Court found that publication of Hutchinson's response to the announcement of the "Golden Fleece Award" did not established that he had access to the media for purposes, thereby making him a public figure. "Clearly those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." 443 U.S. at 135. Media attention garnered by responding to accusations does not make a person a public figure under the rule of *Gertz*.

In *Wolston v. Readers Digest Ass'n, Inc.*, 443 U.S. 157, 99 S.Ct. 2701 the Court found that Wolston, the nephew of 2 persons who had been convicted of spying for the Soviet Union, was not a public figure by virtue of the fact that he had been subpoenaed to appear before a grand jury investigating espionage, failed to appear and been convicted of contempt for failing to appear. The Court found that Wolston had not voluntarily thrust himself or injected himself into the forefront of the public controversy surrounding the investigation of Soviet espionage. "It would be more accurate to say that petitioner [Wolston] was dragged unwillingly into the controversy. The government pursued him in its investigation." Even though Wolston's failure to appear and his contempt citation did attract media attention, and Wolston knew his failure to appear might attract media attention, the Court found that Wolston was not a public figure.

Even though the issue of Soviet espionage made the events newsworthy, "[a] private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention." 443 U.S. at 167.

When someone is drawn into a public forum against their will because of litigation, they do not become a public figure. The Court specifically rejected the argument that a person who engages in criminal conduct should become a public figure for the limited range of issues surrounding the conviction. "To hold otherwise would create an 'open season' for all who sought to defame persons convicted of a crime." 443 U.S. at 168-169. The Supreme Court placed a high value on protecting those convicted of a crime from defamation. What value would the Court put on protecting someone whose only involvement with a crime is to be a victim or falsely accused of it?

### D. A framework for analysis.

The Supreme Court acknowledged in *Gertz* that the peculiar circumstances in each case affect the balance between freedom of the press and an individual's interest in his or her reputation, but in so doing rejected the notion of an *ad hoc* determination of who is a public figure. Rather, the courts should formulate "broad rules of general application" that accommodate the competing interests of free speech and personal reputation. 418 U.S. at 343-44.

The D.C. Circuit in *Waldbaum v. Fairchild Publications*, Inc., 627 F.2d 1287 (D.C. Cir. 1980) established a three part test to determine if a person is a limited-purpose a public figure for purposes of the law of defamation. First, the court must isolate the public controversy. A public controversy "is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." 627 F.2d at 1296. The Court further elaborated:

> To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and

uncovering facts and theories to help the public formulate some judgment. It should ask whether a reasonable person would have expected persons beyond the immediate dispute to fell the impact of its resolution. If the issue was being debated publicly and it if had foreseeable and substantial ramifications for nonparticipants, it was a public controversy. (footnotes and citations omitted.) 627 F.2d at 1297.

Second, "[o]nce the court has defined the controversy, it must analyze the plaintiff's roll in it. Trivial or tangential participation is not enough. The language of *Gertz* makes it clear that the plaintiffs must have 'thrust themselves to the forefront' of the controversies so as to become factors in their ultimate resolution. [citations omitted] They must have achieved a 'special prominence' in the debate. [citations omitted] The plaintiff either must have been purposely trying to influence the outcome or could realistically have been expected, because of his position in the controversy, to have an impact on its resolution." 627 F.2d at 1297. Although the court can look to the plaintiff's past conduct, the extent of press coverage, and the public reaction to his conduct and statements, responding to press inquiries or attempting to reply to comments on oneself through the media does not necessarily mean that a person is attempting to play a significant role in the controversy. 672 F.2d at 1298, citing *Time, Inc. v. Firestone*, 424 U. S. 448, 96 S.Ct. 958 (1976).

Finally, the alleged defamation must have been germane to the plaintiff's participation in the controversy. 627 F.2d at 1298.

The Court in *Waldbaum* intended to provide "useful analytical tools" to determine whether a plaintiff is a public figure, but still recognized that "the touchstone remains" the standard that the Supreme Court set forth in *Gertz* and its progeny. *Lohrenz v. Donnelly*, 350 F.3d 1272, 1279 (2003).

The Fourth Circuit has adopted a more detailed framework which is essentially a five part test to examine the plaintiff's role in the particular public controversy[3]. *Reuber v. Food Chemical News Inc.*, 925 F.2d 703, 708-710 (1991). The Court stated that a defendant must prove five things before a court could properly hold that a plaintiff was a limited-purpose public figure:

    1. The plaintiff had access to channels of effective communication;

    2. The plaintiff voluntarily assumed a role of special prominence in the public controversy;

    3. The plaintiff sought to influence the resolution or outcome of the controversy;

    4. The controversy existed prior to the publication of the defamatory statement; and

    5. The plaintiff retained public figure status at the time of the alleged defamation. 37 F.3d at 1557

In a subsequent decision, the Court added an additional consideration: If the content of the defamatory statement touches upon an area of state law that has traditionally been considered to be defamatory *per se*, then the plaintiff cannot be categorized as a limited purpose public figure solely because he makes reasonable public replies to public accusations. *Wells v. Liddy*, 186 F.3d 505, 534 (1999) citing *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1558 (1994). The Court in *Foretich* stated that it "recognized the devastation that public accusations of child sexual abuse can wreak, and we are extremely reluctant to attribute public figure status to otherwise private persons merely because they have responded to such accusations in a reasonable attempt to

---

[3] Examination of the plaintiff's role in the particular public controversy is the second part of the three part test of *Waldbaum*.

vindicate their reputation." 37 F.3d at 1558. The Court stated that its holding was consistent with the Supreme Court's advice in *Gertz* that courts formulate "broad rules of general understanding" that accommodate the competing interests of press and personal reputation". 37 F.3d at 1559, FN 17.

While the Eight Circuit has not formally adopted a framework for analysis or a multiple-part test to determine public figure status, *Waldbaum* is cited with approval and the considerations that gave rise to the five part test of *Reuber* are recognized as valid considerations by the Eight Circuit.

In *Bagley v. Iowa Beef Processors, Inc.,* 797 F.2d 632, 644-645 (1986), the Court stated that it must first identify the particular public controversy giving rise to allegedly defamatory speech, and such controversy must raise "issues that might reasonably be expected to have an impact beyond the parties directly enmeshed in the particular controversy", citing *Gertz* and *Waldbaum.* Next, the Court stated "[h]aving identified the particular controversy giving rise to the defamation, the court must examine the 'nature and extent' of Bagley's involvement in the controversy" to determine whether Bagley has "thrust himself to the forefront of that controversy in order to influence the resolution of the issues involved." 797 F2d. at 645. *Gertz* and *Waldbaum* are again cited. Finally, the court recognized that although Bagley was involved in community and public service, that service did not relate to the particular controversy giving rise to the allegedly defamatory statements. 797 F.2d at 647.

*Lundell Manufacturing Co., Inc. v. American Broadcasting Company, Inc.*, 98 F. 3d 351 (1996) involved a defamation suit by business (Lundell) which sold a garbage recycling machine to a county government against a television news company (ABC) for

an allegedly defamatory statement that the machine did not work. Although the issues surrounding the purchase of the machine from Lundell were identified by the court as a public controversy, because Lundell did not assert himself into the controversy to help determine its outcome, the company was not a public figure. Although Lundell, who sold the machine to the county, was necessarily involved in a public controversy involving whether the machine worked, the court found that Lundell was not a public figure.

The court found that Lundell did not have access to the media to refute the defamatory report. 98 F. 3d at 365. The court, citing *Hutchinson v. Proxmire*, 443 U.S. 111, 98 S.Ct. 2675 (discussed above), stated that having regular and continuing access to the media is "one of the accouterments of being a public figure". 98 F.3d at 364. This is the rationale for the requirement that a defendant show that the plaintiff have "access to channels of effective communication" which is the first part of the five part test stated in *Reuber v. Food Chemical News Inc.*, 925 F.2d 703, 708-710 (1991) (discussed above).

Similarly, the rationale for the second[4] and third[5] parts of the five part test were also referenced by the court in *Lundell*. "Even though the garbage disposal problem was a matter of public concern, we focus on Lundell's role in the controversy, not the public nature of the controversy itself. ABC does not direct us to any evidence that Lundell placed itself into the controversy to influence the issues involved." 98 F. 3d at 364. To be a public figure, a plaintiff must voluntarily assume a role of special prominence and seek to influence the resolution or outcome of the controversy.

---

[4] The second part of the *Reuber* test is whether "The plaintiff voluntarily assumed a role of special prominence in the public controversy."
[5] The third part of the *Reuber* test is whether "The plaintiff sought to influence the resolution or outcome of the controversy."

Furthermore, an individual does not become a public figure when the media spotlight begins to focus on his person because of the publication of the defamatory material. See *Hutchinson v. Proxmire*, 443 U.S. at 135, 99 S.Ct. at 2689; *Jenoff v. Hearst Corp.*, 644 F.2d at 1007. This is the rational of the fourth requirement in *Reuber* that the controversy existed prior to the publication of the defamatory statement. In *Lundell*, the court stated that "ABC cannot, by its own conduct, create its own defense by making Lundell a public figure." 98 F. 3d 351.

The fifth requirement of *Rueber* is that the plaintiff retained public figure status at the time of the alleged defamation. A court must determine whether the plaintiff was a public figure at the time that the defamatory statement was published. *Brown v. Herald Co., Inc.*, 698 F.2d 949 (8th Cir. 1983); *Rebozo v. Washington Post Co.*, 637 F.2d 375 (5th Cir. 1981). The Supreme Court has left open the question "whether or when an individual who was once a public figure may lose that status by the passage of time." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166, FN 7, 99 S.Ct. 2701, 2706, FN 7. The general rule is that a person who is a public figure with respect to a particular controversy does not lose their status a public figure for purposes of that controversy with the passage of time. *Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1269-70 (7th Cir.1996).

Thus, although the Eight Circuit has not formally adopted a framework for analysis or a multiple-part test to determine public figure status, the frameworks for analysis offered in *Waldbaum v. Fairchild Publications*, Inc., 627 F.2d 1287 (D.C. Cir. 1980) and *Reuber v. Food Chemical News Inc.*, 925 F.2d 703, 708-710 (1991) are firmly rooted in the Supreme Court decisions in *Gertz* and its progeny. Likewise, the rationale

for the framework offered in *Waldbaum* and *Rueber* are entirely consistent with the rationale of the decisions in the Eight Circuit cases cited above.

This Court should also apply the rule of *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1558 (1994), and find that even if plaintiff would otherwise be considered a public figure, if the content of the defamatory statement touches upon an area of state law that has traditionally been considered to be defamatory *per se*, then the plaintiff cannot be categorized as a limited purpose public figure solely because he makes reasonable public replies to public accusations. Although the court in *Foretich* was specifically addressing child abuse, the false allegations against Terry Hobbs in this case are at least equally serious. A fair reading of the alleged defamatory statements[6] amount to an allegation that Terry Hobbs killed, hog tied and dumped in a swamp three eight year old boys, one of which was his step-son. As in *Foretich*, the publicity that surrounds an infamous crime should not cause a person who defends themselves in the press to become a public figure when their only association with the controversy is that of a family member of the victim and someone falsely accused of the crime.[7]

It can be argued that any infamous crime is a public controversy because of the public's interest in seeing the correct person brought to justice. A person who defends themselves against false allegations that they committed the crime would certainly be trying to resolve the public controversy as to who committed the crime. The effect of

---

[6] A copy of a letter posted on the Dixie Chick's web page and a copy of Natalie Maines Pasdar's My Space posting which are at the core of plaintiff's defamation claim are attached as Exhibits "A" and "B" to the Brief in Support of Partial Motion for Summary Judgment regarding the fair report and opinion issue that was filed in this case on June 25, 2009.

[7] See also Rodney A. Smolla, *Law of Defamation*, § 2:37.50. When an individual who is not otherwise properly classified as a public figure responds to an attack on his or her reputation by denying or answering defamatory charges, the mere act of responding, even through channels of mass communication, ought not elevate a person to public figure status.

such a rule would be to require actual malice to be proven in any defamation case that involves a false accusation that the plaintiff committed an infamous crime, even though the Supreme Court in *Gertz* specifically rejected the idea that defamation plaintiffs who seek to recovery for statements made that are associated with any public controversy must prove actual malice. Publicity associated with defending ones self from charges should not elevate that person to public figure status. *Gallaher v. Connell*, 123 Cal.App. 4th 1260 20 Cal.Rptr.3d 673 (2005).

Also, the Supreme Court specifically rejected the idea that a person *convicted* of a crime be automatically considered a public figure with respect to that crime. As discussed above, in *Wolston v. Readers Digest Ass'n, Inc.*, 443 U.S. 157, 99 S.Ct. 2701 the Court specifically rejected the argument that a person who engages in criminal conduct should become a public figure for the limited range of issues surrounding the conviction. "To hold otherwise would create an "open season" for all who sought to defame persons convicted of a crime." 443 U.S. at 168-169. Applying the rule in *Foretich* is necessary to avoid "open season" on any person *falsely accused* of a crime.

## II. Applying the law to the facts of this case.

Plaintiff Terry Hobbs does not and has not held elective office. Terry Hobbs is not and has not been employed by the government. Terry Hobbs is not a public official. See affidavit of Terry Hobbs attached hereto as Exhibit "A". It is not credible to argue that Terry Hobbs is "of general fame or notoriety in the community and of pervasive involvement in the affairs of society" such that he is a general purpose public figure. The question in this case is whether Terry Hobbs is a limited-purpose public figure.

As stated above, the first task in determining whether plaintiff is a limited purpose public figure is to identify the particular public controversy. In a general sense the public controversy involved in this case is the murders of Steve Branch, Michael Moore and Chris Byers and the subsequent conviction of Damien Echols, Jessie Misskelley, Jr. and Jason Baldwin for those murders. The Court must separate the public controversy, which is a dispute that has received public attention because its ramifications will be felt by persons who are not direct participants, from the general newsworthiness and public attention that is focused on an infamous crime. For example in *Foretich*, the public controversy was not the spectacular allegations of child abuse, rather it was the role of child abuse accusations in child custody cases, the protection of the interest of the child in child custody cases, the role of experts in child custody cases, and the power of courts to impose contempt citations in custody cases, etc. 37 F. 3d at 1555. The court concluded, [C]learly, the impact of the Morgan-Foretich battle-unlike most child custody disputes-was felt far beyond the confines of the Morgan and Foretich homes." The impact that was felt by those not immediately involved in the controversy was the public policy response to the issues raised in the controversy.

This is the point at which it becomes clear that Terry Hobbs is not a public figure. The parties have stipulated to the authenticity of numerous media reports regarding the brutal and infamous murder of three boys in West Memphis, Arkansas in May of 1993. See Stipulation No. 1: Regarding News Articles, Blog Entries, Transcripts and Digital Video Disks and Stipulation No. 4: Regarding Various News Articles and Magazine Articles. An examination of the statements made by Terry Hobbs reveals no statements other than those defending in which he defends himself against false charges that he is

17

the killer and statements regarding the personal impact of this crime on him and his family. Attached hereto as Exhibit "B" is a demonstrative exhibit which consists of excerpts of the stipulated news articles which contain quotations from Terry Hobbs. It is intended to be a complete list, although the large number of exhibits makes an error of omission possible.

A review of the exhibits in which Terry Hobbs is quoted reveals that the quotes relate only to defending himself and his direct participation in the "controversy" regarding the infamous crime. There is no advocacy on behalf of families of murdered children, no statements the impact on allegations of occult practices on the fairness of the trial, no statements about mental capacity and whether confessions are voluntary, nothing regarding fairness issues for defendants from low income households, no advocacy for social change or a change in law or policy.

A summary of the exhibits in which Hobbs is quoted is as follows:

**Stipulation No. 1:**

Exhibit 3 and 4 (2007) Hobbs defends himself; Hobbs discusses the impact of the crime on his family. (Exhibit 3 is an electronic link to the article which appears as Exhibit 4).

Exhibit 5 (2007) Hobbs defends himself.

Exhibit 7 (2007) Hobbs defends himself.

Exhibit 8 (2007) Hobbs defends himself.

Exhibit 9 (2007) Hobbs defends himself.

Exhibit 10 (2007) Hobbs defends himself. "It's sad to see that there are some people out here trying to get some killers out of prison that deserve to be hung by a rope," said Terry Hobbs.

Exhibit 12 (2007) Hobbs defends himself.

Exhibit 13 (2007) Hobbs defends himself; Hobbs discusses the impact of the crime on his family.

Exhibit 18 (2007) Hobbs defends himself.

Exhibit 22 (2007) Hobbs defends himself.

Exhibit 23 (2007) Hobbs defends himself.

Exhibit 24 (2007) Hobbs defends himself. Hobbs is defended by his attorney.

Exhibit 29 (2007) Hobbs defends himself; Hobbs discusses the impact of the crime on his family. Hobbs defended by his attorney.

Exhibit 30 (2007) Hobbs defends himself. This is a republishing of a prior quote.

Exhibit 31 (2007) Hobbs defends himself. Hobbs is defended by his attorney.

Exhibit 32 (2007) Hobbs defends himself. Hobbs is defended by his attorney.

Exhibit 38 (2007) Hobbs defends himself. Hobbs defends himself from Mark Byers.

Exhibit 92 (1994) Geraldo Show, Hobbs makes a few statements about the impact of the crime on his family, about his stepson and about the crime.

Exhibit 97 (1996) *Paradise Lost:* Hobbs makes one statement about eventually needing to forgive those who killed his stepson.

## Stipulation No. 4

Exhibit 86 (2007) Hobbs defends himself.

Exhibit 190 (1993) Hobbs and his wife express anger at the defendants.

Exhibit 201 (1994) Maury Povich Show, Hobbs reacts to a tape of his stepson singing and discusses a grove in West Memphis dedicated to the victims.

Exhibit 246 (1993) Hobbs discusses his stepson.

Exhibit 253 (2007) Hobbs defends himself. "Hobbs said he believes the DNA results are the work of "crooked defense attorneys ... trying to get their killer SOBs out of jail."

Exhibit 301 (1994) Hobbs references the second trial after the first.

Exhibit 318 (1994) Hobbs says he found out about the sexual abuse allegations at the trial and that he hopes the punishment fits the crime.

Exhibit 10 of Stipulation No. 1 comes closest to political advocacy, but that statement does not represent Hobbs thrusting himself into the vortex of the public controversy surrounding the death penalty, and Hobbs cannot be said to have had a major impact on the resolution of questions surrounding the death penalty. Also, the statements of Ms. Pasdar relate to guilt or innocence of the convicted, not the punishment. A fair review of the media statements of Hobbs reveals that he has not thrust himself into the vortex of anything that is a public controversy, with the purpose of resolving the dispute and is therefore not a limited purpose public figure. Unlike the situation in *Foretich*, there has been no public policy response to the issues raised by the 1993 West Memphis child murders.

The defendants in this case cannot identify a dimension of this case that impacts persons other than direct participants which Terry Hobbs has addressed in the media in a manner which constitutes thrusting himself to the forefront of the controversy. The public's generic concern about how their tax dollars are being spent is the equivalent of the generic concern that neighborhoods are safe and that convictions are justly obtained. As stated above, the Supreme Court in *Hutchinson v. Proxmire* rejected general concerns applicable to everyone as a sufficient public controversy on which to base a determination that a plaintiff is a public figure. The sensational nature of the crime associated with this case is no different that Mrs. Firestone's sensational divorce[8] case, a matter which captured great public attention, but did not impact persons other than those directly involved. Any such dimension to the story regarding the crime that could

---

[8] *Time, Inc. v. Firestone*, discussed in detail above.

impact persons other than the direct participants has not been addressed Terry Hobbs in the media. In short, Terry Hobbs has not injected himself into the vortex of a public controversy for purposes of resolving its outcome; therefore he is not a limited purpose public figure.

The defendants are left only with the argument that the sensational nature of the crime itself is the public controversy. As stated above, the Eighth Circuit has adopted the definition of public controversy stated in *Waldbaum*. For purposes of analyzing who is or is not a public figure for purposes of defamation law, a public controversy "is a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." 627 F.2d at 1296. Even if the sensational nature of the crime itself were enough to create a public controversy, the role of Terry Hobbs in the controversy is insufficient to make him a public figure.

Should the defendants argue that the particular public controversy started the day the crimes was committed, then Terry Hobbs role in the 15 year controversy is diminished to the point that he is not a public figure. From 1996 until 2007, Hobbs is silent while the public controversy continues to rage in film, in celebrity activism and through multiple appeals and court appearances of the convicted. Should the defendants seek to broadly define the public controversy, Terry Hobbs role in it is diminished to the point of being trivial or tangential, which is insufficient to make him a public figure. If instead, the defendants focus on the period of time after the false implications of Hobbs involvement were leaked to the media (May 2007) in order to enlarge the role of Hobbs in the "controversy", then Hobbs is not a public figure because his media contacts during that time constitute self defense against false implications that he was involved in the

21

murders. Also any quote of Hobbs prior to May 2007 is not related to the particular public controversy and is irrelevant to the determination of whether or not Hobbs is a public figure. Arguments which either broadly define the controversy or narrowly define the controversy offer no assistance to the defendants. Either way, their argument is without merit.

In *Waldbaum*, the court did not find it necessary to determine whether a particular public controversy should be narrowly or broadly to defined, because the larger a controversy is in scope, the smaller any particular participant's role is in that controversy. 627 F.2d at 1297, FN27. This principle is demonstrated in this case. The defendants must offer an argument as to what they contend is the public controversy. In order to include media contacts of Hobbs and public attention given to the crime from 1993-2006, the defendants must offer a broad definition of the public controversy, which necessarily diminishes Hobbs role in it to the point where he cannot be considered a limited purpose public figure. An argument narrowly defining the controversy to focus on the time Hobbs was falsely accused and closer to the center of controversy is without merit because Hobbs is only defending himself. Should defendants argue that the public controversy is limited to 2007 prior media contacts are irrelevant, because the court must focus on the plaintiff's role in the *particular* public controversy or sub-controversy, as is stated in *Waldbaum*.

The second part of the *Waldbaum* test is to examine the role of the plaintiff in the particular public controversy. As stated above, Hobbs media involvement cannot be related to any public controversy as that term is defined by the court; nevertheless, the

factors identified in *Reuber* for analyzing the plaintiff's role in the controversy offer no assistance to defendants in their argument that Hobbs is a public figure.

The first factor in *Reuber* is whether the plaintiff had access to channels of effective communication. In this case, it is clear that Hobbs did not have such access. Numerous facts that are consistent only with the innocence of Hobbs appear in none of the 400 plus exhibits stipulated to by the parties.

A fingerprint which did not match the victims or the convicted was found on the crime scene, a fact that was described as "powerful circumstantial evidence" by the Echols defense team in its October 2007 habeas corpus petition.[9] The fingerprint did not match Terry Hobbs. The fingerprint evidence has been discussed by neither the Echols public relations machine, of which Natalie Maines Pasdar was a part, or in the media. The Echols team strongly implies this print belongs to the real killer, but it does not match Terry Hobbs. This fact would have been covered in detail if Terry Hobbs had access to effective channels of communication.

Similarly, the main basis for the false accusations against Hobbs is the fact that he cannot be excluded as the donor of a hair found on a shoelace of one of the victims that did not match the victims or the convicted. Another hair that does not match the victims or the convicted was found that does not match Terry Hobbs.[10] This hair received no mention by the Echols defense team PR machine and virtually no mention in the media, despite the fact that this type of evidence is the exact same type of evidence that is the

---

[9] The fingerprint evidence is described in more detail on pages 4 and 5 of Plaintiff's Motion for Partial Summary Judgment filed on June 25, 2009 in this case.

[10] The additional hair is described in more detail on pages 8-10 of Plaintiff's Motion for Partial Summary Judgment filed on June 25, 2009 in this case.

basis for the false accusations against Hobbs. This fact would have been covered in detail if Terry Hobbs had access to effective channels of communication.

Also, the DNA evidence offered by the Echols defense team was rejected in circuit court in Arkansas. A certified copy of the order by Judge Burnett is attached as Exhibit "D" to the Motion for Partial Summary Judgment filed by Hobbs on June 25, 2009. On pages 5-6 of his order, Judge Burnett stated "On the other hand, that two other persons [Hobbs and Jacoby] are not excluded from the two hairs does not place them there nor make them killers." This represents a judicial finding that the DNA evidence that is the central basis for the accusations against Hobbs neither places Hobbs on the scene or makes him the killer. Although the fact that Echols petition was denied was covered by the news media, the finding that the evidence neither showed that Hobbs was on the scene or he was the killer was not mentioned in any of the news stories. Had Hobbs had access to effective channels of communication, this fact would have been highlighted in the news articles.

The Echols PR machine, with the assistance of Natalie Maines Pasdar, has managed to get widespread attention to every "fact" that is negative for Terry Hobbs. The numerous facts consistent only with the innocence of Terry Hobbs have received virtually no media attention. This is precisely the unequal access to mass media which is necessary to get one's story out that the Supreme Court was addressing in *Gertz*. Defendants can argue that Hobbs should have told CNN that the finger print was not his, and could have made more effective comments when called by the media to comment. This argument merely reinforces that fact that Hobbs, an employee at a lumber yard with a 10th grade education, is not a public figure. Social influence and ability to be effective

24

in a public debate is a part of the question of whether someone is or is not a public figure. Hobbs' side of the story didn't get out because he lacked the media sophistication and detailed information needed in order to rebut the allegations of the Echols defense team's celebrity backed public relations machine. This is the kind of unequal position in a public debate that the Supreme Court said in *Gertz* justifies permitting a plaintiff to recover for defamation by the showing of negligence rather than actual malice.

The second and third factors identified in *Reuber* for analyzing the plaintiff's role in the controversy are whether the plaintiff voluntarily assumed a role of special prominence in the public controversy and whether the plaintiff sought to influence the resolution or outcome of the controversy. As discussed above, none of Hobbs' media statements relate to a public controversy which can be identified which Hobbs is advocating a particular resolution of or seeking to influence the outcome of. Hobbs involvement in this controversy surrounding the killing of the three boys relates entirely to two categories: Hobbs was the stepfather of a victim, and Hobbs was falsely accused. Neither Hobbs status as a victim nor Hobbs status as someone falsely accused is the voluntary assumption of a special role in the controversy or seeking to influence the outcome of a controversy. Media statements by Hobbs which are self-help and reasonable response to allegations against him should not count against Hobbs when determining whether he is a public figure. *Fortich*, 37 F.3d at 1558.

The forth factor in *Reuber* is whether the controversy existed prior to the publication of the defamatory statement. A defendant cannot argue that the publicity associated with the defamatory comment is a defense in a subsequent defamation action. Here, even though Natalie Maines Pasdar was seeking to use her status as a celebrity to

bring attention to a suspect as an alternative to the convicted, the defendant's statement alone did not initiate the publicity. What happened in this case was that a person associated with the defense team offered Hobbs as an alternative suspect in July of 2007, and reporters began to call Hobbs for comments. See Stipulation No. 4, Exhibits 4, 5, 7, etc. The Echols team actually filed its petition on October 30, 2007. By the time Dennis Riordan, lead counsel for Echols said, "No one is saying that we have established in this case, evidence which establishes guilt, much less guilt beyond a reasonable doubt, to anyone else" it was too late. See Stipulation No. 4, Exhibit 25. Nevertheless, there was already a controversy when Natalie Maines Pasdar accused Hobbs of committing the crime.

The final factor under *Reuber* is that the plaintiff retained public figure status at the time of the alleged defamation. As stated above, a court must determine whether the plaintiff was a public figure at the time that the defamatory statement was published. The Supreme Court has left open the question "whether or when an individual who was once a public figure may lose that status by the passage of time." *Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 166, FN 7, 99 S.Ct. 2701, 2706, FN 7. The general rule is that a person who is a public figure with respect to a particular controversy does not lose their status a public figure for purposes of that controversy with the passage of time. *Milsap v. Journal/Sentinel, Inc.*, 100 F.3d 1265, 1269-70 (7th Cir.1996). The question before this Court is whether Terry Hobbs was a public figure during November 21, 2007 through mid December 19, 2007. Media communications by Terry Hobbs which occurred after December 19, 2007 are irrelevant to this determination.

The final test of *Waldbaum* is whether the alleged defamation is germane to the plaintiff's role in the public controversy. Any possible identifiable public controversy in this case involves the murder of the three boys in West Memphis in 1993, therefore the alleged defamation is related to the controversy.

This Court should apply the three part test of *Waldbaum* and also use the five factors identified in *Reuber* to analyze the plaintiff's role in the controversy, which is the second part of the three part test of *Waldbaum*. Such analysis would be consistent with the dictates of *Gertz* and its progeny, and such analysis indicates that Terry Hobbs is not a limited purpose voluntary public figure.

Finally as stated on pages 14-15 above, this Court should also apply the rule of *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1558 (1994), if the content of the defamatory statement touches upon an area of state law that has traditionally been considered to be defamatory *per se*, then the plaintiff cannot be categorized as a limited purpose public figure solely because he makes reasonable public replies to public accusations. The replies made by Terry Hobbs as evidenced by the stipulated exhibits are reasonable and measured given the PR machine he was facing.

### III. Involuntary public figure.

Defendants may contend that Plaintiff Terry Hobbs is an involuntary public figure. This contention is without merit.

The concept on an involuntary public figure is based on language from the Supreme Court's ruling in *Gertz*: "Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare." 418 U.S. at 345. Indeed, some

commentary has questioned the continuing viability of that category of public figures.[11] If an involuntary public figure is to be "exceedingly rare", the circumstances which would give rise to the classification of someone as an involuntary public figure must likewise be "exceedingly rare." Such is not the circumstances of this case. Persons convicted of a crime have an incentive to accuse someone of the crime in order to create an alternative suspect. A finding that persons falsely accused of a crime are involuntary public figures because of the publicity associated with infamous crimes cannot be what the Supreme Court had in mind because that circumstance is not "exceedingly rare".

As stated above, the Supreme Court specifically rejected the idea that a person *convicted* of a crime be automatically considered a public figure with respect to that crime. "To hold otherwise would create an 'open season' for all who sought to defame persons convicted of a crime." 443 U.S. at 168-169. A broad general rule that a person accused of an infamous crime is an involuntary public figure as to any defamatory statements related to who committed the crime would create an "open season" on any person falsely accused of a crime. This rationale was rejected by the Supreme Court in *Wolston v. Readers Digest Ass'n, Inc.*, 443 U.S. 157, 99 S.Ct. 2701.

In *Dameron v. Washington Magazine, Inc.* 779 F.2d 736 (D.C. Cir 1985), the court found that an air traffic controller who was the only controller on duty at the time of a plane crash, was an involuntary public figure by "sheer bad luck" because he had become a central figure in the resolution of a public question related to air line safety. *Dameron,* unlike this case, involved a public question that had impact beyond the immediate participants in the controversy, and the controller was at the very center of the controversy as to whether civil aviation was safe for the general public.

---

[11] See Rodney A. Smolla, *Law of Defamation*, Section 2.14.

In *Wells v. Liddy*, 186 F.3d 505. (4th Cir. 1999), the Court rejected the rationale of *Dameron*. The court, noting the language cited above that involuntary public figures are exceedingly rare, stated that "unfortunately, bad luck is relatively common." 186 F.3d 538-539. The court rejected "bad luck" as being a proper rationale to conclude that someone was an involuntary public figure. The court in *Wells* also found that the finding of *Dameron* appear to be a move toward the rationale of *Rosenbloom v. Metormedia, Inc*, which was expressly rejected by *Gertz*.

The court in *Wells* held that an involuntary public figure must have pursued a course of conduct from which it was foreseeable that public interest would arise, a public interest must have arisen that is related to the action of the plaintiff, and the plaintiff must be recognized as a central figure during the debate over that matter. Terry Hobbs status in this case is related to being a victim and being falsely accused, neither of which are an intentional course of conduct. This Court should apply the rule of *Wells v. Liddy* and find that Terry Hobbs is not an involuntary public figure.

RESPECTFULLY SUBMITTED this the 20 day of July, 2009.

**TERRY HOBBS**

**BY:** ___/s/ J. Cody Hiland_____
           **J. CODY HILAND, Bar No. 2002041**
           **Attorney for Plaintiff**
           **557 Locust Ave.**
           **Conway, AR  72034**
           **Phone: (501) 932-1007**
           **Fax:    (501) 336-8688**
           **Email:** chilandlaw@alltel.net

**CERTIFICATE OF SERVICE**

I hereby certify that I have caused the foregoing to be served in compliance with the Federal Rules of Civil Procedure on the following persons on this $20$ day of July 2009:

Mr. John E. Moore
Huckabay, Munson, Rowlett and Moore
Regions Center
400 W. Capitol , Suite 1900
Little Rock, AR 72201

Mr. Dan D. Davison
Ms. D'Lesli M. Davis
Fulbright & Jaworski L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, TX 75201-2784

Robert B. Wellenberger
Thompson, Coe, Cousins & Irons, L.L.P.
700 North Pearl Street, Twenty-fifth Floor
Dallas, Texas 75201-2825

/s/ J. Cody Hiland
**J. CODY HILAND**