# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

| | | |
|---|---|---|
| TERRY HOBBS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CV NO.: 4-09-CV-0008BSM |
| | § | |
| NATALIE PASDAR, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM IN SUPPORT OF DEFENDANT
## NATALIE PASDAR'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

SUMMARY OF MOTION ................................................................................................1

SUMMARY JUDGMENT EVIDENCE .........................................................................4

STATEMENT OF FACTS .............................................................................................5

ARGUMENT AND AUTHORITIES ...........................................................................5

I.   SUMMARY JUDGMENT STANDARD AND CHOICE OF LAW ........................................5

    A.    Summary Judgment Standard .............................................................5

    B.    Choice of Law ......................................................................................6

II.   HOBBS' DEFAMATION CLAIMS FAIL AS A MATTER OF LAW ..................................8

    A.    Pasdar's statements are not defamatory as a matter of law regardless of whether the actual malice or negligence standard of fault applies ......................10

        1.    Hobbs admits the Letters do not accuse him of the Murders .................10

        2.    Pasdar's statements about which Hobbs complains fall into three categories:  (1) the body of the Letters; (2) the post-script of the Letters; and (3) the remarks at the Rally ................................................11

        3.    Hobbs admits Pasdar's statements in the body of the Letters and at the Rally are not statements of fact and are not "of and concerning" Hobbs.....................................................................................................12

        4.    The post-script statements in the Letters do not accuse Hobbs of involvement in the Murders....................................................................15

    B.    Hobbs cannot prove actual malice or negligence as a matter of law...................16

        1.    Pasdar's statements relate to issues of public concern and public controversy as a matter of law.................................................................19

        2.    Hobbs is a public figure as a matter of law .............................................23

            a.    Hobbs is a voluntary limited purpose public figure as a matter of law....................................................................................23

                (i)    The various interpretations of "voluntary participation" ............................................................................23

                    (a)    Gertz and its progeny................................24

                    (b)    The Sixth Circuit and Tennessee .............26

                    (c)    Arkansas and the Eighth Circuit..............29

                    (d)    Foretich's inapplicable *per se* exception................................................30

(ii) The facts demonstrate Hobbs voluntarily participated in the controversy as a matter of law ...........32

    (a) Hobbs' injected himself into the controversy long before the DNA test results were known.............................33

    (b) Hobbs leaked the DNA evidence and has continued to aggressively promote his side of the story....................37

(iii) Application of the law to the facts demonstrates Hobbs is a limited-purpose public figure under any standard as a matter of law .............................41

    b. Hobbs is an involuntary public figure as a matter of law.............45

    3. There is no evidence Pasdar acted with actual malice or was negligent ..................................................47

C. The statements in the Letters' post-script are substantially true as a matter of law..................................................53

    1. Hobbs admits Pasdar's post-script statements are not false ....................54

    2. The post-script statements are true ............................................54

D. Pasdar's post-script statements concerning Hobbs are protected speech under the fair report privilege as a matter of law .............................59

    1. The post-script was a fair and accurate report on an official proceeding as a matter of law....................................................59

    2. Hobbs cannot prove actual malice or negligence with regard to the accuracy of Pasdar's report as a matter of law ................................65

E. Hobbs' claims related to the Rally are barred by Tennessee's statute of limitations as a matter of law.............................67

III. HOBBS' FALSE LIGHT INVASION OF PRIVACY CLAIM FAILS AS A MATTER OF LAW ...........68

IV. HOBBS' OUTRAGE CLAIM FAILS AS A MATTER OF LAW....................................................69

V. HOBBS' CLAIMS ALL FAIL BECAUSE HE HAS NOT BEEN DAMAGED AS A MATTER OF LAW ....................................................71

CONCLUSION ....................................................74

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Addington v. Wal-Mart Stores, Inc.*,
    105 S.W.3d 369 (Ark. Ct. App. 2003)..................................................................68-69, 71

*Ali v. Moore*,
    984 S.W.2d 224 (Tenn. Ct. App. 1998)..........................................................................53

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................... 5-6, 16-17, 30, 47

*Atlanta Journal-Constitution v. Jewell*,
    555 S.E.2d 175 (Ga. Ct. App. 2002)..................................................................24, 45-46

*Barry v. Time, Inc.*,
    584 F. Supp. 1110 (N.D. Cal. 1982)...............................................................................30

*Butler v. Hearst-Argyle Television*,
    49 S.W.3d 116 (Ark. 2001) ........................................................... 60-62, 64-65

*Campbell v. Citizens for an Honest Gov't, Inc.*,
    255 F.3d 560 (8th Cir. 2001) ......................................................................17-18, 47

*Celotex Corp. v Catrett*,
    482 U.S. 317 (1986) ...............................................................................................5

*Cloyd v. Press, Inc.*,
    629 S.W.2d 24 (Tenn. Ct. App. 1981)............................................................................27

*Colodny v. Iverson, Yoakum, Papiano & Hatch, GP*,
    936 F. Supp. 917 (M.D. Fla. 1996)................................................................................25

*Connick v. Myers*,
    461 U.S. 138 (1983) .......................................................................................................19

*Dacey v. Florida Bar, Inc.*,
    427 F.2d 1292 (5th Cir. 1970) .......................................................................................25

*Dameron v. Washingtonian Magazine*,
    779 F.2d 736 (D.C. Cir. 1985).................................................................................46-47

*Daniel Goldreyer, LTD. v. Dow Jones*,
    259 A.D.2d 353 (N.Y. App. Div. [1st Dept] 1999)..........................................................46

*Davis v. Tennessean*,
    83 S.W.3d 125 (Tenn. Ct. App. 2001)........................................................................72-73

*Denny v. Lawrence,*
    22 Cal. App. 4th 927 (Cal. Ct. App. 1994)......................................................24

*Dilworth v. Dudley,*
    75 F.3d 307 (7th Cir. 1996)....................................................................25

*Dodrill v. Arkansas Democrat Co.,*
    590 S.W.2d 840 (Ark. 1979), *cert. denied*, 444 U.S. 1076 (1980)..............68-69

*Dodson v. Allstate Ins. Co.,*
    47 S.W.3d 866 (Ark. 2001) ....................................................................9-10

*Dodson v. Dicker,*
    306 S.W.2d 97 (Ark. 1991) ....................................................................9-10

*Doe 1 v. Roman Catholic Diocese,*
    154 S.W.3d 22 (Tenn. 2005) ................................................................69, 71

*Drew v. KATV Television, Inc.,*
    739 S.W.2d 680 (Ark. 1987) ....................................................................17

*Dun & Bradstreet, Inc. v. Greenmoss Builders,*
    472 U.S. 749 (1985) ............................................................................16-18

*Echols v. State,*
    84 S.W.3d 424 (Ark. 2002) ......................................................................22

*Echols v. State,*
    CR-93-450A, *Petitioner Damien Echols' Motion for a New Trial* at 2
    (Ark. Ct. App. April 11, 2008) ..................................................................22

*Ellis v. Price,*
    990 S.W.2d 543 (Ark. 1999) ....................................................................71

*Faulkner v. Ark. Children's Hosp.,*
    69 S.W.3d 393 (Ark. 2002) ..................................................................9, 69

*First Lehigh Bank v. Cowen,*
    700 A.2d 498 (Pa. Super. Ct. 1997)...........................................................61

*Foretich v. Capital Cities/ABC, Inc.,*
    37 F.3d 1541 (4th Cir. 1994) ..............................................................30-32, 43

*Friedgood v. Peters Publ'g Co.,*
    521 So. 2d 236 (Fla. Dist. Ct. App. 1988) ..............................................20, 22

# TABLE OF AUTHORITIES
(continued)

*Fuller v. Russell,*
    842 S.W.2d 12 (Ark. 1992) ................................................................... 17

*Fuqua Homes, Inc. v. Beattie,*
    388 F.3d 618 (8th Cir. 2004) ................................................................... 6

*Ganey v. Kawasaki Motors,*
    234 S.W.3d 838 (Ark. 2006) ........................................................... 6, 8, 67

*Gertz v. Robert Welch, Inc.,*
    418 U.S. 323 (1974) ........................................ 16-18, 23-24, 33, 45-46

*Gomez v. ITT Educ. Servs,*
    71 S.W.2d 542 (2002) ........................................................................... 67

*Hammer v. City of Osage Beach, Mo.,*
    318 F.3d 832 (8th Cir. 2003) ................................................................... 5

*Harris v. Quadracci,*
    856 F. Supp. 513 (E.D. Wisc. 1994) ..................................................... 30

*Harte-Hanks Comm. v. Connaughton,*
    491 U.S. 657 ................................................................................. 17-18, 69

*Hayes v. Booth Newspapers, Inc.,*
    295 N.W.2d 858 (Mich. App. 1980) ..................................................... 24

*Hibdon v. Grabowski,*
    195 S.W.3d 48 (Tenn. Ct. App. 2005) .............................................. 27-28

*Hutchinson v. Proxmire,*
    443 U.S. 111 (1979) ............................................................................. 25

*In re IBP Confidential Business Documents Litigation,*
    797 F.2d 632 (8th Cir. 1986) ........................................................ 30, 42-43

*KARK-TV v. Simon,*
    656 S.W.2d 702 (Ark. 1983) ........................................................ 62, 65-66

*Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,*
    313 U.S. 487 (1941) ............................................................................... 6

*Kurczaba v. Pollack,*
    742 N.E.2d 425 (Ill. App. Ct. 2000) ..................................................... 60

*Lane v. Celedon Trucking, Inc.,*
    543 F.3d 1005 (8th Cir. 2008) ................................................................. 6

*Langford v. Vanderbilt Univ.*,
  287 S.W.2d 32 (Tenn. 1956) ....................................................................61, 64-65

*Lewis v. Newschannel 5 Network, L.P.*,
  238 S.W.3d 270 (Tenn. Ct. App. 2007)...............................16, 21, 45, 46, 47, 60

*Little Rock Newspapers, Inc. v. Dodrill*,
  660 S.W.2d 933 (Ark. 1983) ...................................................................................16

*Live Oak Publ'g Co. v. Cohagan*,
  234 Cal. App. 3d 1277 (1991) ................................................................................25

*Marcone v. Penthouse, Ltd.*,
  754 F.2d 1072 (3rd. Cir. 1985)........................................................................26, 30

*Mark v. King Broad. Co.*,
  618 P.2d 512 (Wash. Ct. App. 1980).....................................................................61

*Masson v. New Yorker Magazine*,
  501 U.S. 496 (1991) ................................................................................................53

*Matsushita Elec. Indus. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ..................................................................................................5

*McCluen v. Roane County Times, Inc.*,
  936 S.W.2d 936 (Tenn. Ct. App. 1996)..................................................................18

*McDowell v. Paiewonsky*,
  769 F.2d 942 (3d Cir. 1985) ...................................................................................26

*Medlin v. Allied Inv. Co.*,
  398 S.W.2d 270 (Tenn. 1966) .................................................................................69

*Medure v. Vindicator Printing Co.*,
  60 F. Supp. 2d 477 (W.D. Pa. 1999) ......................................................................30

*Memphis Publ'g Co. v. Nichols*,
  569 S.W.2d 412 (Tenn. 1978) ...............................................................9, 31-32, 71

*Milkovich v. Lorain Journal Co.*,
  497 U.S. 1 (1990) ......................................................................................................9

*New York Times v. Sullivan*,
  376 U.S. 254 (1964) .....................................................................................17, 18, 48

*Nichols v. Moore*,
  477 F.3d 396 (6th Cir. 2007) ..................................................................................16

*Northport Health Servs., Inc. v. Owens,*
107 S.W.3d 889 (Ark. Ct. App. 2003)..........................................................................71

*Oates v. Chattanooga Publ'g Co.,*
205 S.W.3d 418 (Tenn. Ct. App. 2006)........................................................................70

*Orr v. Argus-Press Co.,*
586 F.2d 1108 (6th Cir. 1978)......................................................................................18

*Pate v. Serv. Merchandise Co.,*
959 S.W.2d 569 (Tenn. Ct. App. 1996)........................................................................17

*Pendleton v. City of Haverhill,*
156 F.3d 57 (1st Cir. 1998)...........................................................................................30

*Pickering v. Bd. of Educ.,*
391 U.S. 563 (1968) .....................................................................................................19

*Press v. Verran,*
569 S.W.2d 435 (Tenn. 1978) ......................................................................................45

*Pritchard v. Times Southwest Broad., Inc.,*
642 S.W.2d 877 (Ark. 1983) ..................................................................................53, 62

*Quality Auto Parts Co. v. Bluff City Buick Co.,*
876 S.W.2d 818 (Tenn. 1994) ................................................................................8-9, 67

*Ramsey v. Fox News Network, L.L.C.,*
351 F. Supp. 2d 1145 (D. Colo. 2005) ....................................................................20, 37

*Revis v. McClean,*
31 S.W.3d 250 (Tenn. Ct. App. 2000).........................................................................10

*Rosanova v. Playboy Enter., Inc.,*
411 F. Supp. 440 (S.D. Ga. 1976), *aff'd,* 580 F.2d 859 (5th Cir. 1978)......................26

*Ross v. Patterson,*
817 S.W.2d 418 (Ark. 1991) ........................................................................................70

*Sahara Gaming v. Culinary Workers,*
984 P.2d 164 (Nev. 1999).............................................................................................61

*Schnupp v. Smith,*
457 S.E.2d 42 (Vir. 1995)..............................................................................................31

*Schubert v. Target Stores, Inc.,*
201 S.W.3d 917 (Ark. 2005) ...........................................................................................6

*Silvester v. Am. Broad. Co.*,
   839 F.2d 1491 (11th Cir. 1988) ........................................................................ 30

*Smith v. Reed*,
   944 S.W.2d 623 (Tenn. Ct. App. 1996) ............................................................. 61

*Solaia Tech v. Specialty Publ'g Co.*,
   852 N.E.2d 825 (Ill. 2006) ........................................................................ 61, 64

*Southall v. Little Rock Newspapers, Inc.*,
   964 S.W.2d 187 (Ark. 1998) ........................................... 16-17 23, 29, 33, 42

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) .................................................................................. 19, 50

*Stem v. Gannett Satellite Information Network, Inc.*,
   866 F. Supp. 355 (W.D. Tenn. 1994) ....................................................... 60-61, 65

*Stilts v. Globe Int'l, Inc.*,
   950 F. Supp. 220 (M.D. Tenn. 1995), *aff'd*, 91 F.3d 144 (6th Cir. 1995) .................... 9, 53

*Street v. Nat'l Broad. Co.*,
   645 F.2d 1227 (6th Cir. 1981) ....................................... 20-22, 27-29, 33, 41-42

*Sullivan v. Baptist Mem'l Hosp.*,
   995 S.W.2d 569 (Tenn. 1999) ............................................................. 9, 10, 53

*Thomas v. Los Angeles Times Commc'ns, LLC*,
   189 F. Supp 2d 1005 (C.D. Cal. 2002) ......................................................... 24-25

*Time, Inc. v. Firestone*,
   424 U.S. 448 (1976) .................................................................................. 20, 22

*Time v. Hill*,
   385 U.S. 374 (1967) ................................................................................. 68-69

*Trigg v. Lakeway Publishers, Inc.*,
   720 S.W.2d 69 (Tenn. Ct. App. 1986) .............................................. 17, 28, 42

*United Ins. Co. of Am. v. Murphy*,
   961 S.W.2d 752 (Ark. 1998) ........................................................... 9, 32, 71, 73

*Waldbaum v. Fairchild Publications, Inc.*,
   627 F.2d 1287 (D.C. Cir. 1980) ....................................... 23-24, 26, 29, 33, 42

*Weigel v. Capital Times Co.*,
   426 N.W.2d 43 (Wisc. Ct. App. 1988) ............................................................. 46

*Wells v. Liddy,*
 186 F.3d 505 (4th Cir. 1999) ...................................................................................31

*West v. Media Gen. Convergence,*
 53 S.W.3d 640 (Tenn. 2001) ............................................................................16, 68

*WFAA-TV, Inc. v. McLemore,*
 978 S.W.2d 568 (Tex. 1998) ...................................................................................30

*Whiteside v. Russellville Newspapers, Inc.,*
 08-313, 2009 WL 857516 (Ark. 03-12-2009) ...........................................................53, 61

*Wilson v. Scripps-Howard Broad. Co.,*
 642 F.2d 371 (6th Cir. 1981), *cert. granted,* 454 U.S. 962,
 *cert. dismissed,* 454 U.S. 1130 (1981)........................................................16, 27

*Wilson v. Slatalla,*
 970 F. Supp. 405 (E.D. Pa. 1997)............................................................................60

*Wolston v. Reader's Digest Ass'n, Inc.,*
 443 U.S. 157, 164 (1979) ..................................................................................25, 26

*Zius v. Shelton,*
 2000 WL 739466 (Tenn. App. 2000) ........................................................................9

**RULES AND STATUTES**

ARK. CODE ANN. § 16-56-104 (1987) .........................................................................8

ARK. CODE ANN. §§ 16-63-501 to -507 (2005).............................................................18

ARK. CODE ANN. § 16-112-201 .................................................................................22

FED. R. CIV. P. 56 ....................................................................................................5

**OTHER AUTHORITIES**

Howard W. Brill, *Arkansas Law of Damages* § 33-11 at 671 (4th ed. 2002) ...............................68

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 150 (1971)......................................................6

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 152 (1971)......................................................7

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 242 (1988)....................................................67

RESTATEMENT (SECOND) OF TORTS § 571 .........................................................................31

RESTATEMENT (SECOND) TORTS § 580B (1977)..................................................................9

**Page(s)**

RESTATEMENT (SECOND) TORTS § 611 (1977) .................................................................59-63, 65

RESTATEMENT (SECOND) OF TORTS §§ 571, 574 ...........................................................................31

RESTATEMENT (SECOND) OF TORTS §§ 652A, 652E (1977) .........................................................68

W. Prosser, *Handbook of the Law of Torts*, § 116 (4th Ed. 1971) ...............................................53

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

TERRY HOBBS,                           §
                                       §
    Plaintiff,       §
                                       §
v.                                     §    CV NO.: 4-09-CV-0008BSM
                                       §
NATALIE PASDAR, *et al.*,              §
                                       §
    Defendants.      §

## MEMORANDUM IN SUPPORT OF DEFENDANT
## NATALIE PASDAR'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Natalie Pasdar ("Pasdar") files this Memorandum in Support of Defendant Natalie Padar's Motion for Summary Judgment and for same, respectfully shows as follows:

## SUMMARY OF MOTION

Through this defamation lawsuit, Terry Hobbs ("Hobbs") threatens the potency of the right of free speech guaranteed by the First Amendment of the U.S. Constitution. Though Hobbs' lawsuit is directed at recording artist Natalie Maines Pasdar, the claims he asserts endanger the rights of all citizens to speak publicly about issues of public concern and injustice with fear of civil suit. While the case has a long and complex factual history, this Court's analysis is relatively easy: Pasdar's First Amendment rights protect her from the claims Hobbs asserts and entitle her to summary judgment.

On May 5, 1993, three eight-year-old boys were murdered in West Memphis, Arkansas (the "Murders"). Three teenagers, the West Memphis 3 ("WM3"), were subsequently convicted of the Murders. A substantial contingent of the public, however, believes the WM3 are innocent and did not receive a fair trial. In fact, the potentially wrongful convictions of the WM3 sparked and continues to fuel a fiery local, national and international controversy over the guilt or

innocence of the WM3. The WM3's efforts to obtain relief from their convictions are on-going and new evidence supporting their claims of actual innocence and their requests for new trials continues to be developed.

Since 1993, Hobbs, the step-father of one of the victims, has repeatedly injected himself into the raging public controversy over the guilt of the WM3 and the propriety of their convictions by seeking out and granting interviews, appearing on television shows and even selling the rights to his life story to a major motion picture company. Hobbs has regularly reached out to and spoken with the press on a variety of topics, including the effect of the Murders on him and his family, his book and movie deals, the character of the WM3 and their defense team, other victim's families, the evidence, the motivations of his wife and other family members, the mental state of one of his girlfriends and whether or not he was involved in the Murders (collectively, the "Events"). He has repeatedly opined that the WM3 are the true "killers."

In early 2007, Hobbs became even more embroiled in the public controversy over the Murders and the guilt or innocence of the WM3. The results of DNA testing ordered by the Arkansas Supreme Court linked Hobbs, not the WM3, to the crime scene. DNA found in the ligature binding one of the victims (who was not Hobbs' step-son) was consistent with Hobbs' DNA. In June 2007, the West Memphis Police Department ("WMPD") interrogated Hobbs. Hobbs took this information to the press in an attempt to frame the debate about the new evidence in a positive light and arouse public sentiment in his favor. The press then engaged in substantial reporting on and speculation over the DNA and other evidence which may link Hobbs to the Murders. From July 2007 through 2008, Hobbs engaged in an active press campaign in which he and a spokesperson proactively spoke to the media in an attempt to deflect the

discussion of his involvement in the Murders, to proclaim Hobbs' innocence, to explain away the DNA evidence, "to get some truth out there," to assure the public that the WM3 were appropriately convicted and presumably, to deter further investigation of his actions.

Pasdar is the lead singer of the musical recording group the Dixie Chicks. In November, 2007, Pasdar caused a letter to be posted on the Dixie Chicks website (the "Website Letter") and caused a nearly identical letter to be posted on the Dixie Chicks MySpace blog (the "MySpace Letter") (together, the "Letters"). The Letters solicited financial support for the WM3's defense fund and attempted to summarize the latest evidentiary developments in the case. As Hobbs admits, in the Letters, Pasdar requested support for the WM3, encouraged readers to research the case, opined that the convictions of the WM3 were an injustice and merely reiterated the evidence that had previously been repeatedly nationally publicized about Hobbs by the press and by the WM3 defense team. In December 2007, Pasdar also spoke at a rally for the WM3 (the "Rally") but never mentioned Hobbs or the specific DNA evidence.

In Hobbs' Complaint, he asserts three causes of action arising out of Pasdar's actions: defamation, false light portrayal, and outrage, each of which is based on his admittedly inaccurate assertion that Pasdar accused Hobbs of the Murders. Each of Hobbs' causes of action should be dismissed as a matter of law.

Hobbs' defamation claims fail as a matter of law because: (1) Pasdar's statements are not capable of defamatory meaning (Hobbs admits that Pasdar did not accuse him of the Murders); (2) Hobbs, who is clearly a public figure, cannot present any evidence (much less clear and convincing evidence) that Pasdar made the statements with actual malice, reckless disregard for the truth, and, alternatively, Hobbs cannot show that Pasdar was negligent; (3) Pasdar's

statements are true; (4) Pasdar's statements are protected by the fair report privilege; and (5) Hobbs' slander claim is barred by Tennessee's statute of limitations.

Hobbs' false light claim fails because: (1) regardless of whether Hobbs is considered a public figure (which he unquestionably is), he cannot prove that Pasdar acted with actual malice as required for any false light claim; and (2) Hobbs has in fact admitted that Pasdar did not accuse him of the Murders or portray him in a false light.

Hobbs' outrage claim fails as a matter of law because: (1) there is no evidence that Pasdar intended to cause emotional distress; (2) Pasdar's conduct was not extreme and outrageous as required by case authority; and (3) Hobbs did not suffer severe emotional distress as a result of Pasdar's statements.

Each of Hobbs' claims also fail as a matter of law because he cannot demonstrate that he has suffered any damage as a result of Pasdar's actions: (1) his emotional distress is admittedly a result of past, unrelated events; and (2) his "reputation" was "ruined" long before Pasdar made her statements.

In sum, Pasdar engaged in speech on a matter of public controversy which is fundamentally protected by the First Amendment of the United States Constitution, and even Hobbs admits she did not do what he once claimed, accuse him of the Murders. For these reasons, as well as those more specifically set forth below, all of Hobbs' causes of action fail and Pasdar is entitled to judgment as a matter of law.

## SUMMARY JUDGMENT EVIDENCE

Pasdar incorporates by reference as though set forth at length herein, Defendant Natalie Pasdar's Motion for Summary Judgment, filed concurrently herewith, including her First Appendix of Summary Judgment Evidence and her Second Appendix of Summary Judgment Evidence.

## STATEMENT OF FACTS

Pasdar hereby incorporates as though set forth at length herein, the Statement of Facts in Support of Defendant Natalie Pasdar's Motion for Summary Judgment, filed concurrently herewith, as well as the evidence in the First Appendix of Summary Judgment Evidence of Defendant Natalie Pasdar and the Second Appendix of Summary Judgment Evidence of Defendant Natalie Pasdar (FILED UNDER SEAL), also filed concurrently herewith.

## ARGUMENT AND AUTHORITIES

### I.
### SUMMARY JUDGMENT STANDARD AND CHOICE OF LAW

**A.     Summary Judgment Standard**

The Court is well aware of the appropriate summary judgment standard. Summary judgment is appropriate when, after adequate time for discovery, the pleadings on file show that there are no genuine material fact issues, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Celotex Corp. v Catrett*, 482 U.S. 317, 322-23 (1986). Summary judgment is proper when the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof." *Celotex*, 482 U.S. at 322. The mere existence of a factual dispute is insufficient to bar summary judgment; "rather, the dispute must be outcome determinative under the applicable law." *Hammer v. City of Osage Beach, Mo.*, 318 F.3d 832, 837 (8th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In order to establish an issue of material fact, Hobbs must "do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The party opposing summary judgment "may not rest upon the mere allegations or denials of his

pleading, but must set forth facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

## B.    Choice of Law

A district court sitting in diversity (as this Court is) must apply the choice of law rules of the state in which it sits, so Arkansas choice of law principles control here. *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496 (1941). In tort cases, Arkansas courts apply the traditional *lex loci delicti* test to determine "the place of the wrong," coupled with consideration of the following factors: (1) predictability of results; (2) maintenance of interstate and international order; (3) simplification of the judicial task, including whether out-of-state law is outcome-determinative; (4) the advancement of the forum's governmental interests; and (5) the application of the better rule of law. *Ganey v. Kawasaki Motors*, 234 S.W.3d 838, 846-47 (Ark. 2006); *Lane v. Celedon Trucking, Inc.*, 543 F.3d 1005, 1009-10 (8th Cir. 2008). In essence, Arkansas' application of *lex loci delicti* plus the five factors are a means for determining which state has the "most significant relationship" to the parties and the case. *Ganey*, 234 S.W.3d at 847 (citing *Schubert v. Target Stores, Inc.*, 201 S.W.3d 917, 922 (Ark. 2005)). Courts emphasize factors (1) and (3) as a means to discourage forum shopping. *Schubert*, 201 S.W.3d at 922; *Ganey*, S.W.3d at 841, 847.

Choice of law can be complicated in multi-state defamation cases, and Arkansas courts provide little guidance. Other jurisdictions usually apply the law of the plaintiff's domicile under the theory that the plaintiff's home state, where the plaintiff claims reputational harm, has the most significant relationship to the plaintiff's defamation action. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 150 (1971); *see also Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 622 (8th Cir. 2004) (Under Missouri law, in a defamation case with widespread dissemination, the most

important consideration is the residence of plaintiff). Privacy litigation also generally applies the law of the plaintiff's residence. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 152 (1971).

Tennessee law applies to this case under both *lex loci delicti* and the five factor test. Hobbs is a resident and citizen of Memphis, Tennessee, and he has lived and worked in Tennessee continuously since 1994. SF 327. Tennessee also has the most significant relationship to this case. No party to this case is a citizen of Arkansas. SF 327-30. As a basis for his claims, Hobbs alleges that his reputation was harmed both in his person and in his business. SF 8. Hobbs specifically claims injury to his reputation in Tennessee. SF 327. Nor do the actions of Pasdar indicate Arkansas should trump Tennessee as the state with the most significant relationship. All of the claims arise out of statements made by Pasdar in the Letters, which were posted on the Internet from California and in the Rally. SF 4-6, 331-32. By Hobbs' own admission, Pasdar's comments at the Rally were also broadcast and heard nationally, including in Tennessee. SF 331. Thus, the fact that Pasdar's comments at the Rally were made in Arkansas is irrelevant to the determination of which state's law applies.

Furthermore, despite the connection of the WM3 to Arkansas and this suit, *this case* has a more significant relationship to Tennessee under the five-factor test. While factors (2) (maintenance of interstate and international order) and (5) (the application of the better rule of law) are not particularly instructive in this instance, factors (1) (predictability of result), (3) (simplification of the judicial task, including whether out-of-state law is outcome-determinative) and (4) (the advancement of the forum's governmental interest) are critical in this case.[1]

---

[1]    Out of an abundance of caution, although Tennessee law applies, Pasdar in her briefing below, has cited to both Arkansas and Tennessee law.

With regard to factor (4), Tennessee has a stronger governmental interest in applying its own defamation laws to protect its citizens claiming reputational harm in Tennessee. In all torts, Tennessee's "right to protect its citizens through application of its own . . . laws is a significant factor that outweighs any interest that Arkansas might have in this case." *Ganey*, 234 S.W.3d at 847.

With regard to factors (1) and (3), Tennessee's statute of limitations in this case is outcome-determinative for Hobbs' slander claims as set forth *infra* at II.E., and Hobbs' decision to bring this case in Arkansas is an impermissible attempt at forum shopping to preserve those claims. *Ganey*, 234 S.W.3d at 847. Specifically, Tennessee has a six-month limitations period for slander with no discovery rule whereas Arkansas has a one year period. *Compare Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820-33 (Tenn. 1994) *with* ARK. CODE ANN. § 16-56-104(4) (1987). Pasdar's remarks at the Rally occurred more than six months but less than one year before Hobbs filed the instant lawsuit. By bringing this case in Arkansas instead of in Tennessee where the alleged harm occurred, Hobbs seeks to retain the benefit of Arkansas' longer limitations period and thereby preserve his cause of action.

Under both *lex loci delicti* and the five factor test, Tennessee law applies to this case and mandates dismissal as a matter of law. However, as set forth below, Arkansas law requires dismissal as well; thus, *even if* the Court determines that Arkansas law applies, Pasdar is entitled to the requested summary judgment as a matter of law.

## II.
### HOBBS' DEFAMATION CLAIMS FAIL AS A MATTER OF LAW

Under Tennessee substantive law, a defamation plaintiff must prove that a party published a false and defamatory statement about the plaintiff with the requisite level of fault – i.e., with either knowledge that the statement was false, reckless disregard for the truth of the

statement or negligence in failing to ascertain the truth of the statement. *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999) (citing RESTATEMENT (SECOND) TORTS § 580B (1977)). Under Arkansas substantive law, a plaintiff must prove: (1) the defamatory nature of the statement of fact; (2) the statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's "fault" in the publication; (5) the statement's falsity; and (6) resulting damages. *Dodson v. Allstate Ins. Co.*, 47 S.W.3d 866, 875 (Ark. 2001). Under both Tennessee and Arkansas law, defamation damages may not be presumed. *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 416, 419 (Tenn. 1978); *United Ins. Co. of Am. v. Murphy*, 961 S.W.2d 752, 756 (Ark. 1998). Instead, a plaintiff must introduce actual evidence showing impairment to reputation and standing in the community, as that reputational harm forms the basis of any defamation claim. *Quality Auto Parts Co.*, 876 S.W.2d at 820 (Tenn. 1994); *United Ins. Co. of Am.*, 961 S.W.2d at 755-56 (Ark. 1998).

Whether the statements in issue are reasonably capable of defamatory meaning is the initial question of law for the court. *Stilts v. Globe Int'l, Inc.*, 950 F. Supp. 220, 223 (M.D. Tenn. 1995), *aff'd*, 91 F.3d 144 (6th Cir. 1995); *Dodson v. Allstate Ins. Co.*, 47 S.W.3d 866, 875 (Ark. 2001). The court is not bound by the plaintiff's interpretation but must look to the words themselves. *Stilts*, 950 F. Supp. at 223. Furthermore, to be capable of defamatory meaning, a statement must explicitly state or imply an assertion of an objective, verifiable fact that is capable of being proven true or false. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19-20 (1990); *Faulkner v. Ark. Children's Hosp.*, 69 S.W.3d 393, 403 (Ark. 2002). Indeed, a statement must be provable as true or false in order to support a defamation claim. *Milkovich*, 497 U.S. at 19-20. As such, an opinion is not capable of asserting a defamatory fact. *Zius v. Shelton*, 2000 WL 739466 (Tenn. App. 2000); *Dodson v. Dicker*, 306 S.W.2d 97, 111 (Ark. 1991). In

determining whether a statement implies a specific assertion of fact and is capable of defamatory meaning, courts should look to, among other things, the overall tenor of the publication. *Revis v. McClean*, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000) ("Allegedly defamatory statements should be judged within the context in which they are made," and "should be read as a person of ordinary intelligence would understand them in light of surrounding circumstances."); *Dicker*, 812 S.W.2d at 99 (Ark. 1991). Finally, as the elements of any defamation claim make clear, a defendant's statement must actually be about the plaintiff in order to defame that person. *Sullivan*, 995 S.W.2d at 571 (Tenn. 1999); *Dodson v. Allstate*, 47 S.W.3d at 875.

A.    **Pasdar's statements are not defamatory as a matter of law regardless of whether the actual malice or negligence standard of fault applies**

Though this case involves a plethora of issues under the law of defamation – actual malice, public figure, truth, fair report privilege – as well as an extraordinarily detailed history of relevant, material facts beginning with the 1993 Murders and sixteen (16) years of further investigation and efforts to obtain post-conviction relief – this Court need not undergo any analysis of that law or those complex facts to grant summary judgment for Pasdar. Pasdar's Letters and her remarks at the Rally are not defamatory on their face. Thus, this Court, exercising its obligation to determine whether, as a matter of law, the statements in issue are capable of defamatory interpretation as a matter of law, may simply review the Letters and the statements at the Rally and determine, as a matter of law, that Pasdar did not defame Hobbs.

1.    **Hobbs admits the Letters do not accuse him of the Murders**

Hobbs' case is founded on the allegation that Pasdar, in both the Letter and at the Rally, accused Hobbs of involvement in the Murders and "suggest that Terry Hobbs is a killer." SF 6. However, at his deposition, Hobbs destroyed his own allegation. SF 6, 241. Hobbs admits that Pasdar does not accuse him of the Murders:

Q:    (PASDAR'S COUNSEL): Okay. I appreciate that, and I think we've established that. My question to you, sir, is where in there do you believe that statements individually or taken as a whole accuse you of murder of one or more of the three little boys. She doesn't do it, does she?

. . .

A:    (HOBBS): No, sir.

SF 241.

Hobbs' admission alone requires dismissal of Hobbs' case, which is founded on the argument that Hobbs has been defamed because Pasdar accused him of killing the three little boys. Obviously, if Pasdar has not made the false statement about Hobbs of which he complains – that he committed the Murders – Hobbs cannot prove Pasdar made a false statement of fact, *he cannot prove the case he alleges as a matter of law*, and Pasdar is entitled to summary judgment.

**2.    Pasdar's statements about which Hobbs complains fall into three categories: (1) the body of the Letters; (2) the post-script of the Letters; and (3) the remarks at the Rally**

Though Hobbs has dismissed his core allegation that Pasdar accused him of the Murders, he seems to still grumble about certain of Pasdar's statements. An analysis of the legal viability of Hobbs' further complaints requires a "breakdown" of what Pasdar is doing in the statements and Hobbs' corresponding complaints. In the body of the Letters (from the date to the signature line) and the remarks at the Rally, Pasdar express her opinion that the WM3 have been wrongly convicted and urges the public to get involved to assist them in their quest for freedom. SF 242, 272-74, 278-87, 291-93. In the post-script of the Letters (everything below the signature line), Pasdar simply recites publicly available and widely discussed evidence in the WM3 case. SF 275, 301, 303.

With regard to the body of the Letters and the statements at the Rally, Hobbs does not agree with Pasdar's opinions and thinks she "should have stayed in Texas and minded her own

business." SF 258. With regard to the post-script of the Letters, Hobbs admits Pasdar is simply repeating accurate, well-publicized information, but does not like that she, as a celebrity, brings more attention to that information. SF 259.

### 3. Hobbs admits Pasdar's statements in the body of the Letters and at the Rally are not statements of fact and are not "of and concerning" Hobbs

Hobbs admits that Pasdar, in the body of the Letters and at the Rally, did not state facts at all. SF 287, 291, 293. The gist of Pasdar's Letters and remarks at the Rally, *as Hobbs admits*, is to express *her belief* that an injustice has occurred: "three men [the WM3] have spent the last 13 years in prison for crimes they didn't commit" (from the Letters) and "I'm just amazed these guys are still in prison . . . . I urge you all to go to WM3.org and donate to the defense fund." (from the Rally remarks). SF 239-40, 279.

Hobbs' admissions are dead-on. Pasdar does not mention Hobbs in the body of the Letters, or refer to him directly or indirectly. SF 283. She does not discuss the facts of the case. SF 288. She only opines that an injustice has occurred and asks for support for the WM3. SF 282-89. Specifically, she voices her opinion that the WM3 convictions were an "injustice" and hopes that readers "will feel compelled to help." SF 282, 288-89. The overall tenor of the Letters is not defamatory and does not accuse Hobbs of Murder as he once claimed. SF 280. The Letters encourage readers to view the evidence and documentaries for themselves and advance her position that "justice has yet to be served." SF 278, 281-82, 289-90. Pasdar refers to the "real killer(s)" who are still out there in an obvious admission that she does not claim to know the identity or number of the people actually responsible for the Murders. SF 289.

Even the specific statements from the body of the Letters chosen as offensive by the Plaintiff's lawyers in response to Pasdar's interrogatories (SF 277) are not actionable. Though Hobbs did not complain of statements in the body of the Letters when asked in his deposition, in

his interrogatory answers he claimed that the following statements in the body of the Letters "suggest that Terry Hobbs is a killer:"

- Below, I have written what the DNA and forensics evidence shows. I hope after reading it and looking at the WM3.org website, you will know that the wrong guys are sitting in jail right now, and feel compelled to help.

- DNA and forensics tests are expensive. They are also what will finally set these men free.

- The evidence is so strong that at the very least the judge will grant a new trial, but hopefully he will overturn the verdict and these guys will finally be sent home to their lives and families. I know this is a hard thing to just take my word on, so please look at the case and the evidence for yourself. I am confident that you will see the DNA evidence is irrefutable and that these three men did not get the kind of trial that is promised to us – as Americans.

- Their killer(s) is still out there, and justice has yet to be served. Please know that your generosity will make a difference.

SF 277.

Of course, because Hobbs admits that the Letters do not accuse him of the Murders, his complaints relating to these statements are irrelevant. SF 277. However, a review of the statements reflect that the statements themselves are innocuous and not defamatory. SF 278-80, 284. The statements are not capable of being proven true or false under *Milkovich*. Instead, the statements merely express Pasdar's hope that readers will contribute to the defense fund, encourage readers to look into the case further, and advance her opinion that justice has not been served as long as the WM3 are in prison. SF 278, 281-82, 289-90. Hope, encouragement and belief in justice are not assertions of fact that one can prove true or false and are not actionable.

Additionally, the statements in the body of the Letters are not "of and concerning" Hobbs. Not only do they not refer to him, but a review of the statements reflect that they do not even suggest the idea that Hobbs committed the Murders. SF 277, 280, 283-84. There is not only no direct or indirect reference to Hobbs, there is no reference to any party but the WM3. SF

277, 280, 283-84. Hobbs can present no evidence that the statements in the body of the Letter are "about" Hobbs, or that they "identify" or "concern" him, as required by defamation law.

In the Rally, Pasdar never even refers to Hobbs, and the statements are similarly not "of and concerning" him. SF 232-35, 237-39. As the transcript and video of the Rally clearly show, Pasdar did not explicitly or implicitly refer to Hobbs in any manner even when she did arguably assert a fact: "It's not about debate. It's about science and I've tried to find negative comments and it's hard to find – it's hard for people to open their mouths or debate something that has now been scientifically proven." SF 232-35, 237-39. Pasdar is claiming here that the WM3 were wrongfully convicted and the evidence failing to link them to the crime scientifically proves their innocence. SF 237, 239, 240. Whether looking at this statement in a vacuum or considering the overall tenor of the speech, no person of ordinary intelligence would conclude that the speech in any way refers to Hobbs or asserts any fact about him. SF 233-40. Further, most of Pasdar's Rally comments do not assert *any* fact. SF 293. The statements are Pasdar's opinions that "it's important for our elected officials . . . to know that we are watching them and care about the decisions that they make," that she's "amazed these guys are still in prison," and that she "urge[s] you all to go to WM3.org to donate." SF 240, 293. The entire content of the Rally remarks was directed towards Pasdar's belief that the WM3 are innocent and deserve a new trial. SF 232, 235-40, 292-93.

Hobbs has admitted that with regard to the body of the Letters, Pasdar is only exercising her right of free speech, that she is giving her opinion and that, in fact, Pasdar does not accuse Hobbs of the Murders. SF 241-42, 245-48. Pasdar does no more in her remarks at the Rally. SF 232-40. Instead, Hobbs' complaint is his concern that Pasdar's comments carry more weight because she is a celebrity. SF 259. Such concern is not actionable if the content of the speech

itself is not actionable. Hobbs would prefer that the issues surrounding the WM3 convictions were a private matter, and he thinks that Pasdar "got in our business when she shouldn't have" (SF 294), but he candidly admits that Pasdar has as much right to speak out about the issue of whether the WM3 are guilty as anyone else ("she can say whatever she wants.") SF 245-48. Pasdar's statements in the body of the Letters and at the Rally are not statements of fact at all and are not "of and concerning Hobbs" as a matter of law.

4.     **The post-script statements in the Letters do not accuse Hobbs of involvement in the Murders**

Moreover, the post-script statements, taken *in toto*, do not accuse Hobbs of committing the Murders. This same post-script of evidentiary bullet points also includes evidence that exculpates Hobbs – that foreign DNA not belonging to any of the West Memphis 3, the victims or anyone else tested – was found on the penises of two of the victims. SF 162, 301. It is counterintuitive that a person accusing another of a crime would include exculpatory evidence related to that person.

The summary also contains a wealth of information and evidence having no relation to Hobbs, included to advance Pasdar's theme that whoever committed the Murders, it was not the WM3 and that the WM3 deserve a new trial – lack of DNA results linking the WM3 to the Murders, forensic expert analysis that certain wounds prosecutors claimed were caused by a knife were actually postmortem animal injuries, and the affidavit from the mother of the girl at a softball game stating that comments attributed to Damien Echols at trial should not have been taken seriously. SF 301. The evidence summary, including the Hobbs evidence, is included to advance Pasdar's sole thesis: the WM3 did not commit the Murders. SF 304. Reviewed in their entirety, the Letters do not make provably false assertions about Hobbs and advance only one

theme – the WM3 are innocent and were wrongfully convicted. SF 279-80, 284-85. A person of ordinary intelligence would read the Letters and the post-script as supporting this thesis.

## B. Hobbs cannot prove actual malice or negligence as a matter of law

In addition to proving state law elements of defamation, "a plaintiff must also satisfy the Constitutional requirements of the First Amendment." *Nichols v. Moore*, 477 F.3d 396, 399 (6th Cir. 2007). Under the First Amendment, a plaintiff must prove *by clear and convincing evidence* that the defendant made the statements with *actual malice* where: (1) a defendant's statements relate to an issue of public concern or public controversy; and (2) the plaintiff is a public official or public figure. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343-45 (1974); *Dun & Bradstreet, Inc. v. Greenmoss Builders*, 472 U.S. 749, 761-63 (1985). If these two elements are not met, the Supreme Court has deferred to state courts in determining the standard of fault in defamation actions brought by private individuals. *Gertz*, 418 U.S at 347. In both Arkansas and Tennessee, a non-public figure plaintiff must show that the defendant acted negligently with regard to the truth of her statement. *West v. Media Gen. Convergence*, 53 S.W.3d 640, 648 (Tenn. 2001); *Little Rock Newspapers, Inc. v. Dodrill*, 660 S.W.2d 933, 938 (Ark. 1983). This standard equates to what "a reasonably prudent person would, or would not, have done under the same or similar circumstances." *Wilson v. Scripps-Howard Broad. Co.*, 642 F.2d 371, 374 (6th Cir. 1981), *cert. granted*, 454 U.S. 962, *cert. dismissed*, 454 U.S. 1130 (1981).

"Summary judgments are particularly well-suited for false light or libel claims because the determination concerning whether the plaintiff is a public figure is a question of law, as is the determination of whether a public figure has come forward with clear and convincing evidence that the defendant was acting with actual malice." *Lewis v. Newschannel 5 Network, L.P.*, 238 S.W.3d 270, 283 (Tenn. Ct. App. 2007) (internal citations omitted); *Anderson*, 477 U.S. at 254-55; *see also Southall v. Little Rock Newspapers, Inc.*, 964 S.W.2d 187, 191 (Ark. 1998)

("Whether a person is a public official or public figure is a mixed question of fact and law to be

determined by the trial court."). A trial judge "must view the evidence presented through the

prism of the substantive evidentiary burden" and "bear in mind the actual quantum and quality of

proof necessary to support liability under *New York Times*." *Anderson*, 477 U.S. at 254. Where

the court is examining the existence of actual malice, "the appropriate summary judgment

question will be whether the evidence in the record could support a reasonable jury finding either

that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff

has not." *Id.* at 256-57; *Drew v. KATV Television, Inc.*, 739 S.W.2d 680, 681-82 (Ark. 1987).[2]

A statement is made with actual malice where the speaker knew that the statement was

false or acted with reckless disregard for its truth. *New York Times v. Sullivan*, 376 U.S. 254,

279-80 (1964), *Gertz*, 418 U.S. at 343-45; *Dun & Bradstreet*, 472 U.S. at 761-63. In *Harte-

Hanks Comm. v. Connaughton*, the Supreme Court elaborated upon the meaning of reckless

disregard for the truth:

> A reckless disregard for the truth, however, requires more than a departure from
> reasonably prudent conduct. **There must be sufficient evidence to permit the
> conclusion that the defendant in fact entertained serious doubts as to the
> truth of his publication. The standard is a subjective one – there must be
> sufficient evidence to permit the conclusion that the defendant actually had a
> high degree of awareness of . . . probable falsity. As a result, failure to
> investigate before publishing, even when a reasonably prudent person would
> have done so, is not sufficient to establish reckless disregard.**

---

[2]  Actual malice is the appropriate standard where the statements regard a public controversy and the plaintiff is a
public figure whether the defamation defendant is a "media" or "non-media" defendant. *Fuller v. Russell*, 842
S.W.2d 12, 14-15 (Ark. 1992) (applying actual malice standard to non-media defendant); *see also Drew v.
KATV Television, Inc.*, 739 S.W.2d 680, 682 (Ark. 1987) (Purtle, J., concurring) ("[A] media defendant stands
in no better position than any other defendant in a defamation action. The media is subject to the same standard
as the general public.") (citing *Dun & Bradstreet*, 472 U.S. 749). The First Amendment does not "limit
protection of journalistic endeavors to those pursued by individuals with college degrees in mass
communications." *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 573 (8th Cir. 2001) (Arkansas
law). Tennessee courts have "specifically held that a non-media co-defendant was entitled to the same First
Amendment protection as a media defendant." *Pate v. Serv. Merchandise Co.*, 959 S.W.2d 569, 575 (Tenn. Ct.
App. 1996) (citing *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 75 (Tenn. Ct. App. 1986)).

---

491 U.S. 657, 688 (1989) (emphasis added).

The actual malice standard is a "daunting" one, and "courts must be cautious about letting libel cases go to the jury under the malice standard where there is no proof that the reporter . . . knew or suspected that the statements in his article were false." *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 569 (8th Cir. 2001); *Orr v. Argus-Press Co.*, 586 F.2d 1108, 1116 (6th Cir. 1978). Evidence of a defendant's ill will, political motive or desire to injure or profit does not constitute actual malice, and the court must not place too much reliance on factors such as the defendant's motive or departure from professional standards. *Campbell*, 255 F.3d at 570; *McCluen v. Roane County Times, Inc.*, 936 S.W.2d 936, 939 (Tenn. Ct. App. 1996). The Court is instead to look to the "information known to, and the conduct of the [defendant]." *Campbell*, 255 F.3d at 570.

The actual malice standard is an exacting standard because "an ordinary standard of care" would not "protect against self-censorship and thus adequately implement First Amendment policies." *Gertz*, 418 U.S. at 345. The freedom of expression upon the public questions necessarily involved when the plaintiff is a public figure "is secured by the First Amendment," and "debate on public issues should be uninhibited, robust and wide-open."[3] *Dun & Bradstreet*, 472 U.S. at 755 (quoting *New York Times*, 376 U.S. at 269-270).

---

[3]  Recognizing the importance of all citizens' First Amendment right to such public debate and that "the valid exercise of the constitutional rights of freedom of speech . . . should not be chilled through abuse of the judicial process," the Arkansas General Assembly recently passed the Citizen Participation in Government Act. ARK. CODE ANN. §§ 16-63-501 to -507 (2005). Absent a showing of actual malice, the act provides immunity from suit for "[a]ll expressions of opinion or criticisms in regard to any legislative, executive, or judicial proceeding, or other proceeding authorized by state, regional, county, or municipal governments; and [a]ll criticisms of the official acts of any and all public officers." ARK. CODE ANN. §§ 16-63-503(2)(B), -504. Thus, if this Court decides Arkansas law should apply to this case, the First Amendment rights invoked by Pasdar's statements, as set forth in detail below, have similarly been codified and are protected by Arkansas law despite Hobbs' admitted efforts to "chill" Pasdar's right to speak out about this public controversy. SF 7.

---

In a case remarkably on point, the U.S. Supreme Court found no actual malice when a political candidate read statements regarding a deputy sheriff provided to him by a local union leader. *St. Amant v. Thompson*, 390 U.S. 727, 728-29 (1968). When the sheriff sued for defamation, the Court held that even though the candidate had no personal knowledge of the sheriff's conduct, had relied solely upon an affidavit from the union leader to make the statements and believed that he was not responsible for his statements because he had quoted that affidavit, there was no actual malice on the part of the defendant unless the defendant himself entertained serious doubts about the publication or there was obvious reason to doubt the veracity of the statement. *Id.* at 730-32. The Court held that the defendant's failure to verify the information with another source and to determine the veracity of the affidavit was not actual malice. *Id.* at 730. The Court further held that when a defendant has relied upon or quoted another source in making a statement, to constitute actual malice, there must be, at a very minimum, "*obvious* reasons to doubt the veracity" of the source. *Id.* at 732.

1. **Pasdar's statements relate to issues of public concern and public controversy as a matter of law**

The actual malice standard applies because Pasdar's statements involve an issue of public concern and/or controversy, and Terry Hobbs is a public figure. A public issue is an issue upon which "free and open debate is vital to informed decision-making by the electorate." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 571-72 (1968). Such matters are usually of "political, social or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). Whether speech addresses a matter of public concern is determined by reviewing the content, form and context of the whole record. *Id.* at 147-148.

While some cases are "merely newsworthy," a great number of judicial proceedings raise public issues and controversies.[4] Specifically, a case which is "the focus of major public debate over the ability of our courts to render even-handed justice" represents "the kind of public controversy referred to in *Gertz*." *Street v. Nat'l Broad. Co.*, 645 F.2d 1227, 1234 (6th Cir. 1981) (Tennessee law); *see also Ramsey v. Fox News Network, L.L.C.*, 351 F. Supp. 2d 1145, 1150 (D. Colo. 2005) (JonBenet Ramsey's murder and investigation were issues of public concern); *Friedgood v. Peters Publ'g Co.*, 521 So. 2d 236, 242 (Fla. Dist. Ct. App. 1988) (citing *Street*, 645 F.2d at 1227) ("highly publicized criminal trial out of which other political and/or legal issues arose" was a public controversy).

All of Pasdar's statements, in both the Letters and at the Rally, are comments upon the same matter of public concern or controversy: particularly, whether the WM3 were appropriately convicted. SF 194-96; 262-76. This question of whether the WM3 actually committed the murders encompasses many issues attendant to that question, all of which go directly to the heart of public concern or controversy. SF 264.

Free and open debate on the workings and efficacy of law enforcement and the criminal justice system is vital to a decision-making electorate interested in the credibility and reliability of its government, whether "the system" works in general, and whether it worked in this specific instance when the State sentenced these three teenagers to death and/or a life behind bars. SF

---

[4]   In *Time, Inc. v. Firestone*, 424 U.S. 448 (1976), the U.S. Supreme Court specifically addressed the distinction between merely newsworthy cases and cases that are or become public controversies. 424 U.S. at 454. *Firestone* was a defamation case based upon a news article about a civil divorce proceeding between a wealthy couple. *Id.* at 449-50. The Court held that a judicial proceeding to dissolve a marriage "is not the sort of 'public controversy' contemplated by *Gertz*, merely because it may appeal to the interests of the public. *Id.* at 454. That is, *Firestone* simply established that not all issues garnering public interest are "public controversies." *Id.* Unlike the divorce proceeding in *Firestone*, this case flows from the highly publicized Murders, subsequent convictions of the WM3 and the astounding amount of local, national and international attention devoted to an issue of great public concern – whether the WM3 were wrongfully convicted. SF 19-50, 262-76.

265-67. Such questions are of critical political and social concern for all citizens (even elsewhere) regarding personal safety and the right to a fair trial, and the freedom to speak out about such concerns is vital to a healthy democratic society. SF 265-67.

These "fairness of the judicial system" questions are quintessential issues of public concern. *Street*, 645 F.2d at 1234. Thus, when Pasdar suggested the WM3 have been wrongly convicted and that action should be taken to get them released or grant them a new trial, she cut right to the heart of this type of public issue. SF 272-75. Pasdar also urges public action from her readers, mentions that many of the people working on the case have worked pro bono for thirteen years, and states that the costs associated with freeing those wrongfully convicted are high. SF 273-74. In fact, her Letters encourage the most public of public action: a letter writing campaign. SF 274. To prohibit Pasdar from advocating for the WM3 and citing the Hobbs evidence would gag her from discussing the very evidence that might suggest the wrongful convictions of the WM3. *See Lewis*, 238 S.W.3d at 299. Pasdar does not have to be correct about whether the WM3 were wrongfully convicted or about the relationship of the Hobbs evidence to that question, but she does have the legal and constitutional right to discuss these most public of facts and issues.

The media's steadfast fixation on the story of the WM3 further demonstrates that all of the attendant issues surrounding the Murders, the trials, the WM3, and yes, the damning evidence swirling around Terry Hobbs, are issues of public concern and public controversy.[5] SF

---

[5] In addition to the specific articles Pasdar has attached in her Appendix of Summary Judgment Evidence, the Court's File contains approximately 400 news articles and television show transcripts, as well as at least forty-eight (48) internet sites and blogs which have tackled all of these topics. SF 268-69. Pasdar relies on the entirety of the parties' Stipulation Nos. 1 and 4. Indeed, every new revelation in the case has yielded countless newspaper articles, television reports and untold internet discussion for the past sixteen (16) years. SF 19-29, 262-76. There have also been two documentaries made which raise these very questions, and at least 4 books which also discuss these matters of public concern. SF 30-39. The MEMPHIS COMMERCIAL APPEAL alone has

*(Cont'd on next page)*

19-50, 262-76. The overwhelming number of news articles about the controversy proves that the public controversy has grown from the initial local coverage of the investigation and trials to nagging national questions about whether the WM3 are actually guilty to more global concerns. SF 25-26. On a more local level, news stations report daily about the ongoing investigation into the propriety of the WM3 convictions. SF 23.

The newspapers are not alone in fixating on the WM3 controversy. SF 29-50. The public nature of this controversy runs far deeper than mere notoriety or "newsworthiness." *Compare Time*, 424 U.S at 454, *with Street*, 645 F.2d at 1234 *and Friedgood*, 521 So. 2d at 242. The controversy has become a national lightning rod for passionate discourse about criminal justice.[6] SF 19-21, 29-31, 34-37, 50, 137. The publicity and debate surrounding the Events has attracted the attention of private individuals, celebrities and politicians all over the globe, in the form of sympathy for the families of the victims, outrage at the Murders themselves, and support for the WM3. SF 40-50. At a more grassroots level, the WM3 have a large network of supporters. SF 41, 44, 46-49. Hobbs himself has acknowledged that the questions of whether

---

*(Cont'd from previous page)*

published more than 94 articles on the Murders, the investigation, the trials, the appeals and the new evidence. SF 23.

[6]   In 2002, the Supreme Court of Arkansas granted Damien Echols' motion for a stay pending an outcome of his petition for DNA testing before the circuit court on the basis of Arkansas' newly passed Act 1780 of 2001, which permits testing of DNA evidence not available at the time of trial. *Echols v. State*, 84 S.W.3d 424, 426 (Ark. 2002) (citing ARK. CODE ANN. § 16-112-201 to -207 (Supp. 2001)). The Court explained that "Act 1780 was passed by the General Assembly in response to nation-wide concerns that innocent persons were being imprisoned and even executed for crimes they did not commit . . . . Accordingly, the purpose in passing Act 1780 was to change Arkansas laws and procedures 'in order to accommodate the advent of new technologies enhancing the ability to analyze scientific evidence.'" *Id.* While not legally necessary, the Court granted the stay "in the interests of justice . . . pursuant to the discretionary authority set out in section 16-112-201(b)" pending the outcome of his petition for DNA testing. According to Echols' Motion for a New Trial filed in state circuit court, "[a]t least part of the impetus for the new enactment of the Arkansas statutes was the continuing controversy concerning the reliability of the judgments of conviction rendered in this very matter." *Echols v. State*, CR-93-450A, Petitioner Damien Echols' Motion for a New Trial at 2 (Ark. Cir. Ct. April 11, 2008).

---

the WM3 are guilty and who murdered the three little boys are continuing issues of public concern. SF 243-44.

## 2. Hobbs is a public figure as a matter of law

An individual may become a public figure with regard to public controversies even if he is not a public official or generally famous:[7]

> In some instances, an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy . . . thereby becomes a public figure for a limited range of issues. In either case, such persons assume special prominence in the resolution of public questions.

*Gertz*, 418 U.S. at 351. In determining if a plaintiff is a public figure, a court should review "the plaintiff's status in relation to the subject of the defamatory article." *Southall v. Little Rock Newspapers*, 964 S.W.2d 187, 191 (Ark. 1998). Where the plaintiff is closely related to the subject of the statements in issue, the plaintiff's resulting prominence with regard to the public issue "invite[s] comment." *Gertz*, 418 U.S. at 345.

### a. Hobbs is a voluntary limited purpose public figure as a matter of law

### (i) The various interpretations of "voluntary participation"

In *Gertz* and its progeny, the U.S. Supreme Court has attempted to ensure that the debate on public issues is uninhibited, robust and wide-open, while accommodating the conflicting need of an individual to redress wrongful injury to his reputation. *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1291 (D.C. Cir. 1980). In balancing these interests, the Court has also established a group of people – limited-purpose public figures – who, by virtue of their voluntary participation in the public controversy that gives rise to the defamation case, are public

---

[7] Though the law recognizes that persons may be general public figures for all purposes, Pasdar here does not allege that Hobbs is such a public figure. Instead, Pasdar asserts that Hobbs is an involuntary public figure and/or a limited purpose public figure, as set forth below.

figures not entitled to recover for defamation absent a showing of actual malice on the part of the alleged defamer. *Gertz*, 418 U.S. at 352; *Waldbaum*, 627 F.2d at 1289.

(a)      *Gertz* and its progeny

A voluntary limited-purpose public figure is an individual who voluntarily injects himself into a particular public controversy and therefore becomes a public figure for a limited range of issues. *Gertz*, 418 U.S. at 345; *Waldbaum*, 627 F.2d at 1292. The court in *Gertz* held voluntary injection is to be determined by considering the "nature and extent" of the plaintiff's participation in the controversy giving rise to the defamation case. *Gertz*, 418 U.S. at 352; *Waldbaum*, 627 F.2d at 1292. *Gertz* established that a major factor in assessing public figure status is the plaintiff's access to the media and his willingness to conduct press interviews on the subject of the public controversy. 418 U.S. at 352. The engagement of the media by the defamation plaintiff is a critical part of the voluntary injection analysis because his willingness to interact with the press on the controversy is likely an attempt to "thrust" himself "to the forefront of particular public controversies in order to influence the resolution of issues involved." *Gertz*, 418 U.S. at 345.[8]

---

[8]  Courts throughout the United States have consistently held that a defamation plaintiff is a public figure if he speaks to the press or otherwise seeks publicity regarding the matters in issue. In *Atlanta Journal-Constitution v. Jewell*, the court held that Olympic security guard Richard Jewell became a public figure when he granted interviews regarding his discovery of a bomb in Olympic Park, the evacuation of the park and his opinion regarding park safety. 555 S.E.2d 175, 184 (Ga. Ct. App. 2002). The Court also held that this rendered him a public figure even with regard to suspicion of his own involvement in the bombing, and his motives for giving the interviews did not matter because he was seeking to influence the resolution of a controversy. *Id.* at 184-85; *see also Denny v. Lawrence*, 22 Cal. App. 4th 927, 933-35 (Cal. Ct. App. 1994) (plaintiff held to be a public figure because he "gave press interviews (which, of course, he could not be forced to do, and which thus must be said to have been done voluntarily) and, rather than limiting his comments to matters he had witnessed, he promoted a version of the case favorable to his brother, taking advantage of his own position as an intimate of his brother . . . to influence public opinion as to the circumstances surrounding the killing and his brother's culpability, if any, for the homicide"); *Thomas v. Los Angeles Times Commc'ns, LLC*, 189 F. Supp 2d 1005, 1011-12 (C.D. Cal. 2002) (holding that the plaintiff was a public figure because he had appeared on ABC's "Nightline" and had been quoted in major newspapers); *Hayes v. Booth Newspapers, Inc.*, 295 N.W.2d 858, 865-66 (Mich. App. 1980) (holding that the plaintiff is a limited-purpose public figure because he "invited

*(Cont'd on next page)*

Gertz's progeny continued to support the rationale for affording less protection to public figures. In *Wolston v. Reader's Digest Ass'n, Inc.*, the Supreme Court explained the rationale for providing less redress to public figures: (1) public figures have a decreased likelihood of injury because they have greater access to 'self-help' through channels of effective communication; and (2) public figures have "voluntarily exposed themselves" to the likelihood people will discuss them in the public arena.[9] 443 U.S. 157, 164 (1979). In *Hutchinson v. Proxmire*, the Court again emphasized the importance of media access as a critical factor in public figure analysis, noting that public figure plaintiffs generally have "regular and continuing access to the media." 443 U.S. 111, 136 (1979). The Court in *Hutchinson* found a relatively obscure scientist to be a private individual on grounds that the plaintiff did not have sufficient media access through

---

*(Cont'd from previous page)*

attention and comment . . . by taking affirmative steps to attract attention when he consented to television as well as to newspaper interviews.").

Similarly, someone who sells their life story and publishes a book becomes a public figure with regard to that publication: "by publishing your own views, you invite public criticism and rebuttal; you enter voluntarily into one of the submarket of ideas and opinions and consent therefore to the rough competition of the marketplace." *Dilworth v. Dudley*, 75 F.3d 307, 309 (7th Cir. 1996); *Colodny v. Iverson, Yoakum, Papiano & Hatch, GP*, 936 F. Supp. 917, 922 (M.D. Fla. 1996) (plaintiff is a public figure because, by writing a book and promoting it through media outlets, he thrust himself into the controversy upon which his book is based); *Dacey v. Florida Bar, Inc.*, 427 F.2d 1292, 1295 (5th Cir. 1970) (plaintiff is a public figure because, by writing a book and appearing on television and radio to promote it, he thrust himself into the vortex of an important public controversy); *Thomas v. Los Angeles Times Commc'ns, LLC*, 189 F. Supp 2d 1005, 1011-12 (C.D. Cal. 2002) (holding that the plaintiff was a public figure because, "[p]erhaps most importantly, [he] cooperated with [the author] in publication of his autobiography"); *Live Oak Publ'g Co. v. Cohagan*, 234 Cal. App. 3d 1277, 1289 (1991) (holding that "[g]enerally, authors are considered to have participated sufficiently in public controversies or . . . otherwise involved themselves in matters of public concern as to be public figures" reasoning that "an author . . . often acts with the purpose of fostering public debate.").

[9]     Although the Court found that Wolston was not a public figure, it did so based upon facts virtually opposite to the facts presented in this case. Wolston simply failed to comply with a subpoena to testify regarding Soviet espionage. *Wolston*, 443 U.S. at 167. Unlike Hobbs, Wolston "led a thoroughly private existence," never wrote a book chronicling the events, "never discussed this matter with the press" and in sum, "was dragged unwillingly into the controversy." Hobbs, on the other hand, by repeatedly taking advantage of his access to media personnel, voluntarily granting numerous press interviews, voluntarily talking to investigators, writing a book and hiring a spokesperson, admits that he was seeking to arouse public sentiment in his favor. SF 51-95, 107-15, 128-32.

---

which to counteract false statements, and the plaintiff only achieved prominence in the controversy by virtue of the defendant's comments about the plaintiff. 443 U.S. at 134-35.[10]

Though *Gertz* and its progeny established Constitutional guideposts, the Court has "not yet fleshed out the skeletal descriptions of public figures and private persons and instead directs courts to "formulate 'broad rules of general application' that accommodate the competing interests of press and personal reputation." *Waldbaum*, 627 F.2d at 1292. In fact, as one federal judge has lamented, the process of defining public figure is "much like trying to nail a jellyfish to the wall." *Rosanova v. Playboy Enter., Inc.*, 411 F. Supp. 440, 443 (S.D. Ga. 1976), *aff'd*, 580 F.2d 859 (5th Cir. 1978). Some jurisdictions have dissected *Gertz's* language to fashion their own step-by-step public figure analysis, while others apply *Gertz's* precise language on a situational basis. Most courts, however, have focused upon the plaintiff's dealings with the media and analyzed whether those dealings reflect a willingness by the plaintiff to publicly engage in the controversy.[11]

### (b) The Sixth Circuit and Tennessee

The Sixth Circuit uses three factors to inform the "voluntary injection" question under *Gertz*: (1) whether the plaintiff voluntarily participated in the controversy; (2) whether the

---

[10]  In fact, the *Hutchinson* opinion's greatest impact on public figure law was in preventing defendants from "bootstrapping" and creating a public figure through their own comments. *See McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3d Cir. 1985) (distinguishing *Hutchinson* and holding plaintiff to be a public figure on the grounds that the "plaintiff was the subject of significant public notoriety and scrutiny well before the alleged defamatory broadcast."). Given the voluminous publicity surrounding the WM3 and Hobbs months and years prior to Pasdar's statements, *Hutchinson* provides little guidance in the instant case.

[11]  Other jurisdictions do not require a defamation plaintiff to seek out media attention in order to become a voluntary public figure. For instance, when a plaintiff engages in voluntary activity, particularly criminal activity, out of which media attention would foreseeably arise, the plaintiff injects himself into a controversy regardless of whether he desired or sought out the media attention in the first place. *Marcone v. Penthouse, Ltd.*, 754 F.2d 1072, 1083 (3rd. Cir. 1985) (Pennsylvania) (an attorney representing prominent criminals and reputedly trafficking drugs was a public figure even though he did not intend for his activities to attract attention); *Rosanova v. Playboy Enter., Inc.*, 580 F.2d 859, 861 (5th Cir. 1978) (because public figure status "does not depend upon the desires of an individual," a plaintiff with a reputed underworld personality and who engaged in a course of activity bound to invite attention was held to be a public figure).

---

plaintiff has access to effective channels of communication to counteract false statements; and

(3) how prominent of a role the plaintiff plays in the controversy. *Wilson v. Scripps-Howard Broad. Co.*, 642 F.2d 371, 374 (6th Cir. 1981), *cert. granted* 454 U.S. 962, *cert. dismissed*, 454 U.S. 1130 (1981); *Street*, 645 F.2d at 1234. Tennessee courts have explicitly adopted the three factor test set forth in *Wilson* and *Street*. *Cloyd v. Press, Inc.*, 629 S.W.2d 24, 26 (Tenn. Ct. App. 1981) (adopting *Wilson*'s three factor test); *Hibdon v. Grabowski*, 195 S.W.3d 48, 59 (Tenn. Ct. App. 2005).

Under the precedent of *Wilson* and *Street*, Sixth Circuit and Tennessee courts routinely hold that a plaintiff who engages in public speech about a controversy voluntarily injects himself into that controversy and becomes a public figure. In *Street*, the court held that the chief accuser in a famous, racially charged rape trial was a public figure regarding the controversy surrounding the fairness of the trial and whether the defendants were falsely accused. 645 F.2d at 1229. The court explained that the plaintiff (clearly a prominent participant in the controversy) had access to effective "channels of communication" merely because "[t]he press clamored to interview her." *Id.* at 1234. Further, "[s]he clearly had access to the media and was able to broadcast her view of the events," which afforded her "a realistic opportunity to counteract any false statements." *Id.* More importantly, she took advantage of this media access and spoke publicly about the controversy:

> Plaintiff gave press interviews and aggressively promoted her version of the case outside of her actual courtroom testimony. In the context of a widely-reported, intense public controversy concerning the fairness of our criminal justice system, plaintiff was a public figure under *Gertz* because she played a major role, had effective access to the media and encouraged public interest in herself.

*Id.* at 1234-35.

In *Hibdon v. Grabowski*, a jet ski enthusiast who boasted about jet ski modifications in an online newsgroup and was profiled by a magazine about those modifications had voluntarily

injected himself into a public controversy because he "had access to and used effective means of communication" and was therefore a public figure. 195 S.W.3d. at 63. Another Tennessee court applying the Sixth Circuit's three-factor test found that a defamation plaintiff had voluntarily injected himself into the controversy and was therefore a public figure because he had "been quoted extensively" in a local newspaper and "would bring information to the [newspaper's] office." *Trigg v. Lakeway Publishers, Inc.*, 720 S.W.2d 69, 73 (Tenn. Ct. App. 1986).

Often, in a public controversy defamation case, a core dispute between the parties makes it impossible to determine whether the plaintiff voluntarily injected himself into the public controversy. This conundrum arose in *Street*, where the defamation plaintiff complained that a television broadcast portrayed her as *falsely* accusing several men of rape, while the broadcaster as a defense, asserted that her accusations *were, in fact, false*. 645 F.2d at 1229. In *Street*, whether the rape accusations were false would dictate whether the plaintiff had "voluntarily" participated in the controversy, and therefore, whether or not she was a public figure: "if she was raped, her participation in the initial legal proceedings was involuntary," but "if she falsely accused the defendants, her participation in this controversy was 'voluntary.'" *Street*, 645 F.2d at 1234. *Street* holds that where the accuracy and/or truth of a core allegation in a defamation case is in issue, "the principle of libel law should not be drawn in such a way that it forces the press, in an uncertain public controversy, to guess correctly," *and the question of voluntary injection should be disregarded entirely. Id.* Consequently, the *Street* court held that in these scenarios, the public figure analysis should focus solely on the plaintiff's prominent role in the controversy and his access to the media. *Id.* at 1234-35.

The *Street* conundrum exists in the instant case because, at their core, Pasdar's statements concern an uncertain public controversy: were the WM3 wrongfully convicted and if so, who

committed the Murders. If Hobbs committed the Murders, his participation in this controversy is clearly voluntary. However, whether Hobbs committed the Murders was uncertain at the time of Pasdar's statements (as it remains), though there is plenty of evidence to strongly suggest his involvement. Because the principles of defamation law should not force a Hobson's choice – those discussing an uncertain public controversy must guess correctly or otherwise remain mum at the risk of million dollar verdicts – "the voluntary injection" component of the *Wilson* test should be disregarded in the instant case as held in *Street*. *Street*, 645 F.2d at 1234-35.

### (c)  Arkansas and the Eighth Circuit

Unlike Tennessee and the Sixth Circuit, Arkansas courts have not set forth a multi-factorial test to determine the voluntary injection element under *Gertz*, but instead have simply applied *Gertz* to hold that individuals who conduct interviews with the media and talk to radio and television reporters about a public controversy have voluntarily injected themselves into the controversy. In the Arkansas Supreme Court's well-reasoned pronouncement on the issue in *Southall v. Little Rock Newspapers*, the court held that the defamation plaintiff, a scientist, was a public figure where he "stated himself in his deposition that he had conducted interviews with the media, had talked to radio and television reporters . . . and had been fairly prominent in the public debate over the regulation of hazardous waste." 964 S.W.2d 187, 192 (Ark. 1998).

The Eighth Circuit has not had the opportunity to apply Arkansas law to the voluntary injection question, but in other scenarios has followed the three-inquiry test established in *Waldbaum v. Fairchild Publications, Inc.*, likely the most cited and influential public figure test among the Circuits. 627 F.2d 1287, 1296-98 (D.C. Cir. 1980). The *Waldbaum* court held that to determine voluntary injection, a court should: (1) isolate the public controversy; (2) analyze the plaintiff's role in the public controversy; and (3) determine whether the alleged defamation was germane to the plaintiff's participation in the controversy. *Waldbaum*, 627 F.2d at 1296-98.

More than two hundred state and federal cases cite *Waldbaum* with approval.[12] Every Circuit Court has either followed *Waldbaum* or, at a minimum, cited it favorably.[13] In fact, the United States Supreme Court has cited *Waldbaum* with approval. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 (1986). The Eighth Circuit has framed its two-part public figure analysis around *Gertz* and *Waldbaum*. First, the Eighth Circuit identifies the particular public controversy giving rise to the allegedly defamatory speech. *In re IBP Confidential Business Documents Litigation*, 797 F.2d 632, 645 (8th Cir. 1986). Then, the Eighth Circuit examines the "nature and extent" of the plaintiff's involvement in that controversy. *Id.*

### (d)  *Foretich*'s inapplicable *per se* exception

In his motion for summary judgment on the public figure issue, Hobbs relies primarily upon a non-controlling (whatever this Court's choice of law determination) Fourth Circuit case appealed from the Eastern District of Virginia. *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541 (4th Cir. 1994). Hobbs MPSJ Public Figure at 15. Hobbs paints *Foretich* with broad strokes, claiming that it mandates private figure status for all defamation plaintiffs who publicly defend their reputations against vile assertions. Hobbs MPSJ Public Figure at 15. The *Foretich* holding is actually a narrow exception to public figure law and is legally inapplicable to the instant case: "a person who has been publicly accused of committing an act of serious sexual misconduct that (if committed and proved beyond a reasonable doubt) would be punishable by imprisonment cannot be deemed a 'limited purpose public figure' merely because he or she makes reasonable replies to those accusations." *Foretich*, 37 F.3d at 1558.

---

[12] *See, e.g., Medure v. Vindicator Printing Co.*, 60 F. Supp. 2d 477, 485-86 (W.D. Pa. 1999); *Harris v. Quadracci*, 856 F. Supp. 513, 517 (E.D. Wisc. 1994); *Barry v. Time, Inc.*, 584 F. Supp. 1110, 1116 (N.D. Cal. 1982); *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571-572 (Tex. 1998).

[13] *See, e.g., Silvester v. Am. Broad. Co.*, 839 F.2d 1491, 1494 (11th Cir. 1988) (explicitly adopting *Waldbaum*'s three part test); *Marcone v. Penthouse, Ltd.*, 754 F.2d 1072, 1083 (3rd Cir. 1985); *Pendleton v. City of Haverhill*, 156 F.3d 57, 67 (1st Cir. 1998).

As Hobbs admits, the exception to the public figure doctrine he asks this Court to adopt applies only to plaintiffs who would "*otherwise be considered a public figure* if the content of the defamatory statement touches upon an area of state law that has traditionally been considered defamatory *per se*." Hobbs MPSJ Public Figure at 15 (emphasis added) (citing *Foretich*, 37 F.3d at 1558). *Foretich* applies this *per se* exception on the basis that certain types of speech (including speech allegedly accusing another of a crime) create a separate cause of action for defamation *per se*, which does not require a plaintiff to prove damages in order to recover. *Foretich*, 37 F.3d at 1558, n.15 (citing RESTATEMENT (SECOND) OF TORTS §§ 571, 574). Critically, *Foretich* was based upon Virginia defamation law, which recognizes a distinct cause of action for defamation *per se*. *Foretich*, 37 F.3d at 1559, n.18; *Schnupp v. Smith*, 457 S.E.2d 42, 46 (Vir. 1995) (upholding defamation *per se* jury verdict under RESTATEMENT (SECOND) OF TORTS § 571); *see also Wells v. Liddy*, 186 F.3d 505, 534 (4th Cir. 1999) ("In *Foretich*, we added an *additional* consideration" when the statements at issue invoke the operative state's law separate defamation *per se* cause of action) (emphasis added) (citing *Foretich*, 37 F.3d at 1558) (both applying Virginia law).

The Fourth Circuit's litmus test for individuals who respond to allegations that they committed a crime is made possible only by the Fourth Circuit and Virginia's recognition of a distinct cause of action for defamation *per se*. *Foretich*, 37 F.3d at 1558-59. Accordingly, jurisdictions that do not recognize a separate defamation *per se* cause of action should not recognize any related public figure exception when interpreting *Gertz*. In this respect, Fourth Circuit and Virginia defamation law critically diverge from Tennessee and Arkansas law because neither Tennessee nor Arkansas recognize a cause of action for defamation *per se*. *Memphis Publ'g v. Nichols*, 569 S.W.2d 412, 418-19 (Tenn. 1978) (abolishing the *per se* distinction *based*

on *Gertz* in a case where the plaintiff alleged a newspaper article accused her of adultery); *United Ins. Co. of Am. v. Murphy*, 961 S.W.2d 752, 754-56 (Ark. 1998) (abolishing the *per se* distinction *based on Gertz* in a case where the plaintiff alleged her employer accused her of stealing customers' money). Thus, *Foretich*'s defamation *per se* "additional consideration" in the public figure analysis is wholly inapplicable to this case regardless of this Court's choice of law determination.

*Foretich* is factually distinct from the instant case as well: the private citizen grandparents in *Foretich* never had any media contact until their former daughter-in-law loudly proclaimed them child molesters, only after which time did they talk to the media.[14] 37 F.3d at 1543-45. Thus, *Foretich* is not factually instructive when a defamation plaintiff has a history of engaging the press and actually "fires the first shot" without provocation in an active attempt to frame the debate over the public controversy and arouse public sentiment in his favor.

Regardless of the law applied, Hobbs must prove by clear and convincing evidence that Pasdar acted with actual malice because, as explained below: (1) the questions of whether the WM3 were wrongfully convicted, who committed the Murders and whether Terry Hobbs may have been involved in the Murders are issues of public concern or controversy; and (2) under *Gertz* and its progeny, Hobbs has been drawn into and injected himself into that controversy.

> **(ii)** **The facts demonstrate Hobbs voluntarily participated in the controversy as a matter of law**

Hobbs is not a passive individual on the sidelines in the discussion over the propriety of the convictions of the WM3. On the contrary, Hobbs is a limited-purpose public figure, who has

---

[14] As discussed in detail below, Hobbs repeatedly talked to the media about the controversy, sold his life story and private journals about the controversy to a major motion picture company, shopped his book about his life and the controversy to numerous publishers, and repeatedly engaged with WM3 investigators (surely with the knowledge that they would use any information they procured from him to assist the WM3 whom he claims are the killers) *before his reputation was ever called into question giving him any reason to defend it against attack.*

---

voluntarily injected himself squarely into this public controversy. *Gertz*, 418 U.S. at 345; *Waldbaum*, 627 F.2d at 1292. Under *Gertz* and *Waldbaum*, this Court should look to the nature and extent of Hobbs' participation in the controversy giving rise to his defamation action to determine whether Hobbs voluntary injected himself into the controversy and invited comment. *Gertz*, 418 U.S. at 352; *Waldbaum*, 627 F.2d at 1292. He clearly has.

### (a) Hobbs' injected himself into the controversy long before the DNA test results were known

A major factor in voluntary injection is Hobbs' access to and his willingness to conduct interviews with the media on the subject of the public controversy. *Gertz*, 418 U.S. at 345; *Street*, 645 F.2d at 1234; *Southall*, 964 S.W.2d at 192. Hobbs has injected himself into the controversy surrounding the WM3 since day one. SF 51-52. In fact, at the June 5, 1993 arraignment of the WM3, he told the press he believed the WM3 were guilty and expressed his desire for revenge. SF 51. During the trials of the WM3 in 1994, Hobbs willingly appeared in a documentary, *Paradise Lost*, that raised the original and subsequently perennial question of whether the WM3 are actually guilty of the crimes for which they have been convicted. SF 32-34. On camera he made clear he believed the WM3 were guilty when he essentially stated that he could not forgive them. SF 54.

In March of 1994, Hobbs appeared on *The Geraldo Rivera Show* to discuss the Murders and the Events. SF 56. By this time, the controversy over whether the WM3 were wrongfully convicted had begun, and Hobbs attacked the WM3 and argued that they were, in fact, guilty. SF 58. He told the father of Jessie Misskelley, in essence, that Misskelley's son had an opportunity to deny involvement in the Murders, he did not, and it was therefore clear he committed the Murders. SF 58. In August of 1994, Hobbs appeared on *The Maury Povich Show* where again the question of whether the WM3 were wrongfully convicted was discussed, and

Hobbs again acted convinced that justice had been served. SF 60. In 1996, the *Paradise Lost* documentary, with Hobbs' on-camera interview included, was released to the public and appeared on cable channel HBO repeatedly. SF 61. At the time Hobbs appeared on these shows, there was no suggestion or allegation that he might be involved in the Murders, and he had no need to go public to defend his name. SF 88.

Soon after the Murders, Hobbs began writing a book about the Murders, the trials, the guilt of the WM3 and the Events. SF 63. Hobbs admits that he informed the press that he was writing the book and that "I've never kept it a secret" from the press. SF 68. Hobbs admits that through the years he has taken action to try to get his book published, including meeting with publishers, and acknowledges he has actively worked to sell the book. SF 72.[15] Hobbs has produced in this litigation his draft of his book, and in it, Hobbs tackles head on the public controversy of whether the WM3 were wrongfully convicted, and repeatedly urges that the WM3 are the true killers. SF 69. In the book, Hobbs discusses intimate details of his life, including his relationship with Stevie and Pam, the events on the day of the Murders, and his feelings about the DNA evidence, reporters and the WM3 defense attorneys, admittedly with the plan that the public will hear his views on those issues.[16] SF 64, 71. During most of the time period that he

---

[15] Conveniently, at his deposition, Hobbs was unable to recall when he began seeking publishers or which publishers he contacted. SF 73. There is no doubt, however, that Hobbs has reached out to them to publicize his version of the story and his views without prompting, before there was any suggestion by anyone that Hobbs could be involved in the Murders and, therefore, before there was any need to defend himself. SF 73.

[16] Additionally, throughout the 1990s and early 2000s, Hobbs was engaged in questionable conduct with public ramifications, often in conflict with Pam Hobbs and Stevie's family. In 1994, after punching Pam in the face, Hobbs shot his un-armed brother-in-law Jackie Hicks Jr. (who had come to Pam's aid) with a .357, using hollow point bullets. SF 321. Ultimately, Hicks' family agreed to allow Hobbs to plead to a lesser offense than the aggravated assault he was charged with, and Hobbs served 11 months and 29 days of probation for the crime. SF 321. The judgment also reflects that Hobbs served 6 months at a workhouse. SF 321. Hobbs was accused by Pam Hobbs and her sister of sexually molesting his daughter, and Child Protective Services was notified. SF 321. Mildred French, Hobbs' former neighbor, also pressed charges against Hobbs for attacking and molesting her as she got out the shower, and she suspects he physically abused his previous wife and her

*(Cont'd on next page)*

---

has been writing and "shopping" the book, there was no suggestion by anyone that Hobbs could be involved in the Murders. SF 73. He has, however, granted interviews in which he has boasted that he thinks he has a good story (300-400 pages), that movie companies are involved, and even stated that he has a "book deal." SF 67, 82. He admits that he would like for his book to influence public opinion toward believing the WM3 convictions are just, and hopefully, keep the WM3 in prison. SF 64.

In 2005 or 2006, again well before anyone claimed Hobbs might be involved in the Murders and before there was any reason for Hobbs to defend his name, Hobbs began negotiating with Dimension Films to sell his life story so that the details of his life could be used in a movie. SF 74, 87. In 2006, he did sell the rights to his life story to Dimension Films. SF 74. Pursuant to the written contract of that sale, Dimension Films has the right to exploit the details of Hobbs' life in any way it sees fit. SF 77-80. At the time of the Dimension Films agreement, Hobbs was comfortable with the fact that his life would appear on screen and in a book for the public view. SF 77. Hobbs realized that the Dimension Films movie would likely tackle the public controversy of whether the WM3 were wrongfully convicted, and Hobbs wanted his participation in the film to reflect his view that the WM3 were not wrongfully convicted. SF 77. Hobbs hoped that by participating in the film, he could influence the outcome of the events with the WM3 by taking a role in convincing the courts, the public, and any interested party that the State had done a good job, rightfully convicted the murderers and the WM3 deserved to stay in prison for their crimes. SF 77.

---

*(Cont'd from previous page)*
     baby when he was her neighbor. SF 321. Hobbs was kicked out of the apartment and ordered to undergo
     counseling because of the incident. SF 321.

Pursuant to the terms of the Dimension Films contract, Dimension Films also purchased the right to use any of the material in Hobbs' book. SF 80. Soon after the contract was signed, Hobbs also agreed to do an interview with the Dimension Films filmmakers as background for the film, and in that interview he discussed his whereabouts on the night of the Murders, the Events, his life and his family's life. SF 84. At the time of this sale of the contents of his book to Dimension Films and the interview, Hobbs was not under attack and had no need to defend his name. SF 87.

In early 2007, Hobbs voluntarily injected himself into the WM3 public controversy when he participated in interviews with various investigators he knew to be working to free the WM3, and whom he knew to be working for the WM3 legal defense team. SF 90-95. Throughout 2007, Hobbs met with at least four different investigators and had at least five meetings with these individuals who were working to collect evidence which would free the WM3. SF 91-92. Hobbs voluntarily provided the information about the Events to the investigators, and he knew that these conversations were not confidential. SF 93-94. Hobbs placed those very topics into the public arena by agreeing to discuss them with persons whom he knew to have every interest in collecting information which would suggest innocence on the part of the WM3 (and if available, the guilt of Hobbs). SF 93-94. Hobbs had to have known that his statements to those investigators could ultimately be used in any public attempt to procure new trials for the WM3. SF 93. When asked why Hobbs attended these meetings, Hobbs does not say he went to defend his good name (nor could he, since he had not yet been implicated in the Murders), but rather, states that he participated in the interviews with the investigators "because I was curious" and "because I wanted to know what kind of people would work to get killers out." SF 95.

In sum, through these years – from 1993 through April of 2007 – there was no suggestion that Hobbs was involved in the Murders and no reason for Hobbs to need to "defend his name and reputation" in the media or to the public. SF 88. Despite the fact that Hobbs had not been pulled into the controversy through the actions of any other party, Hobbs actively engaged the press and parties who were adverse to him concerning the very controversy made the basis of Pasdar's statements: whether the WM3 were wrongfully convicted. SF 89. There can be no doubt that Hobbs is, as a matter of law, a limited-purpose public figure.

### (b) Hobbs leaked the DNA evidence and has continued to aggressively promote his side of the story

The events of those earlier years pale in comparison to Hobbs' more recent actions to voluntarily inject himself into the ongoing public controversy over whether the WM3 were wrongfully convicted. In May of 2007, WM3 investigators privately informed Hobbs that his DNA was a match for the DNA of a hair found at the crime scene binding one of the victims who was not Hobbs' step-son. SF 91. At that time, the WM3 and Echols defense team did not take this test result to the press. SF 114. Instead, Hobbs broke the story and provided the details of the DNA evidence to WMCTV ACTION 5 NEWS reporter Janice Broach. SF 107, 114. Far from defending himself from a public attack, Hobbs "fired the first shot." SF 107, 113-14. He went public himself in an attempt to frame the issue for the debate and arouse public sentiment in his own favor; in his own words, he contacted Broach not to defend his reputation, but "because I can, because I want to." SF 110. Similarly, Hobbs contacted reporter Cathy Frye because "I just wanted someone in the media and the newspaper to hear what I had to say." SF 174. Specifically, he tried to let the public know that his hair was at the crime scene through innocent transference to his step-son Stevie, before the public could hear any other version. SF 173. Hobbs also alerted reporter Mara Leveritt, who also did not have any confirmation of the DNA

prior to Hobbs' disclosure. SF 113. He gave a lengthy interview on a multitude of topics to reporter Laura Smith in an effort portray himself as a sympathetic figure to the public. SF 115. Immediately following Hobbs' actions in *planting* the press story to a number of reporters, a plethora of stories followed which were picked up nationally. SF 116-117. The vast majority of these stories linked Hobbs to the DNA evidence, and it was all Hobbs' doing. SF 117, 119. Hobbs has acknowledged that he has a number of other reporter contacts, and Byers has testified Hobbs also informed him of the DNA evidence, so there is really no telling how many people or news agencies Hobbs alerted to the existence of the DNA. SF 107, 115, 117, 119-22.

Throughout the summer of 2007, additional new evidence was revealed implicating Hobbs in the Murders, including the fact that he had a pocketknife Stevie always carried with him that Stevie's mother had always thought was taken by Stevie's killer(s). SF 124-25. It was also revealed (perhaps by Hobbs) that the WMPD interviewed Hobbs in June 2007 about the DNA results and his possible involvement in the murders. SF 101-02. These stories were widely covered by the press, and Hobbs openly discussed the DNA evidence, the knife evidence and his police interview with the media. SF 105.

From that first interview on the topic of the DNA in July of 2007, through November 2007, Hobbs aggressively pushed to get out his version of events surrounding the DNA and other new evidence that was being collected by the WM3 investigators. SF 128-32. He gave a multitude of interviews, which were quoted repeatedly in newspapers and television reports across the country. SF 130-32. The goal of his interaction with the media was to get the story out from his perspective and convince the public and the powers that be that the WM3 belonged in jail. SF 132. In those interviews, Hobbs did not limit his comments to only the new evidence, he also discussed many topics, including his continued belief in the guilt of the WM3, his

opinion of the defense attorneys and the harm to his reputation from this pre-Pasdar publicity. SF 131.

In late October 2007, the Echols defense team announced via press release ("Press Release") that they would file in federal court the new evidence, request the release of Echols and/or a new trial, and hold a press conference ("Press Conference") to discuss the new evidence. SF 146, 152. On the October 29, 2007 filing date of the Echols Habeas Petition, apparently in anticipation of the Press Conference and publicity surrounding the filing, Hobbs retained Ross Sampson as his media spokesperson. SF 171. Sampson immediately gave media interviews, denying Hobbs' involvement in the Murders, claiming Hobbs was not a suspect and referring to any allegations surrounding Hobbs as "ridiculous," all before the WM3 team had formally taken a position on the Habeas filing, and the new evidence therein. SF 181-82. The purpose of hiring the spokesperson was to get the word out that Hobbs was not involved in the Murders, that any DNA was at the crime scene by innocent transfer, and that the WM3 had been appropriately convicted and should remain in prison. SF 182.

The Echols defense team did issue the Press Release and held the Press Conference to further spread the word that the WM3 had not been forensically tied to the crime scene and to support the claim that the WM3 had been wrongfully convicted. SF 146, 152. At the Press Conference, Echols' attorneys and experts walked the public and the press through the evidence. SF 156-57, 164-70. The press published articles across the nation on Hobbs and the story, some directly quoting the Press Release, and most reiterating the evidence while linking it to Hobbs. SF 156-57, 164-70.

Following the Press Release and Press Conference, Hobbs' press campaign went into overdrive. Hobbs and his spokesperson, Ross Sampson, appeared on CNN's premiere nightly

news show, *Anderson Cooper 360*, where Hobbs pleaded for the nation's sympathy, and Sampson again gave an innocent explanation for the DNA.[17] SF 181-87. Hobbs' admitted goal was to get out his message that the DNA got to the crime scene innocently, Hobbs was not involved in the Murders and the WM3 are guilty. SF 182.

Hobbs is clearly a central figure in the public controversy surrounding the guilt or innocence of the WM3. SF 194-96. Hobbs has continuously and voluntarily injected his voice into the debate from the date of the WM3's 1993 arraignment to the present via press interviews, repeated television and movie appearances, sale of the rights to his life story and his constant work on, shopping of and sale of the contents of his book about the Events. SF 58-61, 63-64, 67-69, 72, 82, 96, 128-32, 171. He deliberately engaged investigators who were adverse to his point of view, and when confronted with unpublished evidence that he might be involved in the Murders, instead of hiding from the press or keeping quiet, Hobbs broadcast it himself through his familiar press channels. SF 90-95, 107, 113-15. He spoke broadly and often about those issues, casting the WM3 as the true killers, proclaiming his own innocence, spinning the DNA and knife evidence in a more positive light, hawking his book, interviewing with WM3 investigators and police, casting dispersions on family and friends and hawking his book. SF 171-96. Repeatedly he opined that he believed the WM3 were guilty and were "killer SOB's," and that the WM3's defense team were "crooked lawyers." SF 131. He openly discussed the impact the media attention had on his reputation. SF 176. He retained a spokesperson to try to further influence the outcome of the controversy and just three weeks prior to Pasdar's Letters, appeared on a nationally broadcast CNN news program to tell the nation how hard it was to be

---

[17] Hobbs even enlisted the help of his daughter, who appeared on *Larry King Live* to advance Hobbs' media message. SF 183-84.

him. SF 132, 171, 182, 185. As recently as August 2008, he was still proactively discussing the evidence in the case. SF 188.

> **(iii)** **Application of the law to the facts demonstrates Hobbs is a limited-purpose public figure under any standard as a matter of law**

Viewing the detailed facts surrounding Hobbs' injection of himself into this controversy, common sense dictates that Pasdar had to be able to reference Hobbs when issuing her statements. Any discussion in mid or late 2007 of the public controversy concerning the WM3 would have been incomplete without reference to Hobbs, the evidence regarding him and Echols' Habeas filing. SF 194-96, 217, 249, 251-57, 276. The Hobbs evidence supports the claim that the WM3 were not involved and that they may have been wrongfully convicted (which is exactly why the Echols defense team discussed Hobbs extensively in the Press Conference and Press Releases of November 2, 2007, and the reason newspaper, television and internet stories focused specifically upon Hobbs and the new DNA and circumstantial evidence throughout the second half of 2007 and beyond). SF 149, 156-63, 249-57. Forbidding a discussion of the Hobbs evidence would unjustly silence the debate, but forbidding a discussion of the Hobbs evidence under the actual malice standard *when Hobbs aggressively pursued the media in an attempt to convince the public the WM3 were guilty and to deflect suspicion away from him before there even was any suspicion of him* would completely capsize the First Amendment. SF 276.

Parsing the language of the various voluntary participation opinions, and putting Hobbs' actions under a microscope lead to the unavoidable conclusion that the actual malice standard must apply to Hobbs' claims. Under *Street*, of course, this Court should disregard the Sixth Circuit's public figure factor (1), voluntary participation, because it is impossible at this time to determine if Hobbs voluntarily injected himself into the controversy in the most fundamental

way – by committing the Murders. 645 F.2d at 1234. Hobbs' other actions, however, so clearly demonstrate voluntary injection, that even if the Court were to assess each of the factors under *Wilson* and *Street*, Hobbs has, as set forth above: (1) voluntarily participated in the controversy over whether the WM3 are guilty since their arraignment in 1993 (and enhanced his participation since early 2007); (2) demonstrated repeatedly that he has access to effective channels of communication to counteract false statements; and (3) played a prominent role in this controversy. Like the plaintiff in *Street*, Hobbs "clearly had access to the media and was able to broadcast" his view of the events" and "more importantly," he gave press interviews, aggressively promoted his version of the case, had effective access to the media and encouraged public interest in himself. 645 F.2d at 1234-35. As in *Trigg*, where the plaintiff was held to be a public figure, Hobbs was quoted extensively and supplied information to the newspapers. 720 S.W.2d at 73.

Hobbs' participation in the controversy has been voluntary in every sense of the word. Under *Southall*, Hobbs is a public figure; he reached out to the press on multiple occasions and thereby made himself prominent in the public debate over the guilt of the WM3. 964 S.W.2d at 192. Under the D.C. Circuit's landmark *Waldbaum* opinion, Hobbs is also a public figure: (1) the public controversy is whether the WM3 were wrongfully convicted; (2) Hobbs has voluntarily spoken out about the core questions in the controversy, the guilt or innocence of the WM3, and received substantial press coverage at his request; and (3) the alleged defamation, a discussion of the evidence suggesting the WM3 were in fact wrongfully convicted is particularly germane to Hobbs' participation in the controversy – specifically his attempts to convince the public and relevant authorities that the WM3 are properly in prison. *Waldbaum*, 627 F.2d at 1296-98. Under the Eighth Circuit's *IBP Confidential* public figure test which mandates a

review of the controversy and the nature and extent of Hobbs' involvement in the controversy, the result is the same. 797 F.2d at 645. Hobbs is necessarily at the center of the debate over the guilt or innocence of the WM3 through circumstance – his very DNA is literally in the middle of the crime scene – but also through his purposeful, longstanding injection of himself into the public forum to discuss the guilt of the WM3 before his possible involvement was even suggested or considered.

Hobbs' reliance on *Foretich* is misplaced, as its holding relates to a very narrow factual scenario that involves outlandish and direct accusations of sexual molestation in a jurisdiction that still recognizes a distinct cause of action for defamation *per se*. Yet, under *any* interpretation of *Foretich*, Hobbs is *still* a public figure. *Foretich* relies on a five part test to determine whether a defamation plaintiff is a public figure: (1) the plaintiff has effective access to channels of communication; (2) the plaintiff voluntarily assumed a role of special prominence in the public controversy; (3) the plaintiff sought to influence the resolution or outcome of the public controversy; (4) the controversy existed prior to the publication of the defamatory statement; and (5) the plaintiff retained public-figure status at the time of the alleged defamation. 37 F.3d at 1553. As discussed *supra*, Hobbs' extensive media access and the preexisting public controversy is well established in the record. SF 51-89, 107-15, 127-32, 171-87. Furthermore, the evidence is replete with examples of Hobbs' voluntary assumption of his prominent role through his repeated efforts to get out his story through the press, and Hobbs achieved this prominence months before Pasdar made any of her statements. SF 51-89, 107-15, 127-32, 171-87.

Under *Foretich*, Hobbs contends that his most recent media appearances (from 2007 to the present), were defensive in nature and therefore qualify him as a private figure under

*Foretich*'s defamation *per se* exception. *See* Hobbs MPSJ Public Figure at 15. Even if *Foretich*'s holding were as broad as Hobbs hopes and somehow applied under Tennessee or Arkansas law, Hobbs would *still* be a public figure because his injection into and participation in this controversy was not defensive. To the contrary, Hobbs fired several "first shots" in this WM3 debate which ended up focused on him. SF 107, 113-14. From his 1993 assertions that the WM3 were the killers, to his sale of his life story and book that argues the WM3 are the killers, through his 2007 encounters with the WM3 investigators, to his leaking of the DNA evidence to the press, Hobbs has actively sought to influence the resolution of the WM3 controversy. Not to put too fine a point on it, but Hobbs has wanted the public and government to know that since the WM3 are guilty and he is not, no further post-conviction analysis or investigation is necessary. SF 51-95, 107-15, 126-32. Hobbs even admitted in his deposition that one of the very reasons he brought this lawsuit was to "chill the rights of other people to advocate for the release of the West Memphis Three." SF 7. By actively seeking media attention on the issue of the guilt of the WM3 and continuing to engage on those issues before being accused of anything, Hobbs not only fired the first shot and therefore voluntarily participated, he has clearly undertaken extensive effort to influence the outcome of the debate.

Hobbs has used his media access to aggressively promote his version of the story in an attempt to keep the WM3 in prison, to portray himself as innocent and lay the ground work for sales of a book. In all, Hobbs and his spokesperson have been quoted in at least twenty-six (26) news articles, Hobbs has appeared and spoken on at least three (3) national television shows, one (1) movie, and he has sold the film rights to his life story, all of which addressed this highly public controversy. SF 53-62, 74-89, 107-15, 126-32, 171-82, 185-87. By frequently publishing his own views on the controversy, Hobbs has unquestionably exposed himself to even greater

media attention and invited comment. Hobbs willingly discussed the same topics as Pasdar well before the Letters and the Rally, and his attempts to portray himself now as a private citizen are unpersuasive. Hobbs is a willing public figure in the very controversy to which Pasdar spoke.

After all the legal research and analysis, after all the sifting through myriad facts involving Hobbs and the media, after reflection on the striking DNA evidence and the resulting very real possibility that Hobbs has voluntarily participated in this 16 year public controversy through his actions in murdering three little boys in Robin Hood Hills on May 5, 1993, Hobbs' *ex post facto* characterization of himself as the reluctant victim simply trying to defend himself against outrageous accusations rings hollow. Hobbs is a limited-purpose public figure.

### b.     Hobbs is an involuntary public figure as a matter of law

Should this Court somehow decide Hobbs is not a "voluntary limited-purpose public figure, the record contains clear and convincing evidence that, at the very least [Hobbs is] an involuntary limited-purpose public figure." *Atlanta Journal-Constitution v. Jewell*, 555 S.E.2d 175, 186 (Ga. Ct. App. 2002). The U.S. Supreme Court specifically recognized that "it may be possible for someone to become a public figure through no purposeful action of his own." *Gertz*, 418 U.S. at 345. Tennessee courts have followed *Gertz* in this regard: "Both the United States Supreme Court and the Tennessee Supreme Court have recognized that a person may become a public figure through no purposeful action of his or her own by being *drawn into* a particular public controversy." *Lewis*, 238 S.W.3d at 298 (citing *Gertz*, 418 U.S. at 345; *Press v. Verran*, 569 S.W.2d 435, 441 (Tenn. 1978)) (emphasis added). In *Lewis*, the defamation plaintiff was found to be a public figure through no voluntary action of his own because he was drawn into a public controversy regarding police misconduct. *Lewis*, 238 S.W.3d at 298. A television station reported that a police officer, the plaintiff's brother-in-law, intervened to keep the plaintiff from being arrested after a traffic stop revealed that the plaintiff had an illegal weapon, gambling slips

and a substantial amount of cash. *Lewis*, 238 S.W.2d at 278-79. The court held the plaintiff was a public figure because all of the facts regarding the plaintiff's traffic stop and the plaintiff's relationship to the police officer contained in a television news story were provided as necessary *context* for the public issue of whether the police officer engaged in misconduct. *Id.* at 299-300. The plaintiff was therefore a public figure, and the actual malice standard applied. *Id.* at 300.

Other jurisdictions have also recognized that an individual may become a public figure by being drawn into a public controversy. *Dameron v. Washingtonian Magazine*, 779 F.2d 736, 741 (D.C. Cir. 1985) (an air traffic controller was a public figure when after a plane crash, he became "embroiled, through no desire of his own, in the ensuing controversy over the causes of the accident); *Jewell*, 555 S.E.2d at 186 (Olympic security guard Richard Jewell who discovered bomb was held to be a public figure because he "became embroiled in the ensuing discussion and controversy over park safety and became well known on this one very limited connection"); *Daniel Goldreyer, LTD. v. Dow Jones*, 259 A.D.2d 353 (N.Y. App. Div. [1st Dept] 1999) (art restorer known only in the profession was an involuntary public figure regarding a controversy over questionable restoration techniques of a valuable painting at a museum); *Weigel v. Capital Times Co.*, 426 N.W.2d 43, 49-50 (Wisc. Ct. App. 1988) (large landowner was a public figure when he received threats and was the subject of publicity regarding a controversy over pollution in a lake).

Hobbs has been drawn into the middle of the public controversy over whether the WM3 were wrongfully convicted and is thereby a public figure. *Gertz*, 418 U.S. at 345. Because DNA consistent with Hobbs' DNA was found in the ligature of one of the victims (who was not his son), and because of the discovery of the plethora of other evidence against Hobbs (his friend's DNA at the crime scene, the knives, the admission that members of his family believe he is

involved, the laundry, etc.), Hobbs became "embroiled . . . in the ensuing controversy . . . . He thereby became well known to the public in this one very limited connection." *Dameron*, 779 F.2d at 741-42.

The facts regarding the discovery of the DNA and other evidence linked to Hobbs are necessary *context* for the public issues of whether the WM3 were wrongfully convicted. *See Lewis*, 238 S.W.3d at 299-300. Echols' attorney admitted as much at the Press Conference when he referred to the DNA results as a "powerful piece of circumstantial evidence . . . that would lead any reasonable juror to acquit Damien Echols." SF 158. It is impossible to intelligently discuss whether or not the WM3 were wrongfully convicted if discussion of the "powerful" Hobbs evidence is *verboten*. Indeed, the evidence linking Hobbs is some of the most persuasive evidence out there supporting the WM3's side of the public controversy. A ruling by this Court deeming Hobbs a private individual – required only to prove negligence – would have a decidedly chilling effect on commentary by a litigation-shy public despite the grave public concerns raised by the controversy.[18] Whether he likes it or not, Hobbs has been drawn into this controversy and is thereby an involuntary public figure.

### 3. There is no evidence Pasdar acted with actual malice or was negligent

Because Hobbs is a public figure and Pasdar spoke on an issue of public concern and/or controversy, the actual malice standard applies. Whether the evidence in the record is sufficient to support a finding of actual malice with convincing clarity is a question of law for the court to decide. *Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 570 (8th Cir. 2001); *Anderson*, 477 U.S. at 255-56. The record before the Court is devoid of *any* evidence (much less

---

[18] Hobbs does not actually contest that his DNA was found in the ligature binding one of the victims who was not his son – he just claims there is an innocent reason it was there. SF 131, 182, 309.

clear and convincing evidence) showing Pasdar acted with actual malice; rather, the record is replete with evidence that affirmatively negates any claim of actual malice.

Actual malice in a defamation suit requires actual knowledge of a statement's falsity or reckless disregard for whether the statement was true or false. *New York Times*, 376 U.S. at 280. In this case, Hobbs claims that Pasdar accused him of committing the Murders, and he must prove that she made that claim with actual malice. Yet, Hobbs admits that he has no knowledge of what Pasdar read, viewed or reviewed to put together the Letters and her remarks for the Rally. SF 260-61, 310. More pertinently, Hobbs has no evidence to support his theory that Pasdar acted with knowledge of a statement's falsity or with reckless disregard to whether the statements were true or false. SF 260-61, 310.

Hobbs has expressly acknowledged that everything Pasdar put in the Letters was not questionable, but rather, well established. SF 249-55, 296-97. He admits that the information Pasdar disclosed had been widely publicized earlier and was "nothing new." SF 249-55, 296-97. As a result, Hobbs has no evidence to suggest that Pasdar in any way acted with malice – as he admits, she was simply repeating allegations from credible sources – the newspapers, news conferences and press releases. SF 260-62, 310. Specifically, months before Pasdar's statements, Hobbs publicly disclosed to the world the same DNA evidence that Pasdar mentioned. SF 107-15. Newspaper articles similarly discussed the DNA as belonging to him, linked to him, or a match, and Hobbs cooperated with those reporters to give his side of the story. SF 107-22. In addition to the media coverage regarding the DNA and new evidence, the evidence was discussed at length in the Echols Habeas filing and supported by multiple expert reports from investigators that recovered the material for testing, the laboratory that ran the tests and expert analysis explaining the test results. SF 142-43, 306-09. The circumstantial evidence

of both the pocketknife and the washing of clothes had been communicated by Pam Hobbs and her sisters to private investigators, the WMPD, to Lorri Davis and to the press, and was then included as evidence in the Habeas Petition. SF 113, 125-27, 149, 295, 301, 306-09. This evidence was again discussed at length in the widely covered Press Conference. SF 151-70.

Pasdar relied heavily on the Summary (i.e., the Press Release), which she believed to have been prepared and/or approved by Echols' attorneys. SF 212-217, 295-304. This reliance demonstrates her lack of malice. The undisputed record further shows that Pasdar acted with great care and concern for the truth and accuracy of the statements she made. SF 197-227, 311-13. Pasdar wrote the heartfelt body of the Letters, expressing her opinion that the WM3 were not guilty, encouraging readers to do their own research on the case and issues, requesting the readers donate to the expensive WM3 cause and requesting readers write letters on behalf of the WM3. SF 246, 277, 289. After the body of the Letters, Pasdar added a post-script, which is in actuality nearly a "cut and paste" of the bullet point list of the latest evidence developed in the case contained in the Press Release and approved by Echols' attorneys. SF 148-49, 212-217 300-02. Pasdar tweaked a small bit of the language to make it more understandable to persons not familiar with the WM3 case, but she did not alter its meaning or truthfulness. SF 300. Even Hobbs admits that the post-script is essentially identical to the information contained in the Press Release, and was merely a regurgitation of the same information that had repeatedly been published by the press. SF 296-97, 302-04.

Pasdar repeatedly took precautions to make her statements as precise and accurate as possible. SF 197-227. She relied upon the Press Release for the post-script evidence summary, and the emails reflect that Pasdar cautiously refused to substantively change the wording of the Letters from what she had received from the Echols defense team. SF 212-217, 222-23. Pasdar

refused these changes because she understood that the language came from Echols' attorneys and that she did not want to destroy the accuracy of their description of the Habeas evidence by tampering with it. SF 212-217, 222-23. The Press Release was drafted by Alice Leeds, a publicist for the Echols' defense team, and its contents were in fact approved by attorneys Riordan, Horgan and Skahan prior to distribution. SF 146-47. Indeed, Pasdar's reliance on the credible source of the attorney-approved Press Release alone demonstrates a lack of actual malice. Like the defendant in *St. Amant*, Pasdar relied upon someone else's words – the Press Release approved by Echols' lawyers for factual accuracy – for the post-script evidence summary in her Letters and has thus demonstrated lack of actual malice. The record definitively establishes that Pasdar never doubted the truth of the Letters when she wrote and published them. SF 197-227; *St. Amant*, 390 U.S. at 730-32.

Pasdar had done her own due diligence on the issues as well. SF 197-207. She had watched the documentaries on the case and the evidence. SF 197. She spoke to Lorri Davis, a leading WM3 activist, on numerous occasions regarding the facts and the evidence. SF 198-208. She watched the Press Conference on the new evidence and Echols' Habeas filing. SF 204. She also watched the *Anderson Cooper 360* profile on the case, which interviewed Hobbs and his spokesman about the evidence, and she had seen other news reports regarding the case and the WM3. SF, 185-86, 205-07. She reviewed the Press Release which she believed was prepared and/or approved by Echols' lawyers and which mirrored everything Pasdar had discussed with Lorri Davis, seen in the Press Conference or seen on *Anderson Cooper 360* and other news reports. SF 185-86, 200-08. As such, in addition to possessing no subjective doubt as to the veracity of her statements, all the information Pasdar reviewed and relied upon bolstered the veracity of the Press Release, and her statements.

In sum, there are simply no facts before this Court that would suggest—much less prove by clear and convincing evidence—that Pasdar had any question about the accuracy of the statements she made in the Letters or at the Rally. The "daunting" standard of active malice has not been met in this case.

In the unlikely event the Court applies the negligence standard to this case, Pasdar's due diligence and the similarity of the Letters' language with the Press Release negates a finding of any sort of fault, negligence or otherwise. SF 197-227, 298-304. The reasonableness of relying on the Press Release is supported by the record, which contains at least two articles published when the Habeas Petition was filed that similarly quoted the Press Release almost verbatim, containing content nearly identical to Pasdar's post-script summary of evidence. SF 162. As someone who had actively followed the case and kept up with the new revelations through, among other things, her conversations with Lorri Davis and review of the Press Conference and the *Anderson Cooper 360* episode, there was also no reason for Pasdar to doubt the veracity of the Press Release, or the Letters. SF 146-49, 152-70, 185-86, 197-227, 298-300, 305, 308. A reasonably prudent person would not hesitate to rely on: information set forth by someone as knowledgeable about the case as Lorri Davis; a Press Release approved by defense attorneys regarding the contents of a motion those same attorneys filed; a Press Conference held by attorneys describing evidence in that motion they had filed, and statements made in a reputable, nationally televised news program. SF 142-49, 152-70, 185-86, 197-227, 298-300, 305, 308. Pasdar's words mirrored the wealth of information that had already been publicly written, spoken, filed in court or sworn to under oath about Hobbs from a wide range of reliable sources, including respected journalists, Echols' attorneys, Pam Hobbs, her sisters and even Hobbs himself. SF 116-27, 142-49, 152-70, 197-227, 298-300, 305, 308. Given the similarity of her

Letters with all the information gleaned from Davis, the Press Release, and other credible sources about the case, a reasonably prudent person in Pasdar's shoes would have considered the statements true and published those statements without concern for defaming anyone mentioned. SF 116-27, 142-49, 152-70, 185-86, 197-227, 298-300, 305, 308. As such, the record establishes Pasdar had no reason to doubt the veracity of the evidence in the Press Release or of any of her subsequent statements in the Letters. SF 116-27, 142-49, 152-70, 185-86, 197-227, 298-300, 305, 308.

The same undisputed facts regarding the writing of the Letters also negate any contention that Pasdar's speech at the Rally was negligent or delivered with actual malice. Pasdar's comments at the Rally concerned the same public controversy – the justness of the WM3 convictions. SF 228-40. Her one potential factual assertion at the Rally, that it had been scientifically proven that the WM3 were innocent, was based on her consideration of the many sources she had consulted: her conversations with Lorri Davis, the Press Release, the Press Conference, Alice Leeds' email, the documentaries, the *Anderson Cooper 360* episode and other news reports, all of which supported her assertion that the evidence did in fact exculpate the WM3. SF 116-27, 142-49, 152-70, 185-86, 197-227, 298-300, 305, 308. Even if Pasdar had actually spoken about Hobbs, which she clearly did not, Hobbs can point to no single piece of evidence suggesting Pasdar doubted or had any reason to doubt the veracity of her statements at the Rally. SF 260-62, 310-11.

Hobbs is a public figure, Pasdar's statements spoke to issues of public concern and/or controversy and Hobbs cannot show any evidence (much less clear and convincing evidence) that Pasdar acted with actual malice or with negligence. As a result, his defamation claims fail as a matter of law.

**C.      The statements in the Letters' post-script are substantially true as a matter of law**

Hobbs' defamation claim similarly fails because Pasdar's statements were true.   Under Arkansas and Tennessee law, truth is an absolute defense to claims for defamation.   *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999); *Pritchard v. Times Southwest Broad., Inc.*, 642 S.W.2d 877, 880 (Ark. 1983).   It is appropriate for a court to grant summary judgment or a directed verdict in a defamation case on the basis of truth.   *Ali v. Moore*, 984 S.W.2d 224, 229-30 (Tenn. Ct. App. 1998); *Stilts v. Globe Int'l, Inc.*, 950 F. Supp. 220, 223 (M.D. Tenn. 1995), *aff'd*, 91 F.3d 144 (6th Cir. 1995); *Pritchard*, 642 S.W.2d at 880; *Whiteside v. Russellville Newspapers, Inc.*, 08-313, 2009 WL 857516 (Ark. 03-12-2009).   To properly assert the defense of truth, it is not necessary prove the literal truth in every detail; rather, it is sufficient to show "the imputation is substantially true, or as it is often put, to justify the 'gist,' the 'sting,' or the substantial truth of the defamation."   *Ali*, 984 S.W.2d at 229 (quoting W. Prosser, *Handbook of the Law of Torts*, § 116, p.798 (4th Ed. 1971)); *Pritchard*, 642 S.W.2d at 880 (quoting Prosser, § 116, p.798-99).   For example, a statement that a sheriff shot a man, when in fact the sheriff had been acting in concert with a deputy who had shot the man has been held substantially true. *Pritchard*, 642 S.W.2d at 879.   A statement that a man was hit in the head with a pistol during a scuffle has been held substantially true whether or not the pistol actually came into contact with the man's head.   *Id.* at 880.   An accusation that a mayor wasted $80,000 of the town's money has been held substantially true even if the mayor only wasted $17,000.   *Id.*   The question of law which the court must resolve is whether the slander or libel as published would have a "different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991).

---

### 1. Hobbs admits Pasdar's post-script statements are not false

In the Letters, Pasdar only mentions Hobbs in the post-script evidence summary, which is a section she copied from the Press Release approved by the WM3 lawyers. SF 298-304. That post-script only purports to list evidence *to be presented in the federal hearing on Echols' Habeas Petition.* SF 222, 295, 301, 305. Hobbs admits that he does not know what evidence will be presented at the federal hearing. SF 306. Hobbs admits that the information Pasdar provides in the Letters is "nothing new," and that all that information had been repeatedly nationally publicized prior to inclusion in Pasdar's Letters. SF 296-97. Moreover, Hobbs admits that he is aware of the evidence Pasdar lists in the Letters. SF 309. For instance, Hobbs does not contest that his DNA was found at the crime scene or that the DNA of his friend was found at the crime scene. SF 309. Hobbs can present no evidence that the post-script statements are false, an essential element of his claim.

### 2. The post-script statements are true

An analysis of the truthfulness of the statements requires an identification of the specific statements about which Hobbs complains. As discussed above, Hobbs has admitted he does not believe the Letters accuse him of the Murders, so there is no need to parse the truth or falsity of whether Hobbs was actually involved in the Murders. SF 241. Hobbs has also admitted that the body of the Letters contain only Pasdar's encouragement that readers look at the evidence and form their own opinions, so those cannot be reviewed for defamation, nor are the Rally remarks statements of fact. *See supra* at II.A. The only other statements in the Letters (and in fact, the only statements in the Letters that refer to Hobbs) are contained in the post-script, where Pasdar recites the latest evidence in the case advanced by Echols in his Habeas filing – and they are true. SF 295, 301, 305-09.

On the most fundamental level, Pasdar post-script statements are true. SF 305. Pasdar writes: "The following is just some of the DNA and forensic evidence *that will be presented in the federal court hearing*," and then goes on to list eight bullet point summaries of evidence which will in fact be presented in the federal court hearing. SF 222, 301, 305. Echols' attorney, Riordan, has acknowledged that the evidence listed in Pasdar's Letters was in fact filed in support of Echols' Habeas filing and will, in fact, be presented at the federal Habeas hearing when it takes place. SF 145, 305-06. Thus, Pasdar's representations concerning the evidence to be presented at the federal hearing are literally true. SF 145, 301, 305-06.

Pasdar has proof that the statements are true and that the evidence she claims exists does exist. SF 308-09. Particularly, as set forth below, every piece of evidence cited by Pasdar in the post-script summary, including the evidence that relates directly to Hobbs, is presented and addressed in the Habeas Petition record, and much of it is independently proven up again by third parties in Pasdar's summary judgment evidence. SF 308. The record demonstrates:

- That the DNA evidence fails to link any of the "three boys" [WM3] to the crime scene.

- That DNA tests also show that a hair with DNA matching Hobbs, who is the stepfather of Stevie Branch, was found in the ligature of Michael Moore, one of the victims.

- That DNA tests also match a hair at the crime scene to a friend of Hobbs, David Jacoby, who was with him that day.

- That DNA test results show foreign DNA from someone other than Echols, Misskelley or Baldwin – on the penises of two of his victims.

- That some of the nation's leading forensic experts have stated that wounds on the victims' bodies were caused by animals at the crime scene – not by knives used by perpetrators.

- That Pam Hobbs, ex-wife of Terry Hobbs, found a pocketknife in Hobbs' drawer that her son, one of the victims, had carried with him at all times and that Pam Hobbs always assumed that her son's murderer had taken during the crime.

- That new information implicated Hobbs, including his own statements made to police in interviews where he acknowledged that several of his relatives suspect him in the crime, and Hobbs' activity in washing his clothes and sheets on the night of the crimes at odd hours for no reason other than to hide evidence from the crimes. With regard to the chronology, while it is true that the Habeas Petition does not include a "timeline," the Habeas Memo and its attached exhibits filed with the Court definitely contain a "chronology" even under Hobbs' definition – multiple accounts of Hobbs' actions and whereabouts at various points of time on the day and night of the Murders.

- That a sworn affidavit from Donna Medford, the mother of one of two girls who testified that they overheard Echols admit to the crime at a softball game, reflects that she now says that Echols' statement was not serious and that neither she nor her daughter believes he committed the crime.

SF 308. Hobbs can proffer no evidence to refute the truthfulness of the above statements.

Hobbs even admits that Pasdar's post-script statements are true. SF 309. Specifically, with regard to each fact contained in the "bullet points" of evidence, Hobbs has either admitted that he is aware of the existence of the evidence, or has stipulated that he does not complain of that evidence. SF 309. In essence, Hobbs does not complain in his deposition of Pasdar's post-script characterizations of the evidence she recites:

- Hobbs acknowledges that the fact that the DNA tests show the hair belonging to him was found in the ligature of one of the victims is contained in the Habeas filings (and therefore will be presented in the federal hearing).

- He admits that the filing made in October included DNA evidence that did not link any of the three boys to the crime scene.

- He admits that the prosecution claimed that Echols sodomized one of the boys.

- He admits that none of Echols' DNA was found on any of the boys.

- He is unaware whether DNA test results show foreign DNA from someone other than Echols, Misskelley, or Baldwin on the penises of two of the victims, but does not complain of this bullet point.

- He admits that he was with Jacoby on May 5, 1993 – the night of the Murders.

- He admits that test results reflect that David Jacoby's DNA was at the crime scene.

- He admits some of the nation's leading forensic experts say the wounds on the victim's bodies were caused by animals at the crime scene, not by knives used by the perpetrators.

- He does not dispute that he has possession of Stevie's knife or that the knife evidence was included with the Habeas filings.

- He admits that his relatives suspect him in the crime, and admits that he told the WMPD that his relatives suspect him in the crime (and understands that evidence was part of the Habeas filing).

- He admits that a chronology is a timeline of events, and a review of the Habeas reflects that a chronological account of his actions is included in the filing.

- He is unaware whether the mother of one of the two girls who testified that they had overheard Echols admit to the crime now says that the statement was not serious, but he does not complain about that allegation at any rate.

SF 309.

To the extent the description of evidence in the post-script summary differs from the detailed evidence in the Habeas Petition or the news reports, Press Release or Press Conference summarizing that evidence, the gist or sting of Pasdar's descriptions are "similar enough" that they provide no different effect on the mind of the reader from that which the pleaded truth would have produced. SF 301-02, 308-09.

Pasdar's summary stated that a hair "belonging to Hobbs" was found in one of the ligatures. SF 301. Whether or not a scientist would use the term "match," "belonging to," "linking" or "not excluding" does not substantially differ in the mind of a person of ordinary intelligence from the literal truth, which is that only 1.5% of the population could be a match and Hobbs falls within that miniscule percentage. In fact, Hobbs devotes substantial time to the technical differences between the terms and their meaning in his motion for summary judgment, yet it was Hobbs who first publicly asserted to the press that the DNA was in fact *his*. Hobbs MPSJ Fair Report at 7-10; SF 107-09, 111-15, 186. The media reports following Hobbs' leak of this information, and even WMPD Police Chief Mike Allen, subsequently asserted that the DNA

was Hobbs'. SF 116-18. Furthermore, the synonymous references to the DNA as matching, linking, belonging to and not excluding Hobbs by the press, the WMPD, Sampson and Hobbs himself illustrate the substantial truth of any of those assertions: laypersons, seasoned journalists and police officers alike simply did not attach any significant difference to the meaning of those words where more than 98.5% of the population had been excluded as a potential donor, and a wealth of other corroborating evidence suggested Hobbs was the donor (whether he was innocent or not). SF 96-97, 107-09, 111-18, 119-22, 157. Thus, under the substantial truth standard, Pasdar's reference to the DNA evidence was substantially correct.

Furthermore, even if Pasdar's characterization of the DNA evidence were ultimately proven false, it does not change the overall gist or sting of the Letter or in any way accuse Hobbs of Murder. Again, in Hobbs' own public statements, which have been reaffirmed by both the WMPD and the Echols defense team, Hobbs' hair could have arrived at the crime scene through innocent transfer. SF 117-18, 131, 173, 182. As such, any assertion that a hair "matching" his or "belonging" to him was found at the crime scene is not an assertion that Hobbs committed the Murders but only that his hair – along with the exculpatory foreign allele – was found at the crime scene. Furthermore, a person of ordinary intelligence would read this bullet point and through the use of common sense, conclude that "it makes sense" that Hobbs' hair was found at the crime scene of his step-son's murder through innocent transfer, as the two lived under the same roof. SF 173.

Hobbs also denies that he did laundry near the time of the murders. SF 309. Hobbs' denial of this fact, however, is immaterial to the resolution of this case. Jo Lynn McCaughey has accused Hobbs of doing laundry at odd hours near the time of murders and stated under oath that she believes he was somehow involved in the Murders. SF 308-09, 321. Hobbs has admitted

that this evidence from McCaughey was in fact in Echols' Habeas filing, and that Pasdar's description of the Habeas Evidence was accurate. SF 246, 309. By virtue of these admissions and a plain reading of Pasdar's Letters that "the following" bullet points were "evidence that will be presented in the federal hearing," the undisputed record before this Court clearly shows that this statement was literally true whether or not Hobbs actually did laundry as McCaughey has confirmed to this Court under penalty of perjury. SF 145, 246, 308-09.

In sum, after (a) Hobbs' admissions in his deposition of the accuracy of Pasdar's statements; (b) a comparison of Pasdar's statements with the evidence filed with the Habeas Petition, the news reports on the evidence and the descriptions of the evidence in the Press Release and the Press Conference; (c) a review of Pasdar's summary judgment evidence independently "proving up" the evidence Pasdar cites; and (d) the testimony of Echols' lawyer that Pasdar's recitation of the evidence to be presented at the federal court hearing is, in fact, the evidence to be presented at the federal court hearing, there can be no doubt that Hobbs has failed to establish Pasdar made any false statement, and Pasdar has fully established the truth of her statements.

**D.  Pasdar's post-script statements concerning Hobbs are protected speech under the fair report privilege as a matter of law**

   **1.  The post-script was a fair and accurate report on an official proceeding as a matter of law**

Pasdar's statements are also protected by the fair report privilege. In the few reported cases applying the fair report privilege, Arkansas courts have generally followed the definition in the RESTATEMENT (SECOND) OF TORTS § 611:

> The publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgment of the occurrence reported.

*Butler v. Hearst-Argyle Television*, 49 S.W.3d 116, 119 (Ark. 2001). Tennessee's fair report privilege also "mirrors the scope of the privilege found in the RESTATEMENT" and protects reports of public proceedings or official actions of government that have been made public. *Lewis v. Newschannel 5 Network, L.P.*, 238 S.W.3d 270, 285 (Tenn. App. 2007).

Though frequently invoked by major media outlets, the application of the fair report privilege is not limited to mainstream media but rather "extends to any person who makes a report on an official proceeding available to the general public." *See* RESTATEMENT (SECOND) TORTS § 611, cmt. *c; see also Wilson v. Slatalla*, 970 F. Supp. 405, 418, n.3 (E.D. Pa. 1997) (applying the privilege under Comment (c) to authors of a non-fiction book despite the fact that it was "unclear whether defendants [were] members of the press" because the authors disseminated the information to the public); *Kurczaba v. Pollack*, 742 N.E.2d 425, 442 (Ill. App. Ct. 2000) ("the privilege is not limited to the media") (citing RESTATEMENT (SECOND) TORTS § 611, cmt. *c*). The fact that Pasdar issued her statements in the Letter or at a Rally rather than in a recognized newspaper does not affect the application of the privilege. Rather, the privilege protects Pasdar because her report was available to the general public through the Dixiechicks.com website.

Tennessee has held that the fair report privilege extends not only to activities held in open court such as hearings and trials but also to the "mere contents of pleadings filed in court though no judicial actions ha[d] been taken."[19] *Stem v. Gannett Satellite Information Network, Inc.*, 866 F. Supp. 355, 358 (W.D. Tenn. 1994) (holding affidavit filed in court was part of an official

---

[19] Comment (e) to RESTATEMENT suggests that initial complaints or petitions standing alone do not invoke the privilege, but that policy exists "to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action." RESTATEMENT (SECOND) OF TORTS § 611, cmt *e* (1977). In ongoing proceedings, such as the WM3's protracted efforts to obtain post-conviction relief based upon their Constitutional rights, these concerns are simply not present.

proceeding, even though plaintiff was not a party to that proceeding) (quoting *Langford v. Vanderbilt Univ.*, 287 S.W.2d 32, 37 (Tenn. 1956)). Arkansas case law is limited on the issue of what constitutes an official proceeding, only recently addressing it when the privilege was applied to witness statements taken by police. *Whiteside v. Russellville Newspapers, Inc.*, No. 08-313, 2009 WL 857516 (Ark. March 12, 2009). But most other jurisdictions have held that "official proceedings" are not limited to activities occurring in open court. *Solaia Tech v. Specialty Publ'g Co.*, 852 N.E.2d 825, 844 (Ill. 2006) ("there is no judicial-action limitation on the fair report privilege in Illinois"); *Sahara Gaming v. Culinary Workers*, 984 P.2d 164, 168 (Nev. 1999) (holding there is no judicial-action limitation under the fair report privilege); *First Lehigh Bank v. Cowen*, 700 A.2d 498, 502 (Pa. Super. Ct. 1997) ("The fair report privilege extends to court pleadings, such as a complaint"); *Mark v. King Broad. Co.*, 618 P.2d 512, 515 (Wash. Ct. App. 1980) ("The privilege attaches to pleadings which have been filed in court and is not contingent on judicial action being taken"). Jurisdictions that apply the privilege even to initial complaints and petitions cite the public nature of all court filings and the public's interest in the judicial system. *See, e.g., Solaia Tech*, 852 N.E.2d at 844.

For a report to be "accurate and complete" as required by the privilege, "it is enough that it conveys a substantially correct account of the proceedings. Furthermore, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression." *Butler*, 49 S.W.3d at 120 (citing RESTATEMENT (SECOND) OF TORTS § 611, cmt. *f* (1977)); *Smith v. Reed*, 944 S.W.2d 623, 625 (Tenn. Ct. App. 1996) ("The report does not have to be a verbatim, technically accurate account in every detail so long as it gives a 'correct and just impression.'"). Arkansas courts have also applied the "substantial truth" doctrine to the fair report privilege, wherein only the

"gist or the 'sting' of an official action or proceeding must be accurately conveyed" to entitle the reporter to the privilege. *Butler*, 49 S.W.3d at 120; *KARK-TV v. Simon*, 656 S.W.2d 702, 704 (Ark. 1983).[20]

The focus of Pasdar's statements—the WM3 trials and their efforts to obtain post-conviction relief—are clearly official proceedings, no matter how her report is characterized. SF 133-44. Though the body of her Letters and her remarks at the Rally are not statements of fact or unbiased reports entitled to protection, the Letters' post-script is a fair report under the RESTATEMENT. In his motion for summary judgment, Hobbs simplistically and incorrectly asserts that Pasdar's report is a report on the filing of Echols' Habeas petition and that the filing is an initial complaint under Comment (e). *See* Hobbs MPSJ Fair Report at 4; RESTATEMENT (SECOND) OF TORTS § 611, cmt *e* (1977). But of course, Pasdar's post-script is not merely a report on the filing of Echols' Habeas Petition (or the specific language included in the Habeas petition *per se*), much less on a "preliminary pleading," but rather the post-script reports on the *latest developments in the case* of the WM3 and Damien Echols (which were summarized in the Habeas petition).

There cannot be any doubt that the ongoing legal battles to obtain post-conviction relief, on which Pasdar reported, are official proceedings. SF 133-44. The discovery and introduction of the latest evidence was the product of prolonged cooperation between defense attorneys, prosecutors and judges in Echols' case regarding, among other things, procedures for obtaining new DNA testing under Arkansas law. SF 133-44. The DNA testing alone required several

---

[20] This is the same legal standard applied to the affirmative defense of truth, but the point of reference is different under the fair report privilege. *See Pritchard v. Times Southwest Broadcasting, Inc.*, 642 S.W.2d 877 (Ark. 1982). With the fair report privilege, the gist or sting of the report is compared to the content of the official proceeding, regardless of whether the statement itself is actually true, while the affirmative defense of truth compares the gist or sting of the statement to the actual truth of the underlying facts. *See* RESTATEMENT (SECOND) TORTS § 611 (1977).

motions to be filed in multiple courts to allow Echols time to test evidence without forsaking his right to pursue other post-conviction remedies. SF 133-44. Simply put, many official actions had already been conducted by Arkansas officials pursuant to Echols' murder case regarding the new evidence which supports his claim for relief in the overall case.

Further, the various other filings, responses and orders in Echols' case, including his three separate Habeas Petitions, are continuations of the state-initiated legal proceeding of Echols' murder case. SF 133-44. Each of these publicly available filings centers on the facts, legal issues and evidence related to the Murders, so it is appropriate to consider all such actions as part of an ongoing official proceeding – the government's quest to keep the WM3 in prison – open to the public. SF 133-44. This official proceeding is also open to the public – the trials were held publically, the post-conviction filings have been filed publically, and the Habeas hearing will be a public hearing. SF 271. The matters that have been and are to be taken up in the proceeding (the guilt or innocence of the WM3 and the propriety of the underlying trials, the existence of new evidence that exonerates the WM3 and may implicate other suspects) are public for the very reason that they are issues of public concern for the reasons set forth *supra* at II.B.1. The discussion of the actual malice/public figure standard is equally applicable here. At a very minimum, the Habeas *hearing*, which will occur to determine the outcome of the Habeas Petition and which will cover the issues listed in the post-script, is an official proceeding. Pasdar's post-script was an update on all of these official proceedings. SF 302-03, 305.

Even if this Court were to construe Pasdar's post-script as narrowly as Hobbs suggests (Pasdar is reporting on the Habeas filing and a pleading is not an official proceeding), the Habeas Petition is not a "preliminary pleading," but rather a review of the state-initiated murder conviction. RESTATEMENT (SECOND) OF TORTS § 611, cmt *e* (1977); SF 133-44. Furthermore, in

most jurisdictions (Arkansas has not decided), Pasdar enjoys protection even for reporting on an initial pleading. *Langford*, 287 S.W.2d at 37; *Solaia Tech.*, 852 N.E.2d at 844; *Butler*, 49 S.W.3d at 122 (Ark. 2001) (Arkansas has not determined the issue).

Pasdar's account of what was occurring in the official proceeding was also, as required by the RESTATEMENT, accurate and complete, and at a minimum, is a fair abridgement of the evidence. SF 305. As discussed above, the accuracy of the statements are proven by the similarity between Pasdar's summary and the Habeas Petition, the news reports on the evidence, the Press Conference and the Press Release. SF 301-02. The Press Release itself provided a fair abridgment of the important points of evidence recently introduced in the case. SF 146-49. By extension, therefore, Pasdar's post-script evidence summary, which relied heavily on that Press Release as Hobbs acknowledged, was a fair and accurate abridgment of the new evidence introduced. SF 150, 301-02. In sum, the shared gist and sting of Pasdar's post-script, the news reports, the Habeas Petition, the Press Release and the Press Conference was that newly acquired DNA, forensic and circumstantial evidence showed that there was no forensic evidence tying the WM3 to the Murders, but the same could not be said for Hobbs. SF 241-42, 249. In reporting the evidence in the same manner as others, Pasdar fairly and accurately presented to her readers the latest developments in the case: the new evidence. SF 302, 305-06.

Hobbs argues that Pasdar's omission of certain points of evidence in the lengthy Habeas Petition makes her report inaccurate. Hobbs MPSJ Fair Report at 5-6, 11; SF 140, 143. None of these "omissions" cited by Hobbs create an erroneous impression on the reader regarding the new evidence in the case, as these "omissions" were either insignificant portions of the Habeas Petition or evidence that was already presented in the previously filed Habeas Petitions in 2004 and 2005, and thus were not *new* evidence in the case. Hobbs MPSJ Fair Report at 5-6, 11; SF

140. 143.  Furthermore, his belief that Pasdar should have included *all* exculpatory evidence regarding him is immaterial in determining whether she accurately reported on the *Echols case* and ignores the fact that she did in fact include evidence exculpating Hobbs.  *See generally* Hobbs MPSJ Fair Report; SF 162, 301, 308-09.

Because the facts that Pasdar presented are verifiably true, Pasdar's report is accurate and complete.  SF 307.  Every evidentiary bullet point in the Letters' post-script is supported by evidence in the Habeas Petition, and much of it has been confirmed by third parties.  SF 308.  A true report is necessarily an accurate one.  Additionally, the fact that Pasdar presented at least one piece of evidence that actually exculpated Hobbs (the foreign allele) and presented other evidence that did not concern Hobbs at all further demonstrates the accuracy and completeness of Pasdar's report.  SF 162, 301, 308-09.

### 2.    Hobbs cannot prove actual malice or negligence with regard to the accuracy of Pasdar's report as a matter of law

Under Tennessee law, the fair report privilege may only be defeated by proof that the defendant acted with actual malice regarding the accuracy of the report.  *Stem*, 866 F. Supp at 360 (citing *Langford*, 287 S.W.2d at 36-37).  In Arkansas, the privilege is lost if the reporter does not exercise the degree of care that "a reasonably careful person would exercise under circumstances similar to those shown by the evidence." *KARK-TV*, 656 S.W.2d at 704 (Ark. 1983); *Butler*, 49 S.W.3d at 120-21 (citing RESTATEMENT (SECOND) OF TORTS § 611, cmt. *b*).  Thus, the Arkansas standard is ordinary negligence.  *KARK-TV*, 656 S.W.2d at 704.  In other words, in Arkansas, the fair report privilege is only lost when the publisher fails to do what is reasonably necessary to insure that the report is accurate and complete or a fair abridgment of the proceeding. *Butler*, 49 S.W.3d at 121.

As discussed *supra* at II.B.3., there is no evidence of actual malice on the part of Pasdar, nor is there any evidence before the Court that Pasdar acted in any way other than the way a reasonably (in fact, extremely) careful person would act in reporting on the new evidence. SF 311-13. In his motion for summary judgment regarding the fair report privilege, Hobbs erroneously fixates on Pasdar's admission that she did not read Echols' 200-page Habeas filing as dispositive of her negligence. Hobbs MPSJ Fair Report at 3. Hobbs' position overstates the ordinary negligence standard of care under Arkansas' fair report doctrine. The Habeas Petition was but one source of public information regarding the new evidence in the Echols case. SF 216-17. As discussed in detail above, the same evidence was presented to Pasdar and the worldwide press through the Press Release and the Press Conference within days of the filing. SF 217.

In fact, Echols' attorneys called the Press Conference specifically in response to the hundreds of interview requests submitted by the press about the filing. SF 151-52. The plethora of articles citing, quoting and relying upon the Press Conference and Press Release published shortly after the filing indicates that even seasoned reporters did not scrutinize the 200-page Habeas filing before writing their stories but instead relied upon those condensed summaries – the Press Release and Press Conference – to glean important highlights from the massive, highly technical Habeas filing. SF 164-70. While journalism industry standards do not provide the standard of care under the fair report privilege, they do illustrate that relying upon the Press Release and Press Conference without reading the Habeas Petition was sufficiently cautious to insure a description of the evidence was accurate and a fair abridgment. *KARK-TV*, 656 S.W.2d at 704. As such, Pasdar's post-script evidence summary is protected by the fair report privilege.

**E.    Hobbs' claims related to the Rally are barred by Tennessee's statute of limitations as a matter of law**

Although statutes of limitations are generally procedural, under Arkansas choice of law determinations, the law of the forum does not automatically apply to every procedural issue. *Ganey v. Kawasaki Motors*, 234 S.W.3d 838, 846 (Ark. 2006) (citing *Gomez v. ITT Educ. Servs*, 71 S.W.2d 542, 545 (2002)). Arkansas courts have explicitly held statute of limitations to be substantive in situations where the time limitations are set out in a statute creating a separate right, and more generally have held that "there is no merit to the . . . claim that Arkansas law automatically applies to an issue involving the applicable statute of limitations." *Ganey*, S.W.3d at 847.

Hobbs may argue that despite the more significant relationship of Tennessee law to the case, Arkansas law should apply because Pasdar came to Little Rock to speak at a Rally and made claims that are the subject of the case. Indeed, this is the only real contact Arkansas has with the facts of this case (as opposed to the WM3 case). Under the RESTATEMENT, forums are not to apply their own statute of limitations if the claim would be barred by the statute of limitations of a state having a more significant relationship to the parties and the occurrence. RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 242 (1988); *see also Ganey*, 234 S.W.3d at 847 (applying Louisiana's outcome-determinative statute of limitations because the plaintiff was a Louisiana citizen, the alleged harm occurred in Louisiana, and Louisiana therefore had a more significant relationship to the case).

As discussed above, Tennessee law applies in this case, and Tennessee has a six-month statute of limitations for slander with no discovery rule. *Quality Auto Parts Co.*, 876 S.W.2d at 820. While Hobbs has not separately claimed libel and slander, they are distinct causes of action, and Hobbs' claims regarding Pasdar's oral statements at the Rally may only be

maintained under a slander cause of action. *Id.* Hobbs filed suit on November 25, 2008, more than six months after Pasdar's December 19, 2007 comments at the Rally. As such, any claims he makes with regard to the Rally are barred under Tennessee's statute of limitations.

**III.**

<u>HOBBS' FALSE LIGHT INVASION OF PRIVACY CLAIM FAILS AS A MATTER OF LAW</u>

Tennessee and Arkansas follow the RESTATEMENT (SECOND) OF TORTS in a false light claim, a subset of an invasion of privacy cause of action. A plaintiff must show that: (1) one invades the privacy of another by placing the other in a false light before the public and causing harm to that person; (2) the false light he was placed in would be highly offensive to a reasonable person; and (3) the defendant had knowledge of or acted with reckless disregard as to the falsity of the publicized matter and the false light in which the plaintiff was placed. RESTATEMENT (SECOND) OF TORTS §§ 652A, 652E (1977); *West v. Media Gen. Convergence*, 53 S.W.3d 640, 644 (Tenn. 2001); *Dodrill v. Arkansas Democrat Co.*, 590 S.W.2d 840, 844-45 (Ark. 1979), *cert. denied*, 444 U.S. 1076 (1980). As in defamation law, this fault element is referred to as actual malice, and is identical to the *New York Times v. Sullivan* standard. *Dodrill*, 590 S.W.2d at 845 (citing *Time v. Hill*, 385 U.S. 374, 386-91 (1967)). To show actual malice under a false light claim, "the evidence must support the conclusion that the publisher had serious doubts about the truth of his publication." *Addington v. Wal-Mart Stores, Inc.*, 105 S.W.3d 369, 377 (Ark. Ct. App. 2003) (citing Howard W. Brill, *Arkansas Law of Damages* § 33-11 at 671 (4th ed. 2002)).

Defamation and false light claims, however, have an important distinction. For purposes of false light claims, where the publication is a matter of general or public concern, the plaintiff must prove fault or actual malice by clear and convincing evidence *regardless of whether the plaintiff is a public figure. Addington*, 105 S.W.3d at 377; *West*, 53 S.W.3d at 647. In practice, because the Letters relate to a matter of general or public concern, as set forth fully *supra* at

II.B.1, Hobbs must prove by clear and convincing evidence that Pasdar published her statements with actual malice under the *New York Times v. Sullivan* standard to recover on his false light claim. *Harte-Hanks Comm. v. Connaughton*, 491 U.S. 657, 688; *Dodrill*, 590 S.W.2d at 845 (citing *Time v. Hill*, 385 U.S. 374, 386-91 (1967)).

The alleged conduct which forms the basis of Hobbs' defamation claims also forms the basis of Hobbs' claim for false light portrayal. SF 3-6. However, as set forth in detail, *supra* at II.B.3, Hobbs can present no evidence (much less clear and convincing evidence) that Pasdar acted with actual malice. Moreover, Hobbs' admission that Pasdar did not actually accuse him of the Murders also defeats his false light claim. SF 241-42. Through the admission, Hobbs proves he has not been portrayed in a false light. Because Pasdar has negated two essential elements of Hobbs' claim for false light portrayal – portrayal in a false light and actual malice – his false light claim fails as a matter of law.

## IV.
## HOBBS' OUTRAGE CLAIM FAILS AS A MATTER OF LAW

Under both Tennessee or Arkansas law, to recover for the tort of outrage, also known as intentional infliction of emotional distress, a plaintiff must show: (1) the defendant either intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of her actions; (2) the defendant's conduct was so extreme and outrageous that it was beyond all bounds of human decency to the point where such conduct is not tolerated by civilized society; and (3) the defendant's conduct resulted in severe emotional distress or mental injury to the plaintiff. *Doe 1 v. Roman Catholic Diocese*, 154 S.W.3d 22, 39 (Tenn. 2005); *Addington*, 105 S.W.3d at 375 (Ark. Ct. App. 2003). Both states take a very narrow view of what constitutes extreme and outrageous conduct. *Medlin v. Allied Inv. Co.*, 398 S.W.2d 270, 274 (Tenn. 1966); *Faulkner v. Ark. Children's Hosp.*, 69 S.W.3d 393, 403-404 (Ark. 2002). The

tort of outrage "is not easily established and requires clear cut proof; merely describing the conduct as outrageous does not make it so." *Ross v. Patterson*, 817 S.W.3d 418, 420 (Ark. 1991). Additionally, courts have required proof of serious emotional injury in order for the plaintiff to avoid summary judgment. *Oates v. Chattanooga Publ'g Co.*, 205 S.W.3d 418, 428 (Tenn. Ct. App. 2006).

The same conduct which forms the basis of Hobbs' defamation claims also forms the basis of Hobbs' claim for outrage. SF 3-4. Yet, Hobbs cannot present a genuine issue of material fact on any of the elements of his claim for outrage. First, there is simply no evidence of intent on the part of Pasdar to inflict emotional distress or any indication that Pasdar knew or should have know that her actions would cause emotional distress to Hobbs. As set forth in Pasdar's Statement of Facts and briefed fully *supra* at II.A., Pasdar, as Hobbs admits, was making a plea for the support of the WM3, as she has the right to do as an American citizen. SF 242, 277, 245-48. She did not accuse of Hobbs of the Murders. SF 241, 277-80, 284, 304. When she spoke of Hobbs at all, she merely recited basic, undisputed, accurate facts previously published by newspapers and television stations across the country months before. SF 295-97, 300-04, 308-09. She could not have and did not have knowledge that the reiteration of facts of which Hobbs was fully aware and that had been so widely publicized could cause him extreme emotional distress. SF 105-27, 296-97.

Pasdar's conduct does not qualify as extreme and outrageous under either Tennessee or Arkansas precedent. The mere fact that countless news reporting and media outlets had published the same facts regarding Hobbs demonstrates that nothing Pasdar said or did was so outrageous as to be "utterly intolerable in civilized society." SF 105-27, 296-97. Public discussion about the WM3 by politicians, activists, journalists, private citizens, celebrities and

internet bloggers was ongoing long before Pasdar wrote the Letters or spoke at the Rally. SF 45-50. The sort of extreme and outrageous conduct which will support a claim for outrage is not present here. Pasdar's actions simply do not rise to the level required by law.

Additionally, Hobbs admits he has not suffered severe emotional distress as a result of Pasdar's actions. Hobbs admits that he has had two "breakdowns" prior to Pasdar's statements SF 71, 181, 316. More to the point, he admits that he cannot separate any damage he has suffered as a result of Pasdar's statements from the damage he has suffered over the past sixteen (16) years as a result of the Murders, the trials of the WM3, the efforts to obtain post-conviction relief for the WM3, his interactions with the WM3 defense team and investigators and/or his interactions with the newspapers and press. SF 314-22. Without proof of severe emotional distress *caused by Pasdar's actions*, there can be no tort of outrage.

Pasdar has negated each of the elements of a claim for outrage as a matter of law and Hobbs' claim should be dismissed.

## V.
## HOBBS' CLAIMS ALL FAIL BECAUSE HE HAS NOT BEEN DAMAGED AS A MATTER OF LAW

Finally, each of Hobbs' claims fail because Hobbs cannot raise a genuine issue of material fact on the issue of damage caused by Pasdar's conduct. Neither Tennessee nor Arkansas recognize presumed damages or defamation *per se* claims, so a defamation plaintiff must prove actual damages. *Memphis Publ'g Co. v. Nichols*, 569 S.W.2d 412, 418-19 (Tenn. 1978); *United Ins. Co. of Am. v. Murphy*, 961 S.W.2d at 756. "In order for liability to attach, there must be evidence that demonstrates a causal connection between defamatory statements made by [defendants] and the injury to [plaintiffs'] reputations." *Northport Health Servs., Inc. v. Owens*, 107 S.W.3d 889, 892 (Ark. Ct. App. 2003) (citing *Ellis v. Price*, 990 S.W.2d 543 (Ark.

1999)). Similarly, outrage claims require a plaintiff to show that the defendant was the cause of plaintiff's distress. *Addington*, S.W.3d at 375; *Doe 1*, 154 S.W.3d at 39.

No causal connection exists between Pasdar's statements and Hobbs' alleged injury. At the time Pasdar posted her Letters and delivered her Rally remarks, the information contained in her statements, which related to Hobbs had already been: introduced by Echols' attorneys in the publicly filed Habeas Petition (SF 142-45), distributed to and publicized by media outlets around the world and by the defense team's Press Release (SF 146-50); discussed in detail by the Echols attorneys and experts at the Press Conference (SF 151-63); widely reported and broadcast by media outlets around the world for months (SF 116-21, 164-70, 268); debated at length on numerous blogs and websites (SF 170, 268); and publicly addressed by Pam Hobbs, her family (SF 123, 125), and most importantly, Hobbs himself (SF 104-05, 107-15, 126-32, 171-74, 177-78, 181-87, 192-93).

Hobbs admits that in this scenario, where the statement he complains of had been made countless times before and distributed across the nation many months before any of the conduct made the basis of the Complaint, he cannot come forward with any evidence to demonstrate that any of his alleged harm is attributable to Pasdar's statements. SF 322, 325. Hobbs has admitted that any emotional distress he has suffered from the facts made the basis of this suit cannot be separated from the emotional distress he has suffered from the Murders, the trials, the appeals, his interactions with the WM3 defense team and investigators and/or his interactions with the newspapers and press. SF 326.

Hobbs also admits that he cannot demonstrate harm to his reputation as a result of Pasdar's statements. SF 322, 325-26. Hobbs' horrific reputation related to his other past actions and criminal history negates his claim for reputational harm. Tennessee law explicitly provides

that a notorious person without a good name may not recover for injury to reputation under the "libel-proof doctrine." *Davis v. Tennessean*, 83 S.W.3d 125, 130-31 (Tenn. Ct. App. 2001). "To suffer injury to one's standing in the community or damage to one's public reputation, one must possess good standing and reputation for good character in the first place." *Id.* at 130. While Arkansas courts have not adopted an explicit "libel-proof" doctrine, the preclusion of presumed damages and requirement of a causal connection between a statement and reputational harm inherently presumes that a plaintiff's reputation in the community must be capable of being harmed. *United Ins. Co. of Am. v. Murphy*, 961 S.W.2d at 755-56.

As the record shows, Hobbs has a long history of violence, allegations of child abuse (as a victim and perpetrator), drug use and dishonesty. SF 315, 321. He has a criminal record and a lengthy criminal file in Shelby County, Tennessee. SF 314-15, 321. Even more to the point, Hobbs admits that prior to Pasdar's statements his reputation was "a pretty screwed up one." SF 314. Prior to Pasdar's statements Hobbs: was accused and charged with molesting his next door neighbor; arrested for drug possession; accused of molesting his daughter when she was four years old and then again when she was eight years old and yet again as a teenager; filed for bankruptcy; had warrants issued for his arrest; shot his unarmed brother-in-law with a hollow-point .357 bullet; was given probation and sent to the workhouse; was nationally connected to the murder of his step-son and two other eight-year-old boys through DNA results and the testimony others including members of Stevie's family and accused of admitting that he found the bodies of the murdered eight-year-old boys before the police did. SF 181, 315, 321. When asked how his reputation could get any worse, Hobbs can only respond "Well, it would get better if people would quit jumping on the bandwagon." SF 357. Simply put, his reputation within his community was not capable of being harmed by the statements Pasdar made.

Even Hobbs does not blame Pasdar for his alleged injuries; Hobbs' public complaints about reputational harm from the DNA and other evidence either predate Pasdar's statements or place the blame elsewhere. SF 322. Hobbs explicitly referred to his bad reputation in the community during his nationally televised *Anderson Cooper 360* interview on November 7, 2007, three weeks before Pasdar's statements. SF 177, 185-86. His subsequent claim of reputational harm in February 2008 targeted the Echols defense team, not Pasdar, as a source of his bad reputation. SF 322. Without explicitly complaining of reputational harm, Hobbs had publicly blamed the Echols defense attorneys on numerous occasions for the publicity of the new evidence prior to Pasdar's statements, even filing a complaint against Riordan with the Arkansas Supreme Court. SF 322. His journal has several entries in which he blames the WM3 defense team and the press for his troubles. SF 322. As a result, Pasdar's statements could not have caused his alleged harm, because Hobbs had already injured his own reputation through his abhorrent conduct and because the content of Pasdar's statements had already been widely disseminated in his community and around the world long before Pasdar posted her Letters or attended the Rally. SF 322.

The record clearly shows that Hobbs has not suffered any emotional or reputational injury caused by Pasdar's statements. SF 325-26. As a result, Hobbs cannot prove the essential damages element for any of his claims for defamation, false light portrayal or outrage, and those claims should be dismissed.

## CONCLUSION

For the foregoing reasons, all of Hobbs' causes of action fail as a matter law. Accordingly, Defendant Natalie Pasdar respectfully requests, pursuant to Federal Rule of Civil Procedure 56, that this Court enter a final judgment that Terry Hobbs take nothing on his claims

asserted herein, dismiss this case with prejudice and award Pasdar her costs and all other and further relief to which she may be justly entitled.

Dated: August 21, 2009

Respectfully submitted,

/s/ Dan D. Davison
    Dan D. Davison
    Lead Attorney
    Pro Hac Vice
    ddavison@fulbright.com
    D'Lesli Davis
    Pro Hac Vice
    ddavis@fulbright.com

FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

/s/ John E. Moore
    John E. Moore
    State Bar No. 82111
    john.moore@hmrmlaw.com

HUCKABAY MUNSON, ROWLETT & MOORE P.A.
Regions Center
400 W. Capital, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 374-6536
Facsimile: (501) 374-5906

COUNSEL FOR DEFENDANT,
NATALIE PASDAR, Individually, and
NATALIE PASDAR d/b/a DIXIE CHICKS.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon the following counsel of record in accordance with the Federal Rules of Civil Procedure, on this 21st day of August, 2009.

J. Cody Hiland
HILAND LAW FIRM
557 Locust Avenue
Conway, Arkansas 72034

Bob Wellenberger
THOMPSON, COE, COUSINS & IRONS, L.L.P.
700 North Pearl Street
Plaza of the Americas, Twenty-Fifth Floor
Dallas, Texas 75201-2832

/s/ Dan D. Davison
Dan D. Davison