# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

| | | |
|---|---|---|
| TERRY HOBBS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CV NO.: 4-09-CV-0008BSM |
| | § | |
| NATALIE PASDAR, *et al.,* | § | |
| | § | |
| Defendants. | § | |

## STATEMENT OF FACTS IN SUPPORT OF DEFENDANT
## NATALIE PASDAR'S MOTION FOR SUMMARY JUDGMENT

### A.     Hobbs files the instant lawsuit

**Statement of Fact No. 1:**

On November 25, 2008, Terry Hobbs ("Hobbs") filed the instant suit against recording artists Natalie Pasdar ("Pasdar") and the Dixie Chicks in Arkansas District Court in Pulaski County. Exhibit ("Ex.") 1, Hobbs Dep. 160:5-160:12; Ex. 14, Compl. (Hobbs Dep. Ex. 2).

Response:

**Statement of Fact No. 2:**

On January 7, 2009, Defendants removed the case to this Court on the basis of diversity jurisdiction. Court's File, Notice of Removal.

Response:

**Statement of Fact No. 3:**

In his Complaint, Hobbs asserts against Pasdar causes of action for: (1) defamation; (2) false light invasion of privacy; and (3) outrage. Ex. 1, Hobbs Dep. 160:5-160:12; Ex. 14, Compl. ¶¶ 20-27 (Hobbs Dep. Ex. 2).

Response:

**Statement of Fact No. 4:**

Hobbs' allegations stem from: (1) the November 26, 2007, letter posted on the Dixie Chicks website ("Website Letter"); (2) a nearly identical letter posted on the Dixie Chicks MySpace blog ("MySpace Letter") (collectively the "Letters"); and (3) a December 19, 2007, "Free the West Memphis Three" rally ("Rally") at which Pasdar made remarks. Ex. 1, Hobbs Dep. 11:20-12:19, 160:5-160:12; Ex. 14, Compl. ¶¶ 14, 17. (Hobbs Dep. Ex. 2).

Response:

**Statement of Fact No. 5:**

The substance of the Letters is identical, and Hobbs' complaints about each Letter are the same. Ex. 1, Hobbs Dep. 307:16-307:22.

Response:

**Statement of Fact No. 6:**

In his Complaint, Hobbs claims that, in the Letters and at the Rally, Pasdar accused him of murdering three eight-year-old boys, one of them his step-son, Stevie Branch, in the Robin Hood Hills area of West Memphis, Arkansas on May 5, 1993 (the "Murders").[1] Ex. 14, Compl. ¶¶ 15-16 (Hobbs Dep. Ex. 2); Ex. 15, Hobbs Supp. Ans. No. 2-3, 6.

Response:

**Statement of Fact No. 7:**

Hobbs has candidly admits that one of his purposes in bringing this lawsuit is to "chill the rights of other people to advocate for the release of the West Memphis Three," who Hobbs claims were properly convicted of the Murders. Ex. 1, Hobbs Dep. 46:21-47:3, 434:12-434:15, 614:2-614:7, 614:9-614:11.

---

[1] In his deposition, however, Hobbs admits that Pasdar did not accuse him of the Murders. Ex. 1, Hobbs Dep. 308:15-308:22; 308:25-309:18.

Response:

**Statement of Fact No. 8:**

Hobbs seeks damages for injuries to his person, business, reputation, and for embarrassment, humiliation, mental trauma, and loss of income, and seeks punitive damages. Ex. 1, Hobbs Dep. 12:5-13:7; Ex. 14, Compl. ¶¶ 28-31.

Response:

**Statement of Fact No. 9:**

Hobbs' attorney has sought to publicize this case. Ex. 1, Hobbs Dep. 161:23-161:25; Ex. 19, Hiland Press Release.

Response:

**Statement of Fact No. 10:**

Specifically, J. Cody Hiland ("Hiland"), Hobbs' attorney, issued a press release about the case in which he said, "While all Americans have the right of free speech, that right does not extend to falsely accusing someone of a triple homicide. . . . Terry Hobbs had absolutely nothing to do with these murders." Ex. 1, Hobbs Dep. 161:23-161:25; Ex. 19, Hiland Press Release.

Response:

**Statement of Fact No. 11:**

Hobbs approves of his attorney's action in speaking to the press about Hobbs' belief that he has been accused of the Murders. Ex. 1, Hobbs Dep. 161:23-161:25.

Response:

**B.     The Murders and the subsequent conviction of the WM3**

**Statement of Fact No. 12:**

Sometime in the evening of May 5, 1993, or the early morning hours of May 6, 1993, three eight-year-old-boys, Michael Moore, Steven Branch ("Stevie") and Christopher Byers,

were murdered in the Robin Hood Hills area of West Memphis, Arkansas. Ex. 1, Hobbs Dep. 354:13-354:25; Ex. 42, P. Hobbs Dec. ¶ 4; Ex. 47, Byers Dec. ¶ 3.

Response:

**Statement of Fact No. 13:**

Hobbs is the step-father of Stevie Branch; he was married at the time of the Murders to Stevie's mother, Pam Hobbs. Ex. 1, Hobbs Dep. 354:20-354:22, 355:11-355:13; Ex. 42, P. Hobbs Dec. ¶¶ 3-5.

Response:

**Statement of Fact No. 14:**

On June 3, 1993, the West Memphis Police Department ("WMPD") arrested teenagers Damien Echols ("Echols"), Jason Baldwin ("Baldwin") and Jessie Misskelley ("Misskelley"), whom the press would dub the West Memphis 3 (the "WM3"), and they were ultimately charged with the Murders. Ex. 1, Hobbs Dep. 355:1-355:10.

Response:

**Statement of Fact No. 15:**

In 1994, Misskelley was convicted of murder and sentenced to life in prison plus forty years. Ex. 1, Hobbs Dep. 360:9-360:13.

Response:

**Statement of Fact No. 16:**

Also in 1994, Baldwin and Echols were convicted in a joint trial; Baldwin was sentenced to life in prison without the possibility of parole and Echols was sentenced to death by lethal injection. Ex. 1, Hobbs Dep. 360:14-360:23.

Response:

**Statement of Fact No. 17:**

The WM3 are currently in prison and each is seeking post-conviction relief. Ex. 1, Hobbs Dep. 360:24-361:3.

Response:

**Statement of Fact No. 18:**

Lorri Davis is the wife of Echols and a leading activist in the fight to free Echols, Baldwin and Misskelley. Ex. 1, Hobbs Dep. 159:6-159:9; Ex. 6, Davis Dec. ¶ 3.

Response:

**C.     The incredible national attention focused on issues of public concern and controversy: the Murders, the trials, the WM3 and whether the WM3 were wrongfully convicted**

      **1.     News reports**

**Statement of Fact No. 19:**

Despite the trials and convictions, Hobbs admits (as he must) that since 1994 there has been a public controversy over whether the WM3 were wrongfully convicted. Ex. 1, Hobbs Dep. 15:9-16:25, 178:14-178:16, 178:19-178:23.

Response:

**Statement of Fact No. 20:**

Hobbs also admits that the question of who actually committed the Murders has been an issue of public concern at least since the 1994 convictions of the WM3. Ex. 1, Hobbs Dep. 15:9-16:25.

Response:

**Statement of Fact No. 21:**

Indeed, according to anyone familiar with the surrounding facts, including Hobbs, Pam Hobbs, Marie Hicks (Pam's mother), Jo Lynn McCaughey (Pam's sister), Judy Sadler (Pam's

sister), John Mark Byers (the father of victim Christopher Byers), Ross Sampson (Hobbs' media spokesperson), David Jacoby (Hobbs' friend who was with Hobbs on the night of the murders and is allegedly an alibi witness), Lorri Davis (a WM3 activist), Dennis Riordan (Echols' attorney) and Pasdar herself, there has been a public controversy over whether the WM3 were wrongfully convicted and, as a result, the nationwide press and public have expressed great interest in the Murders, the trials, the convictions of the WM3, the WM3's post-conviction relief efforts, the victims, the victims' families, the WM3, whether or not the WM3 were wrongfully convicted and, if so, who is the real killer(s) (collectively, the "Events"). Ex. 1, Hobbs Dep. 176:24-177:10; Ex. 42, P. Hobbs Dec. ¶ 6; Ex. 44, Hicks Dec. ¶¶ 5-9; Ex. 43, McCaughey Dec. ¶¶ 5-11; Ex. 45, Sadler Dec. ¶ 6; Ex. 47, Byers Dec. ¶ 5; Ex. 7, Sampson Dep. 18:11-20:1; Ex. 10, Jacoby Dec. ¶ 4; Ex. 6, Davis Dec. ¶¶ 4-8, 12-17, 19-21, 44-47; Ex. 8, Riordan Dec. ¶¶ 3-12; Ex. 2, Pasdar Dec. ¶¶ 3-4, 41-46.

Response:

**Statement of Fact No. 22:**

This national (and international) attention surrounding the controversy over the convictions of the WM3, all aspects of the case and its players has undisputedly continued for the fifteen (15) years since the little boys were killed and the WM3 were convicted. Ex. 1, Hobbs Dep. 15:9-16:5, 175:25-178:24, 183:17-184:22, 235:16-236:9, 246:10-247:12; Ex. 7, Sampson Dep. 18:11-18:24; Ex. 10, Jacoby Dec. ¶ 4; Ex. 42, P. Hobbs Dec. ¶ 6; Ex. 43, McCaughey Dec. ¶ 10; Ex. 44, Hicks Dec. ¶ 9; Ex. 47, Byers Dec. ¶¶ 5-6.

Response:

**Statement of Fact No. 23:**

Locally, there have been at least than ninety-four (94) articles regarding the Events in the MEMPHIS COMMERCIAL APPEAL alone.[2] Court's File, Stip. No. 1 (Exs. 36, 38, COMMERCIAL APPEAL articles); Court's File, Stip. No. 4 (Exs. 195, 228-229, 231-237, 240, 242-246, 253, 255-260, 262-290, 314-353, COMMERCIAL APPEAL articles).

Response:

**Statement of Fact No. 24:**

Many of the stories focus on the Murders, the WM3, and the question of the "justness" of the WM3 convictions, certain of the newspaper articles are devoted to stories on the victims' families, and almost all question who really killed the eight-year-olds on May 5, 1993. Ex. 42, P. Hobbs Dec. ¶ 6; Ex. 43, McCaughey Dec. ¶ 5; Ex. 44, Hicks Dec. ¶¶ 5-9; Ex. 47, Byers Dec. ¶ 5; Court's File, Stip. Nos. 1 and 4.

Response:

**Statement of Fact No. 25:**

Numerous stories about the Events have appeared in newspapers across the country and around the globe, from the NEW YORK TIMES to the CHICAGO TRIBUNE to the LOS ANGELES TIMES, and many others.[3] Court's File, Stip. No. 1 (Ex. 23 (NEW YORK TIMES), 18 (LOS ANGELES TIMES)); Court's File, Stip. No. 4 (Ex. 132, 137, 151, 164, 169 (NEW YORK TIMES), 99,

---

[2]     Pasdar, in the interest of economy, when filing supporting news articles, websites and blogs, has filed only a sample of such materials. If the Court desires further proof in this regard, Pasdar would request leave be granted and she can easily supplement the record with as many articles as the Court desires. The parties have stipulated to the authenticity of the many of these articles, and reference is made to the Court's file and the stipulations therein. Moreover, such articles are not hearsay: they are offered at this time not for the truth of the matters asserted therein but to demonstrate the volume of attention focused on the Events and Hobbs, for the purpose of demonstrating Hobbs' status as public figure. FED. R. EVID. 801.

[3]     Additionally, local and national television news stations have aired video reports about the Events, though it has been difficult to capture such old video. Ex. 1, Hobbs Dep. 347:18-347:19; Ex. 48, Hobbs Journal 1085. Pasdar currently is in the process of attempting to subpoena such video from the relevant television news stations.

119-120, 154, 177 (CHICAGO TRIBUNE), 86, 103, 125, 136, 150, 163, 168 (LOS ANGELES TIMES), 81, 92 (Salt Lake City, UT), 82, 96, 149, 160 (Georgia), 83 (Australia), 85, 172 (England), 88 (Iowa), 89 (Kansas), 90, 162 (Louisiana), 91, 93,111, 114, 127 (California), 94-95 (Spain), 98, 122 (New Jersey), 100 (Milwaukee, WI), 101, 110 (Pennsylvania), 104-105, 126, 146 (Florida), 107-109, 183, 190 (Canada), 115, 135, 166-167, 182 (Texas), 116-117 (Washington, D.C.), 118, 121 (New York), 123-124, 131 (Massachusetts), 184 (Ohio), 185 (Missouri)).

Response:

**Statement of Fact No. 26:**

The Associated Press has run nearly eighty (80) stories on the Events since 1993, which have been made available to papers all over the country for re-print. Court's File, Stip. No. 4 (Exs. 1-79).

Response:

**Statement of Fact No. 27:**

Indeed, the victims' families have received letters and interview requests from entertainment and news organizations all over the country. Ex. 42, P. Hobbs Dec. ¶ 6; Ex. 43, McCaughey Dec. ¶ 8; Ex. 47, Byers Dec. ¶ 5.

Response:

**Statement of Fact No. 28:**

Even America's Most Wanted ran a story about the Murders on May 14, 1993 and President Bill Clinton sent a sympathy letter. Ex. 42, P. Hobbs' Dec. ¶¶ 8, 13; Ex. 43, McCaughey Dec. ¶¶ 6, 8; Ex. 44, Hicks Dec. ¶¶ 6, 7.

Response:

### 2. Internet

**Statement of Fact No. 29:**

On the Internet, at least fifty (50) different blogs and websites are devoted to the Events, justice for the allegedly wrongfully convicted WM3, the quest to determine the true culprits, or have links to articles and discussions about these issues. Court's File, Stip. No. 1 (Exs. 48-91); Court's File, Stip. No. 4 (Exs. 212-214, 226, 354-359, 361-365).

Response:

### 3. Visual arts

**Statement of Fact No. 30:**

In the visual arts, film production companies and national cable television channels have taken up the question of whether the WM3 were wrongfully convicted. Ex. 1, Hobbs Dep. 59:18-59:22.

Response:

**Statement of Fact No. 31:**

Two nationally distributed documentary films, *Paradise Lost: The Child Murders at Robin Hood Hills* and *Paradise Lost 2: Revelations*, aired on the national cable channel, HBO, (on January 18, 1996 and July 28, 2000, respectively), and focused a great deal of attention on questions surrounding the convictions of the WM3 for the Murders, the trials, the victims, the victims' families and the search for the murderers. Ex. 1, Hobbs Dep. 59:18-59:22; Ex. 6, Davis Dec. ¶ 4; Ex. 42, P. Hobbs Dec. ¶ 7; Ex. 43, McCaughey ¶ 11; Ex. 47, Byers Dec. ¶ 6; Court's File, Stip. No. 1 (Ex. 97, *Paradise Lost: The Child Murders at Robin Hood Hills* DVD, 6/10/96; Ex. 98, *Paradise Lost II: Revelations* DVD, 3/12/01).

Response:

**Statement of Fact No. 32:**

The HBO films contain actual footage of the trials, interviews with the WM3 and interviews with parents of the victims. Ex. 1, Hobbs Dep. 59:18-61:9, 362:7-362:11; Court's File, Stip. No. 1 (Ex. 97, *Paradise Lost: The Child Murders at Robin Hood Hills* DVD, 6/10/96; Ex. 98, *Paradise Lost II: Revelations* DVD, 3/12/01); Ex. 2, Pasdar Dec. ¶ 3.

Response:

**Statement of Fact No. 33:**

Particularly, in *Paradise Lost: The Child Murders at Robin Hood Hills* filmed in part in 1994, released in 1996, Hobbs is interviewed and voluntarily appears on screen. Ex. 1, Hobbs Dep. 362:7-362:11; Ex. 42, P. Hobbs Dec. ¶ 7; Ex. 6, Davis Dec. ¶ 4.

Response:

**Statement of Fact No. 34:**

Each film raises serious questions about whether the WM3 were wrongfully convicted and is sympathetic towards the WM3. Ex. 1, Hobbs Dep. 631:9-631:16, 632:24-633:14; Court's File, Stip. No. 1 (Ex. 97, *Paradise Lost: The Child Murders at Robin Hood Hills* DVD, 6/10/96; Ex. 98, *Paradise Lost II: Revelations* DVD, 3/12/01).

Response:

**Statement of Fact No. 35:**

The documentaries have been critically acclaimed: the first documentary won multiple awards, including a Peabody Award and an Emmy Award for Outstanding Achievement in Informational Programming, and it was nominated for several other awards. Ex. 6, Davis Dec. ¶ 4.

Response:

### 4. Publishers and recording industries

**Statement of Fact No. 36:**

The publishing and recording industries have also seized on the issue of whether the WM3 were wrongfully convicted as a topic of great national interest and debate. Ex. 1, Hobbs Dep. 151:6-151:13; Ex. 6, Davis Dec. ¶ 4.

Response:

**Statement of Fact No. 37:**

Several nonfiction books about the Murders, the trials, whether the WM3 were wrongfully convicted, the victims and their families have been written and nationally distributed, including the 1995 book *Blood of Innocents: The True Story of Multiple Murder in West Memphis, Arkansas*, the October 2002 book, *The Devil's Knot: The True Story of the West Memphis 3*, and Echols' own June 3, 2003 book, *Almost Home: My Life Story Vol 1*. Ex. 1, Hobbs Dep. 151:6-151:13; Ex. 6, Davis Dec. ¶ 4.

Response:

**Statement of Fact No. 38:**

These books are currently available for purchase at local bookstores and on websites such as Amazon.com. Ex. 6, Davis Dec. ¶ 4.

Response:

**Statement of Fact No. 39:**

Additionally, a collection of essays and fiction writings, *The Last Pentacle of the Sun: Writings in Support of the West Memphis 3*, was published as a fundraiser for the Damien Echols Defense Fund in October 2004. Ex. 6, Davis Dec. ¶ 4.

Response:

**Statement of Fact No. 40:**

Even a musical album entitled "Free the West Memphis 3" has been nationally released with songs by Eddie Vedder, Tom Waits, Steve Earle and L7. Ex. 6, Davis Dec. ¶ 7.

Response:

### 5. Public charity and support

**Statement of Fact No. 41:**

Local and community charity efforts have also focused on the victims' families. Ex. 1, Hobbs Dep. 595:12-595:18, 597:1-597:7, 625:16-627:11; Ex. 46, P. Hobbs Second Dec. ¶ 16.

Response:

**Statement of Fact No. 42:**

There has been an outpouring of public generosity through financial support and sympathy to the victims' families. Ex. 42, P. Hobbs Dec. ¶ 8; Ex. 43, McCaughey Dec. ¶¶ 8, 41; Ex. 44, Hicks Dec. ¶ 6; Ex. 46, P. Hobbs Second Dec. ¶ 16; Ex. 49, Hobbs Journal (HOBBS 998-999; 1045-1057).

Response:

**Statement of Fact No. 43:**

Even President Bill Clinton sent a letter to Pam and Terry Hobbs expressing his sympathy for their loss. Ex. 42, P. Hobbs Dec. ¶ 8; Ex. 43, McCaughey Dec. ¶ 8; Ex. 44, Hicks Dec. ¶ 6; Ex. 49, Hobbs Journal (HOBBS 999).

Response:

**Statement of Fact No. 44:**

Fundraisers have been held for the families of the victims. Ex. 43, McCaughey Dec. ¶ 41; Ex. 46, P. Hobbs Second Dec. ¶ 16; Ex. 49, Hobbs Journal (HOBBS 1056-1057).

Response:

**Statement of Fact No. 45:**

The nationwide publicity has also created a large network of active WM3 supporters. Ex. 1, Hobbs Dep. 176:24-178:5; Ex. 6, Davis Dec. ¶¶ 5-7.

Response:

**Statement of Fact No. 46:**

There are "Free the WM3" bumper stickers on cars all over Memphis and planes flying the same banner have flown over Little Rock. Ex. 1, Hobbs Dep. 177:21-178:2.

Response:

**Statement of Fact No. 47:**

Echols receives over 2,000 letters and cards each year. Ex. 6, Davis Dec. ¶ 6.

Response:

**Statement of Fact No. 48:**

The WM3.org website, which is devoted to raising both awareness of the plight of the WM3 and the funds necessary to overturn the allegedly wrongful convictions, receives an average of 70,000 "hits" per month. Ex. 6, Davis Dec. ¶ 6.

Response:

**Statement of Fact No. 49:**

Davis herself estimates that she has fielded more than 10,000 emails and letters regarding the case since 1996. Ex. 6, Davis Dec. ¶ 6.

Response:

**Statement of Fact No. 50:**

Numerous celebrities, including, comedienne Margaret Cho, rock group Pearl Jam lead singer Eddie Vedder, actor Will Ferrell, actress Winona Ryder, singer Henry Rollins, members of the rock group Metallica and many others have made pleas for funds and donated their music,

their images and their time to the WM3 cause. Ex. 1, Hobbs Dep. 177:11-177:20, 178:3-178:5; Ex. 6, Davis Dec. ¶ 7.

Response:

**D.     From 1993-2007, Terry Hobbs voluntarily injects himself into the public controversy over whether the WM3 were wrongfully convicted**

**Statement of Fact No. 51:**

Over the last sixteen (16) years, Hobbs has repeatedly placed himself on the public stage, opening himself up in public avenues to discuss the convictions of the WM3, the Murders, the trials, their effect on him, the evidence, suspicions that he is the true killer and details of his personal life, including his relationship with his wife and her family, his girlfriends, his parenting decisions and the book he is writing and marketing about the Events. Ex. 1, Hobbs Dep. 52:15-54:6, 56:1-57:18, 347:20-348:2, 362:7-362:22; Ex. 42, P. Hobbs Dec. ¶¶ 9-15, 25-26; Ex. 43, McCaughey Dec. ¶¶ 9, 29-30; Ex. 47, Byers Dec. ¶¶ 11-13. Since day one of the WM3 judicial proceedings, the June 5, 1993 arraignment of WM3, Hobbs spoke out to the press about his belief that the WM3 were guilty and his desire for revenge, saying "I think we'd all like to get at them. . . . These were our babies. They were just kids. I was looking for a way to climb over a bench myself. It's very hard to sit there." Ex. 1, Hobbs Dep. 608:13-608:22, 609:12-609:15, 609:21-610:3, 635:19-635:23 (Hobbs Dep. Ex. 33); Court's File, Stip. No. 4 (Ex. 245).

Response:

**Statement of Fact No. 52:**

In fact, from 1993 to the present, Hobbs has never expressed any desire to stay out of the public eye, and instead has reached out to the media and participated in local and national television shows and other media to discuss the Events. Ex. 1, Hobbs Dep. 362:7-362:22; Ex. 42, P. Hobbs Dec. ¶ 15; Ex. 43, McCaughey Dec. ¶ 9.

Response:

1.      **Television and film**

**Statement of Fact No. 53:**

During the 1994 trials, Hobbs granted an interview to and spoke on camera with the *Paradise Lost* filmmakers. Ex. 1, Hobbs Dep. 362:7-362:11.

Response:

**Statement of Fact No. 54:**

In the interview, Hobbs discusses the WM3 and acknowledges that he believes they committed the Murders; he states: "I don't feel it is fair for someone right now to ask me to forgive the ones who caused [Hobbs' home to be] torn apart." Court's File, Stip. No. 1 (Ex. 97, *Paradise Lost: The Child Murders at Robin Hood Hills* DVD, 06/10/96).

Response:

**Statement of Fact No. 55:**

It appears the Hobbs family was paid by the *Paradise Lost* filmmakers. Ex. 49, Hobbs Journal (HOBBS 1004).

Response:

**Statement of Fact No. 56:**

On March 16, 1994, less than one year after the Murders, Hobbs also voluntarily appeared on the nationally syndicated television show, *The Geraldo Rivera Show,* in an episode entitled: "Kids Who Kill: Did the Devil Make Them Do It?" Ex. 1, Hobbs Dep. 362:8-362:22; Court's File, Stip. No. 1, (Ex. 92, *The Geraldo Rivera Show* transcript, 3/16/1994); Ex. 42, P. Hobbs Dec. ¶ 14; Ex. 43, McCaughey Dec. ¶ 7; Ex. 44, Hicks Dec. ¶ 8; Ex. 47, Byers Dec. ¶ 7.

Response:

**Statement of Fact No. 57:**

Hobbs knew that going on Geraldo's show would put him and his family in the public eye and bring attention to the family. Ex. 42, P. Hobbs Dec. ¶ 14.

Response:

**Statement of Fact No. 58:**

On the show, Hobbs publicly discussed his reaction to and belief in the propriety of the conviction of the WM3, by stating about Misskelley's father: "I have a lot to say to that man. But I can—I don't want to talk to him. I don't appreciate the actions of your son. He come out of your home, out of your raisings. . . . He had a chance to tell the whole world he didn't do it. And he didn't [deny involvement]." Court's File, Stip. No. 1 (Ex. 92, *The Geraldo Rivera Show* transcript, 3/16/1994). When the Misskelley confession is discussed, Hobbs claims that he sees the Misskelley confession as the smoking gun, proving the guilt of the WM3. *Id.*

Response:

**Statement of Fact No. 59:**

On August 2, 1994, Hobbs voluntarily appeared on an episode of *The Maury Povich Show* to discuss the Events. Ex. 1, Hobbs Dep. 457:2-457:8; Court's File, Stip. No. 4 (Ex. 201, *The Maury Povich Show* transcript, 8/2/94).

Response:

**Statement of Fact No. 60:**

On the show, Hobbs again discussed the guilt of the WM3, the Misskelley confession and a grove dedicated to the victims in West Memphis. Court's File, Stip. No. 4 (Ex. 201, *The Maury Povich Show* transcript, 8/2/94). Hobbs also tells the public that the Events "hurt," and that it hurts to watch his wife go through the Events. Court's File, Stip. No. 4 (Ex. 201, *The Maury Povich Show* transcript at p.15, 8/2/94).

Response:

**Statement of Fact No. 61:**

In 1996, the film *Paradise Lost* was released and the Hobbs interview was broadcast across the country on the cable channel HBO. Ex. 1, Hobbs Dep. 59:19-59:22; Ex. 6, Davis Dec. ¶ 4; Court's File, Stip. No. 1 (Ex. 97, *Paradise Lost: The Child Murders at Robin Hood Hills* DVD, 06/10/96).

Response:

**Statement of Fact No. 62:**

The film has been available for viewing ever since, through DVD and VHS rentals and purchases. Ex. 6, Davis Dec. ¶ 4.

Response:

   **2.    Books**

**Statement of Fact No. 63:**

Since the Murders, for at least 14 ½ years beginning in 1993 or 1994, Hobbs has written several drafts of a book about the Events and the effect of the Events on him and his family, which he has attempted to sell to book publishers. Ex. 1, Hobbs Dep. 56:1-57:18, 366:24-367:1 (Hobbs Dep. Exs. 11-14); Ex. 42, P. Hobbs Dec. ¶ 12; Ex. 43, McCaughey Dec. ¶ 31; Ex. 49, Hobbs Journal (HOBBS 1003).

Response:

**Statement of Fact No. 64:**

The book also repeatedly alleges that the WM3 are the real killers. Ex. 49, Hobbs Journal (HOBBS 0985, 0992,0996, 1076, 1096). He admits that he would like for his book to influence public opinion toward believing the that WM3 convictions are just, and hopefully, keep the WM3 in prison. Ex. 1, Hobbs Dep. 458:22-461:19.

Response:

**Statement of Fact No. 65:**

Hobbs also refers to his drafts of the book as his Journal. Ex. 1, Hobbs Dep. 18:5-18:11, 56:22-56:24.

Response:

**Statement of Fact No. 66:**

Hobbs hopes his book will be published. Ex. 1, Hobbs Dep. 56:1-57:13; Ex. 42, P. Hobbs Dec. ¶ 12.

Response:

**Statement of Fact No. 67:**

Hobbs admits that he has told people that he has a book deal and/or that he would like to have one. Ex. 1, Hobbs Dep. 57:23-58:8, 346:23-348:2.

Response:

**Statement of Fact No. 68:**

In fact, the press has known for years that he is writing a book about the Events because "I've never kept it a secret." Ex. 1, Hobbs Dep. 347:8-347:11.

Response:

**Statement of Fact No. 69:**

The drafts of the book repeatedly emphasize Hobbs' belief that the WM3 were properly convicted. Ex. 49, Hobbs Journal (HOBBS 00985, 00992, 00996, 01076, 01096).

Response:

**Statement of Fact No. 70:**

The drafts of the books also tackle intimate and personal areas of Hobbs' life. Ex. 1, Hobbs Dep. 362:23-363:7, 367:2-367:9; Ex. 49, Hobbs Journal (HOBBS 953, 955-6, 958-9, 961,

964, 966, 971, 975, 983-984, 987, 991, 993-994, 998-9, 1006-1007, 1011, 1018-1019, 1023, 1038-1039, 1042-1048, 1052, 1056-1057, 1062, 1064, 1072-1074, 1078-79, 1084-1082, 1090, 1092-1097, 1099-1100).

Response:

**Statement of Fact No. 71:**

In particular, Hobbs discusses raising Stevie, the events of May 5, 1993, the search for the missing boys, his reaction to the discovery of the bodies, that he was told the boys put up a fight, the burial, the breakdown of his marriage, allegations his wife cheated on him, his mental breakdowns, his reaction to the kindness of strangers, sexual activity with his wife, outside sympathy and generosity towards the victims' families, his fight with Pam Hobbs and the ensuing shooting of her brother Jackie Hicks Jr., the subsequent aggravated assault charge against Hobbs, his interviews with WM3 investigators, the effect of the actions of the WM3 defense team on his reputation, his feelings about the DNA evidence and WM3 attorneys and his feelings about betrayal by reporters. Ex. 1, Hobbs Dep. 362:23-363:7, 367:2-367:9; Ex. 49, Hobbs Journal (HOBBS 953, 955-956, 958-959, 961, 964, 966, 971, 975, 983-984, 987, 991, 993-994, 998-9, 1006-1007, 1011, 1018-1019, 1023, 1038-1039, 1042-1048, 1052, 1056-1057, 1062, 1064, 1072-1074, 1078-1079, 1084-1082, 1090, 1092-1097, 1099-1100).

Response:

**Statement of Fact No. 72:**

Hobbs has already had numerous contacts with publishers and others about getting the Journals published, so there is no question that Hobbs has willingly made his private life public in order to seek publication of his book. Ex. 1, Hobbs Dep. 56:1-57:13.

Response:

**Statement of Fact No. 73:**

Conveniently, at his deposition, Hobbs was unable to recall when he began seeking out publishers or which publishers he contacted. Ex. 1, Hobbs Dep. 56:22-57:22. There is no doubt, however, that Hobbs has reached out to them to publicize his version of the story and his views without prompting, before there was any suggestion by anyone that Hobbs could be involved in the Murders and, therefore, before there was any need to defend himself. Ex. 1, Hobbs Dep. 56:22-56:24, 460:13-461:9, 464:15-465:10.

Response:

3.     **Hobbs sells the rights in his life story to Dimension Films**

**Statement of Fact No. 74:**

In July of 2006, Hobbs sold to Dimension Films the rights to his life story and the life story of Stevie for use in a major motion picture. Ex. 1, Hobbs Dep. 52:15-54:6 (Hobbs Dep. Ex. 8); Ex. 7, Sampson Dep. 45:5-54:24 (Sampson Dep. Ex. 14); Ex. 16, Hobbs Dimension Films contract; Ex. 42, P. Hobbs Dec. ¶¶ 9-11 (Ex. 1); Ex. 43, McCaughey Dec. ¶ 12.

Response:

**Statement of Fact No. 75:**

During the process of selling those life rights, Hobbs hired an attorney, Ross Sampson, to review the contracts before signing the deal. Ex. 1, Hobbs Dep. 52:2-52:17; Ex. 7, Sampson Dep. 45:5-50:18; 56:20-58:8; Ex. 42, P. Hobbs Dec. ¶ 25.

Response:

**Statement of Fact No. 76:**

At the time that Hobbs entered into the contract, he fully expected Dimension Films to make a film out of his life story, and he knew that his story, the story of Stevie and his family, the Murders, the trials and the effect of the Events on them would be 'out there' for the general

public to see and know. Ex. 1, Hobbs Dep. 53:9-53:14, 54:8-54:20; Ex. 7, Sampson Dep. 46:7-47:4, 48:13-53:16; Ex. 42, P. Hobbs Dec. ¶ 11.

Response:

**Statement of Fact No. 77:**

Hobbs was comfortable with the fact that Dimension Films would produce a movie portraying him, Pam and Stevie, and comfortable that the film company would have the right to use any of the details of his life in the film. Ex. 1, Hobbs Dep. 53:9-53:14, 54:8-54:20; Ex. 7, Sampson Dep. 46:7-47:4, 48:13-53:16; Ex. 16, Dimension Film contract; Ex. 42, P. Hobbs Dec. ¶¶ 9-11. Hobbs understood that the major focus of a motion picture about the Murders would be whether the WM3 were wrongfully convicted and he was hopeful that his story would convince the public and the relevant authorities that the WM3 are appropriately in prison. Ex. 1, Hobbs Dep. 460:13-461:9.

Response:

**Statement of Fact No. 78:**

As part of the terms of the contract, Hobbs sold to Dimension Films the right to use his book, the Journals, about the Events in any movie. Ex. 1, Hobbs Dep. 343:11-343:25 (Hobbs Dep. Ex. 8); Ex. 7, Sampson Dep. 47:18-48:24, 50:19-52:19 (Sampson Dep. Ex. 14); Ex. 16, Hobbs Dimension Films contract; Ex. 42, P. Hobbs Dec. ¶ 9.

Response:

**Statement of Fact No. 79:**

Hobbs has produced in this litigation a copy of the first draft of the contract he signed, only the consideration amount appears to be wrong ($15,000 for Hobbs and his wife rather than $25,000). Ex. 1, Hobbs Dep. 343:23-345:13, 462:19-463:1 (Hobbs Dep. Ex. 8); Ex. 7, Sampson

Dep. 47:12-47:24 (Sampson Dep. Ex. 14); Ex. 16, Hobbs Dimension Films contract; Ex. 42, P. Hobbs Dec ¶¶ 9-10.

Response:

**Statement of Fact No. 80:**

From the contract and his attorney's testimony, it appears that Hobbs also sold the right to use his Journals and information therein to Dimension Films along with the rights in his life story. Ex. 7, Sampson Dep. 50:19-52:19; Ex. 16, Hobbs Dimension Films contract.

Response:

**Statement of Fact No. 81:**

The press reported on Hobbs' sale of his rights in his life story for use in a major motion picture. Ex. 1, Hobbs Dep. 346:12-346:19, 347:20-348:2, 349:17-350:10 (Hobbs Dep. Exs. 9-10); Court's File, Stip. No. 1 (Ex. 38, COMMERCIAL APPEAL news article, "Familiar Face," 11/27/07); Ex. 26 (same article).

Response:

**Statement of Fact No. 82:**

Hobbs reportedly bragged to the press in interviews that there would be a movie about him and the Events, stating "I think I have a pretty good story about this." Ex. 1, Hobbs Dep. 347:12-348:2, 348:10-348:15; Court's File, Stip. No. 1 (Ex. 43, WMCTV 5 Action News article, "Step-father of a West Memphis Three Victim Writing Book," 08/08/08); Ex. 29 (same article).

Response:

**4.  Hobbs' interviews with Dimension Films**

**Statement of Fact No. 83:**

Following the sale of the rights to his life story, Hobbs voluntarily sat down at least twice with his ex-wife, Pam, and Dimension Films for an interview to be used in the creation of the

film. Ex. 1, Hobbs Dep. 54:21-55:14; Ex. 42, P. Hobbs Dec. ¶ 11; Ex. 43, McCaughey Dec. ¶ 12; Ex. 17, Dimension Films interview.

Response:

**Statement of Fact No. 84:**

In the interviews, Hobbs described his life, the events leading up to the Murders, the Murders, his whereabouts at the time of the Murders and the effect the Events had upon him. Ex. 1, Hobbs Dep. 54:21-55:14 (Hobbs Dep. Ex. 15); Ex. 42, P. Hobbs Dec. ¶ 11; Ex. 17, Dimension Films interview. At the time of the interviews, Hobbs expected that Dimension Films would make a movie out of his life and that the Events, the Murders, the WM3 convictions and his and Pam's lives would be made public. Ex. 42, P. Hobbs Dec. ¶ 11.

Response:

**Statement of Fact No. 85:**

Specifically, Hobbs revealed much to the filmmakers for use in the movie, including his account of the chronology of events on May 5, 1993, his claim that he called and made a police report at 5:30 p.m. about the missing boys, the search for the boys, frustration with the WMPD's search efforts, and allegations of WMPD corruption. Ex. 1, Hobbs Dep. 365:18-365:24; Ex. 17, Hobbs Dimension Films interview (PASDAR 2590-2628, 2629-2662, 2665).

Response:

**Statement of Fact No. 86:**

Hobbs also sold the rights to the life story of Stevie. Ex. 7, Sampson Dep. 48:13-49:8, 50:1-50:8; Ex. 16, Hobbs Dimension Films contract.

Response:

**Statement of Fact No. 87:**

At the time of this sale of the contents of his book to Dimension Films and the interview, Hobbs had not been implicated in the Murders and had no need to defend his name. Ex. 1, Hobbs Dep. 464:15-465:10.

Response:

**Statement of Fact No. 88:**

In sum, through these years – from 1993 through at least April 2007 – there was no public suggestion that Hobbs was involved in the Murders and no need for Hobbs to "defend his name and reputation" in the media or to the public. Ex. 1, Hobbs Dep. 464:15-465:10. However, from 1993 through 2008, Hobbs has aggressively peddled his life story, his opinion on the justness of the WM3 convictions and his version of the Events to filmmakers, documentarians, book publishers and newspaper reporters. Ex. 1, Hobbs Dep. 52:15-54:6, 54:21-55:14, 56:1-57:18, 347:12-348:2, 362:7-362:22, 457:24-461:19.

Response:

**Statement of Fact No. 89:**

Despite the fact that Hobbs had not been pulled into the controversy through the actions of any other party, Hobbs actively engaged the press and parties who were adverse to him concerning the very controversy made the basis of Pasdar's statements: whether the WM3 were wrongfully convicted. Ex. 1, Hobbs Dep. 457:24-461:9, 464:15-467:4, 467:14-468:18, 469:18-470:7.

Response:

E.    **The new 2007 evidence and Hobbs' further injection of himself into the public controversy regarding whether the WM3 were wrongfully convicted**

   1.    **Hobbs voluntarily meets with WM3 investigators to discuss the case and his possible involvement**

**Statement of Fact No. 90:**

In the spring and summer of 2007, on multiple occasions, Hobbs voluntarily met with private investigators working for Echols' defense team. Ex. 1, Hobbs Dep. 374:23-377:20.

   Response:

**Statement of Fact No. 91:**

On May 19, 2007, Hobbs met with Ron Lax ("Lax"), at which time Lax informed Hobbs that his DNA was consistent with the DNA of a hair found in the ligature binding Murder victim Michael Moore. Ex. 1, Hobbs Dep. 125:23-126:3, 373:14-373:19; Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 6, 60-61, 63-66; Ex. 3, Habeas Exhibits at X, Y, AA, BB, LL); Ex. 13, Press Conference transcript (HOBBS 00117).

   Response:

**Statement of Fact No. 92:**

Hobbs subsequently met with Lax one or two more times, WM3 investigator Rachel Geiser once or twice, and WM3 criminal profiler John Douglas twice. Ex. 1, Hobbs Dep. 375:14-375:17, 376:23-377:20.

   Response:

**Statement of Fact No. 93:**

During Hobbs' meetings with WM3 investigators, Hobbs was the person providing information. Ex. 1, Hobbs Dep. 381:12-382:5, 467:14-468:15, 469:18-470:2. Hobbs knew that the investigators with whom he met were working for the WM3 and their legal defense team and

were working to collect evidence which would free the WM3. Ex. 1, Hobbs Dep. 465:11-466:22.

Response:

**Statement of Fact No. 94:**

Hobbs also knew the discussions during the meetings with the WM3 investigators were not confidential. Ex. 1, Hobbs Dep. 466:12-466:22.

Response:

**Statement of Fact No. 95:**

When asked why Hobbs attended these meetings, Hobbs does not say he went to defend his good name (nor could he, since he had not yet been implicated), but rather, states that he participated in the interviews by the investigators "because I was curious" and "because I wanted to know what kind of people would work to get killers out." Ex. 1, Hobbs Dep. 375:21-376:7; Ex. 47, Byers Dec. ¶ 25. Hobbs also admits that he met with the WM3 investigators in order to let them know the WMPD and prosecutors had done a good job in catching the killers and getting a conviction and that there was no need for further investigation. Ex. 1, Hobbs Dep. 466:23-467:4, 467:14-468:16, 469:18-470:7.

Response:

2.      **The new DNA evidence**

**Statement of Fact No. 96:**

The DNA evidence Lax disclosed to Hobbs was a striking piece of evidence: according to the DNA report, only 1.5% of the population could be a match for the DNA found at the crime scene. Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 61; Ex. 3, Habeas Exhibits at AA, BB); Ex. 13, Press Conference transcript (HOBBS 00117).

Response:

**Statement of Fact No. 97:**

Hobbs fell into that 1.5% of the population.  Ex. 13, Press Conference transcript (HOBBS 00117).

Response:

**Statement of Fact No. 98:**

The DNA test of another hair found at the crime scene was consistent with the DNA of David Jacoby, Terry Hobbs' friend with whom he had spent time the night of the Murders.  Ex. 1, Hobbs Dep. 169:3-169:5, 169:8, 171:6-171:8, 171:11-172:5, 293:17-293:24, 569:22-571:19 (Hobbs Dep. Ex. 32); Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 6, 62-63, 65-66; Ex. 3, Habeas Exhibits at X, Y, BB); Ex. 10, Jacoby Dec. ¶¶ 6, 8-14; Ex. 13, Press Conference transcript (HOBBS 00118); Ex. 47, Byers Dec. ¶ 9.

Response:

**Statement of Fact No. 99:**

According to the DNA report, only 7% of the population could be a match for this Jacoby-related DNA found at the crime scene.  Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 63; Ex. 3, Habeas Evidence at BB); Ex. 13, Press Conference transcript (HOBBS 00118).

Response:

**Statement of Fact No. 100:**

The DNA testing was performed by the Bode Lab in Arkansas, which has been approved by the State of Arkansas for use in criminal proceedings.  Ex. 6, Davis Dec. ¶ 8; Court's File, Stip. No. 2 (Ex. 3, Habeas Evidence at P-S, W).

Response:

### 3. The WMPD interview of Hobbs

**Statement of Fact No. 101:**

On June 21, 2007, the WMPD conducted a formal interview of Hobbs and interrogated him regarding his whereabouts on and recollections about May 5 and 6, 1993. Ex. 1, Hobbs Dep. 377:21-379:24; Ex. 18, Hobbs WMPD Interview (PASDAR 1282); Ex. 42, P. Hobbs Dec. ¶ 23; Ex. 47, Byers Dec. ¶ 8.

Response:

**Statement of Fact No. 102:**

In the WMPD interview, Hobbs admits (among other things) that Pam Hobbs and her family suspect him of involvement in the Murders. Ex. 1, Hobbs Dep. 305:9-305:22; Ex. 18, Hobbs WMPD Interview (PASDAR 1300); Ex. 42, P. Hobbs Dec. ¶ 24.

Response:

**Statement of Fact No. 103:**

The transcript and video of Hobbs' police interview are widely available on the internet. Ex. 1, Hobbs Dep. 37:5-37:11; Ex. 42, P. Hobbs Dec. ¶ 23; Ex. 43, McCaughey Dec. ¶ 21; Ex. 47, Byers Dec. ¶ 8.

Response:

**Statement of Fact No. 104:**

As with the DNA evidence, Hobbs also was the first to disclose to the press the details surrounding his WMPD interview. Exs. 20-21, 24 (various news articles); Court's File, Stip. No. 1 (Exs. 3-5, 8, 13); Court's File, Stip. No. 4 (Ex. 253).

**Statement of Fact No. 105:**

The newspapers reported widely that the WMPD had interviewed Hobbs, and Hobbs openly discussed the WMPD interview with reporters in many of these articles. Exs. 20-21, 24

(various news articles); Court's File, Stip. No. 1 (Exs. 3-6, 8, 13, 14, 16, 19); Court's File, Stip. No. 4 (Ex. 253).

Response:

**Statement of Fact No. 106:**

Hobbs also told the WMPD about his plans to publish the book, stating "I have writers wanting to put it in a book form for me. . . . I'm gonna put it on the market." Ex. 18, Hobbs WMPD Interview (PASDAR 1312).

Response:

4. **Hobbs attempts to influence the outcome of the controversy by initiating press coverage of and aggressively promoting his preferred message about the DNA to the media and others he believed would publicize his version**

**Statement of Fact No. 107:**

In July 2007, Hobbs made public the DNA test results implicating him when in an attempt to get his side of the story out, he volunteered to reporter Janice Broach at WMC-TV, (who did not yet know the results of the DNA testing) that he had been told his DNA was at the crime scene and he called John Mark Byers, father of Murder victim Christopher Byers, and also told him that the WM3 had discovered DNA matching Hobbs' in the ligature binding one of the victims. Ex. 1, Hobbs Dep. 121:3-121:9, 219:10-219:20, 220:13-220:20; Ex. 47, Byers Dec. ¶ 25.

Response:

**Statement of Fact No. 108:**

Hobbs admits that he wanted the public to know that if the victims had his hair on them, it was because the boys played with Stevie pretty regularly, not because Hobbs committed the Murders or because the WM3 did not. Ex. 1, Hobbs Dep. 220:25-221:5.

Response:

**Statement of Fact No. 109:**

On July 19-21, 2007, Broach wrote three separate stories focusing on the DNA evidence Hobbs provided her. Ex. 1, Hobbs Dep. 219:10-220:24; Court's File, Stip. No. 1 (Ex. 6, WMCTV ACTION 5 NEWS article, "DNA Evidence May Connect Family Member," 7/19/07; Ex. 9, WMCTV ACTION 5 NEWS article, "Court Documents Reveal New Details," 7/20/07; Ex. 12, WMCTV ACTION 5 NEWS article, "West Memphis Three: Mom Speaks Out," 7/21/07); Ex. 23, WMCTV ACTION 5 NEWS article, "Court Documents Reveal New Details," 7/20/07.

Response:

**Statement of Fact No. 110:**

Hobbs acknowledges that he has spoken to Ms. Broach "millions of times." Ex. 1, Hobbs Dep. 121:16-122:1, 196:14-197:7. He talks to her not to defend himself, but "Because I can, because I want to." Hobbs Dep. 197:4-197:16.

Response:

**Statement of Fact No. 111:**

Hobbs believes that Broach takes his calls because the issue of whether the WM3 were wrongfully convicted is an ongoing story – she returns Hobbs' calls if he needs her to. Ex. 1, Hobbs Dep. 197:15-197:22.

Response:

**Statement of Fact No. 112:**

In Broach's stories, the Hobbs DNA evidence is linked to the question of whether the WM3 were wrongfully convicted: the stories report that no DNA from the WM3 was found at the crime scene, and that defense attorneys said the DNA test found DNA from Terry Hobbs, the step-father of one of the murdered boys. Ex. 1, Hobbs Dep. 219:24-220:8.

Response:

**Statement of Fact No. 113:**

In July 2007, Hobbs revealed to longtime WM3 reporter, Mara Leveritt, the DNA evidence involving him; Leveritt then wrote an article in the ARKANSAS TIMES detailing the new evidence and quoting Hobbs extensively regarding his WMPD interview, the DNA evidence, a knife owned by Stevie discovered by Pam Hobbs in Hobbs' possessions, and Pam Hobbs' belief that the WM3 were wrongfully convicted. Court's File, Stip. No. 1 (Ex. 4, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07; Ex. 8, Maraleveritt.com website post, "Terry Hobbs Reports Being Told His DNA Was Found At Crime Scene," 7/20/07); Ex. 20, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07.

Response:

**Statement of Fact No. 114:**

Leveritt identified Hobbs as the source for the news of the DNA evidence implicating him; as Leveritt explained, "I had heard rumors, but it was only when I called Mr. Hobbs that I heard the specifics that his DNA had been found on one of the knots on one of the boys." Court's File, Stip. No. 1 (Ex. 7, ARKANSAS MATTERS "DNA Status Report Released," 07/19/07); Ex. 22 (same article). At the time that Hobbs disclosed the DNA evidence to the press, it was unknown to the public, the press had not printed it, the WM3 investigators had not told the press about it and Hobbs was not in a position of needing to defend his "good name." Court's File, Stip. No. 1 (Ex. 7, ARKANSAS MATTERS "DNA Status Report Released," 07/19/07); Ex. 22 (same article). The very article quoting Hobbs discussing the DNA evidence and citing him as Leveritt's original source regarding the DNA evidence reported that "Damien Echols attorney is not ready to comment on the new developments." Court's File, Stip. No. 1 (Ex. 7, ARKANSAS MATTERS "DNA Status Report Released," 07/19/07); Ex. 22 (same article). According to Lorri Davis, it was not the strategy of anyone affiliated with the WM3 to publicize the DNA

information at the time Hobbs leaked the information to the press in July 2007. Ex. 6, Davis Dec. ¶ 8.

Response:

**Statement of Fact No. 115:**

In addition to Broach and Leveritt, Hobbs has numerous relationships with other reporters; he admits he has also talked to reporter Laura Smith with the CRITTENDEN COUNTY TIMES "a lot" over the years. Ex. 1, Hobbs Dep. 228:2-228:22; *see also* Ex. 49, Hobbs Journal (HOBBS 1077-1078; 1097). By July 2007, Hobbs had a clear channel of communication to get information to the public. Ex. 1, Hobbs Dep. 121:3-121:9, 121:16-121:21, 219:10-219:20, 220:13-220:20, 228:2-228:22.

Response:

5.      **The newspapers and television news report the DNA as "matching" Hobbs**

**Statement of Fact No. 116:**

Other local and national newspapers subsequently wrote articles which specifically disclosed that the DNA of one hair found in the ligature of victim Michael Moore was a "match" with Hobbs' DNA, and that the DNA of another hair found on a stump at the crime site was a "match" for Hobbs' friend, David Jacoby, with whom he had been on the night of the Murders. Ex. 1, Hobbs Dep. 80:9-81:15, 82:4-82:8, 84:4-84:19, 169:3-169:5, 169:8, 171:19-172:5, 221:17-221:21, 294:17-294:24; Ex. 42, P. Hobbs Dec. ¶¶ 16, 22; Court's File, Stip. No. 1 (Exs. 3-38); Court's File, Stip. No. 4 (Exs. 84-86, 253).

Response:

**Statement of Fact No. 117:**

Many articles that addressed the new DNA evidence definitively stated *that the DNA at the crime scene was Hobbs'*:

- Memphis' WMCTV ACTION 5 NEWS: "Sources say DNA from Terry Hobbs, Steve Branch's step-father, was discovered in the rope used to tie up one of the boys." Court's File, Stip. No. 1 (Ex. 6, WMCTV ACTION 5 NEWS article, "DNA Evidence May Connect Family Member," 7/19/07);

- Little Rock's KARK 4 News: "News reports say DNA from Terry Hobbs, Stevie Branch's stepfather, was discovered in a rope used to tie up the young boys." Ex. 22; Court's File, Stip. No. 1 (Ex. 7, ARKANSAS MATTERS article, "DNA Status Report Released," 7/19/07); Ex. 22 (same article);

- Memphis' WMCTV ACTION 5 NEWS: "The tests found DNA from Terry Hobbs, the stepfather of one of the murdered boys." Court's File, Stip. No. 1, (Ex. 9, WMCTV ACTION 5 NEWS article, "Court Documents Reveal New Details," 7/20/07); Ex. 23 (same article);

- CRITTENDEN COUNTY TIMES: "The hair was reportedly Hobbs', and police attributed his hair to secondary transfer." Court's File, Stip. No. 1 (Ex. 13, CRITTENDEN COUNTY TIMES news article, "Hobbs: This Isn't How," 7/24/07); Ex. 24 (same article);

- Memphis' WMCTV ACTION 5 NEWS: "New DNA testing shows a hair from one of the boys' stepfathers, Terry Hobbs, was found in the shoelaces used to tie up the 8-year old boys." Court's File, Stip. No. 1 (Ex. 12, WMCTV ACTION 5 NEWS article, "West Memphis Three: Mom Speaks Out," 7/21/07);

- WMCTV ACTION 5 NEWS: "In July, Terry Hobbs knew defense investigators were looking at him because his hair was discovered in the shoe laces of one of the murdered boys." Court's File, Stip. No. 1 (Ex. 21, WMCTV ACTION 5 NEWS article, "New Evidence Points to New Suspects," 10/30/07); and

- NEW YORK TIMES: "As for the stray hair, the West Memphis Police Department and the stepfather it appears to belong to, Terry Hobbs, have discounted the finding." Court's File, Stip. No. 1 (Ex. 23, NEW YORK TIMES article, "Defense Offers New Evidence," 10/31/07).

Response:

**Statement of Fact No. 118:**

Even WMPD Chief Mike Allen believed the hair from the ligature was Hobbs': "A hair believed to have come from Hobbs was found at the crime scene, [West Memphis Police Chief] Allen confirmed, but said he thinks the hair got there through normal transference among family members." Ex. 1, Hobbs Dep. 228:23-229:7, 231:15-231:19; Court's File, Stip. No. 4, (Ex. 253,

COMMERCIAL APPEAL news article, "Step Dad Queried in Boys' Slaying," 07/19/07); Ex. 21 (same article).

Response:

**Statement of Fact No. 119:**

Hobbs admits that after the spring and summer 2007, it was well known that his DNA was linked to the crime scene because the press was widely reporting it. Ex. 1, Hobbs Dep. 224:6-224:10. Of course, the press was reporting it because Hobbs – not the WM3 – had told the press about the evidence. Ex. 1, Hobbs Dep. 121:3-121:9, 219:10-219:20, 220:13-220:20; Ex. 20, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07; Court's File, Stip. No. 1 (Exs. 3-5, 7-10, 13).

Response:

**Statement of Fact No. 120:**

Other local press and numerous newspapers across the country reported on the DNA discovery and referenced Hobbs by name as a DNA match or link. Ex. 1, Hobbs Dep. 224:6-224:10, 225:22-226:11; Ex. 42, P. Hobbs Dec. ¶¶ 16, 22; Ex. 43, McCaughey Dec. ¶ 13; Ex. 47, Byers Dec. ¶ 10; Court's File, Stip. No. 1 (Exs. 3-38); Court's File, Stip. No. 4 (Exs. 84-86, 253).

Response:

**Statement of Fact No. 121:**

In fact, at least forty (40) articles published between July 2007 and November 2007, specifically mentioned that the hair at the crime scene potentially belonged to Hobbs. Court's File, Stip. No. 1 (Exs. 3-38); Court's File, Stip. No. 4 (Exs. 84-86, 253).

Response:

**Statement of Fact No. 122:**

In Hobbs' words, the new evidence was "all over the airways." Ex. 1, Hobbs Dep. 200:4-200:9; Ex. 43, McCaughey Dec. ¶¶ 27-28.

Response:

6.     **Other evidence points to Hobbs**

**Statement of Fact No. 123:**

If Hobbs' announcement to neighbors, reporters and the nation of the non-public fact that his DNA had been found at the crime scene, his interview with the WMPD and the ensuing local and national press reports did not call enough national attention to Hobbs, numerous other articles in the summer of 2007 reported that Pam Hobbs and her relatives suspected Hobbs of involvement in the Murders. Ex. 1, Hobbs Dep. 141:5-142:11; Court's File, Stip. No. 1 (Exs. 4, 10, 12, 14, 16, 30); Ex. 42, P. Hobbs Dec. ¶ 29; Ex. 43, McCaughey Dec. ¶¶ 20, 23-25; Ex. 44, Hicks Dec. ¶ 16.

Response:

**Statement of Fact No. 124:**

Articles and blog posts appearing in July and August of 2007 also disclosed additional new evidence (besides the DNA and police interview) that pointed to Hobbs' involvement in the Murders. Ex. 1, Hobbs Dep. 226:12-226:20, 227:13-227:17; Ex. 42, P. Hobbs Dec. ¶ 29; Court's File, Stip. No. 1 (Exs. 4, 10, 12, 14, 52).

Response:

**Statement of Fact No. 125:**

Specifically, these articles reported that Pam Hobbs had discovered in 2004 that Hobbs was in possession of Stevie's prized pocketknife, which Stevie had carried with him at all times and which the family had always believed was taken by Stevie's murderer. Ex. 1, Hobbs Dep.

226:12-226:20, 227:13-227:17; Court's File, Stip. No. 1 (Exs. 4, 12, 14); Ex. 42, P. Hobbs Dec. ¶¶ 17, 29; Ex. 43, McCaughey Dec. ¶ 15.

Response:

**Statement of Fact No. 126:**

Hobbs willingly discussed the pocketknife evidence with the press as well. Ex. 1, Hobbs Dep. 226:12-227:2.

Response:

**Statement of Fact No. 127:**

In one interview, Hobbs admitted that he might have been in possession of Stevie's knife (he now admits that he does have the knife) and gave a detailed explanation for why he might have it. Ex. 1, Hobbs Dep. 226:12-227:2; Court's File, Stip. No. 1, (Ex. 4, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article).

Response:

7.　　**The plethora of Hobbs interviews and comments**

**Statement of Fact No. 128:**

Hobbs admits that the controversy on which the press focused in 2007 was the "same old" original controversy: were the WM3 wrongfully convicted? Ex. 1, Hobbs Dep. 142:12-142:19.

Response:

**Statement of Fact No. 129:**

Hobbs was aggressive in dealing with the media on this and other topics throughout 2007. Court's File, Stip. No. 1 (Ex. 4, 7, 13).

Response:

**Statement of Fact No. 130:**

Hobbs gave numerous interviews and in those, he strongly expressed his opinion about the propriety of the WM3 convictions, the character of Echols' defense team, his parenting decisions, the mental stability of Stevie's mother, Hobbs' shooting of his brother-in-law and subsequent aggravated assault charge, his innocence, his interviews with the WMPD and his plans to write a book. Court's File, Stip. No. 1 (Ex. 4, 7, 13, 24); Court's File, Stip. No. 4 (Ex. 253); SF 130, *infra*.

Response:

**Statement of Fact No. 131:**

Below, by way of example only, are numerous excerpts from articles in which Hobbs was interviewed:

- [Hobbs] believes the DNA results are the work of "crooked defense attorneys trying to get their killer SOBs out of jail. . . . It ain't gonna work," said Hobbs. . . . He said a private detective working for defense lawyers told him one of his hairs was found on a shoelace used to tie up one of the murdered boys. . . . "That's understandable," said Hobbs. "All three of them boys used to come play at my house." Court's File, Stip. No. 1 (Ex. 4, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article);

- "Ron [Lax] claims that a piece of my hair is in the knots that tied up [victim] Michael Moore. Does that bother me? . . . No ma'am, it does not . . . because I don't believe a thing he has to say because he's working for the defense team." Court's File, Stip. No. 1 (Ex. 4, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article);

- Terry Hobbs dismissed the knives as having "nothing to do with anything. . . . I'd bought some, and found some and Pam bought me some. I just threw them in a drawer, and that's where they'd been for years." . . . Asked whether one of the knives was a pocket knife given to Stevie by his grandfather, Terry Hobbs responded, "I don't know. It could have been. And it could have been it was in the drawer because we didn't want him to have it. I didn't want a kid of mine to go around with a pocket knife – not a kid who was 8 years old. Would you?" Court's File, Stip. No. 1 (Ex. 4, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article);

- As for his ex-wife, he [Hobbs] said "Pam's got some problems. This thing has taken a toll on her. It's really hurt her. I don't think she really supports the idea [the WM3] are innocent. I think she's doing it out of anger. . . . It's kind of sad. And I'm really sorry that people think she supports that theory." Court's File, Stip. No. 1 (Ex. 4, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article);

- Another element of her anger, Pam Hobbs said, relates to her brother, whom Terry Hobbs shot in the abdomen during an altercation 10 years ago. That brother died last year. Terry Hobbs dismisses the episode. "The truth is," he said, "when a man is trying to kill you, you have a right under the United States Constitution to defend and protect yourself." Nevertheless, he acknowledged that he was charged with aggravated assault, fined and placed on probation. Court's File, Stip. No. 1 (Ex. 4, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article);

- For his part, Terry Hobbs said he's not worried and that he has nothing to hide. With regard to the retested DNA, he said, "I've been told that nothing that's going on right now is going to change a thing." Asked who'd given him that assurance, he replied, "Brent Davis," the prosecuting attorney. Court's File, Stip. No. 1 (Ex. 4, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article);

- In a telephone interview on Monday, Stevie's stepfather, Terry Hobbs, confirmed that West Memphis Police had videotaped an interview with him within the last three weeks. Court's File, Stip. No. 1 (Ex. 3, MEMPHIS FLYER article, "New Evidence in West Memphis 3 Case," 7/19/07);

- Terry Hobbs said Thursday that West Memphis Police detectives interviewed him three weeks ago, asking his whereabouts on the night of the 1993 murders. . . . "I have nothing to hide," Hobbs, 49 told THE COMMERCIAL APPEAL. "I still didn't have nothing to do with them boys dying." Court's File, Stip. No. 4 (Ex. 253, COMMERCIAL APPEAL article, "Stepdad Queried in Boys' Slayings," 7/19/07); Ex. 21 (same article);

- Reporter: "Did you murder the little boys?" "I'd have to laugh and say there's something wrong with someone who would think that," Terry Hobbs said. "It's sad to see that there are some people out here trying to get some killers out of prison that deserve to be hung by a rope," Hobbs added. Court's File, Stip. No. 1 (Ex. 7, ARKANSAS MATTERS article, "DNA Status Report Released," 7/19/07); Ex. 22 (same article);

- Hobbs claimed a private investigator from the defense team told him one of his hairs was discovered in a knot in one of the shoe laces used to tie up the three eight-year-olds. . . . "If Michael Moore or Christopher Byers had a piece of my hair on shoe strings, these little boys came to my home and played with our little boy pretty

regularly." Court's File, Stip. No. 1 (Ex. 9, Action News 5 article, "Court Documents Reveal New Evidence," 7/20/07); Ex. 23 (same article);

- "I don't know what to think about it," Hobbs said. "It's their job to do what they do." Hobbs, now divorced from Steve Branch's, (sic) mother said he's not worried because he knows he has done nothing wrong. Court's File, Stip. No. 1 (Ex. 9, Action News 5 article, "Court Documents Reveal New Evidence," 7/20/07); Ex. 23 (same article);

- "I sat in a room the other day and was filmed, videoed, and audioed," Hobbs said. "It kind of aggravated me." Court's File, Stip. No. 1 (Ex. 8, MaraLeveritt.com blog post, "Terry Hobbs Reports Being Told His DNA Was Found At The Crime Scene," 7/20/07);

- "I went and talked to the police in West Memphis for a follow-up." Ex. 24; Court's File, Stip. No. 1 (Ex. 13, CRITTENDEN COUNTY TIMES article, "Hobbs: This Isn't How," 7/24/07); Ex. 24 (same article);

- Hobbs said he believes in their [the WM3's] guilt. "I'm more than convinced because [the police are] more than convinced," Hobbs said. "Mike Allen's a good man, and I believe what I know, and I only know what they tell me. I think it's just a sad, desperate attempt for the defense to be doing what they're doing." Ex. 24; Court's File, Stip. No. 1 (Ex. 13, CRITTENDEN COUNTY TIMES article, "Hobbs: This Isn't How," 7/24/07); Ex. 24 (same article);

- But the recent attention does take its toll, Hobbs said. "I try to go on the best I can, then something like this comes up, you know, and Hawaii looks pretty good sometimes, just to get away. This isn't how things could have been or should have been for all of us." Ex. 24; Court's File, Stip. No. 1 (Ex. 13, CRITTENDEN COUNTY TIMES article, "Hobbs: This Isn't How," 7/24/07); Ex. 24 (same article); and

- Hobbs has said the hair on the shoelaces must have been innocently transferred from himself to one of the victims, who "played with our boy regularly." Court's File, Stip. No. 1 (Ex. 17, Arkansas Online article, "Defense Presents New Evidence," 10/30/07).

Response:

## Statement of Fact No. 132:

Hobbs admits that the goal of his interaction with the media was to get the story out from his perspective and to convince the public and the powers that be that the WM3 belonged in jail.

Ex. 1, Hobbs Dep. 207:17-207:22, 457:24-461:19.

Response:

**F.     The ongoing judicial proceedings**

**1.     The post-conviction relief efforts generally**

**Statement of Fact No. 133:**

The WM3 cases are ongoing in the Arkansas court system, where Echols is currently represented by San Francisco attorney Dennis Riordan.  Ex. 8, Riordan Dec. ¶¶ 3-4; Ex. 6, Davis Dec. ¶ 11.

Response:

**Statement of Fact No. 134:**

Since their convictions in 1994, the WM3, including Damien Echols, have filed numerous motions for post-conviction relief in state and federal courts, including but not limited to motions to dismiss, motions for new trial, and Rule 37 petitions.  Ex. 8, Riordan Dec. ¶ 4.

Response:

**2.     Echols' previous Habeas Petitions and efforts to obtain DNA testing**

**Statement of Fact No. 135:**

In 2002, Echols filed a Motion for Forensic DNA Testing, and the Arkansas Supreme Court granted and extended a Motion for Stay of Proceedings (pending outcome of DNA Petition) in the lower court.  Ex. 8, Riordan Dec. ¶ 5.

Response:

**Statement of Fact No. 136:**

In 2004, an Order for DNA Testing was issued pursuant to Arkansas Code Sections 16-112-201, *et seq.*  Ex. 8, Riordan Dec. ¶ 5.

Response:

**Statement of Fact No. 137:**

This section of the Arkansas Code was passed by the Arkansas legislature in 2001 in part due to the continuing controversy concerning the reliability of the convictions in the WM3 case. Ex. 8, Riordan Dec. ¶ 5.

Response:

**Statement of Fact No. 138:**

Meanwhile, the Arkansas Supreme Court requested and received DNA Status Reports while Echols' motions before the court were stayed. Ex. 8, Riordan Dec. ¶ 5.

Response:

**Statement of Fact No. 139:**

During the entire post-conviction relief process, Echols and his attorneys have had to communicate and cooperate frequently with Arkansas state officials, including prosecuting attorney Brent Davis, in order to obtain DNA testing and preserve his post-conviction remedies. Ex. 13, Press Conference transcript (HOBBS 00133, 00136).

Response:

**Statement of Fact No. 140:**

Prior to October 2007, Damien Echols had filed a Petition for a Writ of Habeas Corpus ("Original Habeas Petition") in 2004 and a First Amended Petition for Writ of Habeas Corpus ("First Amended Habeas Petition") in 2005. Court's File, Stip. No. 2 (Ex. 1, Habeas Petition ¶¶ 14-15). Both Echols' Original Habeas Petition and his First Amended Habeas Petition included requests for relief on grounds of the jury's extrajudicial receipt and consideration of Jessie Misskelley's "confession." Ex. 8, Riordan Dec. ¶ 12. The First Amended Habeas Petition also requested relief on the grounds of the jury's lack of impartiality. Ex. 8, Riordan Dec. ¶ 12.

Response:

**Statement of Fact No. 141:**

The State of Arkansas moved to dismiss the First Amended Habeas Petition, and the Court denied the motion. Court's File, Stip. No. 2 (Ex. 1, Habeas Petition ¶¶ 16-17).

Response:

3.    **The Echols Habeas Petition and the WM3's ongoing efforts to obtain post-conviction relief**

**Statement of Fact No. 142:**

On October 29, 2007, Echols filed a Second Amended Petition for Habeas Corpus ("Habeas Pet."), a Memorandum in Support ("Habeas Memo"), and evidence in support ("Habeas Evidence") (collectively, "Habeas Petition"). Ex. 1, Hobbs Dep. 288:12-288:17, 288:20-288:23, 289:1-289:2, 290:3-290:7; Ex. 6, Davis Dec. ¶ 9; Ex. 8, Riordan Dec. ¶ 5; Stip. No. 2 (Ex. 1, Habeas Pet.; Ex. 2, Habeas Memo; Ex. 3, Habeas Evidence); Ex. 42, P. Hobbs Dec. ¶ 20; Ex. 47, Byers Dec. ¶ 14.

Response:

**Statement of Fact No. 143:**

The filing was over 200 pages and included the DNA, laundry and knife evidence. Ex. 6, Davis Dec. ¶ 10; Ex. 8, Riordan Dec. ¶ 6; Court's File, Stip. No. 2 (Ex. 1, Habeas Petition; Ex. 2, Habeas Memo; Ex. 3, Habeas Evidence). In the Habeas Memo, fingerprint evidence is mentioned only twice and in total, occupies approximately half of a page. Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 46, 106).

Response:

**Statement of Fact No. 144:**

The entire Habeas Petition is a public record available to anyone by request and is publicly accessible online through PACER.[4]  Ex. 8, Riordan Dec. ¶ 6.

Response:

**Statement of Fact No. 145:**

Echols' lawyers plan to present the evidence filed in support of the Habeas filing at the federal Habeas hearing, which has not yet occurred.  Ex. 8, Riordan Dec. ¶¶ 6, 11.

Response:

**4.      The Press Release**

**Statement of Fact No. 146:**

On October 30, 2007, Echols' defense team distributed to the press a release originally drafted by Echols' publicist, Alice Leeds, summarizing the new evidence (the "Press Release"). Ex. 6, Davis Dec. ¶ 12; Ex. 9, Leeds Dec. ¶¶ 3, 8; Ex. 12, Press Release.

Response:

**Statement of Fact No. 147:**

Prior to distributing the Press Release, it was approved and its accuracy verified by three of Echols' lawyers, Riordan, Donald Horgan and Gerald Skahan.  Ex. 6, Davis Dec. ¶ 12; Ex. 8, Riordan Dec. ¶ 7; Ex. 9, Leeds Dec. ¶ 7; Ex. 38, Leeds Press Release Email.

Response:

**Statement of Fact No. 148:**

The Press Release, which summarized the new forensic evidence contained in the Habeas filing, was distributed to media outlets all over the country, including the NEW YORK TIMES, THE

---

[4]     Five (5) specified exhibits were filed under seal.

WASHINGTON POST, the LOS ANGELES TIMES, and the major network broadcast affiliates in Memphis and Arkansas. Ex. 9, Leeds Dec. ¶¶ 4, 8; Ex. 12, Press Release. The Echols defense team wanted these media outlets to pick up the story and report on it to their readers and viewers. Ex. 9, Leeds Dec. ¶ 8.

Response:

**Statement of Fact No. 149:**

The Press Release sets forth the following evidentiary bullet points: "The filing includes dozens of expert reports, witness affidavits, scientific reports and other submissions. The highlights include:

- DNA test results showing that a hair found in the ligature of one of the victims matches Terry Hobbs, the step-father of another one of the victims.

- DNA test results showing foreign DNA - on the penises of two of the victims - from someone other than Echols or the other two men who were convicted.

- DNA test results matching a hair at the crime scene to a man who was with Terry Hobbs on the day of the crimes. This places Hobbs at the scene of the crime, since it refutes any theory that the Hobbs' hair (found in the ligature of one of the victims) was there before the crime.

- Scientific analysis from some of the nation's leading forensics experts, stating that wounds on the victims' bodies were caused by animals at the crime scene – not knives used by the perpetrators, as the prosecution claimed. These wounds were the centerpiece of the prosecution's case, and evidence was presented that a knife recovered from a lake near one defendant's home caused the wounds. The conclusive expert analysis showing that animals caused the wounds after the victims died also completely undercuts the testimony of a jailhouse informant (who testified about Echols using a knife to cause the wounds) and a discredited "expert" who testified that the knife wounds were part of a satanic ritual.

- Sworn affidavits outlining new evidence uncovered by Pam Hobbs (the ex-wife of Terry Hobbs) who found a knife in Terry Hobbs' drawer that her son (one of the victims) had carried with him at all times. After her son was killed, the knife was not among his personal effects that police gave to the Hobbs family, and Pam Hobbs always assumed that her son's murderer had taken it during the crime.

- New information implicating Terry Hobbs – including his own statements made to police in recent interviews where he acknowledged that several of his relatives

suspect him in the crime. The filing also includes a chronology of Hobbs' activities on the night of the crimes, when he washed his clothes and sheets at odd hours for no reason other than to hide evidence from the crimes.

- A sworn affidavit that refutes hearsay evidence from Echols' trial. The mother of one of two girls who testified that they overheard Echols admit to the crime at a softball game now says that Echols' statement was not serious and that neither she nor her daughter believes he committed the crime."

Ex. 6, Davis Dec. ¶ 13; Ex. 12, Press Release; Ex. 32, Leeds Press Release Email.

Response:

**Statement of Fact No. 150:**

Hobbs acknowledges that these Press Release bullet points contain the same information that would later be included almost word-for-word in the Letters that form the basis of his current claims. Ex. 1, Hobbs Dep. 243:1-243:9.

Response:

5. **The Press Conference**

**Statement of Fact No. 151:**

Echols' attorneys received over 300 interview requests from media outlets around the world in response to their filing of the Habeas Petition and the distribution of the Press Release. Ex. 8, Riordan Dec. ¶ 8; Ex. 13, Press Conference transcript (HOBBS 00133).

Response:

**Statement of Fact No. 152:**

On November 1, 2007, capitalizing on the national attention Hobbs had already brought to the DNA, other evidence and himself, Echols' attorneys held a press conference to discuss their view that the WM3 were wrongfully convicted, the Habeas Petition and the evidence ("Press Conference"). Ex. 1, Hobbs Dep. 239:19-240:13, 240:18-241:9; Ex. 6, Davis Dec. ¶¶ 8, 15; Ex. 8, Riordan Dec. ¶¶ 9-10; Ex. 13, Press Conference transcript; Ex. 42, P. Hobbs Dec. ¶ 21; Ex. 43, McCaughey Dec. ¶ 25; Ex. 47, Byers Dec. ¶ 14.

Response:

**Statement of Fact No. 153:**

At the Press Conference, in addition to discussing the Echols Petition generally and the arguments made therein, Echols' lawyers and defense experts specifically discussed Terry Hobbs and his relationship to the evidence, including the DNA evidence, his whereabouts on the night of the Murders, Pam Hobbs' discovery of Stevie's pocketknife in Terry Hobbs' possessions, and Pam Hobbs' family's suspicions that Terry Hobbs was involved in the Murders. Ex. 1, Hobbs Dep. 240:18-241:9; Ex. 6, Davis Dec. ¶ 16; Ex. 8, Riordan Dec. ¶ 10; Ex. 13, Press Conference transcript.

Response:

**Statement of Fact No. 154:**

Hobbs watched the Press Conference and knew that a main topic was his DNA. Ex. 1, Hobbs Dep. 239:19-239:22, 240:4-240:13.

Response:

**Statement of Fact No. 155:**

Former FBI criminal profiler John Douglas at the Press Conference expressed his opinion that the killer's profile was consistent with Terry Hobbs. Ex. 13, Press Conference transcript (HOBBS 00127-00129; 00131-00132; 00134).

Response:

**Statement of Fact No. 156:**

Hobbs was mentioned by name at least thirty-five (35) times at the Press Conference, and in the question and answer segment alone, nine (9) of the twenty-three (23) press questions regarding the new evidence focused on Hobbs and his possible involvement. Ex. 13, Press Conference transcript.

Response:

**Statement of Fact No. 157:**

The following are merely a few of the mentions the speakers at the Press Conference

made of Hobbs:

- [Tom Fedor, serologist expert] Good morning everyone. My name is Tom Fedor. I work for the Serological Research Institute in Richland, California. . . . What I learned from the cigarette butt that was thought to have been smoked by **Terry Hobbs** and I'll say "thought to have been" because one of them was recovered from the front yard of his residence. Another cigarette butt was recovered from an ashtray in his house. The DNA that I recovered from those cigarette butts does not exclude the person who smoked them from being the source of a particular hair found at the crime scene. That hair was associated with a ligature that bound the victim Moore. Approximately .12% of the population could also be the source of that cigarette butt DNA in case there are any doubts about whether it is **Hobbs'** DNA on that cigarette butt or not. Very few other people could have provided that particular DNA sample. In respect to the hair that was associated with the ligature, approximately 1.5% of the population at large could be the source of that hair. . . . **Terry Hobbs** could be the source of that hair on the ligature.

    . . .

- [Ex-FBI profiler John Douglas] So, I did this detailed analysis and went to the inquisitor private investigators in Memphis and what they said was "Douglas is describing some people here that we ought to take a look at" and low and behold David Jacoby was never interviewed by law enforcement. He waited for the cops to come knocking on his door. **Terry Hobbs** was never interviewed by the police until we conducted interviews of **Terry Hobbs**. I interviewed him two times and had one interview where he was very, very credible because I didn't have any background information on him, but then five days later when we get this more detailed information, specific information, I talked to a total liar on a Monday night. He is a total liar. The guy I'm talking to now is being confronted with his lies and it is totally a different type of bird. The person responsible for this crime can look at you right in the eye, can look at a camera and say that I didn't do it. Because of the psychopathic personality, there is no remorse. Anyone who perpetrates a crime like this and leaves the victims like this in this condition is only concerned about himself. You can put them on the polygraph, he will pass the polygraph particularly if its 14 years later.

Ex. 13, Press Conference transcript (HOBBS 00117-118, 00128-129).

Response:

**Statement of Fact No. 158:**

In his final statement at the Press Conference, Riordan articulated the reason Hobbs had been further drawn into the controversy over whether the WM3 were wrongfully convicted: Riordan called the Hobbs DNA evidence a "powerful piece of evidence . . . that would lead any reasonable juror to acquit Damien Echols" and compared the DNA evidence probability to a person driving a rare model car, which had been seen at the crime scene. Ex. 13, Press Conference transcript (HOBBS 00143-144).

Response:

**Statement of Fact No. 159:**

At the Press Conference, the experts and attorneys additionally discussed the other evidence set forth in the Press Release that would also be mentioned in Pasdar's Letters. Ex. 13, Press Conference transcript.

Response:

**Statement of Fact No. 160:**

They referenced a knife found in a lake behind Jason Baldwin's house, which the prosecution alleged was used in the Murders. Ex. 13, Press Conference transcript (HOBBS 00114-115; 00120-124); Ex. 2, Pasdar Dec. ¶ 8.

Response:

**Statement of Fact No. 161:**

The experts expressed their opinion that the victims had no knife wounds, and that the alleged knife wounds were actually caused by postmortem animal predation. Ex. 2, Pasdar Dec. ¶ 8; Ex. 13, Press Conference transcript (HOBBS 00120-124, 00135).

Response:

**Statement of Fact No. 162:**

The attorneys and experts also explained that a foreign allele was found on the penis of Steven Branch, which could not be linked to any victim or defendant. Ex. 2, Pasdar Dec. ¶ 8; Press Conference transcript (HOBBS 00116).

Response:

**Statement of Fact No. 163:**

All of these evidentiary points were similarly contained in the Press Release (Ex. 12), and would later appear in Pasdar's Letters (Exs. 3-4). Ex. 2, Pasdar Dec. ¶ 13; *compare* Exs. 3-4, Letters *with* Ex. 12, Press Release; Ex. 8, Riordan Dec. ¶ 11.

Response:

**G.     The press reports widely on the Press Release, Press Conference, new evidence and Terry Hobbs**

**Statement of Fact No. 164:**

Soon after the Press Conference, a video of it was posted on the WM3.org website where it has remained available for public viewing ever since. Court's File, Stip. No. 1 (Ex. 99, "West Memphis 3 Legal Defense Team Press Conference," 11/02/07); Ex. 6, Davis Dec. ¶ 19.

Response:

**Statement of Fact No. 165:**

Additionally, the video of the Press Conference is available to the general public on YouTube or through a simple Google search of "West Memphis 3 Press Conference." Ex. 6, Davis Dec. ¶ 20.

Response:

**Statement of Fact No. 166:**

The question of whether the WM3 had been wrongfully convicted received even more national media attention during November of 2007 because of the Press Conference, the Press

Release and the new evidence. Ex. 1, Hobbs Dep. 200:14-200:17; Ex. 6, Davis Dec. ¶ 21; Ex. 9, Leeds Dec. ¶¶ 8-9; Ex. 42, P. Hobbs Dec. ¶ 21; Ex. 43, McCaughey Dec. ¶ 25; Ex. 47, Byers Dec. ¶ 14.

Response:

**Statement of Fact No. 167:**

Arkansas and Memphis media outlets such as WMCTV, KAIT 8, the ARKANSAS DEMOCRAT-GAZETTE, MY FOX MEMPHIS, and KARK 4 extensively covered the Habeas filing, the Press Conference and the new evidence related to Hobbs. Court's File, Stip. No. 1 (Exs. 17, 20-22, 24-27, 30, 34).

Response:

**Statement of Fact No. 168:**

At least two media outlets quoted the Press Release bullet points verbatim and specifically referred to Hobbs by name in articles and blog posts about the Habeas Petition. Ex. 1, Hobbs Dep. 234:21-235:12; Ex. 12, Press Release; Court's File, Stip. No. 1 (Ex. 16, democraticunderground.com blog post, "Echols' Attorneys File New Motion," 10/29/07; Ex. 19, American Chronicle article, "Echols' Attorneys File New Evidence," 10/30/07).

Response:

**Statement of Fact No. 169:**

In addition to the local coverage, many national and international news outlets, including the NEW YORK TIMES, THE LOS ANGELES TIMES, THE GUARDIAN, THE OBSERVER and CNN.com published articles discussing the new DNA evidence, other Habeas Petition evidence and whether the WM3 had been wrongfully convicted. Court's File, Stip. No. 1 (Exs. 18, 23, 28-29, 31-32); Court's File, Stip. No. 4 (Ex. 85); Ex. 42, P. Hobbs Dec. ¶¶ 21-22.

Response:

**Statement of Fact No. 170:**

In addition to the news articles, many message boards and blogs discussed these same issues at the time of the filings. Ex. 1, Hobbs Dep. 233:10-233:19; Court's File, Stip. No. 1 (Exs. 53-60); Court's File, Stip. No. 4 (Ex. 362).

Response:

**H.     From 2007 through 2008 Hobbs repeatedly and voluntarily injects himself further into the controversy by granting numerous interviews designed to frame the debate and influence the outcome**

**Statement of Fact No. 171:**

On October 29, 2007, in addition to his prior television and movie appearances, his book about the Events and his life, his selling of movie and book rights to his "life story," his granting of a full interview with filmmakers regarding his whereabouts on the night of the Murders and the effect of the Events on his life, and his prior interviews with the press on all sorts of topics, Hobbs engaged a media spokesperson "to get the word out that Terry W. Hobbs is not the bad person as the investigators and defense team for Damien Echols has made me out to be." Ex. 1, Hobbs Dep. 47:22-48:16, 49:23-49:24, 50:1-50:5, 50:20-51:1; Ex. 7, Sampson Dep. 23:15-25:15, 27:7-28:20, 30:10-32:9, 38:1-38:10; Court's File, Stip. No. 1, (Exs. 22, 24, 37); Ex. 42, P. Hobbs Dec. ¶¶ 24-25; Ex. 43, McCaughey Dec. ¶ 29; Ex. 44, Hicks Dec. ¶ 13; Ex. 47, Byers Dec. ¶ 11; *see also* Ex. 49, Hobbs Journal (HOBBS 1077).

Response:

**Statement of Fact No. 172:**

Near the time Echols filed his Habeas Petition and the defense team was planning to hold a press conference, Hobbs' spokesman gave a press interview framing the issues just before the Echols Press Conference occurred. Ex. 7, Sampson Dep. 28:18-32:16, 35:14-36:19.

Response:

**Statement of Fact No. 173:**

Hobbs wanted to tell public that the right people were in prison and that his DNA could be at the crime scene as a result of normal, innocent transference. Ex. 1, Hobbs Dep. 122:24-123:7, 170:6-170:19; Ex. 7, Sampson Dep. 63:10-64:7, 66:5-67:24. Hobbs and his spokesperson, Ross Sampson, were quoted in several newspapers getting Hobbs' message out on October 30 through November 1 – the days following the Habeas filing and prior to Echols' defense team's Press Conference. Court's File, Stip. No. 1 (Exs. 22, 24, 37); Ex. 7, Sampson Dep. 27:16-29:1, 34:16-35:11, 35:14-37:17, 38:1-38:10. Echoing his media interviews, Sampson expressed his belief during his deposition that the concept of innocent transfer was not surprising and that "it makes sense." Ex. 7, Sampson Dep. 63:10-64:7, 67:15-67:24.

Response:

**Statement of Fact No. 174:**

And Hobbs was again at times the instigator of the articles, calling news reporters because "I just wanted someone in the media and the newspaper to hear what I had to say." Ex. 1, Hobbs Dep. 207:17-207:22; *see also* Ex. 49, Hobbs Journal (HOBBS 1077).

Response:

**Statement of Fact No. 175:**

Hobbs specifically recalls that he contacted Cathy Frye at the ARKANSAS DEMOCRAT-GAZETTE and spoke with her a few times. Ex. 1, Hobbs Dep. 207:10-207:25; Ex. 49, Hobbs Journal (HOBBS 1077). He did not call her to defend his reputation, but rather says, "I just wanted someone in the media and the newspaper to hear what I had to say." Ex. 1, Hobbs Dep. 207:10-207:25. The Cathy Frye interviews resulted in an article. Ex. 1, Hobbs Dep. 208:16-208:19.

Response:

**Statement of Fact No. 176:**

The resulting article discusses the DNA and Hobbs' link to it, and Hobbs says his reputation has been ruined. Ex. 1, Hobbs Dep. 207:10-207:25, 208:16-208:18, 209:1-210:7, 211:22-212:22; Court's File, Stip. No. 1 (Ex. 39, ARKANSAS DEMOCRAT-GAZETTE article, "Reputation is Ruined," 2/3/08); Ex. 27 (same article). However, Hobbs does not mention Pasdar or the Dixie Chicks as a cause of harm to his reputation but instead blames the Echols defense team and investigators. Ex. 1, Hobbs Dep. 212:3-213:1; Court's File, Stip. No. 1 (Ex. 39, ARKANSAS DEMOCRAT-GAZETTE article, "Reputation is Ruined," 2/3/08); Ex. 27 (same article).

Response:

**Statement of Fact No. 177:**

Hobbs and/or Sampson granted at least six (6) additional interviews in which Hobbs discussed in venues from the COMMERCIAL APPEAL to CNN's prime time national news program *Anderson Cooper 360*, topics as varied as the propriety of the WM3 convictions, the character of Echols' defense team, his parenting decisions, the mental stability of Stevie's mother, Hobbs' shooting of his brother-in-law and subsequent aggravated assault charge, his innocence, his interviews with the WMPD and his plans to write a book. Ex. 1, Hobbs Dep. 47:22-48:16, 49:23-49:24, 50:1-50:5, 50:20-51:1, 457:9-457:11, 458:10-458:21 (Hobbs Dep. Ex. 20); Ex. 28, ARKANSAS DEMOCRAT-GAZETTE news article, "Retrial Sought," 5/31/08); Court's File, Stip. No. 1 (Exs. 22, 24, 30, 37-39, 43); Ex. 42, P. Hobbs Dec. ¶¶ 24-25; Ex. 43, McCaughey Dec. ¶ 29; Ex. 44, Hicks Dec. ¶ 13; Ex. 47, Byers Dec. ¶ 11.

Response:

**Statement of Fact No. 178:**

In the interviews, Hobbs and Sampson repeatedly confirmed that the WM3 were the killers, that Hobbs was innocent and that "justice has been served." Ex. 1, Hobbs Dep. 48:4-48:16, 50:20-51:4; Ex. 7, Sampson Dep. 28:10-28:17, 35:4-35:11, 35:14-35:18 (Sampson Dep. Ex. 10); Court's File, Stip. No. 1 (Ex. 24, MY FOX MEMPHIS article, "Hobbs Attorney Unconcerned," 10/31/07; Ex. 30, KAIT-TV article, "Continuing Coverage: Pam Hobbs Speaks Out," 11/7/07).

Response:

**Statement of Fact No. 179:**

Hobbs repeatedly attacked the WM3 and the people working for them, attacked the press and asked the country for sympathy. Ex. 1, Hobbs Dep. 209:14-213:12, 351:7-352:19, 457:9-457:11, 458:10-458:21 (Hobbs Dep. Ex. 20); Ex. 28, ARKANSAS DEMOCRAT-GAZETTE article, "Retrial Sought," 5/31/08); Court's File, Stip. No. 1 (Exs. 22, 30, 38-39, 43).

Response:

**Statement of Fact No. 180:**

Hobbs also discussed whether the DNA was his, how it might have gotten on the victim, the suspicions of Pam Hobbs and her family that he was involved in the Murders, the WMPD police interview, his family life, girlfriends, parenting skills and his upcoming book deal. Ex. 1, Hobbs Dep. 32:17-33:5, 113:15-114:23, 457:9-457:11, 458:10-458:21 (Hobbs Dep. Ex. 20); Ex. 28, ARKANSAS DEMOCRAT-GAZETTE news article, "Retrial Sought," 5/31/08); Court's File, Stip. No. 1, (Exs. 22, 30, 38-39, 43).

Response:

**Statement of Fact No. 181:**

Below are various excerpts from articles in which Hobbs and his spokesperson, Sampson, were interviewed:

- "It's sad to see that there are people out here trying to get killers out of prison, that deserve, every one of them, to be hung by a rope," said Terry Hobbs. Court's File, Stip. No. 1 (Ex. 30, KAIT-TV article, "Continuing Coverage: Pam Hobbs Speaks Out," 11/7/07);

- "They (defense lawyers) have nothing better to do than try to get some killers out of prison. And they have to point the finger at somebody," Hobbs said again Monday in a phone interview. Ex. 1, Hobbs Dep. 351:7-352:19 (Hobbs Dep. Ex. 10); Court's File, Stip. No. 1 (Ex. 38, COMMERCIAL APPEAL article, "Familiar Face," 11/27/07); Ex. 26 (same article);

- "When the circus left town they left a clown behind," Hobbs said Monday of [John Mark] Byers and his allegations. "For whatever reason he's doing this [accusing Hobbs], and I think I know, he's on the wrong page." Ex. 26; Court's File, Stip. No. 1 (Ex. 38, COMMERCIAL APPEAL article, "Familiar Face," 11/27/07); Ex. 26 (same article);

- "I want people to know I haven't done nothing wrong," [Hobbs] said in a Friday night interview at a Memphis barbecue restaurant. "I want them to hear it from me." Ex. 1, Hobbs Dep. 209:14-213:24; Court's File, Stip. No. 1, (Ex. 39, ARKANSAS DEMOCRAT-GAZETTE article, "Reputation is Ruined," 2/3/08); Ex. 27 (same article);

- "Hobbs, 49, is angry, saying that in the past year, defense investigators have ruined his reputation and caused him to have a nervous breakdown." Ex. 1, Hobbs Dep. 209:14-213:24; Court's File, Stip. No. 1, (Ex. 39, ARKANSAS DEMOCRAT-GAZETTE article, "Reputation is Ruined," 2/3/08); Ex. 27 (same article);

- "That's so crazy," Hobbs said Friday when asked about her [Sharon Nelson's] claims that he was the first to find the boys' bodies, but didn't tell the police or his wife about his discovery. "Some people will say anything to get their 15 seconds of fame, and that, to me, sounds like one of those people." The woman, he said, wasn't a girlfriend. She was interested in him, but he didn't reciprocate. "And no," he added, "I didn't find the boys' bodies." Ex. 1, Hobbs Dep. 457:9-457:11, 458:10-458:21 (Dep. Ex. 20); Ex. 28, ARKANSAS DEMOCRAT-GAZETTE news article, "Retrial Sought," 5/31/08); Ex. 28 (same article);

- "I am not a child killer. . . . I haven't done anything wrong and everybody knows that." Ex. 1, Hobbs Dep. 345:12-348:2; Court's File, Stip. No. 1 (Ex. 43, WMCTV ACTION 5 NEWS article, "Step-father of a West Memphis Three Victim Writing Book," 8/8/08); Ex. 29 (same article);

- Hobbs also said he has kept a journal that began the day in May the bodies of the three boys were discovered. "Part of it is in the hands of a publisher or a book writer . . . not a publisher, a writer. I think we are going to write a pretty good story about this," Hobbs said. Hobbs also said it is about 300-400 pages and someone in Hollywood wants the first rights to the book. Ex. 1, Hobbs Dep. 345:12-348:2; Court's File, Stip. No. 1 (Ex. 43 WMCTV ACTION 5 NEWS article, "Step-father of a West Memphis Three Victim Writing Book," 8/8/08); Ex. 29 (same article);

- Terry Hobbs' attorney Ross Sampson says Hobbs denies having anything to do with the murders of the three 8-year-old boys. Court's File, Stip. No. 1 (Ex. 22, WMCTV ACTION 5 NEWS article, "Father Outraged," 10/30/07);

- "This really doesn't affect us at all," said Sampson. . . . "The perception is that this is somehow an accusation against Mr. Hobbs and we don't perceive that as such," said Sampson. . . . "Mr. Hobbs believes justice has been served," said Sampson. Ex. 7, Sampson Dep. 27:16-28:20 (Sampson Dep. Ex. 10); Court's File, Stip. No. 1 (Ex. 24, MY FOX MEMPHIS article, "Hobbs' Attorney Unconcerned," 10/31/07); Ex. 30 (same article); and

- Hobbs' attorney, Ross Sampson, wasn't worried about the new evidence. "The allegation itself is ridiculous," he said. . . . Terry Hobbs has not been charged with anything and his attorney does not expect that to happen. "We really don't expect any type of legal action taken by the state of Arkansas against Mr. Hobbs," Sampson said. Ex. 7, Sampson Dep. 35:4-35:11 (Sampson Dep. Ex. 11); Ex. 31, WM3.vox.com blog post citing WMCTV Action News 5 article, "New West Memphis 3 Evidence to be Outlined at News Conference," 11/1/07.

Ex. 1, Hobbs Dep. 48:4-48:16, 50:20-51:4; Ex. 42, P. Hobbs Dec. ¶¶ 25-26; Ex. 43, McCaughey Dec. ¶¶ 29-30; Ex. 44, Hicks Dec. ¶ 12; Ex. 47, Byers Dec. ¶ 12.

Response:

**Statement of Fact No. 182:**

Hobbs' purpose in hiring Sampson was to get the word out that Hobbs was not involved in the Murders, that any Hobbs DNA got to the crime scene by innocent transference, and that the WM3 had been appropriately convicted and should remain in prison. Ex. 1, Hobbs Dep. 170:2-170:19; Ex. 7, Sampson Dep. 35:4-35:11, 35:14-35:18.

Response:

**Statement of Fact No. 183:**

Hobbs even allowed his daughter, Amanda Hobbs, to go on national television on CNN's acclaimed *Larry King Live* television show to get out his message. Ex. 1, Hobbs Dep. 21:13-21:17; Court's File, Stip. No. 1 (Ex. 95, *Larry King Live* transcript, 12/19/07).

Response:

**Statement of Fact No. 184:**

During the program, Amanda Hobbs responded to the DNA evidence and claims by John Mark Byers that Terry Hobbs was responsible for the Murders, saying: "It makes me sick, it really does." Court's File, Stip. No. 1 (Ex. 95, *CNN Larry King Live* transcript, 12/19/07).

Response:

**Statement of Fact No. 185:**

In what was probably his most far-reaching effort, on November 7, 2007, Hobbs and his spokesperson, Ross Sampson, appeared on the national cable news channel, CNN, on its flagship evening broadcast, *Anderson Cooper 360*. Ex. 1, Hobbs Dep. 21:7-21:8, 47:4-47:16, 50:20-51:4; Ex. 7, Sampson Dep. 21:15-21:18, 24:13-24:8, 64:8-69:16 (Sampson Dep. Ex. 9); Court's File, Stip. No. 1 (Ex. 94, *Anderson Cooper 360* transcript, 11/7/07). The key question, as framed by CNN was: "Are they [the WM3] actually innocent?" Court's File, Stip. No. 1 (Ex. 94, *Anderson Cooper 360* transcript, 11/7/07). The episode focuses on the evidence Hobbs first made public – his DNA being found at the crime scene. *Id.*

Response:

**Statement of Fact No. 186:**

In the segment, Hobbs is asked about the DNA evidence and in response seeks the nation's sympathy:

Q: So who could the hairs belong to? . . . Is it possible, Mr. Hobbs, that that was your hair?

Sampson: Sure.

. . .

Hobbs: You live with this every day. And then, to have your friends and neighbors look at you and think, is there something else there? That's – that hurts.

Ex. 1, Hobbs Dep. 21:7-21:8; Ex. 7, Sampson Dep. 65:19-67:16; Court's File, Stip. No. 1, (Ex. 94, *Anderson Cooper 360* transcript, 11/7/07).

Response:

**Statement of Fact No. 187:**

Three separate CNN-affiliated websites posted national articles quoting Hobbs and Sampson on the show. Court's File, Stip. No. 1 (Exs. 29, 31-32, CNN.com web postings, "Defense: New Evidence May Clear West Memphis Three," 11/07/07).

Response:

**Statement of Fact No. 188:**

Hobbs also gave an interview in August 2008 to Janice Broach in which he discussed his efforts to sell his story as a book and movie. Ex. 1, Hobbs Dep. 346:12-346:19.

Response:

**Statement of Fact No. 189:**

In the article resulting from his August 2008 interview with Janice Broach, Hobbs admits he has worked on the book for years and that the press has known about Hobbs' book for years. Ex. 1, Hobbs Dep. 347:8-348:25; Court's File, Stip. No. 1 (Ex. 43, ACTION NEWS 5 article, "Step-father of WM3 Victim Writing a Book," 8/8/08); Ex. 29 (same article).

Response:

**Statement of Fact No. 190:**

Hobbs has made no secret he has worked on his book with the hopes of publishing and selling it. Ex. 1, Hobbs Dep. 348:16-348:25; Court's File, Stip. No. 1, (Ex. 38, COMMERCIAL APPEAL article, "Familiar Face," 11/27/07); Ex. 26 (same article).

Response:

**Statement of Fact No. 191:**

Hobbs has also gone to the press with the news about his book, publicly stating that he is writing a 300-400 page book, taken from a journal he has kept since the day of the Murders. Ex. 1, Hobbs Dep. 347:20-348:2; Court's File, Stip. No. 1 (Ex. 43, WMCTV ACTION 5 NEWS article, "Step-father of a West Memphis Three Victim Writing a Book," 8/8/08) ; Ex. 29 (same article).

Response:

**Statement of Fact No. 192:**

The interviews Hobbs and his spokesperson gave were re-printed and re-quoted around the country: quotes from Hobbs regarding the 2007 events have appeared in at least twenty–six (26) newspaper articles locally and nationally. Court's File, Stip. No. 1 (Exs. 3-10,12-13, 17-18, 22-24, 29-32, 38-39, 40 43); Court's File, Stip. No. 4 (Exs. 190, 253); Ex. 28, ARKANSAS DEMOCRAT-GAZETTE article, "Retrial Sought," 5/31/08); Ex. 31, WM3.vox.com blog post citing WMCTV Action News 5 article, "New West Memphis 3 Evidence to be Outlined at News Conference," 11/01/07.

Response:

**Statement of Fact No. 193:**

Even apart from the original articles and interviews, Hobbs' words live on via the internet; many of these articles and stories containing Hobbs' quotes have been re-posted or linked by various blogs and websites. Court's File, Stip. No. 1 (Exs. 48-91).

Response:

I.    **Hobbs recognizes he is in the center of the public controversy**

**Statement of Fact No. 194:**

Hobbs acknowledges that all the Events and the 2007 issues combine to form one lengthy controversy over the original question: whether the WM3 were wrongfully convicted. Ex. 1, Hobbs Dep. 14:9-16:8, 16:19-16:25, 142:12-142:19, 178:19-178:23.

Response:

**Statement of Fact No. 195:**

Given the fact that Hobbs is the source of the disclosure of the key DNA evidence – ground zero so to speak – given the close association of Hobbs with the latest evidence in the WM3 case, given Hobbs' penchant for granting interviews to reporters that call him or that he himself calls and given Hobbs' desire to get out the word that the killers are already in prison and that he is not a bad person, it is no surprise that even Hobbs must admit he is in the center of this very public controversy concerning whether the WM3 were wrongfully convicted. Ex. 1, Hobbs Dep. 120:6-120:12, 121:3-121:23, 122:24-123:7, 219:10-219:20, 220:13-220:20; Ex. 20, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07; Court's File, Stip. No. 1 (Exs. 4, 8).

Response:

**Statement of Fact No. 196:**

Hobbs candidly admitted in his journal how expansive the press interest was in him after he made public the evidence and how willingly he further participated with the press on the stories. Ex. 1, Hobbs Dep. 362:23-363:7, 367:7-367:9; Ex. 49, Hobbs Journal (HOBBS 01085).

Response:

**J.      Pasdar learns about the WM3 controversy**

**Statement of Fact No. 197:**

Pasdar first became aware of the West Memphis 3, the Robin Hood Hills Murders and Terry Hobbs in approximately May, 2007, when she watched the two *Paradise Lost* documentaries.  Ex. 2, Pasdar Dec. ¶ 3.

Response:

**Statement of Fact No. 198:**

After watching the films, Pasdar decided to donate money to the Damien Echols Legal Defense Fund.  Ex. 2, Pasdar Dec. ¶ 5; Ex. 6, Davis Dec. ¶ 24; Ex. 37, Pasdar Donation Email (DAVIS 001-002).

Response:

**Statement of Fact No. 199:**

Following Pasdar's donation, Lorri Davis, contacted Pasdar to thank her for the donation. Ex. 2, Pasdar Dec. ¶ 6.

Response:

**Statement of Fact No. 200:**

Davis' outreach to Pasdar began a lengthy correspondence between the two about the WM3 case.  Ex. 2, Pasdar Dec. ¶¶ 6-13, 17.

Response:

**Statement of Fact No. 201:**

From that time to present, Pasdar and Davis communicated informally through email and phone calls, with Davis educating Pasdar about the Murders, the evidence, the convictions, the WM3 efforts to obtain release from incarceration and relief from their convictions, and the publicity surrounding the WM3.  Ex. 2, Pasdar Dec. ¶ 7; Ex. 6, Davis Dec. ¶ 23.

Response:

**Statement of Fact No. 202:**

As Damien Echols's wife and a leading WM3 activist, Davis is one of the persons most knowledgeable about the Events, the WM3, their ongoing judicial proceedings and the publicity surrounding the Events. Ex. 2, Pasdar Dec ¶ 6; Ex. 6, Davis Dec. ¶¶ 3-11, 15-21, 39.

Response:

**Statement of Fact No. 203:**

Because of Davis' wealth of knowledge about the WM3, Pasdar relied upon Davis as her primary source of information to keep her informed and updated about the proceedings, the new evidence and the publicity surrounding the WM3. Ex. 2, Pasdar Dec. ¶ 8.

Response:

**Statement of Fact No. 204:**

In early November 2007, Davis sent Pasdar a link to the Echols legal defense team Press Conference, where the defense team spoke specifically about the new evidence contained in the Habeas filing, including the evidence which potentially implicates Hobbs. Ex. 2, Pasdar Dec. ¶ 8. Pasdar watched the Press Conference. Ex. 2, Pasdar Dec. ¶ 8.

Response:

**Statement of Fact No. 205:**

Pasdar at different times also saw various news reports about the WM3, which only confirmed what Davis had already told her about the case. Ex. 2, Pasdar Dec. ¶ 8.

Response:

**Statement of Fact No. 206:**

On or about November 7, 2007, Pasdar also watched the WM3 profile and Hobbs' interview on CNN's *Anderson Cooper 360*, which addressed the WM3 controversy, the new

evidence in the case, and interviewed Hobbs and his spokesman about the meaning of the new evidence. Ex. 2, Pasdar Dec. ¶ 9; Court's File, Stip. No. 1 (Ex. 94, *Anderson Cooper 360* transcript, 11/7/07).

Response:

**Statement of Fact No. 207:**

On November 12, 2007, Pasdar emailed Lorri Davis about Hobbs' appearance on *Anderson Cooper 360*. Ex. 2, Pasdar Dec. ¶ 10; Ex. 6, Davis Dec. ¶ 26; Ex. 33, Pasdar WM3 Emails (DAVIS 013-015).

Response:

**Statement of Fact No. 208:**

Pasdar told Davis that she was thinking of ideas for raising money for the Echols defense team. Ex. 2, Pasdar Dec. ¶ 10; Ex. 6, Davis Dec. ¶ 27; Ex. 33, Pasdar WM3 Emails (DAVIS 013-015).

Response:

**Statement of Fact No. 209:**

Soon thereafter, Pasdar, with the help of her managers at Strategic Artist Management, began trying to organize a screening of the *Paradise Lost* films in Los Angeles to raise awareness of and money for the WM3. Ex. 2, Pasdar Dec. ¶ 11; Ex. 6, Davis Dec. ¶ 28; Ex. 11, Renshaw Dec. ¶ 4; Ex. 33, Pasdar WM3 Emails (SAM 003-004; DAVIS 013-015).

Response:

**K.      Pasdar's due diligence regarding the Letters**

**Statement of Fact No. 210:**

On November 16, 2007, Pasdar informed Davis that she was "putting a letter together . . . with a link to find out more information and donate." Ex. 2, Pasdar Dec. ¶ 12; Ex. 6, Davis Dec. ¶ 29; Ex. 33, Pasdar WM3 Emails (DAVIS 013-015).

Response:

**Statement of Fact No. 211:**

At that time, Pasdar again donated to the defense fund. Ex. 2, Pasdar Dec. ¶ 12; Ex. 6, Davis Dec. ¶ 30; Ex. 33, Pasdar WM3 Emails (DAVIS 013-015).

Response:

**Statement of Fact No. 212:**

On November 17, 2007, Davis emailed Pasdar a document titled "Summary of New Evidence in Damien Echols (and the "West Memphis 3") Case" ("Summary") (Ex. 34). Ex. 2, Pasdar Dec. ¶ 13; Ex. 6, Davis ¶ 31; Ex. 34, Davis Summary Email (DAVIS 016-018).

Response:

**Statement of Fact No. 213:**

The Summary (Ex. 34) sent to Pasdar on November 17, 2007 attached the Press Release (Ex. 12) prepared by WM3 publicist Alice Leeds, which was approved by Echols' defense attorneys Riordan, Donald Horgan and Gerald Skahan. Ex. 6, Davis Dec. ¶ 32; Ex. 8, Riordan Dec. ¶ 7; Ex. 9, Leeds Dec. ¶¶ 4-7, 10; Ex. 12, Press Release; Ex. 34, Davis Summary Email.

Response:

**Statement of Fact No. 214:**

Davis offered the Summary (Ex. 34) to Pasdar as a list of possible "talking points" for the fundraising letter Pasdar was putting together. Ex. 2, Pasdar Dec. ¶ 13; Ex. 6, Davis Dec. ¶ 34.

Response:

**Statement of Fact No. 215:**

Pasdar understood and believed the Summary (Ex. 34) had been prepared and approved as factually accurate by Echols' attorneys and was an accurate reflection of the new evidence the defense team was prepared to present to the federal court. Ex. 2, Pasdar Dec. ¶ 14.

Response:

**Statement of Fact No. 216:**

In addition to her conversations with Davis and review of the Press Conference, the *Anderson Cooper 360* Show and other various news reports, Pasdar relied heavily on the language from the Summary (Ex. 34) and Press Release (Ex. 12) in drafting her Letters to seek donations, particularly in the Letters' post-script, which is nearly identical to the evidence highlights in the Summary (Ex. 34) and in the Press Release (Ex. 12). Ex. 2, Pasdar Dec. ¶¶ 14-15, 33-34; SF 301, *infra.*

Response:

**Statement of Fact No. 217:**

As Hobbs admits, all the information contained in the Press Release (Ex. 12) and/or Summary (Ex. 34) is information which had been public and widely reported since July 2007. Ex. 1, Hobbs Dep. 234:21-235:12; Ex. 6, Davis ¶¶ 33, 43; Ex. 9, Leeds Dec. ¶ 10.

Response:

**Statement of Fact No. 218:**

On November 20, 2007, Pasdar forwarded a draft of the letter to her management team for review and posting on the Dixie Chicks website and the Dixie Chicks MySpace blog. Ex. 2, Pasdar Dec. ¶ 16; Ex. 11, Renshaw Dec. ¶ 5; Ex. 35, Pasdar Editing Emails (PASDAR 022-024).

Response:

**Statement of Fact No. 219:**

On November 20, 2007, Pasdar also emailed Davis a draft of the letter and asked for feedback. Ex. 2, Pasdar Dec. ¶ 17; Ex. 6, Davis Dec. ¶ 36; Ex. 36, Pasdar Letter Emails (DAVIS 024-026).

Response:

**Statement of Fact No. 220:**

Davis enthusiastically approved the letter as factually accurate. Ex. 2, Pasdar Dec. ¶ 17; Ex. 6, Davis Dec. ¶ 36; Ex. 36, Pasdar Letter Emails (DAVIS 024-026).

Response:

**Statement of Fact No. 221:**

On November 21, 2007, Simon Renshaw ("Renshaw"), Pasdar's manager, emailed Pasdar some suggested changes to the letter. Ex. 2, Pasdar Dec. ¶ 18; Ex. 11, Renshaw Dec. ¶ 5; Ex. 35, Pasdar Editing Emails (PASDAR 025-028).

Response:

**Statement of Fact No. 222:**

On November 22, 2007, Pasdar rejected Renshaw's suggestions:

Overall, I don't mind grammar corrections or wording that states things more clearly, but all of the legal stuff is copied directly from the court filing and legal papers that were written by the defense team. I don't want to put any of that in my own words. The DNA evidence is not 'what I think', but what has been proven in the testing and id (sic) just being presented in the federal court hearing.

Ex. 2, Pasdar Dec. ¶ 19; Ex. 11, Renshaw Dec. ¶ 5; Ex. 35, Pasdar Editing Emails (SAM 370-375).

Response:

**Statement of Fact No. 223:**

A few minutes later, on November 22, 2007, to ensure no substantive changes were made to the letter, Pasdar also sent a similar email to Morgan Zeuhlke, an employee at SAM responsible for arranging the posting of the Letters on the website:

> Morgan, Please know that other than grammatical corrections, I don't want any of Simon's changes to be made to the letter. He doesn't realize that I took all of the legal talk directly from the documents written by the defense team. I am talking to him in the AM to go over all of it, but I just wanted to save you some work if I could.

Ex. 2, Pasdar Dec. ¶ 20; Ex. 11, Renshaw Dec. ¶ 6; Ex. 35, Pasdar Editing Emails (PASDAR 025-028).

Response:

**Statement of Fact No. 224:**

Consequently, no substantive changes were made to the draft of the letter before posting it on the website. Ex. 2, Pasdar Dec. ¶ 21; Ex. 11, Renshaw Dec. ¶ 7.

Response:

**Statement of Fact No. 225:**

On or about November 26, 2007, the Website Letter was posted on the Dixie Chicks' website. Ex. 2, Pasdar Dec. ¶ 22; Ex. 11, Renshaw Dec. ¶ 8.

Response:

**Statement of Fact No. 226:**

A few days earlier, the MySpace Letter had been posted on the Dixie Chicks MySpace blog. Ex. 2, Pasdar Dec. ¶ 23.

Response:

**Statement of Fact No. 227:**

The bodies of the MySpace Letter and the Website Letter are identical except that when linking to sample letters for a letter writing campaign, the Website Letter says, "Click here to download the sample letter" whereas the MySpace Letter says, "By clicking on this link, you can download the sample letter." Ex. 2 Pasdar Dec. ¶ 24. The postscript of the Website Letter and the MySpace Letter are identical . Ex. 2, Pasdar Dec. ¶ 24; Exs. 3-4, Letters; Ex. 1, Hobbs Dep. 307:16-307:22.

Response:

**L.     The Rally**

**Statement of Fact No. 228:**

In early December, 2007, Davis asked Pasdar to help deliver letters and petitions regarding the WM3 to the Governor of Arkansas, and to make some brief remarks at a WM3 Rally in Little Rock. Ex. 2, Pasdar Dec. ¶ 35; Ex. 6, Davis Dec. ¶ 40; Ex. 38, Davis Rally Emails (DAVIS 034-035).

Response:

**Statement of Fact No. 229:**

To help Pasdar prepare her remarks, publicist Alice Leeds prepared a "Summary Message Points for Little Rock Rally." Ex. 2, Pasdar Dec. ¶ 36; Ex. 6, Davis Dec. ¶ 41; Ex. 9, Leeds Dec. ¶ 12; Ex. 38, Davis Rally Emails (DAVIS 034-035); Ex. 39, Leeds Rally Email (SAM 159-161).

Response:

**Statement of Fact No. 230:**

Hobbs is not referred to in the "Summary Message Points" for the Rally. Ex. 2, Pasdar Dec. ¶ 36; Ex. 39, Leeds Rally Email (SAM 159-161).

Response:

**Statement of Fact No. 231:**

Pasdar did rely on the "Summary Message Points" when making her remarks on December 19, 2007. Ex. 2, Pasdar Dec. ¶ 37; Ex. 6, Davis Dec. ¶ 42.

Response:

**Statement of Fact No. 232:**

Only one fairly complete video of Pasdar's remarks at the Rally is available. Ex. 2, Pasdar Dec. ¶ 38; Ex. 5, Rally transcript.

Response:

**Statement of Fact No. 233:**

In her remarks, Pasdar does not mention or in any way refer to Terry Hobbs. Ex. 1, Hobbs Dep. 191:17-191:21, 201:3-201:6; Ex. 2, Pasdar Dec. ¶¶ 37, 39; Ex. 5, Rally transcript; Ex. 6, Davis Dec. ¶ 42.

Response:

**Statement of Fact No. 234:**

She does not refer specifically to the forensic evidence at the Rally. Ex. 2, Pasdar Dec. ¶ 39; Ex. 5, Rally transcript.

Response:

**Statement of Fact No. 235:**

Aware that Pasdar did not speak his name at the Rally, Hobbs purports to complain about the following comments Pasdar allegedly made at the Rally: "When you see the films and when you go the website you'll learn all the evidence that is there, and this there now, you just feel like what can I do" and "Well I feel like she saying her scientifically proven statement is what they

came up with the stuff about me." Ex. 1, Hobbs Dep. 201:3-201:17, 202:5-202:9, 202:19-202:24.

Response:

**Statement of Fact No. 236:**

In his Interrogatory responses, Hobbs complains that Pasdar says "It's not a debate about opinion. It's science and it's overwhelming." Ex. 15, Hobbs' Supp. Ans. No. 1.

Response:

**Statement of Fact No. 237:**

The video of the Rally shows that Pasdar's actual words were:

"It's not about debate. It's about science and I've tried to find negative comments and it's hard to find – it's hard for people to open their mouths or debate something that has now been scientifically proven."

Ex. 2, Pasdar Dec. ¶ 39; Ex. 5, Rally transcript.

Response:

**Statement of Fact No. 238:**

Nowhere in the comments does Pasdar link what was scientifically proven to Hobbs. Ex. 2, Pasdar Dec. ¶ 40; Ex. 5, Rally transcript.

Response:

**Statement of Fact No. 239:**

Pasdar was stating that it had been scientifically proven that there was no forensic evidence tying the WM3 to the crime scene and it was hard to debate whether they were wrongfully convicted. Ex. 2, Pasdar Dec. ¶ 40.

Response:

**Statement of Fact No. 240:**

Her point is that it has been scientifically proven the WM3 did not commit the Murders through the absence of evidence. Ex. 2, Pasdar Dec. ¶ 40; Ex. 5, Rally transcript. Her comments do not state that it has been scientifically proven that Hobbs did commit the Murders. Ex. 2, Pasdar Dec. ¶ 40. In fact, she said "I'm just amazed these guys are still in prison. . . . I urge you all to go to WM3.org and donate to the defense fund." Ex. 5, Rally transcript.

Response:

**M.      Hobbs admits the Letters are not defamatory**

**Statement of Fact No. 241:**

Hobbs candidly admits in his deposition facts which demonstrate that the Letters are simply not actionable. Contrary to the allegations in his Complaint, Hobbs admits that the statements in the Letters *do not accuse him of murder.* Ex. 1, Hobbs Dep. 308:15-308:22, 308:25-309:18. More precisely, Hobbs states:

> Q:      (PASDAR'S COUNSEL): Okay. I appreciate that, and I think we've established that. My question to you, sir, is where in there do you believe that statements individually or taken as a whole accuse you of murder of one or more of the three little boys. She doesn't do it, does she?
>
>         . . .
>
> A:      (HOBBS): No, sir.

Ex. 1, Hobbs Dep. 308:15-308:22, 308:25-309:1.

Response:

**Statement of Fact No. 242:**

Hobbs acknowledges the gist of the Letters is really a call for people to get involved on behalf of the WM3. Ex. 1, Hobbs Dep. 278:22-279:6, 279:8.

Response:

**Statement of Fact No. 243:**

And, despite his bluster about Pasdar's actions, Hobbs admits that it is a matter of public concern who murdered the three little boys, and that the trials themselves were a matter of national and international concern. Ex. 1, Hobbs Dep. 247:1-247:12.

Response:

**Statement of Fact No. 244:**

Further, Hobbs specifically admits that it is a matter of public concern whether the WM3 were wrongfully convicted of murder. Ex. 1, Hobbs Dep. 249:6-249:20.

Response:

**Statement of Fact No. 245:**

He also admits that Pasdar and the Dixie Chicks are entitled to their opinions on whether the WM3 were wrongfully convicted. Ex. 1, Hobbs Dep. 250:1-250:9.

Response:

**Statement of Fact No. 246:**

When confronted with Pasdar's Letters, Hobbs even acknowledges that the body of her Letters contain only Pasdar's opinions regarding the case, that she is entitled to express her opinion, and that Pasdar's statements about the evidence are accurate statements previously reported all over the nation. Ex. 1, Hobbs Dep. 260:7-260:9, 308:10-308:14.

Response:

**Statement of Fact No. 247:**

Hobbs specifically admits that Pasdar is entitled to say that the West Memphis Three deserve a new trial. Ex. 1, Hobbs Dep. 187:18-188:21.

Response:

**Statement of Fact No. 248:**

He acknowledges that the First Amendment means "people can shoot off if they want to" and that means "she can say anything she wants." Ex. 1, Hobbs Dep. 186:20-186:24, 187:12-187:15, 187:18-187:21

Response:

**Statement of Fact No. 249:**

Hobbs also admits that statements in the Letters about which Hobbs complains contain only information that was widely publicized and widely reported in the press and by the Echols defense team well in advance of the Letters. Ex. 1, Hobbs Dep. 11:20-12:6, 12:16-13:7, 183:17-183:22, 226:4-226:11. The ironic thing is that Hobbs was the source for the disclosure of the DNA evidence that he now tries to prohibit Pasdar from discussing. Ex. 1, Hobbs Dep. 121:4-121:9, 219:10-219:20, 220:13-220:20; Ex. 20, ARKANSAS TIMES article, "New Evidence in West Memphis Murders," 7/19/07; Court's File, Stip. No. 1 (Exs. 4, 8).

Response:

**Statement of Fact No. 250:**

Before the Letters were published, all of the statements in them had been made in and by the national press many times, for many months, often at the instigation of Hobbs himself. Ex. 1, Hobbs Dep. 184:1-184:22.

Response:

**Statement of Fact No. 251:**

In fact, Hobbs admits that mentioning Hobbs the way Pasdar did has "been done a million times." Ex. 1, Hobbs Dep. 185:13-185:23.

Response:

**Statement of Fact No. 252:**

Simply put, Hobbs admits "Her statements are not any different than any others." Ex. 1, Hobbs Dep. 260:7-260:9, 308:10-308:14.

Response:

**Statement of Fact No. 253:**

With regard to the post-script of the Letters, Hobbs acknowledges that the press had been reporting about Hobbs' DNA for several months before the posting of the Letters. Ex. 1, Hobbs Dep. 219:1-219:9.

Response:

**Statement of Fact No. 254:**

The types of statements and allegations made in Pasdar's bullet point post-script were the subject of national and international attention starting in the Spring 2007, up through today. Ex. 1, Hobbs Dep. 235:4-236:9.

Response:

**Statement of Fact No. 255:**

In fact, "page after page and week after week" those allegations concerning DNA were made. Ex. 1, Hobbs Dep. 236:2-236:24. In short, all of the statements made about Hobbs in the post-script originally had been made long before Pasdar made her statements and they continue to be made today. Ex. 1, Hobbs Dep. 236:2-237:3.

Response:

**Statement of Fact No. 256:**

Hobbs also recognizes that people have been saying the WM3 got a "raw deal" and need a new trial for sixteen (16) years. Ex. 1, Hobbs Dep. 188:2-188:12.

Response:

**Statement of Fact No. 257:**

Hobbs admits that his only real complaint in this suit is that Pasdar "jumped on the bandwagon." Ex. 1, Hobbs Dep. 263:5-263:18, 263:21-263:23, 263:25-264:13.

Response:

**Statement of Fact No. 258:**

His real issue with Pasdar is that she did not "stay in Texas and mind her own business" instead of "sticking her nose into my business matters." Ex. 1, Hobbs Dep. 185:1-185:3, 320:20-320:25.

Response:

**Statement of Fact No. 259:**

Hobbs' only complaint about Pasdar making the same statements every one else had made is that people "tend to believe celebrities," and she should have stayed out of family business. Ex. 1, Hobbs Dep. 260:7-260:9, 264:14-264:25, 308:10-308:14.

Response:

**Statement of Fact No. 260:**

Finally, Hobbs also admits that he has no evidence or facts to demonstrate Pasdar acted with actual malice and/or acted with reckless disregard for the facts when making her statements. Ex. 1, Hobbs Dep. 250:25-251:20, 252:25-253:3, 253:6-253:16, 253:18-253:20, 274:6-274:22.

Response:

**Statement of Fact No. 261:**

Nor could he: Hobbs does not know what Pasdar looked at or watched prior to the creation of the Letters. Ex. 1, Hobbs Dep. 252:16-252:24.

Response:

## N.    Pasdar's statements relate to an issue of public concern or controversy

**Statement of Fact No. 262:**

All of Pasdar's statements, in both the Letters and at the Rally, are comments upon the same issues of public concern or controversy about which the press and public had been speaking since 1994: whether the WM3 were wrongfully convicted.  Ex. 2, Pasdar Dec. ¶ 41; Ex. 6, Davis Dec. ¶ 43.

Response:

**Statement of Fact No. 263:**

Hobbs himself has acknowledged that the questions of whether the WM3 are guilty and who murdered the three little boys are issues of public concern.  Ex. 1, Hobbs Dep. 15:9-16:5, 16:19-16:25.  He acknowledges that there is nothing wrong with people being informed of what goes on at the public courthouse.  Ex. 1, Hobbs Dep. 309:19-309:25.

Response:

**Statement of Fact No. 264:**

This question of whether the WM3 actually committed the Murders (and all of the issues attendant to that question: Who else could have murdered Chris Byers, Steve Branch and Michael Moore?  Did law enforcement thoroughly investigate all possible suspects?  Did law enforcement and prosecutors pin the murders on three innocent youths to avoid public outcry?  Has the Arkansas legal system for the last sixteen (16) years turned a blind eye to errors in the trials?  Are the interested government representatives protecting their current power through a defense of wrongful convictions?  Have the authorities done all they can do to assure they convicted the actual murderers?  Were the WM3 adequately represented at trial?  Does Damien Echols deserve to be put to death?  Why do prosecutors and law enforcement appear to refuse to

consider Hobbs as a suspect with the evidence mounting against him?) go directly to the heart of public concern and controversy. Ex. 2, Pasdar Dec. ¶ 42; Ex. 6, Davis Dec ¶ 44.

Response:

**Statement of Fact No. 265:**

Free and open debate on the workings and efficacy of law enforcement and the criminal justice system is vital to a decision-making electorate interested in the credibility and reliability of its government. Ex. 2, Pasdar Dec. ¶ 43; Ex. 6, Davis Dec ¶ 45.

Response:

**Statement of Fact No. 266:**

Whether "the system" works in general, and whether it worked in this specific instance is of fundamental concern to all citizens of the U.S. who rely on government to "get it right" and do so in a fair and just manner. Ex. 2, Pasdar Dec. ¶ 44; Ex. 6, Davis Dec. ¶ 46.

Response:

**Statement of Fact No. 267:**

Such questions go to the heart of the public's interests in their government, particularly the issues of safety, fairness and abuse of power. Ex. 2, Pasdar Dec. ¶ 45; Ex. 6, Davis Dec. ¶ 47.

Response:

**Statement of Fact No. 268:**

The parties have filed with the Court Stipulations Nos. 1 and 4, which contain over 400 news articles and television show transcripts, as well as at least forty-eight (48) internet sites and blogs which have tackled all of these topics, most of which address the fundamental public controversy: were the WM3 wrongfully convicted? Court's File, Stip. No. 1 (Exs. 1-42)

(articles); Court's File, Stip. No. 4 (Exs. 1-370) (articles); Court's File, Stip. No. 1 (Exs. 43-91) (blogs and websites).

Response:

**Statement of Fact No. 269:**

The fact that the press has "locked in" on the story of the Murders, convictions and Events further demonstrates that the issues are issues of public concern and public controversy. Court's File, Stip. No. 1 (Exs. 1-91); Court's File, Stip. No. 4 (Exs. 1-370).

Response:

**Statement of Fact No. 270:**

The coverage over the years and months leading up to the Letters reflects that the public concern and controversy have grown from an interest in local safety and law enforcement during the investigation and trials into more grand questions about the reliability of the system itself and the government's willingness to self-examine in the event of alleged mistakes. Court's File, Stip. No. 1 (Ex. 2, 11, 27); Court's File, Stip. No. 4 (Exs. 1-22, 188-90).

Response:

**Statement of Fact No. 271:**

It is obvious that the proceedings were and are public: the trials were held publically, the post-conviction filings have been filed publically, and the Habeas hearing will be a public hearing. Ex. 6, Davis Dec. ¶ 12; Ex. 8, Riordan Dec. ¶ 6.

Response:

**Statement of Fact No. 272:**

Even Pasdar's language in the Letters demonstrates the "public-ness" of the topics: Pasdar requested the readers and listeners across the country become involved in righting the

alleged wrong by donating money and educating themselves. Exs. 3-4, Letters; Ex. 2, Pasdar Dec. ¶ 46.

Response:

**Statement of Fact No. 273:**

Pasdar mentions that many of the people working on the case have worked *pro bono* for thirteen (13) years, and that the costs associated with freeing those wrongfully convicted are high. Ex. 2, Pasdar Dec. ¶ 46; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 274:**

She encourages people to engage in a letter-writing campaign to the Governor of Arkansas. Exs. 3-4, Letters.

Response:

**Statement of Fact No. 275:**

And at the end of her Letters, she articulates the very evidence that demonstrates that the WM3 convictions were wrongful, the publicly known forensic and other evidence included in the Echols Habeas filing. Exs. 3-4, Letters; Ex. 2, Pasdar Dec. ¶ 46.

Response:

**Statement of Fact No. 276:**

Because much of that evidence – that Hobbs' DNA was at the crime site, that Hobbs' friend's DNA was at the crime site, that Hobbs is in possession of a knife that belonged to a victim, that Hobbs did laundry at an unusual time, that Hobbs' family thinks he was involved in the Murders – involves Hobbs, to prohibit Pasdar from citing the Hobbs evidence would be to gag her from discussing the already disclosed evidence that a jury hearing the case about the Murders today would most certainly need to consider in deciding whether the WM3 were guilty

beyond a reasonable doubt, and which most assuredly is a part of the present debate over whether the WM3 were wrongfully convicted, and is the very evidence that might suggest wrongdoing of very public concern – wrongful convictions of the WM3. Exs. 3-4, Letters; Ex. 2, Pasdar Dec. ¶ 46.

Response:

## O.  The body of the Letters are not defamatory and are admitted opinion

**Statement of Fact No. 277:**

Though Hobbs' admission that the Letters do not accuse him of committing the Murders is dispositive, the undisputed facts also demonstrate that contrary to Hobbs' original legal assertions, the Letters do not accuse Hobbs of committing the Murders. Ex. 1, Hobbs Dep. 308:10-308:14; Ex. 2, Pasdar Dec. ¶ 25; Exs. 3-4, Letters. With regard to the body of the Letters, Hobbs complains solely of the following statements:

- Below, I have written what the DNA and forensics evidence shows. I hope after reading it and looking at the WM3.org website, you will know that the wrong guys are sitting in jail right now, and feel compelled to help.

- DNA and forensics tests are expensive. They are also what will finally set these men free.

- The evidence is so strong that at the very least the judge will grant a new trial, but hopefully he will overturn the verdict and these guys will finally be sent home to their lives and families. I know this is a hard thing to just take my word on, so please look at the case and the evidence for yourself. I am confident that you will see the DNA evidence is irrefutable and that these three men did not get the kind of trial that is promised to us – as Americans.

- Their killer(s) is still out there, and justice has yet to be served. Please know that your generosity will make a difference.

Ex. 15, Hobbs' Supp. Ans. No. 2.

Response:

**Statement of Fact No. 278:**

In fact, the Letters do just the opposite: they argue the WM3 are not the murderers and that the "killer(s) is still out there, and justice has yet to be served." Ex. 1, Hobbs Dep. 309:2-309:25. Ex. 2, Pasdar Dec. ¶ 25; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 279:**

Pasdar states her purpose in the first sentence of the Letters and that purpose is to call attention to an alleged injustice: "I'm writing this letter because I believe that three men have spent the last 13 years in prison for crimes they didn't commit." Ex. 2, Pasdar Dec. ¶ 26; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 280:**

Even a brief review of the body of the Letters reveals that Pasdar's theme, far from "Terry Hobbs is the murderer" is "Please give money to help the WM3, there has been an injustice – they did not commit the Murders." Ex. 2, Pasdar Dec. ¶ 28; Exs. 3-4, Letters. Hobbs admits the gist of the body of the Letters is that the WM3 were wrongfully convicted. Ex. 1, Hobbs Dep. 278:22-279:6, 279:8.

Response:

**Statement of Fact No. 281:**

He also acknowledges that in the Letters, Pasdar encourages people to watch the HBO documentaries, look at the Habeas filing and then contribute to the defense fund; basically she asks them to get involved in the public controversy. Ex. 1, Hobbs Dep. 278:22-279:6, 279:8-279:16, 279:19-279:20.

Response:

**Statement of Fact No. 282:**

The body of the Letters – from the date at the top, down to Pasdar's name near the bottom of the first page – details and supports the ongoing post-conviction legal struggle of the WM3 and specifically requests donations to help the WM3 pay legal costs. Ex. 1, Hobbs Dep. 278:22-279:6, 279:8-279:16, 279:19-279:20; Ex. 2, Pasdar Dec. ¶ 27; Exs. 3-4, Letters. Pasdar does not mention Hobbs in the body of the Letters. Ex. 2, Pasdar Dec. ¶ 27; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 283:**

In fact, in the body of the Letters, Pasdar does not refer to Hobbs in any way, directly or indirectly. Ex. 2, Pasdar Dec. ¶ 27; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 284:**

Simply put, in the body of the Letters, Pasdar does not claim to know who or how many people committed the Murders, and she certainly does not claim that Terry Hobbs did it. Ex. 2, Pasdar Dec. ¶ 28; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 285:**

Pasdar only claims that the WM3 were wrongfully convicted. Ex. 2, Pasdar Dec. ¶ 28; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 286:**

The assessment that the WM3 were wrongfully convicted is Pasdar's opinion. Ex. 2, Pasdar Dec. ¶ 25.

Response:

**Statement of Fact No. 287:**

Hobbs also admits that the body of the Letters are Pasdar's opinion that the WM3 were wrongly convicted. Ex. 1, Hobbs Dep. 277:13-277:23, 278:1-278:2, 278:4-279:6, 278:9.

Response:

**Statement of Fact No. 288:**

Pasdar's statements in the body of the Letters are simply not assertions of objective facts capable of being proven true or false: she opines that the WM3 are not guilty, that justice has not been served and that the killer(s) are still out there. Ex. 2, Pasdar Dec. ¶¶ 25, 27; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 289:**

The Letters encourage readers to view the evidence and documentaries for themselves and even in advancing her position that "justice has not been served," Pasdar states the "real killer(s)" are still out there in an obvious admission that she does not claim to know the identity or number of the people actually responsible for the Murders. Ex. 2, Pasdar Dec. ¶¶ 25-27; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 290:**

The specific statements chosen as offensive by the lawyers in response to Pasdar's interrogatories (Ex. 15, Hobbs' Supp. Ans. No. 2) are also facially opinions: these statements (SF 277, *supra*) merely express Pasdar's hope that readers will contribute to the defense fund, encourage readers to look into the case further and advance her opinion that justice has not been served as long as the WM3 are in prison. Ex. 2, Pasdar Dec. ¶¶ 26-27.

Response:

**Statement of Fact No. 291:**

Pasdar's Rally comments are similarly opinion – she simply states that she believes the WM3 were wrongfully convicted. Ex. 5, Rally transcript.

Response:

**Statement of Fact No. 292:**

Pasdar's statements at the Rally focus solely on one point: that it has been scientifically proven the WM3 did not commit the Murders through the absence of evidence, and in her opinion, they are not the murderers. Ex. 2, Pasdar Dec. ¶ 40.

Response:

**Statement of Fact No. 293:**

Thus, most, if not all, of Pasdar's Rally comments do not assert any fact: the statements are merely Pasdar's opinions that "it's important for our elected officials . . . to know that we are watching them and care that the decisions that they make." Ex. 5, Rally transcript. In fact, the entire the content of the Rally remarks was directed towards Pasdar's belief that the WM3 are innocent and deserve a new trial. Ex. 5, Rally transcript.

Response:

**Statement of Fact No. 294:**

Despite Hobbs' admission that Pasdar has the right to advocate on behalf of the WM3, he would prefer that the issues surrounding the WM3 convictions were a private matter, and he thinks that Pasdar "got in our business when she shouldn't have." Hobbs Dep. 183:17-183:25.

Response:

**P.     The post-script of the Letters simply reiterates well-publicized, true information**

**Statement of Fact No. 295:**

The post-script of the Letters, the portion from "The following is just some of the DNA and forensic evidence . . ." through the end of the Letters is identical in both the Website Letter and the MySpace Letter.  Ex. 2, Pasdar Dec. ¶ 29; Exs. 3-4, Letters.

With regard to the post-script of the Letters, Hobbs complains solely of the following statements:

- DNA tests also show that a hair belonging to Terry Hobbs, the step-father of one of the victims, was found in the ligature of one of the victims.

- DNA tests also match a hair at the crime scene to a friend of Hobbs that was with him that day.

- Sworn affidavits outlining new evidence uncovered by Pam Hobbs (the ex-wife of Terry Hobbs) who found a knife in Terry Hobbs' drawer that her son (one of the victims) had carried with him at all times.  After her son was killed, the knife was not among his personal effects that police gave to the Hobbs family, and Pam Hobbs always assumed that her son's murderer had taken it during the crime.

- New information implicating Terry Hobbs including his own statements made to police in recent interviews where he acknowledged that several of his relatives suspect him in the crime.  The filing also includes a chronology of Hobbs' activities on the night of the crimes, when he washed his clothes and sheets at odd hours for no reason other than to hide evidence from the crimes.

Ex. 15, Hobbs' Supp. Ans. No. 2.

Response:

**Statement of Fact No. 296:**

Hobbs admits that the post-script contains the same information the national press had repeatedly made public months before the Letters.  Ex. 1, Hobbs Dep. 243:1-243:9.

Response:

**Statement of Fact No. 297:**

In simple terms, Hobbs admits that the statements in the post-script are "nothing new," and most importantly, that they are true statements. Ex. 1, Hobbs Dep. 243:1-243:9.

Response:

**Statement of Fact No. 298:**

Moreover, the post-script language did not originate with Pasdar. Ex. 2, Pasdar Dec. ¶ 30; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 299:**

Instead, the post-script language was essentially "cut and paste" into the Letters from a document Pasdar received directly from Echols' defense team. SF 301-02, *infra*. The post-script simply summarizes information Pasdar had learned through press reports and contains the same bullet points found in the Summary (Ex. 34) which is the same document as the final Press Release (Ex. 12), released and publicized nearly one month before Pasdar's Letters, with minimal language changes making the language more "layperson friendly." Ex. 2, Pasdar Dec. ¶ 30; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 300:**

Specifically, of the eight bullet points in the post-script, four bullet points basically contain "cut and paste" identical language from the Summary (Ex. 34) and the remainder of the bullet points have been minimally altered to make the evidence more understandable to someone unfamiliar with the case. Ex. 2, Pasdar Dec. ¶ 30; Exs. 3-4, Letters.

Response:

**Statement of Fact No. 301:**

The minimal differences between the Summary (Ex. 34) and/or the Press Release (Ex. 12), on one hand, and the Letters' post-script, on the other hand, are set forth below:

| SUMMARY AND/OR PRESS RELEASE | PASDAR LETTERS |
|---|---|
| The filing includes dozens of expert reports, witness affidavits, scientific reports and other submissions. The highlights include: | The following is just some of the DNA and forensic evidence that will be presented in the federal court hearing: |
| • DNA test results showing that a hair found in the ligature of one of the victims matches Terry Hobbs, the step-father of another one of the victims. | • DNA tests also show that a hair belonging to Terry Hobbs, the step-father of one of the victims, was found in the ligature of one of the victims. |
| • DNA test results showing foreign DNA - on the penises of two of the victims - from someone other than Echols or the other two men who were convicted. | • DNA test results show foreign DNA from someone other than Echols, Misskelley, or Baldwin on the penises of two of the victims. |
| • DNA test results matching a hair at the crime scene to a man who was with Terry Hobbs on the day of the crimes. This places Hobbs at the scene of the crime, since it refutes any theory that the Hobbs' hair (found in the ligature of one of the victims) was there before the crime. | • DNA tests also match a hair at the crime scene to a friend of Hobbs that was with him that day. |
| • Scientific analysis from some of the nation's leading forensics experts, stating that wounds on the victims' bodies were caused by animals at the crime scene – not knives used by the perpetrators, as the prosecution claimed. These wounds were the centerpiece of the prosecution's case, and evidence was presented that a knife recovered from a lake near one defendant's home caused the wounds. The conclusive expert analysis showing that animals caused the wounds after the victims died also completely undercuts the testimony of a jailhouse informant (who testified about Echols using a knife to cause the wounds) and a discredited "expert" who testified that the knife wounds were part of a satanic ritual. | • Scientific analysis from some of the nation's leading forensics experts, stating that wounds on the victims' bodies were caused by animals at the crime scene not by knives used by the perpetrators, as the prosecution claimed. These wounds were the centerpiece of the prosecution's case, and evidence was presented that a knife recovered from a lake near one defendant's home caused the wounds. |
| • Sworn affidavits outlining new evidence uncovered by Pam Hobbs (the ex-wife of Terry Hobbs) who found a knife in Terry | • Sworn affidavits outlining new evidence uncovered by Pam Hobbs (the ex-wife of Terry Hobbs) who found a knife in |

| SUMMARY AND/OR PRESS RELEASE | PASDAR LETTERS |
|---|---|
| Hobbs' drawer that her son (one of the victims) had carried with him at all times. After her son was killed, the knife was not among his personal effects that police gave to the Hobbs family, and Pam Hobbs always assumed that her son's murderer had taken it during the crime. | Terry Hobbs' drawer that her son (one of the victims) had carried with him at all times. After her son was killed, the knife was not among his personal effects that police gave to the Hobbs family, and Pam Hobbs always assumed that her son's murderer had taken it during the crime. |
| • New information implicating Terry Hobbs – including his own statements made to police in recent interviews where he acknowledged that several of his relatives suspect him in the crime. The filing also includes a chronology of Hobbs' activities on the night of the crimes, when he washed his clothes and sheets at odd hours for no reason other than to hide evidence from the crimes. | • New information implicating Terry Hobbs including his own statements made to police in recent interviews where he acknowledged that several of his relatives suspect him in the crime. The filing also includes a chronology of Hobbs' activities on the night of the crimes, when he washed his clothes and sheets at odd hours for no reason other than to hide evidence from the crimes. |
| • A sworn affidavit that refutes hearsay evidence from Echols' trial. The mother of one of two girls who testified that they overheard Echols admit to the crime at a softball game now says that Echols' statement was not serious and that neither she nor her daughter believes he committed the crime. | • A sworn affidavit that refutes hearsay evidence from Echols' trial. The mother of one of two girls who testified that they overheard Echols admit to the crime at a softball game now says that Echols' statement was not serious and that neither she nor her daughter believes he committed the crime. |
| Ex. 12, Press Release; Ex. 32, Leeds Press Release Email; Ex. 34, Davis Summary Email. | Ex. 2, Pasdar Dec. ¶ 30; Exs. 3-4, Letters; Ex. 35, Pasdar Editing Emails. |

Response:

**Statement of Fact No. 302:**

A brief comparison of the Summary (Ex. 34) and/or Press Release (Ex. 12), on the one hand, to the Letters' post-script, on the other hand, reflects (as Hobbs admits) that Pasdar has done no more than "parrot" the Press Release and the Summary, which themselves do no more than summarize the Habeas evidence and the prior national news reports previously issued about Hobbs and the new evidence. Ex. 1, Hobbs Dep. 243:1-243:9, 282:4-283:1; Ex. 2, Pasdar Dec. ¶¶ 31, 41; Exs. 3-4, Ex. 6, Davis Dec. ¶¶ 37, 43; Letters; Ex. 12, Press Release; Ex. 34, Davis Summary Email; Ex. 35, Pasdar Editing Emails; Ex. 36, Pasdar Letter Emails. In fact, the bullet

points in the Letters and Press Release have been the subject of national and international attention from the spring of 2007 through today. Ex. 1, Hobbs Dep. 234:21-237:3.

Response:

**Statement of Fact No. 303:**

The Summary (Ex. 34) used by Pasdar is a summary of the evidence made public by the WM3 defense team at a major Press Conference (Ex. 13) almost one month before the Letters were posted. Ex. 2, Pasdar Dec. ¶ 31; Exs. 3-4, Letters; Ex. 6, Davis Dec. ¶ 38; Ex. 9, Leeds Dec. ¶ 10.

Response:

**Statement of Fact No. 304:**

Thus, though the post-script mentions Hobbs by name and lists the evidence which pertains to Hobbs, it does not accuse Hobbs of the Murders, but rather concludes that the credible evidence, some of which has nothing to do with Hobbs, demonstrates that the WM3 did not commit the Murders. Ex. 1, Hobbs Dep. 308:15-308:22, 308:25-309:18; Ex. 2, Pasdar Dec. ¶ 31; Exs. 3-4, Letters.

Response:

**Q.    Pasdar's post-script Letter statements are true**

**Statement of Fact No. 305:**

First, in the most fundamental way, Pasdar's post-script (the only portion of the Letters that relate to Hobbs) is literally true, as each piece of evidence Pasdar cites is, in fact, just as she said: "evidence that will be presented in the federal court hearing." Ex. 1, Hobbs Dep. 290:11-291:3; Ex. 2, Pasdar Dec. ¶ 32; Exs. 3-4, Letters; Court's File, Stip. No. 2, (Ex. 1, Habeas Pet.; Ex. 2, Habeas Memo; Ex. 3, Habeas Evidence). The bullet points simply summarize what has been publicized for months. Ex. 1, Hobbs Dep. 279:9-279:16, 279:19-279:20, 282:4-282:11,

282:17-283:1. Of course, just as the Letters state: the Habeas Petition, Memo and Evidence, reflect what evidence "will be presented in the federal court hearing." Ex. 8, Riordan Dec. ¶ 11; Ex. 6, Davis Dec. ¶ 39, Ex. 9, Leeds Dec. ¶ 11.

Response:

**Statement of Fact No. 306:**

The evidence recited in the Letters is in fact included in the Echols Habeas papers. Ex. 8, Riordan Dec. ¶ 11; Ex. 6, Davis Dec. ¶ 39. Hobbs does not dispute that the evidence Pasdar cites will, in fact, ultimately be presented at the Habeas hearing. Ex. 1, Hobbs Dep. 461:20-462:13.

Response:

**Statement of Fact No. 307:**

Second, the truth of Pasdar's characterizations is independently verifiable; *i.e.*, the forensic evidence Pasdar says exists actually does exist, as proven by the evidence filed in support of the Echols Habeas filings. Court's File, Stip. No. 2 (Ex. 1, Habeas Pet.; Ex. 2, Habeas Memo; Ex. 3, Habeas Evidence).

Response:

**Statement of Fact No. 308:**

Listed below is the evidence cited in the Letters, followed by reference to the actual evidence as it exists in the Habeas filing, and in certain instances, reference to independent confirmation of the existence of such evidence:

- That the DNA evidence fails to link any of the "three boys" [WM3] to the crime scene. Ex. 1, Hobbs Dep. 289:9-289:12; Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 6, 56-59, 63, 64; Ex. 3, Habeas Evidence at P, Q, R, S, T, U, V, W, Y).

- The DNA tests also show that a hair of Hobbs', who is the step-father of Stevie Branch, was found in the ligature of Michael Moore, one of the victims. Ex. 1, Hobbs Dep. 169:3-169:5, 169:8-169:15, 291:6-291:13; Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 6, 60-61, 63-66; Ex. 3, Habeas Exhibits at X, Y, BB).

- DNA tests also match a hair at the crime scene to a friend of Hobbs, David Jacoby, who was with him that day. Ex. 1, Hobbs Dep. 294:20-294:24; Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 6, 62-63, 65-66; Ex. 3, Habeas Exhibits at X, Y, BB).

- DNA test results show foreign DNA from someone other than Echols, Misskelley or Baldwin on the penises of two of his victims. Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 59; 64; Ex. 3, Habeas Exhibits at V-1).

- Some of the nation's leading forensic experts have stated that wounds on the victims' bodies were caused by animals at the crime scene – not by knives used by the perpetrators. Ex. 1, Hobbs Dep. 296:16-296:22, 297:2; Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 7-8, 33-34, 36, 66-93; Ex. 3, Habeas Evidence at A, Y EE, FF, II, KK, OO, PP).

- Pam Hobbs, ex-wife of Terry Hobbs, found a knife in Hobbs' drawer that her son, one of the victims, had carried with him at all times and that Pam Hobbs always assumed that her son's Murderer had taken it during the crime. Ex. 1, Hobbs Dep. 226:12-226:20, 227:13-227:17, 297:17-297:18, 298:1-298:5, 298:15-298:20; Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 6-7, 62; Ex. 3, Habeas Evidence at X, Y); Ex. 42, P. Hobbs Dec. ¶ 17; Ex. 43, McCaughey Dec. ¶ 15.

- New information implicated Hobbs, including his own statements made to police in interviews where he acknowledged that several of his relatives suspect him in the crime, and Hobbs' activity in washing his clothes and sheets on the night of the crimes at odd hours for no reason other than to hide evidence from the crimes. Ex. 1, Hobbs Dep. 305:9-305:22, 306:1-306:8; Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 61; Ex. 3, Habeas Exhibits at X, Y); Ex. 42, P. Hobbs Dec. ¶¶ 18, 23-24; Ex. 43, McCaughey Dec. ¶¶ 14, 16-19, 21, 23-24.

- A sworn affidavit from Donna Medford, the mother of one of two girls who testified that they overheard Echols admit to the crime at a softball game, reflects that she now says that Echols' statement was not serious and that neither she nor her daughter believes he committed the crime. Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 35-36, 105-106; Ex. 3, Habeas Exhibits at RR).

Response:

## Statement of Fact No. 309:

Third, as set forth below, Hobbs admits that Pasdar has correctly stated the bulk of the evidence (or he has stipulated that he does not complain of that evidence):

- Hobbs acknowledges that the fact that the DNA tests show the hair belonging to Hobbs was found in the ligature of one of the victims is contained in the Habeas

filings (and therefore will be presented in the federal hearing). Ex. 1, Hobbs Dep. 168:23-169:5, 169:8-169:15, 288:20-288:23, 289:1-289:2.

- Hobbs admits that the Echols Habeas filing made in October 2007 included DNA evidence that did not link any of the WM3 to the crime scene. Ex. 1, Hobbs Dep. 168:23-169:2, 289:9-289:16.

- Hobbs admits that the prosecution claimed that Echols sodomized one of the boys. Ex. 1, Hobbs Dep. 289:3-289:8.

- Hobbs admits that none of Echols' DNA was found on any of the boys. Ex. 1, Hobbs Dep. 289:9-289:12.

- Hobbs is unaware of whether DNA test results show foreign DNA from someone other than Echols, Misskelley, or Baldwin on the penises of two of the victims, but does not complain of the bullet point in the Letters relating to this point. Ex. 1, Hobbs Dep. 289:13-289:18.

- Hobbs admits he was with Jacoby on the night of May 5, 1993. Ex. 1, Hobbs Dep. 171:11-172:5.

- Hobbs admits that test results reflect that David Jacoby's DNA was at the crime scene. Ex. 1, Hobbs Dep. 169:3-169:5, 169:8.

- Hobbs admits some of the nation's leading forensic experts say the wounds on the victim's bodies were caused by animals at the crime scene, not by knives used by the perpetrators. Ex. 1, Hobbs Dep. 296:16-296:22, 296:25-297:2.

- Hobbs does not dispute that he has possession of Stevie's knife or that the knife evidence was included in the Echols Habeas filings. Ex. 1, Hobbs Dep. 297:10-298:12, 298:15-298:20.

- Hobbs admits that his relatives suspect him of committing the Murders, and admits that he told the WMPD that his relatives suspect him in the crime (and acknowledges that such evidence was part of the Habeas filing). Ex. 1, Hobbs Dep. 305:9-305:22, 306:4-306:8, 306:10-306:11.

- Hobbs admits that a chronology is a description of events and when they occurred; and a review of the Habeas filing reflects that it includes several descriptions of Hobbs' whereabouts and actions at various times on the day and night of the Murders. Ex. 1, Hobbs Dep. 464:2-464:7; Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 61, 63-66; Ex. 3, Habeas Evidence at X, Y).

- Hobbs is unaware whether the mother of one of the two girls who testified that they had overheard Echols admit to the crime now says that the statement was not serious, but he does not complain about that allegation in the Letters at any rate. Ex. 1, Hobbs Dep. 306:12-306:19, 306:21-306:25.

- Although he now denies it, summary judgment evidence before the Court supports the Letters' bullet point regarding Hobbs doing laundry at an odd hour for no reason other than to hide evidence of the crimes. Ex. 1, Hobbs Dep. 109:10-109:16; Ex. 43, McCaughey Dec. ¶ 14. Hobbs also acknowledges that, other than the fact that it came from Pasdar, nothing in the Letters was new, which includes the point regarding laundry. Ex. 1, Hobbs Dep. 183:17-183:22.

Response:

**R.  Pasdar did not make her statements in the Letters with actual malice, reckless disregard for the truth or negligence**

**Statement of Fact No. 310:**

Hobbs has no knowledge of any facts that would suggest Pasdar questioned the truth of her statements at the time she made them. Ex. 1, Hobbs Dep. 251:10-253:20.

Response:

**Statement of Fact No. 311:**

In fact, Pasdar was anything but careless as she wrote the Letters. Ex. 2, Pasdar Dec. ¶ 33.

Response:

**Statement of Fact No. 312:**

At the time she prepared the Letters, which did not mention Hobbs in the body, and which relied upon the specific language of the Summary (Ex. 34), Pasdar had already had many conversations with Davis about the case, seen the *Paradise Lost* documentaries and news reports such as *Anderson Cooper 360* about the case and reviewed the content covered by the Echols defense team in the November 1, 2007 Press Conference. Ex. 2, Pasdar Dec. ¶¶ 33-34.

Response:

**Statement of Fact No. 313:**

As set forth in more detail *supra* at Pasdar's Statement of Facts 199-227, she had spoken to persons knowledgeable about the case, particularly Davis, and she acted to remain faithful to

the language from the Summary (Ex. 34), refusing to tamper with language she believed had been provided and approved by the attorneys directly involved in the case. Ex. 2. Pasdar Dec. ¶ 34.

Response:

S.    **Hobbs' has not been damaged by Pasdar's statements**

**Statement of Fact No. 314:**

Prior to November 26, 2007, the date of Pasdar's Letters, Hobbs acknowledges his reputation was a "pretty screwed up one." Ex. 1, Hobbs Dep. 261:19-261:24.

Response:

**Statement of Fact No. 315:**

Hobbs admits that after the Murders, his reputation "could have been better" as he was arrested for drug possession, was accused by his daughter at the age of four and in her teenage years (when Child Protective Services was called)[5] of sexually molesting her, had been accused of breaking into the house of and physically and sexually assaulting his neighbor after she confronted him regarding her suspicions of his physical abuse of his wife and baby, was divorced, had filed for bankruptcy, had warrants issued for his arrest, had shot with a hollow-point bullet his unarmed brother-in-law after allegedly hitting his own wife (Pam Hobbs) in the face, had been sentenced to serve time in the workhouse and almost a year on probation for the offense, had been nationally connected by his DNA at the crime scene to the Murders and had reportedly beat his wife and kids repeatedly. Ex. 1, Hobbs Dep. 137:1-137:10, 263:5-263:18, 263:21-263:23, 263:25, 325:20-328:20; Ex. 9, Sadler Dec. ¶ 7-16; Ex. 18, Hobbs WMPD Interview (PASDAR 1318-1323, 1330, 1332, 1334-1336); Ex. 40, B. Muse Dec. ¶ 6; Ex. 41, S.

---

[5]    Hobbs admits that child abusers and drug users generally have poor reputations in their communities. Ex. 1, Hobbs' Dep. 135:10-135:20.

Muse Dec. ¶¶ 10-14, 17; Ex. 43, McCaughey Dec. ¶¶ 33-41, 44-45; Ex. 44, Hicks Dec. ¶¶ 17-18; Ex. 46, P. Hobbs Second Dec. ¶¶ 6-10, 16, 21; 25; Ex. 48, French Dec. ¶ 6.

Response:

**Statement of Fact No. 316:**

By his own admission, Hobbs suffered emotional breakdowns in 1993 or 1994 and in 2007 (before the Letters or the Rally) after he was informed by WM3 defense investigator Ron Lax that his hair had been found in a ligature binding one of the victims. Ex. 1, Hobbs Dep. 213:09-214:21; Court's File, Stip. No. 1 (Ex. 39, ARKANSAS DEMOCRAT-GAZETTE article, "Reputation is Ruined," 2/3/08); Ex. 27 (same article). Although he now denies its occurrence, Hobbs' journal describes a similar emotional breakdown he had in 1993-1994. Ex. 1, Hobbs Dep. 599:15-599:23, 600:2-601:17; Ex. 49, Hobbs Journal (HOBBS 1060).

Response:

**Statement of Fact No. 317:**

Hobbs admits that, since the 2007 DNA revelations, he has publicly addressed questions from the press, the WM3 team, Pam Hobbs and her family and the public, regarding whether he killed the boys. Ex. 1, Hobbs Dep. 142:2-142:11. Immediately following the July 2007 Janice Broach article, Hobbs started to get calls from neighbors and friends about the DNA evidence. Ex. 1, Hobbs Dep. 219:24-220:12.

Response:

**Statement of Fact No. 318:**

Hobbs frankly admits that people became suspicious of whether he was involved in the Murders as a result of all the press which, ironically, was initiated by Hobbs himself. Ex. 1, Hobbs Dep. 19:5-20:10, 121:3-121:9, 141:19-143:11, 144:8-144:22, 219:10-219:20, 220:13-220:20; Ex. 49, Hobbs Journal (HOBBS 1084-1085).

Response:

**Statement of Fact No. 319:**

Pam Hobbs agrees, acknowledging that as a result of the press coverage of the new evidence, many people in Arkansas approached Pam Hobbs to ask about Terry Hobbs' possible involvement in the Murders. Ex. 42, P. Hobbs Dec. ¶ 23.

Response:

**Statement of Fact No. 320:**

Press reports have reflected that Hobbs was abused by his father. Ex. 1, Hobbs Dep. 211:11-211:19.

Response:

**Statement of Fact No. 321:**

In addition to his admissions that his reputation "could have been better," there is substantial evidence that Hobbs had a very poor reputation prior to the Letters or the Rally. The following is included in sworn testimony filed in Pasdar's First Appendix of Summary Judgment Evidence:

- Pam Hobbs, Hobbs' ex-wife, has stated under oath that Hobbs hit her on more than one occasion. Ex. 46, P. Hobbs Second Dec. ¶ 8.

- Hobbs' sister, Judy Sadler, has sworn that Hobbs hit Pam, beat Stevie, that he locked Stevie in the closet, that he forced Stevie and Amanda to watch pornography with him, that he watched pornography with Amanda on his lap and that he forced Stevie to sexually molest Amanda. Ex. 45, Sadler Dec. ¶¶ 7-19.

- Marie Hicks, Pam's mother, has testified that Amanda accused Hobbs of molesting her when Amanda was four years old. Ex. 44, Hicks Decl. ¶ 18.

- Jo Lynn McCaughey has also testified to Hobbs' sexual molestation of Amanda. Ex. 43, McCaughey Dec. ¶¶ 33-35.

- Amanda Hobbs, Hobbs' daughter, has admitted in her journal that she had accused Hobbs of sexually molesting her, that Hobbs repeatedly beat her, that she has her "Father's awful blood," and prays "God please take my father out of me. . . . I

don't want to be like him. . . . We both know how he hit me and I don't want 2 be angry like him or violent like him." Ex. 45, Sadler Dec. ¶ 13, (Sadler Dep. Ex. 1).

- Marie Hicks, Pam's mother, has sworn that Stevie was terrified of Hobbs, that Stevie told her Hobbs beat Stevie when he had "accidents." Ex. 44, Hicks Dec. ¶ 17.

- Jo Lynn McCaughey also affirmed that Hobbs beat Stevie. Ex. 43, McCaughey Dec. ¶ 42.

- Jo Lynn McCaughey, Pam's sister, has testified that after she told Hobbs she believed he was involved in the Murders, as the two were talking about the possible mutilation of Christopher Byers by the murderer, Hobbs said, "You know I've got experience from working in a slaughterhouse, don't you?" Ex. 43, McCaughey Dec. ¶ 16.

- Pam Hobbs and her family have testified that, after hitting Pam in the face, Hobbs shot Pam's unarmed brother (who had come to her aid), causing him severe injuries. Ex. 42, P. Hobbs Second Dec. ¶ 9; Ex. 43, McCaughey Dec. ¶ 39.

- Hobbs' former next-door neighbor has testified that after confronting Hobbs about his suspected physical abuse of his wife and baby, Hobbs broke into her house and physically and sexually assaulted her. Ex. 48, French Dec. ¶¶ 4, 6.

- Sheila Hicks Muse, Pam Hobbs' sister, and her husband Brandon Muse have sworn that in November of 1997, they observed Hobbs having his daughter Amanda, then age 8, give him a lap dance. Ex. 41, S. Muse Dec. ¶ 17; Ex. 40, B. Muse Dec. ¶ 6.

- Sheila Muse has also sworn that Hobbs beat Stevie. Ex. 41, S. Muse Dec. ¶¶ 10-14.

Response:

**Statement of Fact No. 322:**

Hobbs has also admitted that Pasdar has not damaged his reputation; through the years, Hobbs has acknowledged his reputation has been ruined, but he has not blamed it on Pasdar or the Dixie Chicks; instead Hobbs blames the destruction of his reputation on the WM3 defense team. Ex. 1, Hobbs Dep. 212:3-212:22; Ex. 48, Hobbs Journal (HOBBS 1077-1081, 1085-1088, 1090-1093; 1100); Court's File, Stip. No. 1 (Ex. 39, ARKANSAS DEMOCRAT-GAZETTE article, "Reputation is Ruined," 2/3/08); Ex. 27 (same article). Hobbs has even filed a grievance against Echols' attorney, Dennis Riordan, complaining that Riordan is damaging his reputation. Ex. 1,

Hobbs Dep. 379:25-380:3, 380:18-380:23. He cannot name one person who believes Pasdar's "allegations," or even anyone who saw the Letters on the Internet. Ex. 1, Hobbs Dep. 334:4-335:5, 362:3-362:6.

Response:

**Statement of Fact No. 323:**

He also complains about John Mark Byers, father of Christopher Byers, who has made statements about Hobbs in public and on the internet. Court's File, Stip. No. 1 (Ex. 38, COMMERCIAL APPEAL article, "Familiar Face," 11/27/07); Ex. 26 (same article); *see also* Ex. 49, Hobbs Journal (HOBBS 1101).

Response:

**Statement of Fact No. 324:**

With regard to the Letters, when Hobbs learned of the Letters he took no action to contact Pasdar or the Dixie Chicks and/or to seek a retraction. Ex. 1, Hobbs Dep. 245:4-245:9.

Response:

**Statement of Fact No. 325:**

Moreover, Hobbs admits he has not suffered emotional distress as a result of Pasdar's statements: he cannot identify any damage to him from Pasdar's statements which is separate and apart from damage he sustained as a result of press and media reports in the spring and summer of 2007, and specifically the connection of his DNA to the crime scene, which was initially disclosed to the media by Hobbs himself. Ex. 1, Hobbs Dep. 121:3-121:21, 122:24-123:7, 219:10-221:15, 255:16-255:20, 256:16-256:17, 259:11-259:18.

Response:

**Statement of Fact No. 326:**

Hobbs cannot separate any injury allegedly caused by Pasdar's statements from the injury he endured as a result of the Murders, the trials, the WM3's efforts to obtain post-conviction relief, his interaction with the WM3 defense team and/or the newspaper and press reports about developments in the WM3 case and how those developments impact the public controversy over whether the WM3 were wrongfully convicted. Ex. 1, Hobbs Dep. 255:1-255:9, 255:12-255:13, 255:15, 258:2-259:10.

Response:

    **2.    Choice of law**

**Statement of Fact No. 327:**

Terry Hobbs is a citizen of the State of Tennessee and a resident of Shelby County, Tennessee. Ex. 1, Hobbs Dep. 162:3-162:9. He has continuously lived in Tennessee since 1994. Ex. 1, Hobbs Dep. 64:15-64:21. Hobbs works in Tennessee and the majority of his friends are in Tennessee. Ex. 1, Hobbs Dep. 162:8-162:18. Hobbs specifically claims injury to his reputation in Tennessee. Ex. 1, Hobbs Dep. 217:1-218:15.

Response:

**Statement of Fact No. 328:**

Natalie Pasdar is a citizen of the State of California and a resident of Los Angeles County, California. Ex. 2, Pasdar Dec. ¶ 47.

Response:

**Statement of Fact No. 329:**

Emily Robison is a citizen of Texas. Ex. 14, Compl. ¶ 2; Court's File, Defendants' Original Answer ¶ 2.

Response:

**Statement of Fact No. 330:**

Martha MaGuire is a citizen of the State of Texas. Ex. 14, Compl. ¶ 4; Court's File, Defendants' Original Answer ¶ 4.

Response:

**Statement of Fact No. 331:**

Pasdar delivered her remarks at the Rally on December 19, 2007, more than six months before Hobbs filed this lawsuit on November 25, 2008. Ex. 2, Pasdar Dec. ¶ 48.

Response:

**Statement of Fact No. 332:**

The Letters were posted on the internet from California. Ex. 2, Pasdar Dec. ¶ 16, 22-23.

Response:

Dated: August 21, 2009.

Respectfully submitted,

/s/ Dan D. Davison
    Dan D. Davison
    Lead Attorney
    Pro Hac Vice
    ddavison@fulbright.com
    D'Lesli M. Davis
    Pro Hac Vice
    ddavis@fulbright.com

FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

/s/ John E. Moore
    John E. Moore
    State Bar No. 82111
    john.moore@hmrmlaw.com

HUCKABAY, MUNSON, ROWLETT & MOORE P.A.
Regions Center, 400 W. Capital, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 374-6536
Facsimile: (501) 374-5906

COUNSEL FOR DEFENDANT,
NATALIE PASDAR, INDIVIDUALLY, AND
NATALIE PASDAR D/B/A DIXIE CHICKS.

## CERTIFICATE OF SERVICE

This pleading was served on the following counsel of record in accordance with the

Federal Rules of Civil Procedure on the 21st day of August, 2009.

| | |
|---|---|
| J. Cody Hiland<br>HILAND LAW FIRM<br>557 Locust Avenue<br>Conway, AR 72034 | Robert Wellenberger<br>THOMPSON, COE, COUSINS & IRONS, L.L.P.<br>700 North Pearl Street<br>Plaza of the Americas, Twenty-Fifth Floor<br>Dallas, Texas 75201-2832 |

/s/ Dan D. Davison
Dan D. Davison