**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF ARKANSAS
WESTERN DIVISION**

**TERRY HOBBS**

      **Plaintiff,**

**v.**                            **Case No. 4:09CV00008 BSM**

**NATALIE PASDAR, Individually, and
NATALIE PASDAR,
EMILY ROBISON, and
MARTHA MAGUIRE (formerly SEIDEL) d/b/a DIXIE
CHICKS,**

      **Defendants.**

**PLAINTIFF'S RESPONSE TO DEFENDANT NATALIE
PASDAR'S MOTION FOR SUMMARY JUDGEMENT**

Plaintiff Terry Hobbs for his Response to Defendant Natalie Pasdar's Motion for

Summary Judgment and for his response to Defendant Dixie Chick's Motion for

Summary Judgment respectfully states:

**1.  Arkansas law should be applied to this case.**

In *Wallis v. Mrs. Smith's Pie Co.*, 261 Ark. 622, 550 S.W.2d 453 (1977), the

Arkansas Supreme Court adopted a choice-of-law test involving the five choice-

influencing factors promulgated by Dr. Robert A. Leflar. The five factors are: 1)

predictability of results; 2) maintenance of interstate and international order; 3)

simplification of the judicial task; 4) advancement of the forum's governmental interests;

and 5) application of the better rule of law, citing *Ganey v. Kawasaki Motors Corp.,*

*U.S.A.,* 366 Ark. 238, 234 S.W.3d 838 (2006). The court explained that it had adopted the

choice-influencing factors to soften the application of the doctrine of *lex loci delecti*, and

that both the *lex loci delecti* doctrine and Leflar's five choice-influencing factors should be considered.   Arkansas law should be applied in this case because Arkansas has the "most significant relationship" to the parties and to the case.  This case involves application of Arkansas law to an Arkansas crime, legal proceedings in Arkansas that resulted in the conviction of three persons for committing the crime and the subsequent challenges to the conviction in state and federal courts in Arkansas.  Pasdar personally appeared in Arkansas to discuss this crime and Pasdar's letter asks persons to write Arkansas elected officials regarding the crime and asks persons to contribute to an Arkansas defense fund.  Arkansas has the most significant relationship to this case and Arkansas law should be applied.

Additionally, Pasdar's argument regarding forum shopping is without merit.  A review of the answer filed by Pasdar on January 7, 2009 reveals the identity of the true "forum shopper".  In Paragraph 48 of her answer, Pasdar pleads "entitlement to all defenses and relief available to it under the Arkansas Civil Justice Reform Act, Act 649 of 2003."  On April 30, 2009, the Arkansas Supreme Court struck down significant portions of Act 649 of 2003. *Johnson v. Rockwell Automation, Inc.*, 2009 Ark. 241, --- S.W.3d ----, 2009 WL 1218362 (2009).   Now, Pasdar suggests that Arkansas law does not apply in this case, despite having pled a defense specific to Arkansas law.  Pasdar audaciously suggests that the claim was filed in Arkansas to avoid Tennessee's statute of limitations. In fact, Pasdar has waived the statute of limitations affirmative defense because she did not plead it in her answer. Ordinarily in civil litigation, a statutory time limitation is forfeited if not raised in a defendant's answer or in an amendment thereto. Fed. Rules Civ. Proc. 8(c), 12(b), and 15(a),  *Day v. McDonough*, 547 U.S. 198, 126

S.Ct. 1675 (2006). Pasdar wanted the benefit of the Arkansas Civil Justice Reform Act, and when portions of it were declared unconstitutional, Pasdar went shopping for law that was more favorable to her position. The limitations period of Tennessee is neither a basis to conclude that Tennessee law should be applied nor is it a defense to Plaintiff's claim because it was waived when Pasdar did not raise it in her answer.

### 2. The statements made by Pasdar are capable of defamatory meaning.

Pasdar correctly states that whether statements in issue are reasonably capable of defamatory meaning is the initial question of law for the court and that the court is not bound by the Plaintiff's interpretation. Pasdar's MSJ at page 9. Pasdar then seeks to bind the court with a false claim of an "admission" by the Plaintiff, after stating that the Plaintiff's interpretation is not binding on the court. This is the first[1] of many so-called "admissions" citeed by Pasdar in which counsel for Pasdar asked questions to Hobbs which required that he apply or be aware of legal standards applicable in this case. Pasdar's letter does not state that "Hobbs is the killer of the three victims", nor is such a direct statement necessary for a defamation case to proceed.

Hobbs is not required to know the legal standard which is applied to Pasdar's statements. Counsel for Hobbs objected to the deposition question[2] when asked because it called for a legal conclusion. Hobbs only agreed that there was no direct accusation that he killed the three boys and for him to offer any other answer requires him to know the legal standard which this Court will apply. The Court should disregard this and all of

---

[1] Pasdar even attempts to resolve the First Amendment issues in this case with a bogus "admission". See SF 248. While Pasdar is free to rely on Hobbs for insight on First Amendment jurisprudence, *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997 (1974) is certainly more authoritative than is Mr. Hobbs.
[2] On page 11 of her MSJ, Pasdar quotes the deposition of Hobbs. Conveniently omitted from the quote is an objection to the question because it calls for a legal conclusion regarding the standard of interpretation that should be applied to a statement to determine if it is defamatory. See Hobbs Deposition at 308-309.

the other bogus "admissions" in which counsel for Pasdar used legal standards in deposition questions to attempt to obtain concessions from Hobbs as to what the law is. Hobbs has a 10th grade education and is not required to debate applicable legal standards with Pasdar's lawyer, which is precisely the reason that questions that call for legal conclusions from lay witnesses are objectionable. Hobbs does not know and is not required to know about the doctrine of innuendo or the fact that he can prove that statements that do not mention him by name are still actionable if he can prove that they were "of and concerning" him. This Court should apply the law to Pasdar's statements without reference to the legal opinions of Hobbs derived from counsel to Pasdar's deposition questions.

Pasdar's statements are capable of defamatory meaning. Pasdar says that the new DNA evidence clears the WM3 and also states that the DNA evidence belongs to Terry Hobbs. In her letter, Pasdar stated:

> Below, I have written what the DNA and forensics evidence shows. I hope after reading it and looking at the WM3.org website, you will know that the wrong guys are sitting in jail right now, and feel compelled to help.

This statement, couple with Pasdar's statement that "DNA tests also show that a hair belonging to Terry Hobbs, the step-father of one of the victims, was found in the ligature of one of the victims" amount to an accusation that Hobbs is the killer. At minimum, a reasonable juror could conclude that these statements amount to an accusation that Hobbs is the real killer of the three victims. Pasdar also said. "[t]he filing also includes a chronology of Hobbs' activities on the night of the crimes, when he washed his clothes and sheets at odd hours for no reason other than to hide evidence from the crimes." Pasdar can call this statement part of a "post-script" but she nevertheless published it. It

is hers; she owned it when she published it.  It is a defamatory statement made worse by the fact that there is no chronology and that the statement about "the night of the crimes" is inconsistent with the only time of death offered by the Echols defense team.  Taken as a whole, the gist of Pasdar's letter is not just that the WM3 are not guilty, it is that the WM3 are not guilty and that Terry Hobbs is guilty.

Similarly, Pasdar's argument[3] that the "statements in the body of the Letters are not 'of and concerning' Hobbs" is without merit.  Pasdar says that the DNA belongs to Terry Hobbs.  Anything Pasdar says about the DNA or the scientific evidence necessarily is of and concerning Hobbs because of her own statements regarding the DNA.  The same is true of statements made at the rally.  Pasdar said[4] at the rally, "I'm just amazed that these guys are still in prison and that they turn into men in prison.  It's not about opinion any more.  It's not about debate.  It's about science…"  It is a reasonable conclusion that the science referred to by Pasdar is the DNA test, which she says belongs to Terry Hobbs, statements which a reasonable juror could conclude amount to an accusation that Terry Hobbs is the real killer.

Pasdar's negligence is described in Hobbs's motion for partial summary judgment regarding fair report which was filed on June 26, 2009 and incorporated herein by this reference as if set forth word for word.  Pasdar failed to read the filing that she claimed to be referring to in her letter.  In her letter[5], Pasdar asks that others read the evidence for themselves, and she failed to read it.  Had she read it and understood it, as well as paid attention to the press conference she also watched, the contradictions and omissions of

---

[3] Pasdar's MSJ at Page 13.
[4] A transcript of what Pasdar said at the rally is attached to her MSJ as Exhibit 5.
[5] Pasdar stated in her letter, "I know that this is a hard thing to just take my word on, so please look at the case and the evidence for yourself." ,

the press release would have been obvious. The omission of the fingerprint, the inconsistency of the time of death with the phantom chronology, the misuse of the word "match" with respect to DNA tests, the failure to mention another hair in a ligature for which Hobbs has been excluded, the possibility of passive transfer acknowledged by Echols own experts, and other facts should have been known by Pasdar before she wrote a letter containing such serious allegations. Pasdar was negligent for failing to know what she was talking about before making the statements that she made.

Pasdar also acted with actual malice. Actual malice requires a subjective doubt as to the truth of the accusation. Pasdar states that she does not know who committed the crime. CITE. Pasdar says that she included exculpatory evidence related to other DNA what does not match Hobbs. CITE. Pasdar says she was not referring to Hobbs as the killer when she used the word "killer(s)" in her letter. Each of these statements represent an expression of doubt on the part of Pasdar as to whether Hobbs killed the three victims. Despite such subjective doubt on the part of Pasdar, she still stated:

> Below, I have written what the DNA and forensics evidence shows. I hope after reading it and looking at the WM3.org website, you will know that the wrong guys are sitting in jail right now, and feel compelled to help.

This statement, couple with Pasdar's statement that "DNA tests also show that a hair belonging to Terry Hobbs, the step-father of one of the victims, was found in the ligature of one of the victims" amount to an accusation that Hobbs is the killer. An accusation that Hobbs is the killer when Pasdar's own statements indicate that she doubts he is the killer constitutes actual malice. Similarly, Pasdar stated that "[t]he filing also includes a chronology of Hobbs' activities on the night of the crimes, when he washed his clothes and sheets at odd hours for no reason other than to hide evidence from the crimes." In

that Pasdar subjectively doubts that Hobbs is the killer, her publication of the statement that Hobbs washed his clothes for no reason other than to hide evidence from the crimes" is made with actual malice.

Finally Pasdar states that "the eight bullet points in the post-script, four bullet points basically contain "cut and paste" identical language from the Summary (Ex. 34) and the remainder of the bullet points have been minimally altered to make the evidence more understandable to someone unfamiliar with the case."  See SF 301, which cites Ex. 2, Pasdar Dec. ¶ 30; Exs. 3-4, Letters, as its factual basis.   The following statement appears in the summary:

> This places Hobbs at the scene of the crime, since it refutes any theory that the Hobbs' hair (found in the ligature of one of the victims) was there before the crime.

Pasdar in her declaration accepts this statement as her own, perhaps in anticipation of the argument that she specifically omitted this statement because she had subjective doubts about its truthfulness.  Pasdar cannot have it both ways.  This is yet another statement that accuses Hobbs of the crime, because it (falsely) states that the Echols petition presented evidence that eliminated the possibility of passive transfer of the hair in question.[6]  This statement directly contradicts statements by Thomas Fedor regarding passive transfer of the hair in response to questions at the Echols Defense Team Press Conference[7]:

**Question:** What likelihood of hairs being transferred from a body - maybe I go into the woods and I have a hair on my body and it's transferred to a ligature like that? What's the possibility of that? That's what Mr. Hobbs says to us possibly happened and the reason that his hair appeared at the crime scene.

---

[6] Despite the fact that the summary and the press release state that evidence placed Hobbs at the scene of the crime, and the fact that Pasdar adopted that statement as her own, Pasdar uses the possibility of passive transfer to argue that the DNA match language is not an accusation the Hobbs committed the crime.  See Memorandum in Support of MSJ at page 58.  Pasdar cannot have it both ways.

[7] A transcript of the Echols defense team press conference is attached as Exhibit 13 to Pasdar's MSJ.  The portions quoted above appear at bates pages HOBBS00134-00135.

**Thomas Fedor:** It's possible that someone other than delivered his hair, if it is his hair, to the scene. In the same way that it must be possible that Mr. Hobbs, if it was him, transferred David Jacoby's hair to the scene. Hairs that are acquired from somebody else - that we don't grow ourselves - simply adhere by static electricity to our clothing and they fall off from time to time. Things can speed up the transfer of hairs; things can slow down the transfer of hairs. Activity speeds it up; inactivity slows it down. That sort of thing.

**Question:** So would it be unusual (?) a hair in that ...

**Thomas Fedor:** Well, it's possible that his stepson legitimately carried Terry Hobbs' hair to that scene - that's certainly possible. It need not require Mr. Hobbs to be present. Although on the other hand it is possible that Mr. Hobbs and not his stepson brought that hair to the scene. There really isn't any way to be sure.

Pasdar says that her letter did not change the meaning of the Summary, and the Summary states that Echols offered proof which eliminated the possibility of passive transfer of the hair because the evidence placed Hobbs at the scene of the crime. This is yet another contradiction between the summary/letter and what the Echols experts actually said. Again, if Pasdar doubts that Hobbs is the killer, why did she publish as statement that Hobbs was at the scene of the crime? Again, if as Pasdar argues on page 65 of her Memorandum in support of MSJ, that a foreign allele inconsistent with Hobbs was presented in her letter, why did she publish a statement that said he washed clothes on the night before the crime for no other reason than to hide evidence of the crime?

In her Memorandum in Support of Motion for Summary Judgment, Pasdar repeats the false claim that statements the he complains of were "merely a regurgitation of the same information that had been repeatedly published in the press." Memorandum at page 49. In truth, the statements in the press release, the summary and Pasdar's letters were published in 2 articles. See Memorandum at page 51.

An additional falsehood is stated on page 56 of the memorandum. Hobbs does proffer evidence that statements in the post-script are false. Hobbs proffers evidence that the time of death of the three victims was on May 6, 1993, therefore a statement that he washed clothes on May 5, 1993 is false. Hobbs denies that he washed his clothes, curtains etc on the night of May 5, 1993, and that he did so to conceal evidence of the crimes. Pasdar relies on another bogus "admission" when it comes to DNA evidence. The deposition questions regarding DNA evidence were objected to because of lack of foundation[8] because Hobbs is not qualified to testify on DNA or DNA statistics. Hobbs has proffered Echol's expert Thomas Fedor to refute the contention that the DNA evidence places Hobbs at the scene of the crime.

**3. Hobbs statements that he believes the right persons have been convicted for the crime and statements made to defend himself do not amount to a thrusting of himself to the forefront of a "particular public controversy" as that term is defined by the courts.**

The Supreme Court acknowledged in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997 (1974) that the peculiar circumstances in each case affect the balance between freedom of the press and an individual's interest in his or her reputation, but in so doing rejected the notion of an *ad hoc* determination of who is a public figure. Rather, the courts should formulate "broad rules of general application" that accommodate the competing interests of free speech and personal reputation. 418 U.S. at 343-44.

In *Time, Inc. v. Firestone,* 424 U. S. 448, 96 S.Ct. 958 (1976), the court found that despite Firestone's social status, that she "did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society" and that "she did not

---

[8] Hobbs deposition at pages 169-175, 288- 289.

thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it." 424 U.S. at 453.

The Supreme Court requires that a defamation plaintiff thrust themselves to the forefront of any particular public controversy *in order to influence the resolution of the issues involved in it*. Pasdar identifies no issue that Hobbs was seeking to resolve other than a generic belief that the right persons are in jail.[9] "Such interviews should have had no effect upon the merits of the legal dispute" therefore she was not attempting to influence the resolution of the questions involved in the divorce. 424 U.S. at 454, FN3. Pasdar argues that *Firestone* only stands for the limited proposition that there must be a public controversy for a plaintiff to be a public figure. This is an incorrect reading of *Firestone*. The Supreme Court required that a defamation plaintiff thrust themselves to the forefront of a *particular controversy*. A generic controversy is not sufficient. In *Hutchinson v. Proxmire*, 443 U.S. 111, 98 S.Ct. 2675 (1979), the court stated:

> Hutchinson did not thrust himself or his views into public controversy to influence others. Respondents have not identified such a particular controversy; at most, they point to concern about general public expenditures. But that concern is shared by most and relates to most public expenditures; it is not sufficient to make Hutchinson a public figure. If it were, everyone who received or benefited from the myriad public grants for research could be classified as a public figure-a conclusion that our previous opinions have rejected. The "use of such subject-matter classifications to determine the extent of constitutional protection afforded defamatory falsehoods may too often result in an improper balance between the competing interests in this area." *Time, Inc. v. Firestone, supra*, 424 U.S., at 456, 96 S.Ct., at 966.

The United States Supreme Court's view as to the rule of *Firestone* was stated in *Hutchinson v. Proxmire*. The Supreme Court's view of the rule in *Firestone* is

---

[9] The issue of whether the so-called "WM3" were wrongly convicted is the only public controversy identified by Pasdar.

inconsistent with Pasdar's view of the rule in *Firestone*.   Under Pasdar's view, any victim of a crime who states a belief that the accused are guilty would become a public figure for purposes related that crime, even though the Plaintiff is without the ability to influence the resolution of the controversy regarding the crime. Broad generic controversies should be distinguished from narrower more specific controversies by examining legislative remedies or advocacy for particular policies related to the crime. As the court stated in *Foretich v. Capital Cities/ABC, Inc*., 37 F.3d 1541 (4th Cir., 1994).

> Furthermore, Dr. Morgan's prolonged contempt incarceration for refusing to divulge Hilary's whereabouts raised a special set of public policy issues. According to one congressional report, the controversy implicated "local and national issue[s] joining together various political, social, and religious organizations," including the National Organization for Women, the American Civil Liberties Union, Fathers for Equal Rights, the National Network for Victims of Sexual Assault, the Prison Fellowship Ministries, and the National Congress of Men. *Civil Contempt Hearing, supra* note 2, at v. The public discussion of those issues ultimately prompted Congress and the President to secure Dr. Morgan's release through federal legislation limiting the power of the District of Columbia courts to impose contempt in child-custody cases. Clearly, the impact of the Morgan-Foretich battle-unlike most child-custody disputes-was felt far beyond the confines of the Morgan and Foretich homes.

Hobbs has not used the attention focused on him as a victim to advocate policy changes.

What Pasdar identifies as the public controversy has no impact on persons other than those directly involved.  Pasdar's argument ignores the definition of public controversy stated in Waldbaum *v. Fairchild Publications*, Inc., 627 F.2d 1287 (D.C. Cir. 1980).  Pasdar notes that *Waldbaum* is a "landmark" case[10], and then ignores its definition of public controversy.   A public controversy "is a dispute that in fact has

---

[10] Pasdar states that the "landmark Waldbaum decision correctly establishes a widely accepted , three-factor analysis for identifying limited purpose public figures:…"  Pasdar's response to Plaintiff's motion for partial summary judgment at page 17.

received public attention because its ramifications will be felt by persons who are not direct participants." 627 F.2d at 1296. The Court further elaborated:

> To determine whether a controversy indeed existed and, if so, to define its contours, the judge must examine whether persons actually were discussing some specific question. A general concern or interest will not suffice. The court can see if the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment. It should ask whether a reasonable person would have expected persons beyond the immediate dispute to feel the impact of its resolution. If the issue was being debated publicly and it if had foreseeable and substantial ramifications for nonparticipants, it was a public controversy. (footnotes and citations omitted.) 627 F.2d at 1297.

The murder of the three boys in West Memphis, Arkansas has attracted a great deal of publicity, but Pasdar does not even attempt to offer *foreseeable and substantial ramifications for nonparticipants* related to the case, and does not offer any statements by Hobbs that are an attempt to address a part of the case that does have ramifications for non-participants. This is why Hobbs is not a public figure. Pasdar glosses over the issue of identifying the particular public controversy and ignores the distinction between a matter of public concern for purposes of applying the rule in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759, 105 S.Ct. 2939 (1985) with a particular pubic controversy which has foreseeable and substantial ramifications for nonparticipants which must be identified in order to determine that a plaintiff is a public figure.

Whether the right people are in jail for the murder is a matter of public concern within the meaning of *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*. However, whether the right people are in jail for the murders is not a particular public controversy within the meaning of *Waldbaum* because that controversy has no foreseeable and substantial ramifications for nonparticipants. For Hobbs to be a public figure, he must

have thrust himself to the forefront of the particular public controversy for purposes of resolving issues presented therein.  Exhibit "B" attached to Hobbs' motion for partial summary judgment is a list of media statements made by Hobbs.  Hobbs' statements do not relate to any part of a controversy that has foreseeable and substantial ramifications for persons who are not directly involved in the controversy.

Furthermore, Hobbs has not at the forefront of the controversy identified by Pasdar except to the extent that he is defending himself.  Pasdar identifies 26 news articles, three national television shows and one movie, in which Hobbs has been quoted.  The content of such quotes is stated in Exhibit "B" as stated above.  The parties have stipulated to hundreds of media reports regarding this case, the vast majority of which do not quote Hobbs.  But most significantly, a review of what Hobbs said shows that Hobbs did not address a part of the controversy related to the "WM3" which has foreseeable and substantial ramifications for persons who are not directly involved in the controversy.  Terry Hobbs is not a public figure.

On July 20, 2009, Plaintiff filed a Motion for Partial Summary Judgment regarding the public figure issue.  Plaintiff by this reference incorporates the July 20, 2009 motion into this filing as if set forth herein word for word.

**4.  Pasdar's statements are not protected by the fair report privilege because they do not involve a report of an official action.**

Pasdar argues that the fair report privilege applies only to that part of her letter and My Space posting which she refers to as the post-script.  Pasdar argues that the post-script is not a fair report about the Habeas petition filed by Damien Echols on October 31, rather it is a fair report about the latest developments in the entire history of the case.

This fiction must be maintained by Pasdar because of *Butler v. Hearst-Argyle Television, Inc.*, 345 Ark. 462, 49 S.W.3d 116 (2001). In *Butler* the court, referring to the *Restatment (Second) of Torts* Section 611 (1977) stated "Section 611 does state that a 'report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported.' Section 611 cmt. *e.*" Although the court rejected Butler's argument regarding Comment *e* because the issue had not been raised in the trial court, the court offered no statement that in adopting Section 611 of the Restatement, that it was rejecting Comment *e*. A federal court applying state law in a diversity case should consider relevant state court decisions, "analogous decisions, considered dicta, ... and any other reliable data." *Kovarik v. American Family Ins. Group*, 108 F.3d 962, 964 (8th Cir.1997) (quoting *Ventura v. Titan Sports, Inc*., 65 F.3d 725, 729 (8th Cir.1995). In dicta, the Arkansas Supreme Court has indicated a willingness to apply Comment *e*. This Court should apply Comment *e* in this case.

Pasdar must maintain a fiction that she was making a fair report of all of the proceedings to date, not just the petition that was filed on October 31, 2008. This is necessary so that an official action can be included in what she is summarizing to avoid the application of Comment *e*. In her letter and My Space posting at issue in this case, Pasdar specifically refers to "legal papers" filed in late October and a "200-page court filing". There is no reference to other aspects of the case. Pasdar's own letter claims she was summarizing a legal pleading filed in late October, not summarizing any official action. The language of Comment *e* requires an official action to be reported on for the fair report privilege to apply. Because there is no official action associated with the filing by a litigant of its petition, Pasdar must maintain the fiction that she was also

14

summarizing prior events in the case that did involve official action.  This argument is without merit and should be rejected by the Court.

*Whiteside v. Russellville Newspapers, Inc.*, 2009 Ark. 135, --- S.W.3d ----, (2009) is cited by Pasdar in support of the proposition that it is uncertain what the Arkansas Supreme Court considers a report of an official proceeding.  While it is true that the issue regarding Comment *e* has not been specifically resolved, it is equally clear that the court used the comments to the *Restatement (Second) of Torts* § 611 to resolve the case.  In *Whiteside*, the court relied upon Comment *d*, which specifically states that filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege.

> A report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. The publication, therefore, of *the contents of preliminary pleadings such as a complaint or petition*, before any judicial action has been taken is not within the rule stated in this Section. (Emphasis added.)

The Arkansas Supreme Court has adopted the *Restatement (Second) of Torts* § 611.  The Arkansas Supreme Court has used the comments to § 611 as guidance when interpreting § 611.  This Court should use Comment *e* as the basis of a determination that Pasdar's comments about a petition filed in Arkansas are not protected by the fair report privilege. See *Kovarik v. American Family Ins. Group*, 108 F.3d 962, 964 (8th Cir.1997).

**5.  Pasdar's argument that the fair report privilege applies to a press release is without merit because in this case the press release was false.**

Pasdar claims that the fact that she did not read the pleading she claims to be making a fair report about does not determine this issue in part because she did read and rely on a press release issued by the Echols defense team.  Pasdar cites *Procter &*

*Gamble Co. v. Quality King Distributors, Inc.*, 974 F.Supp. 190, (E.D.N.Y.,1997) in support of the proposition that statements made that summarize a press release regarding a pleading are still privileged as a fair report of a judicial proceeding. The basis for the courts finding is as follows:

> The statements in the Letter and the Press Release merely assert that P & G had instituted an action against Quality King for selling counterfeit products, as well as for trademark and package design infringement. The statements are thus a "substantially accurate" rendering of the allegations of the complaint. It is irrelevant that P & G, a party to the action, issued the statements, rather than the media.

Because the press release accurately described the complaint, reliance on the press release was justified. The press release issued by the Echols defense team is a false description of its own filing if what the Echols team said in its own press conference on November 1, 2007 is true. Pasdar quoted the press release extensively in her letter. The same contradictions between the Echols defense team's press conference summary and Pasdar's post-script contained her letter exist with respect to the Echols defense team's press release and what was said at the Echols defense team's press conference. One additional contradiction appears in the press release that Pasdar did not quote in her letter. The press release made the following statement:

> DNA test results matching a hair at the crime scene to a man who was with Terry Hobbs on the day of the crimes. This places Hobbs at the scene of the crime, since it refutes any theory that the Hobbs hair (found in the ligature of one of the victims) was there before the crime.

See Exhibit 32 attached to Defendant's Motion for Summary Judgment filed on August 21, 2009, at bates page PASDAR 1461.

At the Echols press conference on November 1, 2007, the following discussion

took place with Thomas Fedor, an expert witness on the Echols defense team:

> Question: What likelihood of hairs being transferred from a body - maybe I go into the woods and I have a hair on my body and it's transferred to a ligature like that? What's the possibility of that? That's what Mr. Hobbs says to us possibly happened and the reason that his hair appeared at the crime scene.

> Thomas Fedor: It's possible that someone other than delivered his hair, if it is his hair, to the scene. In the same way that it must be possible that Mr. Hobbs, if it was him, transferred David Jacoby's hair to the scene. Hairs that are acquired from somebody else - that we don't grow ourselves - simply adhere by static electricity to our clothing and they fall off from time to time. Things can speed up the transfer of hairs; things can slow down the transfer of hairs. Activity speeds it up; inactivity slows it down. That sort of thing.

> Question: So would it be unusual (?) a hair in that ...

> Thomas Fedor: Well, it's possible that his stepson legitimately carried Terry Hobbs' hair to that scene - that's certainly possible. It need not require Mr. Hobbs to be present. Although on the other hand it is possible that Mr. Hobbs and not his stepson brought that hair to the scene. There really isn't any way to be sure.

Exhibit 13 to Pasdar's Motion for Summary Judgment filed on August 21, 2009 at bates pages HOBBS 00134-00135. The press release says that DNA placed Hobbs at the scene of the crime. In the press conference, DNA expert Thomas Fedor said that there wasn't any way to be sure whether any hair was transferred to the scene by someone other than Hobbs. Fedor stated: "It need not require Mr. Hobbs to be present." This contradicts the statement in the press release that the DNA evidence "places Hobbs at the scene of the crime". The press release is false. Even if what the DNA expert said is false and the press release is actually true, Pasdar claims to have reviewed both the press release and a video of the press conference. Pasdar should have known that the above statements were contradictory. The same is true for all of the other omissions and contradictions stated in Hobbs Motion for Partial Summary Judgment.

The above illustrates why the fair report privilege should not be applied in this case. Pasdar is an advocate for one side of this dispute. To permit her to claim a privilege to repeat lies told by the side she agrees with in a press release without even reading the pleading is to permit both her and the lawyers[11] for Damien Echols to lie without consequence. Such a result would not be justice in this case.

The reason the court in *Procter & Gamble Co. v. Quality King Distributors, Inc.*, 974 F.Supp. 190, (ED N.Y.,1997) permitted a summary of a complaint to be privileged is because it found that the press release accurately described the complaint and in New York, unlike Arkansas, a complaint without official action can be privileged as a fair report. In this case, the press release and the expert witness's description of the filing contradicted one another. A false press release should not be the basis for a claim of a fair report.

**6. Pasdar's argument that the gist of the letters is true is without merit.**

In *Whiteside v. Russellville Newspapers, Inc*., 2009 Ark. 135, --- S.W.3d ----, (2009) the substantial truth doctrine was described as follows:

> In addition to considering the comments provided in section 611, this court has applied the substantial-truth doctrine in testing the accuracy of a report. See *KARK-TV v. Simon*, 280 Ark. 228, 229, 656 S.W.2d 702, 703 (1983). The literal truth is not necessary, the substantial truth will suffice, and, as long as the gist or the sting of the publication is in essence true, some minor conflicts in what was alleged will not eliminate the privilege. See id. (citing *Pritchard v. Times Sw. Broad., Inc*., 277 Ark. 458, 642 S.W.2d 877 (1982).

In his motion Hobbs listed a number of contradictions and omissions which indicate that the "report" made by Pasdar does not constitute an accurate and complete or a fair

---

[11] A lawyer is immune from a defamation suit in Arkansas. *Selby v. Burgess*, 289 Ark. 491, 712 S.W.2d 898 (1986).

abridgment of the occurrence reported. This Court must find that such contradictions are minor conflicts in order to find that the statements are privileged. They certainly are minor to Pasdar, because she is not the one being falsely accused of murder. Hobbs does not view statements that accuse him of murder as minor when such statements would not have been made had Pasdar read the pleading and understood the press conference. Words do matter, especially when someone is being falsely accused of a crime. In *Dillard Dept. Stores, Inc. v. Felton*, 276 Ark. 304, 634 S.W.2d 135 (1982) the court found that because statements made were false, a qualified privilege was lost. The court stated:

> Martin did not simply state that appellee was under investigation for theft, or for violation of rules, but that appellee was fired because he was caught stealing. The statement was factually incorrect and obviously injurious to the appellee. He was not caught stealing and according to appellant's argument on appeal he had not even been fired, but had quit. The most that Martin could have said in truth was that appellee had been found to be in possession of goods without a receipt and was suspected of theft.

276 Ark. at 309-310. Pasdar considers it minor whether the DNA matched, whether the fingerprint that did not match Hobbs should have been mentioned and a time of death that is incompatible with a chronology of events that does not exist. If Pasdar had been concerned with the accuracy of her comments, Hobbs would not stand falsely accused of murder.

### 7. Hobbs has offered proof of damage to reputation.

In *Hogue v. Ameron, Inc.*, 286 Ark. 481, 695 S.W.2d 373 (1985), the Arkansas Supreme Court held that a plaintiff's testimony that his reputation was injured is enough to take the case to the jury in a defamation case. When Hogue sued, the only evidence of injury to his reputation was his testimony and that of another witness who testified

"rather vaguely" that Hogue's reputation changed for the worse about the time of the investigation of the accusations. *Id*. at 483, 695 S.W.2d 373. The trial court granted a motion for directed verdict. The Arkansas Supreme Court reversed and remanded the case, holding that Plaintiff's own testimony was sufficient evidence of harm to reputation.

A plaintiff must establish actual damage to his reputation, but the showing of harm is slight. *Ellis v. Price*, 337 Ark. 542, 990 S.W.2d 543 (1999) citing *Mitchell v. Globe International Publishing, Inc*., 773 F.Supp. 1235 (W.D.Ark.1991). A plaintiff must prove that the defamatory statement(s) have been communicated to others and that the statements have detrimentally affected those relations. The law does not require proof of actual out-of-pocket expenses. *Id*.

Hobbs has a former friend whose opinion of Hobbs is less as a result of accusations who referenced the Dixie Chicks as part of the basis for believing the accusations against Hobbs. Hobbs Deposition at 216-218[12]. Hobbs further stated damage to reputation in his deposition (pages 19-20, 221-212, 260-264. In response to discovery requests, The Dixie Chicks state that the letter on the website was "hit" 15,086 times by 14,106 different visitors. See Exhibit "C" to Plaintiff's Response to Pasdar's Motion for Summary Judgment[13].

Pasdar was asked in discovery to provide the number of hits to the My Space page. Pasdar answered "I do not know" and made no effort to describe what effort was

---

[12] Pasdar selectively quoted the Deposition of Hobbs. In order to complete the record and to prevent Pasdar from claiming there is no evidence of facts stated by Hobbs in his deposition, Hobbs offers as Exhibit "D" to this response a significant portion of the transcript of Hobbs deposition that was no included in Pasdar's filing.

[13] Exhibit "C" contains two copies of the responses to interrogatories. The initial copy is verified but was distorted in the process of electronic transmission; the second copy is more legible but not signed or verified. The content of the two copies is identical.

made to determine the number of hits.  Given that Pasdar is in control of her site and she

refuses to make any effort to state the number of hits, this Court should infer that a

complete answer to the question would be adverse to Pasdar.  In *Slaughter v. Capitol*

*Supply Co., Inc*., 2009 Ark. 221, --- S.W.3d ----, 2009 WL 1098544 (2009) the court

referenced with approval the following Arkansas Model Jury Instruction:

> Where relevant evidence is within the control of the party in whose
> interest it would naturally be to produce it, and that party fails to do so
> without satisfactory explanation, you may draw the inference that such
> evidence would not have been favorable to that party.

That an adverse inference may arise from the fact of missing evidence is a generally

accepted principle of law.  *Smith v. United States*,, 128 F.Supp.2d 1227 (ED Ark. 2000)

citing *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir.1988) and *Goff v. Harold Ives*

*Trucking Co., Inc*., 342 Ark. 143, 27 S.W.3d 387 (2000).  In that Pasdar has failed to

produce information within her control and has failed to offer any explanation, this Court

should infer that thousands of additional persons viewed her defamatory comments on the

My Space page.  Finally, Pasdar offers a series of scurrilous and false allegations from

Hobbs ex-wife and her family in support of the allegation that the reputation of Hobbs

was too bad to be injured.  Hobbs denies virtually all of these allegations.  See Hobbs

Deposition, pages 473-569.  Furthermore, during the Hobbs' divorce proceeding Terry

Hobbs was given custody of the parties' daughter.  Hobbs Deposition at 328, attached

hereto as Exhibit "E" after it was inadvertently omitted from Exhibit "D".  If a small

portion of what is alleged by Pam Hobbs and her family is true, Terry Hobbs would not

have been awarded custody of the parties' minor child.  This Court should disregard the

false allegations by Pam Hobbs and her family against Terry Hobbs.

RESPECTFULLY SUBMITTED this the 28th day of September, 2009.


**TERRY HOBBS**



**BY:**      **/s/ J. Cody Hiland_____**
   **J. CODY HILAND, Bar No. 2002041**
   **Hiland, Davies & Thomas**
   **Attorney for Plaintiff**
   **609 Locust Ave.**
   **Conway, AR  72034**
   **Phone:  (501) 513-0088**
   **Fax:     (501) 513-0085**
   **Email:** cody.hiland@att.net


## CERTIFICATE OF SERVICE

   I hereby certify that I have caused the foregoing to be served in compliance with the Federal Rules of Civil Procedure on the following persons on this 28th day of September 2009:

Mr. John E. Moore                              Mr. Dan D. Davison
Huckabay, Munson, Rowlett and Moore            Ms. D'Lesli M. Davis
Regions Center                                 Fulbright & Jaworski L.L.P.
400 W. Capitol , Suite 1900                    2200 Ross Avenue, Suite 2800
Little Rock, AR 72201                           Dallas, TX 75201-2784

Robert B. Wellenberger
Thompson, Coe, Cousins & Irons, L.L.P.
700 North Pearl Street, Twenty-fifth Floor
Dallas, Texas  75201-2825


   **/s/ J. Cody Hiland_____**
   **J. CODY HILAND**