**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| TERRY HOBBS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CV NO.: 4-09-CV-0008BSM |
| | § | |
| NATALIE PASDAR, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NATALIE PASDAR'S REPLY IN**
**SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Natalie Pasdar ("Pasdar") files her Reply in support of her Motion for Summary Judgment and for same respectfully shows as follows:

## SUMMARY OF REPLY

Plaintiff Terry Hobbs' ("Hobbs") Response to Defendant Natalie Pasdar's Motion for Summary Judgment ("Response") is legally and factually inadequate. In his Response, Hobbs presents virtually no evidence, fails to address many of Pasdar's factual and legal bases for summary judgment and badly misconstrues the law and facts relevant to this case. In a sentence: Hobbs' Response provides no basis to deny Pasdar's Motion for Summary Judgment ("Pasdar MSJ"). Thus, Pasdar's MSJ must be granted.

## ARGUMENTS AND AUTHORITIES

### I.
### THERE IS NO GENUINE ISSUE OF MATERIAL FACT TO BE TRIED

#### A. Hobbs Has Not Controverted Any of Pasdar's Statements of Fact

Because Hobbs has not controverted any of Pasdar's Statements of Fact, Pasdar's statements are undisputed and her MSJ must therefore be granted. In response to Pasdar's MSJ,

Hobbs must do more than simply show "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Under Local Rule 56.1(c), Hobbs "must still 'present evidence sufficiently supporting the disputed material facts that a reasonable jury could return a verdict in his favor.'" *Owen v. Unum Group, Inc.*, 2009 U.S. Dist. LEXIS 55165, *2 (W.D. Ark., June 29, 2009) (quoting *Pope v. ESA Services, Inc.*, 406 F.3d 1001, 1003-04 (8th Cir. 2005)). Because Hobbs does not (and cannot) show even a metaphysical doubt as to the truth of Pasdar's Statements of Fact, Pasdar's MSJ must be granted.

## 1. Hobbs' unsupported "denials" of Pasdar's Statements of Fact are ineffective

In support of her MSJ, Pasdar presented a wealth of evidence, combined with 332 Statements of Fact ("Pasdar SF"), supporting dismissal of all of Hobbs' claims. In his Response to Pasdar's SF ("Response SF"), Hobbs admitted at least 114 of Pasdar's statements, and has asserted 210 conclusory "denials," for which he provides no explanation, no reference to contradictory evidence and no other reason and/or support for the "denials."

Hobbs' blanket denials purport to refute facts that are so plainly clear from the evidence, it defies comprehension (and possibly Rule 11) to understand how such facts could be denied. The following are just a few of the more egregious examples:

- Hobbs denies several statements of fact that merely provide citations to and direct quotes from newspaper articles that have already been stipulated to by all parties. Response SF 109, 114, 117-18, 186-87.

- Hobbs denies the number of times his name is spoken at the Press Conference when the transcript of the Press Conference – which was produced and relied upon by Hobbs and authenticated as accurate by Dennis Riordan – is in the record and clearly refers to Hobbs the specifically enumerated times. Response SF 156.

- Hobbs even denies that: (a) he has lived in Tennessee continuously since 1994; (b) he works in Tennessee; (c) he claims reputational harm in Tennessee; and (d) the

majority of his friends live in Tennessee. Response SF 327. These are statements taken directly from his own words during his deposition. Ex. 1, Hobbs Dep. 64:15-64:21, 162:8-162:18, 217:1-218:15.

- Hobbs denies many statements of fact taken directly from sworn declarations filed in support of Pasdar's MSJ, including sworn statements about Pasdar's preparation and writing of the Letters, about the accuracy of her statements in summarizing the Habeas Evidence, and about Hobbs' bad reputation. Response SF 202-03, 205-06, 220, 228, 231, 305, 315-21. Throughout the entire discovery process, Hobbs has made no effort to depose any of the witnesses who provided declarations, all of whom were included in Pasdar's Rule 26 Disclosures, and he has not refuted the veracity of their statements other than by his oft-repeated, but never supported, response: "Denied."

Possessing no actual evidence through which to refute the abundance of facts stacked against him, Hobbs ignores the summary judgment evidence before the Court and attempts to "controvert" Pasdar's Statement of Facts pursuant to the requirements of Local Rule 56.1. The law, however, requires Hobbs to *present evidence* in response to Pasdar's Statements of Fact and MSJ that would permit a reasonable juror to return a verdict in his favor. He has not done so.[1] Hobbs' one-word refrain cannot preserve his meritless claims. In sum, Hobbs' naked "denials" are ineffective, and Pasdar's MSJ must be granted.

## 2. Hobbs has not identified (and cannot identify) any issues of material fact as to which a genuine issue exists to be tried

Local Rule 56.1(b) requires Hobbs to file, in addition to his Response and brief, a separate, short and concise statement of material facts as to which a genuine issue exists to be tried. L.R. 56.1(b). Hobbs failed to file such a statement. Therefore, the Court should assume that all of Pasdar's Statements of Fact are undisputed. *Bozeman v. Unilever Best Foods N. Am.,*

---

[1] The only exhibits Hobbs attached to his Response consist of discovery responses submitted by the Defendants and excerpts from his own deposition. He cites to his deposition for the argument that his admissions regarding the non-defamatory nature of Pasdar's statements were in response to objectionable questions that called for legal conclusions, which as discussed *infra*, were neither objectionable nor asking for legal conclusions. Response at 3-4.

2007 U.S. Dist. LEXIS 7108, *4, n.1 (E.D. Ark. Jan. 29, 2007).  As a result, Pasdar's MSJ must be granted.

**B.      Hobbs' Admissions are Not Objectionable**

Hobbs' only substantive argument for avoiding the effect of his admissions is that the deposition questions allegedly called for legal conclusions.[2]  Rule 704 does not prohibit lay witness opinion testimony, even if it addresses an ultimate issue.  *U.S. v. Bolden*, 545 F.3d 609, 622 (8th Cir. 2008).  In *Bolden*, the defense "was no doubt pursuing a legal question," but the question regarding a co-conspirator's "equal participation" in a crime did not improperly elicit a legal opinion because the witness was clearly testifying from a lay perspective, exactly like Hobbs.  *Id.*

The key question complained of by Hobbs' counsel merely elicits Hobbs' lay opinion (as the plaintiff and party bringing the suit) on a straight-forward factual issue – whether Pasdar accused him of committing the Murders.   Specifically, Hobbs' counsel complains of the following question:

> Q:      (PASDAR'S COUNSEL):  My question to you, sir, is where in [the Letters] ***do you believe*** that statements individually or taken as a whole accuse you of murder of one or more of the three little boys?  She doesn't do it, does she?

---

[2]      While Hobbs makes a blanket objection to Pasdar's deposition questions at this late stage, the vast majority of Pasdar's deposition questions, which elicited damning admissions from Hobbs, were neither objected to nor were they objectionable.  Hobbs' basis for his legal conclusion objection is Fed. R. Evid. 704.  Indeed, it appears that during the course of the deposition, when Hobbs' counsel was uncertain about a possible answer his client might provide (or did not like the answer that was provided) he made a "calls for a legal conclusion" objection.  Some of the "legal conclusions" objected to by Hobbs' counsel included, but are by no means limited to, the following:  why did you sue my client? (Hobbs Dep. at 12); is everything in your Complaint true and correct? (Hobbs Dep. at 161); would you agree that the WM3 case is a well known and controversial issue? (Hobbs Dep. at 178); and in either the Letter or at the Rally, do you have any reason to believe Pasdar knew what she was saying was false? (Hobbs Dep. at 251-53).

Ex. 1, Hobbs Dep. 308:15-308:20 (emphasis added). Of course, Hobbs answered "No" to this question. Rule 704's advisory committee note also provides insight: "the question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed." FED. R. EVID. 704 advisory committee's note. Pasdar's question is strikingly similar to the advisory committee's second example and thus, should be allowed.

The factual basis of Hobbs' lawsuit is that Pasdar has falsely accused him of the Murders. Pasdar's counsel was not asking Hobbs for a legal dissertation on defamatory meaning. Rather, the question simply asks Hobbs (the person who is accusing Pasdar of defaming him) to identify in layman's terms how *he personally* believes the Letters or statements at the Rally accuse him of the Murders, not to explain any legal theory or offer any legal opinion. Thus, Pasdar's question does not call for a legal conclusion.

The subsequent line of questioning further demonstrates why Hobbs' current objection should be disregarded – because Hobbs' counsel did not object to the vast majority of Pasdar's questions which he now claims resulted in "bogus" admissions. Ex. 1, Hobbs Dep. 309:2-309:18. In sum, Hobbs' objections are not valid, his admissions were not derived from objectionable questions and often times, Hobbs' counsel did not object to the questions about which he now complains. Just because an objection is made does not mean that the resulting testimony should be ignored. The Court should overrule Hobbs' baseless objections and consider the facts before the Court.

As demonstrated in the briefing and evidence before the Court, all of Hobbs' legal arguments fail as a matter of law. Hobbs' claims must be dismissed on any or all of the

following grounds: (1) Pasdar's statements are incapable of defamatory meaning and Hobbs admits as much; (2) Pasdar's statements are protected under the First Amendment because Hobbs is a public figure with regard to the public controversy surrounding the WM3, and Pasdar acted without actual malice; (3) even if Hobbs were a private individual, Pasdar was not negligent; (4) Pasdar's post-script statements, the only ones which refer to Hobbs, were substantially true; (5) Pasdar's statements are protected by the fair report privilege; (6) Hobbs is libel-proof and cannot prove any damages as a result of Pasdar's statements; (7) Hobbs' claim for false light is invalid as a matter of law, and Hobbs concedes dismissal through his lack of response; and (8) Hobbs' outrage claim is invalid as a matter of law, and Hobbs concedes dismissal through his lack of response. Hobbs' Response has failed to show that a material fact issue exists to be tried in this case, and all of his claims should be dismissed.

## II.
### TENNESSEE HAS A MORE SIGNIFICANT RELATIONSHIP WITH *THIS* CASE

Hobbs claims that Arkansas law applies to this action because the events surrounding the WM3 took place in Arkansas. In so doing, he fails to address Pasdar's explanation that in *multistate* defamation or privacy cases where, as here, the plaintiff alleges that the statements were published nationwide, the plaintiff's state has the most significant relationship. RESTATEMENT (SECOND) OF CONFLICT OF LAWS §§ 150, 152 (1977); *Fuqua Homes, Inc. v. Beattie*, 388 F.3d 618, 622 (8th Cir. 2004).

While facts surrounding the WM3 and the Murders are relevant to the instant case, the relevance of those facts does not change the relationship that forms the crux of Hobbs' allegations: Hobbs claims reputational harm in his community and in his business; Hobbs has been a continuous citizen of Tennessee for fifteen years; Hobbs works in Tennessee; the majority

of Hobbs' friends live in Tennessee; and Hobbs claims reputational harm because his Tennessean friends allegedly think less of him. Pasdar SF 327.[3] In fact, after months of discovery, the *only* individual Hobbs has identified as having a lower opinion of Hobbs lives in Memphis, Tennessee. Ex. 1, Hobbs Dep. 217:1-218:15; Response at 20. Furthermore, Tennessee is closely connected to the WM3 case. The Tennessee newspaper, MEMPHIS COMMERCIAL APPEAL, has covered this case as extensively as any Arkansas news outlet, and has specifically interviewed and quoted Hobbs about the DNA evidence and other relevant issues. Pasdar SF 23, 81, 118, 131, 177, 181.

Finally, the controversy surrounding the WM3 and the Murders and the passionate debates regarding justice, Constitutional rights, DNA testing legislation and other issues have taken place on a national stage, on the internet, in newspapers and on television. Pasdar SF 19-50, 137, 262-71. Hobbs himself has alleged that Pasdar's celebrity status – presumably not limited to an Arkansas audience – is the reason he chose to sue her instead of other individuals who have made similar statements. Pasdar SF 259. He also cites in his Response the number of "hits" the Letters allegedly received on the Dixie Chicks website, again, presumably not limited to Arkansas citizens. Response at 20. Hobbs' emphasis on the location of Pasdar's remarks at the Rally is similarly made irrelevant by his assertion that her remarks "attracted significant media attention and were widely printed, disseminated and broadcast to an expansive audience." Complaint at ¶ 18. Based on his own theory of reputational harm, this is a quintessential multi-state defamation action wherein Hobbs' home state will have the most significant relationship to

---

[3]    Again, Hobbs' denial of Pasdar's Statements of Fact regarding his longstanding citizenship and ties to Tennessee cannot be taken seriously given his sworn testimony to the contrary. Compare Response SF 327 with Ex. 1, Hobbs Dep. 64:15-64:21, 162:8-162:18, 217:1-218:15.

the case. Moreover, when considering Hobbs' Tennessee connections and citizenship in light of Tennessee's own relationship to the WM3 controversy, Tennessee has the most significant relationship to this case.

Nevertheless, as demonstrated in the briefing before the Court, even *IF* the Court were to apply Arkansas substantive law, Pasdar is entitled to the requested summary judgment.

## III.
## HOBBS' DEFAMATION CLAIM FAILS AS A MATTER OF LAW

**A.    Pasdar's Statements are Not Reasonably Capable of Defamatory Meaning**

**1.    Hobbs ignores the obvious gist and tenor of Pasdar's statements about the WM3**

Hobbs' argument to preserve his defamation claim consists primarily of bootstrapping any statement Pasdar has ever made about the WM3, science or DNA to a single evidentiary bullet point that stated some of the DNA found at the crime scene belonged to Hobbs. Response at 5. Hobbs now claims that because of this bullet point, "anything Pasdar says about the DNA and scientific evidence necessarily is of and concerning Hobbs" and somehow an accusation against him. Response at 5-6. This revisionism of the obvious tenor and gist of Pasdar's statements – that the *WM3* are innocent and that the science and DNA exculpate the *WM3* – requires vast, interpretative leaps which no reasonable juror would make; and one Hobbs himself has not previously made or supported with any summary judgment proof.

For example, Hobbs claims that Pasdar's encouragement of readers to inform themselves about the WM3 and her stated belief that "the DNA and forensics evidence shows . . . the wrong guys are sitting in jail" is an accusation against Hobbs. Response at 4. Pasdar does not say the DNA at the crime scene exclusively belonged to Hobbs; rather, she says (as many others before her said): (a) some DNA found at the crime scene belonged to Hobbs; (b) some DNA at the

crime scene matches Jacoby; (c) a foreign allele found at the crime scene does not match any of the WM3; (d) scientific evidence refutes the prosecution's original theory about knife wounds; and (e) most importantly, *no* genetic material or any other scientific evidence from the crime scene is linked to the WM3. Thus, her claim that the science and DNA prove the WM3's innocence stands under her own words whether she includes any of the Hobbs evidence or not. Therein lies the non-defamatory gist of everything Pasdar says in the body of the Letters and the Rally, which is supported by the evidence in the post-script: despite the abundance and variety of scientific evidence uncovered, *none* of the scientific evidence places the WM3 at the crime scene. Hobbs' attempt to fabricate an accusation by bootstrapping all Pasdar's DNA or scientific references simply does not fit the tenor and gist of Pasdar's Rally and Letter statements about the WM3's innocence.

Hobbs similarly continues to emphasize Pasdar's alleged failure to discuss evidence which potentially exculpated him from the Murders as indicative of her statements' defamatory meaning and/or her negligence.[4] Response at 6. Hobbs again refers to fingerprint evidence in the Habeas Memo and an irrelevant discussion of Dr. Peretti's estimated time of death. *Id.* Pasdar did not write her Letters about Hobbs, she was not reporting on whether Hobbs was innocent or guilty, and any mention of Hobbs in her Letters was incidental to her attempt to inform the public about the WM3 and the new evidence in their case. The Hobbs evidence, in combination with the Jacoby evidence, the foreign allele and the absence of any genetic material

---

[4] It is unclear exactly what point Hobbs argues in this section of the Response, which purportedly addresses whether the statements are capable of defamatory meaning, yet also cites the alleged "omissions and contradictions" in the context of the fair report privilege as indicative of Pasdar's negligence. Regardless, Hobbs' fixation on whether Pasdar sufficiently explained Hobbs' innocence is irrelevant both as to whether or not the statements Pasdar did make (as opposed to statements she "omitted" or "contradictions" she did not recognize and/or publicize and are therefore not at issue in the case) are capable of defamatory meaning or whether she was reasonably prudent in ensuring the accuracy of the statements she did make.

from the WM3, was considered by many to be exculpatory evidence *for the WM3*, and this evidence was repeatedly emphasized by the defense team in the Press Conference, the Press Release, and throughout the Habeas Memo and Habeas Evidence. Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 6, 64-66; Ex. 3, Habeas Evidence at X, Y, BB); Pasdar SF 149, 153, 155-58. Thus, it was wholly reasonable, non-defamatory and accurate for Pasdar to have included all of this evidence in her Letters when addressing the Echols case and discussing whether the WM3 are innocent. Similarly, it was appropriate and accurate for the many other reporters to likewise include this same information in their reports on the Habeas Petition, the Press Conference and the general developments in the case between July 2007 and November 2007. Pasdar SF 96-100, 104-08, 107-32, 148-51, 164-70.

Hobbs also engages in elaborate bootstrapping in an attempt to claim Pasdar possessed actual malice.[5] Hobbs claims that "actual malice requires subjective doubt as to the truth of the accusation," and that Pasdar's subjective doubts about the killers' identity evident in the Letters shows that her later reference to the DNA as Hobbs' constitutes evidence of her doubts about the truth of her "accusation" against Hobbs. Response at 6. As discussed *infra*, Hobbs misstates the actual malice standard by erroneously presuming an "accusation" has been made. Additionally, his own concession dispositively proves that the gist of Pasdar's Letters are not defamatory. Hobbs admits in his Response that statements regarding the "killer(s)" and evidence exculpatory towards Hobbs in the Letters "represent an expression of doubt on the part of Pasdar as to whether Hobbs killed the three victims." *Id*. Since, as Hobbs now argues, these statements in

---

[5] Once again, Hobbs interchangeably analyzes the gist or meaning of Pasdar's statements and whether she possessed actual doubts about the truth of the statements. For the reasons discussed *infra*, the summary judgment record clearly establishes Pasdar acted with no actual malice, and Hobbs cannot refute this through his unsupportable, conclusory denials. Indeed, Hobbs has presented no summary judgment evidence of actual malice.

the Letters acknowledge Pasdar's doubt as to the identity of the true killer(s), her subsequent statement about Hobbs' DNA is clearly not an accusation that he is the killer, and is not in any way inconsistent with Pasdar's uncertainty as to the real killer(s). In sum, Pasdar's statements in the Letters and at the Rally were not made with negligence or actual malice and do not accuse Hobbs of committing the Murders.

## B. Hobbs is a Public Figure

Hobbs bases his denial of public figure status on three unsupportable grounds: (1) no particular public controversy exists in this case; (2) the WM3 controversy affects only those directly involved; and (3) Hobbs only "defended himself."

### 1. Whether the WM3 were wrongfully convicted is a public controversy

Hobbs adopts the untenable position that there is no public controversy surrounding the WM3 that could confer public figure status on him. Response at 9-12. Hobbs has not presented a single piece of evidence to support this position, ignores the wealth of summary judgment evidence provided by Pasdar to the contrary, and misconstrues relevant case law in reaching his conclusion that the intense public debate over whether the WM3 were wrongfully convicted is not enough to create a "particular public controversy."

The absurdity of Hobbs' newest position that the public debate over whether the WM3 were wrongfully convicted is not a public controversy is apparent to anyone who reviews the record. Nevertheless, out of an abundance of caution, Pasdar is compelled to briefly address this issue. In trying to show no public controversy exists, Hobbs badly mischaracterizes Pasdar's interpretation of *Time, Inc. v. Firestone*, 424 U.S. 448 (1976), and then purports to rely upon *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541 (4th Cir. 1994) and *Waldbaum v. Fairchild*

*Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) in concocting a "definition" of public figure allegedly suitable to his myopic view of the scope of the WM3 controversy. Response at 10-12.

*Firestone* recognized that a prerequisite to limited-purpose public figure status is the existence of a public controversy. 424 U.S. at 454. At the core, Mrs. Firestone could not be a public figure with respect to her divorce proceedings because, while newsworthy, a divorce is a private matter, not a public controversy. Pasdar does not, as Hobbs falsely implies, assert that a generic controversy can give rise to limited-purpose public figure status. Rather, Pasdar's clear purpose in citing *Firestone* is to demonstrate that the facts underlying the *Firestone* decision are distinct from the facts giving rise to this lawsuit. Pasdar MSJ at 20. Specifically, the event underlying *Firestone* was a private matter – a divorce proceeding. This lawsuit, however, relates to an extremely public matter – the Murders and subsequent convictions of the WM3, which captivated the nation (and perhaps the world). Hobbs himself has dubbed the Murders "one of the most infamous crimes in the history of the State of Arkansas." Pasdar MSJ Ex. 15, Hobbs' Supp. Ans. No. 6.

In the face of the motion, Hobbs now appears to consider the Murders and convictions a "generic controversy" despite calling the crime "one of the most infamous crimes in the history of the State of Arkansas" and admitting in his deposition that there has been a public controversy over whether the WM3 were wrongfully convicted since 1994. Pasdar MSJ Ex. 15, Hobbs' Supp. Ans. No. 6; Response at 10; Pasdar SF 19-20. The public controversy identified by Pasdar – whether the WM3 were wrongfully convicted – is anything but generic. In fact, the controversy is "particular" in every sense of the word: it relates to a particular crime resulting in the arrests of three particular teenagers (the WM3), which were followed by particularly objectionable trials that arguably violated the particular Constitutional rights of the three

teenagers who have since been in a particularly unfortunate situation – sitting in prison (one on Death Row), convicted of a heinous crime they may not have committed.

      **2.      The WM3 controversy has already impacted and continues to impact non-participants**

Hobbs also bases his conclusion that whether the WM3 were wrongfully convicted is not a public controversy on the statement that the controversy "has no impact on persons other than those directly involved." Response at 11. This position lacks merit.

Hobbs' assertion that Pasdar "does not even attempt to offer foreseeable and substantial ramifications for nonparticipants related to the case . . ." is an outright falsehood. Response at 12. In fact, Pasdar describes in detail how the WM3 controversy impacts non-participants. Pasdar MSJ at 19-23; Pasdar SF 19-21, 23-26, 29-31, 34-37, 50, 132, 194-96, 262-76, 243-44. By way of example only, Pasdar: (a) establishes through applicable case law that judicial proceedings often raise public controversies [Pasdar MSJ at 20]; (b) proves through sworn declarations and other competent summary judgment evidence (which Hobbs does not and cannot controvert) that the WM3 controversy is undeniably a public controversy of political and social concern to the community and requires free and open debate in order to maintain an informed electorate [Pasdar MSJ at 19]; and (c) points out that the WM3 controversy has sparked significant legislative reform effectively impacting every person convicted of a crime who seeks exoneration through DNA testing [Pasdar MSJ at 22, n.6]. Additionally, although it seems elementary, even Hobbs and his counsel must recognize that the specific inquiry into whether the WM3's Constitutional rights were violated (and especially whether the State is trying to execute an innocent person) has an enormous, fundamental impact on the freedoms of every citizen.

Just as he failed to do in response to 210 of Pasdar's Statements of Fact, Hobbs fails to present *any* summary judgment evidence to show the WM3 controversy is a private matter with no ramifications on outsiders. Response at 11-12. Hobbs also fails to address the plethora of cases cited by Pasdar in support of her position that judicial proceedings often become public controversies and that 'fairness of the judicial system' questions are quintessential issues of public concern. Hobbs concedes that the Murders "attracted a great deal of publicity," and then tries to fabricate a deficiency in Pasdar's public figure reasoning by misapplying his narrow definition of public figure and ignoring the wealth of evidence presented by Pasdar. Response at 12. Hobbs, however, misses the mark with his "analysis." Pasdar has never asserted that the media attention surrounding the Murders automatically creates a public controversy; rather, it is (among other things) the steadfast fixation of the media combined with the obsession of the public with the guilt or innocence of the WM3 that creates the public controversy. In sum, whether the WM3 were wrongfully convicted is a particular public controversy in every sense and under every possible legal definition.

### 3. Hobbs actively engaged in the WM3 controversy to influence its outcome

Finally, Hobbs contends that he is not a public figure since he is only at the forefront of the controversy because he is "defending himself." Hobbs' Response on this issue is not only inadequate and unsupported, it is false. Hobbs merely refers the Court to his Exhibit "B," which he claims contains the contents of his media interviews. Response at 12. Hobbs fails to address any of the summary judgment evidence presented by Pasdar. Hobbs also attempts to liken his actions to those of Mrs. Firestone's in the *Time, Inc. v. Firestone* case. Response at 10.

Hobbs' comparison of his actions to Mrs. Firestone's (while I'm sure she would be flattered) is baseless, at best. Mrs. Firestone was "compelled to go to court by the State in order

to obtain legal release from the bounds of matrimony." *Firestone*, 424 U.S. at 454. Hobbs, on the other hand, has never been compelled by anyone to do anything or to talk to anyone about the Murders.[6] Instead, Hobbs chose to speak to the WM3 investigators because he was "curious" about "what kind of people would work to get killers out." Pasdar SF 95. Hobbs chose to call news reporters to lobby for the WM3 to stay in prison "Because I can" and "Because I want to." Pasdar SF 110. Hobbs certainly chose freely to write a book, promote his book through his media contacts, sell his life rights and the life rights of his murdered step-son to a major movie company, hire a media spokesperson and appear on CNN's *Anderson Cooper 360*, *The Geraldo Rivera Show* and *The Maury Povich Show* – all in an admitted effort to keep the "killer SOB's" in prison. Pasdar SF 51-115, 128-32, 171-93.

Hobbs incorrectly states that "Pasdar identifies no issue that Hobbs was seeking to resolve other than a generic belief that the right people are in jail." Response at 10. Hobbs' belief in the WM3's guilt, however, is certainly not generic and Pasdar has discussed at length Hobbs' relentless efforts to influence the outcome of the public controversy over whether the WM3 were wrongfully convicted. Pasdar MSJ at 32-45; Pasdar SF 128-32, 171-96. Hobbs' efforts to keep the WM3 in prison are specifically calculated to influence the outcome of the public controversy, not merely to defend himself. Pasdar MSJ at 23-45. Indeed, common sense shows that Hobbs' interviews, his book writing and promotion, his television appearances and his repeated public comments – that the WM3 are "killers" with "crooked defense attorneys"

---

[6] Hobbs may argue that he was "compelled" to talk to the WMPD in 2007 when they asked him to come in for questioning. Although Hobbs spoke to the WMPD voluntarily, even if a police request for an interview can be deemed to have compelled Hobbs to speak, this is the only time Hobbs could have possibly been compelled to do so. All of Hobbs' other television appearances, interviews and press statements and actions were voluntary.

who "deserve to be hung by a rope" – were calculated and direct attempts to influence the outcome of the public controversy over whether the WM3 were wrongfully convicted.

Incredibly, Hobbs ignores key portions of Pasdar's public figure argument by utterly failing to explain the major public activities that prove he was not merely defending himself and that show exactly why he is so clearly a public figure.  In particular, Hobbs never addresses:  (a) the sale of the rights to his life story to Dimension Films; (b) the sale of the rights to the life story of his murdered step-son to Dimension Films; (c) his multiple interviews with WM3 investigators; (d) his hiring of a media spokesperson and their subsequent actions; (e) his incredible access to effective channels of public communication; (f) his appearance on CNN's *Anderson Cooper 360*, *The Geraldo Rivera Show* and *The Maury Povich Show*; (g) his efforts to write a book, have it published and promote sales of his book through his media contacts; or (h) his admissions that his actions were an attempt to convince the public and relevant authorities that the WM3 were appropriately in prison.  Pasdar MSJ at 32-45; Pasdar SF 128-32, 171-96. Hobbs voluntarily engaged in these actions because he could and because he wanted to.  Hobbs' actions so clearly and undeniably make him a limited-purpose public figure that his argument to the contrary casts doubt over his entire lawsuit.

### 4. Hobbs presents virtually no evidence to that he is a private figure

As seems to be his *modus operandi*, Hobbs has presented virtually no evidence to support his position that he is not a public figure.  Hobbs presents no evidence that the WM3 controversy is a private matter affecting only the direct participants.  Hobbs neglects his duty to respond to Pasdar's legal arguments that judicial proceedings, especially criminal cases, often become public controversies.  Finally, Hobbs completely fails to discuss the major public activities that conclusively prove he is a public figure attempting to influence the WM3 controversy.

Not only has Hobbs failed to present any evidence to support his position that no public controversy exists, he completely failed to respond to Pasdar's Counter Statement of Facts filed in support of her Response to Hobbs' Motion for Partial Summary Judgment Regarding Public Figure ("Counter SF").  Pasdar's Counter SF incorporate by reference her Statement of Facts filed in Support of Pasdar's MSJ and also independently establish that "at least since the HBO *Paradise Lost* documentaries [released in 1996], there has been a public controversy over whether the WM3 were wrongfully convicted."  Pasdar Counter SF 6.  They also establish that "the public controversy over the propriety of the WM3 convictions has expanded to be a national controversy to the point of almost being 'a cause.'"  Pasdar Counter SF 6.  Hobbs' failure to address these statements of fact result in their being deemed admitted under Local Rule 56.1.

### 5. Hobbs concedes that he is an involuntary public figure

In her Motion for Summary Judgment Pasdar asserted that, "[s]hould this Court somehow decide Hobbs is not a 'voluntary limited-purpose public figure, the record contains clear and convincing evidence that, at the very least [Hobbs is] an involuntary limited-purpose public figure."  Pasdar MSJ at 45-47.  Pasdar's MSJ contained legal analysis as well as factual support for her position.  Pasdar MSJ at 45-47.  Hobbs did not address this point in his Response.  Therefore, Hobbs has effectively conceded that, at a minimum, he is an involuntary limited-purpose public figure.

In sum, Hobbs has not and cannot present any summary judgment evidence that he is a private figure.  To the contrary, Pasdar has presented overwhelming (and uncontroverted) evidence that Hobbs is a public figure, including Hobbs' candid admission that he voluntarily thrust himself into the raging public debate over whether the WM3 were wrongfully convicted in

a calculated effort to keep the "killer SOBs" in prison.  Pasdar SF 77, 95, 178, 195.  Hobbs is a

public figure.

## C.      Hobbs Cannot Prove that Pasdar Acted Negligently or with Actual Malice

Hobbs' argument that Pasdar possessed actual malice ignores the true standard of review:

whether clear and convincing evidence shows that Pasdar entertained serious doubts about the

truth of her statements.[7]  *Harte-Hanks Comm. v. Connaughton*, 491 U.S. 657, 688.  First and

foremost, nothing in the record shows, suggests or even hints that Pasdar entertained *any* doubts

about the truth of her statements, much less serious doubts as required by law.  Furthermore, the

record is clear:  sworn declarations and corroborating documented correspondence show that

Pasdar was extremely diligent when writing her Letters.  Pasdar SF 197-227, 311-13.  She

consulted reliable sources most familiar with the case, and she copied almost verbatim an

attorney-approved description of the new evidence in the Echols case.  Pasdar SF 197-227.

When asked to edit the Letters, she refused to change content that she believed had been

prepared by Echols' attorneys and which had in fact been approved by those attorneys as

accurate.  Pasdar SF 212-17, 222-23.

Hobbs continues to allege that Pasdar's failure to read the Habeas Petition constituted

negligence.  Response at 5.  Pasdar's reading the Habeas Petition was not a reasonably necessary

precaution with regard to the truth of her statements about the WM3 because she had access to

---

[7]    As discussed above, Hobbs claims that because Pasdar was uncertain who the killer(s) was, this was evidence
that she subjectively doubted her supposed "accusation" that Hobbs was the killer.  Pasdar's stated subjective
doubt as to the reality of the true killer(s) is distinct from whether evidence shows she doubted the truth of her
*statements or representation*s.  Absent evidence in the record to the contrary, Pasdar can consistently and
affirmatively state that Hobbs' DNA was found at the crime scene (as well as the foreign allele and possibly
Jacoby's DNA) while clearly indicating to the readers that she also does not know the identity of the real
killer(s).  Hobbs of all people should recognize this, given his vigilant attention to the concept of innocent
transfer, and there is no evidence at all in the record that Pasdar doubted the truth of either of these statements.
Hobbs cannot have it both ways.

the people most informed about the case and she reasonably relied on their representations about the case. Pasdar SF 197-227. Hobbs asserts no justification (or facts) as to why or how Pasdar was negligent in this regard, and he completely fails to respond to the wealth of evidence before the Court showing Pasdar's diligent and reasonable efforts to ensure the accuracy of her statements, including her consultation of Lorri Davis, reliance upon an attorney-approved Press Release, knowledge of press reports and her seeking the advice and help of her own management and public relations team in drafting the Letters. Pasdar SF 197-227. There is not a scintilla of evidence in the record before the Court that shows Pasdar doubted or had reason to doubt the veracity of her comments. No matter which fault standard is applied to Pasdar, there is no genuine issue of material fact on the issues of actual malice or negligence.

**D.     The Gist of the Letters and the Statements in the Post-Script were Substantially True**

Hobbs offers no evidence to counteract Pasdar's defense of truth. Individuals have sworn to and corroborated the truth of every one of Pasdar's statements made the basis of Hobbs' complaint. Pasdar SF 305-06, 308. The truth of her statements in citing evidence presented in the Habeas Petition is sworn to by Echols' attorney and supported by the Habeas Petition itself. Pasdar SF 305-06. The actual truth about several of the points of evidence about Hobbs are corroborated by Jo Lynn McCaughey and Pam Hobbs. Pasdar SF 308. Hobbs responds to this wealth of evidence with his standard one word "denial" and nothing more. This "denial," unsupported by any evidence and contained only in a pleading prepared by lawyers desperately seeking to avoid summary judgment, does not create a material issue of fact in the face of the overwhelming evidence supplied by Pasdar. Hobbs also fails to distinguish between the

affirmative defense of truth and the application of the fair report privilege, so he generally weaves together his argument against each.[8]

Substantial truth, for the purpose of the issues before the Court, is determined by whether the statement as published would have a "different effect on the mind of the reader from that which the pleaded truth would have produced." *Masson v. New Yorker Magazine*, 501 U.S. 496, 517 (1991). Hobbs' only stated argument (outside of empty denials) to contest the truth of Pasdar's statements is that she incorrectly described the DNA as "belonging" to him or a "match" and that there is a possibility of innocent transfer. Response at 6-8, 17. To illustrate his point, Hobbs repeatedly cites a quote from the expert witness Tom Fedor talking about the possibility of innocent transfer, or alternatively, the possibility of a guilty Hobbs innocently transferring Jacoby's hair. Response at 7-8, 17.

Once more, the truth of Pasdar's statements has nothing to do with how well she proved the case of Hobbs' guilt or innocence. If Hobbs' DNA were innocently transferred to the crime scene, Pasdar's statement that his hair was found in a ligature would still be absolutely true. Furthermore, Hobbs has divulged to the press, and did not contest in his own deposition, that his DNA was discovered at the crime scene. Pasdar SF 107-14, 309. Numerous reporters, and even

---

[8]    As explained in Pasdar's MSJ, the defense of truth and fair report privilege use the same standard of comparison but compare different points of reference. The defense of truth is concerned with whether the statements are actually true whereas the fair report privilege is concerned with whether a report on a proceeding accurately describes that proceeding, even if statements made at the proceeding are untrue. Pasdar MSJ at 62, n.20. Pasdar's claim that "the following is just some of the evidence" in the Echols case distinctly raises both of these defenses and requires separate analyses. If it is literally true that a point of evidence Pasdar cites was a piece of evidence introduced in the case, that statement is literally true and absolutely privileged. If the post-script as a whole is an accurate or fair abridgment – i.e., captures the gist of the new developments in the case – then it is a fair report. Thus, any "omissions" or "contradictions," no matter how major or minor, are irrelevant to the affirmative defense of truth, so long as the specific cited evidence was introduced in the case as Pasdar explicitly stated. Conversely, the actual truth of Pasdar's statements in the post-script – the evidence itself – is completely irrelevant to fair report analysis, as the purpose of the privilege is to protect potentially false statements when reporting on an official proceeding.

WMPD Chief Mike Allen, have referred to the DNA as belonging to Hobbs. Pasdar SF 116-17. Hobbs of course "denies" all of this now, but provides nothing to support his denial. The record clearly establishes that a statement that DNA belonged to Hobbs does not have a substantially different effect on the mind of the average reader than if Pasdar had technically parsed out the miniscule percentage of the population that could have donated the DNA and explained that Hobbs and Jacoby each fall within that miniscule percentage. *See* Pasdar MSJ at 57-58.

Similarly, Hobbs contests the truth of the point concerning Hobbs' doing laundry near the time of the Murders. Response at 6-7. The Habeas Evidence clearly includes testimony from Rachel Geiser alleging that on the basis of her interview with Jo Lynn McCaughey, Hobbs washed clothes at an odd hour near the time of the Murders. Court's File, Stip. No. 2 (Ex. 3, Habeas Evidence at X). Additionally, McCaughey has reaffirmed this allegation with a sworn statement that she witnessed Hobbs do laundry at an odd hour near the time of the Murders. Pasdar SF 308. This evidence will be presented at the habeas hearing and makes Pasdar's statement true. Pasdar SF 305-06. Hobbs concedes by his stipulation that the laundry evidence was included in the Habeas Evidence. Court's File, Stip. No. 2 (Ex. 3, Habeas Evidence at X). Hobbs has also made no effort to depose or cross-examine McCaughey or introduce any evidence to refute the actual truth of her sworn statement about him doing laundry. It is therefore undisputed in the record that: (a) the Habeas Petition contains evidence that Hobbs did laundry at an odd hour; and (b) McCaughey's statement that Hobbs did laundry at an odd hour is

actually true. These facts are not sufficiently disputed by Hobbs' conclusory, unsupported denials.[9]

**E.     The Post-Script is Protected by the Fair Report Privilege**

Pasdar maintains that Tennessee (not Arkansas) law applies to this case; Pasdar's report, however, is protected by the fair report privilege under either state's laws.[10]   In his Response, Hobbs has continued his trend of misstating the law of fair report, failing to respond to several of Pasdar's key points and missing the most important point:  that Pasdar reported on an official proceeding no matter how Pasdar's report is characterized and regardless of whether Arkansas would adopt Comment (e).

**1.     Pasdar reported on an official proceeding no matter how her report is characterized and regardless of whether Arkansas has adopted Comment (e)**

Hobbs fails to recognize or respond to the fact that both the plain language and explicit policy reasons for Comment (e) do not apply to Pasdar's report.  Comment (e) applies only to "preliminary pleadings such as a complaint or petition, before any judicial action has been taken."  RESTATEMENT (SECOND) OF TORTS § 611, cmt. *e*.  Comment (e) explicitly does not apply where "some judicial action has been taken, so that in the normal progress of the proceeding, a final decision will be rendered."  *Id*.  A Habeas Petition, much less a *Second*

---

[9]    Hobbs also attempts to preserve this denial at times by claiming that the chronology of events in the Habeas Petition contradict Dr. Peretti's estimated time of death.  Response at 6-9.  This does not change the literal truth of whether Hobbs did laundry or whether evidence concerning Hobbs' laundry was included in the Habeas Petition and will be presented at the hearing.  It was and it will.

[10]    Hobbs does not address whether Tennessee's fair report privilege would protect Pasdar's statements despite his explicit recognition that a choice of law issue exists in this case.  *See* Hobbs Fair Report MPSJ at ¶ 13; Response at 1-3.  Tennessee requires a showing of actual malice with regard to the accuracy of the report about an official proceeding as opposed to Arkansas' negligence standard, and Tennessee explicitly applies the privilege to pleadings absent judicial action whereas the judicial action limitation is an issue of first impression in Arkansas.  *See* Pasdar MSJ at 60-61, 65-66.  Thus, while Pasdar contends her report is privileged under Arkansas' fair report standard, Tennessee's lesser fault standard and explicit extension of the privilege to reports on court pleadings clearly protect her statements in the post-script as well.

*Amended* Habeas Petition, is by definition not preliminary; it is a form of post-conviction relief, which seeks to set aside a state-initiated conviction and incarceration as unconstitutional.[11] Judicial action, in the form of investigation, prosecution, conviction and in this case, opposition to the writ by the State, was a necessary prerequisite to Echols filing his Habeas Petition, and a final decision will be rendered in the normal process of his post-conviction relief efforts. Pasdar SF 133-45. Even under Hobbs' arbitrary division of the Habeas Petition from the ongoing Echols murder case, judicial action had been taken in the form of the State's prior motion to dismiss his First Amended Habeas Petition and the Court's Order Denying the Motion to Dismiss. Pasdar 133-45.

It is Hobbs who creates a legal fiction[12] here by partitioning different motions and even different, amended versions of the same motion into somehow distinct proceedings. In reality, these motions all comprise necessary steps (in the same official, state-initiated proceeding) towards the rendering of a final decision regarding Echols' murder trial and conviction. Pasdar's reference to the Habeas Petition, the latest step in the proceeding at the time of the Letters, does not change the ongoing nature of the official proceeding and the evidence presented therein. *See* Pasdar SF 133-144.

---

[11]  While Echols' writ of habeas corpus does contain the word "petition," it is neither preliminary nor before any judicial action has been taken. The policy goal and final decision language of Comment (e) clearly intend to describe the initiation of a lawsuit, and do not apply to post-conviction relief efforts.

[12]  Hobbs somehow views Pasdar's characterization of the report on the Echols case as a legal fiction intended to avoid a finding that her failure to read the Habeas Petition was negligent. *See* Response at 14. For reasons discussed throughout Pasdar's briefing, Pasdar's failure to read the Habeas Petition was not negligent regardless of how the report is characterized. Either way, she provided a fair report – of the Echols case and of or the Habeas Petition – by consulting multiple reliable sources with intimate knowledge about the case and the Habeas Petition. Thus, it was not necessary for her to read the lengthy, hypertechnical Habeas Petition. *See* Pasdar MSJ at 65-66.

Furthermore, Comment (e) was written "to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping an action." *Id.* In other words, a person cannot initiate a lawsuit for the purpose of printing and then reporting upon the defamatory words in the complaint or petition as a means of avoiding defamation liability for the words printed therein. Echols' effort to obtain his Constitutional right of habeas corpus is completely unrelated to this policy concern, and the pleading in question is not the type of "preliminary pleading such as a petition or complaint" contemplated by Comment (e). *Id.* Hobbs does not address the obvious difference, nor can he. Whether she reported solely on the Habeas Petition or more broadly on the Echols murder case, Pasdar clearly reported on an official proceeding, upon which judicial action had been taken, and which was and is well on its way towards rendering a final decision.

2.     **Hobbs continues to misstate the law of fair report privilege**

Hobbs has, for the third time, completely misstated the law of fair report in Arkansas by claiming that Arkansas has adopted Comment (e). Response at 14 (citing *Butler v. Hearst-Argyle Television, Inc.*, 49 S.W.3d 116 (Ark. 2001)). The applicability of Comment (e) to this case, or more generally, its acceptance by the Arkansas Supreme Court at all, is clearly an issue of first impression. The determination of what constitutes an official proceeding was first addressed in *Whiteside v. Russellville Newspapers, Incorporated*, in an unrelated context of witness statements given to police, which did not invoke the language of Comment (e). No. 08-313 WL 857516 (Ark. March 12, 2009). In *Whiteside*, the Court held that the witness statements were a part of an official proceeding. *Id.*

*Butler* did not hold, favor in *dicta*, or otherwise indicate in any way how it would rule either on Arkansas' adoption of Comment (e) or the applicability of Comment (e) to a report on

an affidavit. Rather, the court merely recognized the judicial action argument had been raised on appeal by the plaintiff, referred to the provision of Comment (e) relating to the judicial action limitation, and then explained why it *declined to reach the merits* on the issue, which had not been discussed at trial or in the appellate briefs. 49 S.W.3d at 122. As discussed in Pasdar's prior briefing, many jurisdictions that follow the Restatement have independently decided to reject the judicial action limitation with regard to public court pleadings in spite of Comment (e). Pasdar MSJ at 61; Pasdar Fair Report Response at 13-14. Arkansas has not decided this issue, and Hobbs' characterization of *Butler* is incorrect. *Butler* is relevant to this case in determining Arkansas' legal standard for the fair report privilege, but it provides no guidance regarding the applicability of Comment (e) to any type of court pleading, much less a second amended writ of habeas corpus.

### 3. Pasdar's report was accurate and a fair abridgment of the evidence, and Hobbs has not created an issue of material fact regarding its truthfulness

As discussed *supra*, Pasdar's statements in the post-script were substantially true. Furthermore, Pasdar's statements provided an accurate report and/or fair abridgment of that evidence (regardless of whether the evidence was true). A report need not be exhaustive, and it is accurate or a fair abridgment if none of the omissions create an erroneous impression. *Butler*, 49 S.W.3d at 120; *Smith v. Reed*, 944 S.W.2d 623 (Tenn. Ct. App. 1996). Furthermore, the "substantial truth" standard may be applied under Arkansas law whereby the report is accurate as long as it captures the gist or sting of the official proceeding. *Butler*, 49 S.W.3d at 120.

In reporting on the new evidence, Pasdar relied heavily on the Press Release, as well as the Press Conference and other sources she consulted. Hobbs does not dispute that the Press Release can be a fair report on an official proceeding; rather, he claims the Press Release Pasdar

relied upon was false. The truth of the statements in the Press Release, however, are of no consequence to the fair report privilege, so long as they accurately report on the content of the official proceeding – the new evidence in the Echols case. *See generally* RESTATEMENT (SECOND) OF TORTS § 611. Furthermore, under the terms of Hobbs' own argument, Pasdar's belief in the innocence of the WM3 or advocacy on their behalf is irrelevant to the determination of whether her report is privileged. Hobbs admits that a press release distributed by a party would still be privileged if it provided a fair report; thus, the beliefs or position of the publisher are irrelevant to the consideration of the report's accuracy. *See* Response at 18.

In now claiming that the gist of the Letters was not true and/or the fair report privilege does not apply, Hobbs again emphasizes inconsequential alleged "contradictions and omissions." Response at 18. An omission of a half-page briefing on a single point of evidence in a 200-page memorandum of law is minor and does not create an erroneous impression on the reader when describing the totality of the new evidence introduced by Echols. Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 46, 106). The omission of Hobbs' self-concocted theory regarding Dr. Peretti's estimated (but not accepted) time of death does not create an erroneous impression about the proceeding upon which Pasdar reports. Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 37, n.17); *See* Pasdar's Fair Report Response at 19-20. Again, these issues are minor with regard to Pasdar's report, not because of their import to Hobbs, but rather, because they were insignificant or irrelevant to the official proceeding upon which Pasdar reported – the Echols murder case and the new evidence supporting Echols' innocence as set forth in the Habeas briefing.

Hobbs also preoccupies himself with supposed contradictions between the Press Conference and the Press Release in the context of his innocent transfer theory. Response at 18.

Even if such contradictions exist, it is unclear how such differences would impact whether Pasdar accurately reported on the Echols case.[13]  Hobbs claims an omitted sentence from the Press Release about the Jacoby hair placing Hobbs at the scene of the crime contradicts Fedor's qualified explanation of transfer.[14]  Response 15-16.  Because Pasdar never published this statement, it is irrelevant to the consideration of whether her report was accurate or a fair abridgment.

Furthermore, this omitted statement from the Press Release as well as all statements in Pasdar's Letters regarding the DNA accurately capture the gist of the Habeas Petition and the new evidence in the case.  The Habeas Memo specifically says that because of the possible Jacoby hair and other circumstantial evidence surrounding him, Hobbs "would be hard pressed to come up with an innocent explanation" for the DNA evidence at the crime scene.  Court's File, Stip. No. 2 (Ex. 2, Habeas Memo at 66).  Thus, it was an accurate abridgment of the gist of the new evidence and the Habeas Petition (albeit slightly less nuanced than Fedor's description) when the Press Release suggested the DNA evidence placed Hobbs at the scene of the crime.  Regardless, the evidentiary bullet points that were included in Pasdar's Letters were all qualified by Pasdar as evidence that would be presented in the Echols case.  Exs. 3, 4, Letters.  As the inconsequential "omissions" and "contradictions" did not create an erroneous impression, and all

---

[13]    The Press Release and Press Conference were both reliable sources upon which Pasdar and the rest of the press corps relied as a means of understanding the extremely technical nature of the latest evidence presented in the Echols case.  Pasdar SF 148, 151, 164-70, 197-227.  Naturally, a one page Press Release or Letter will not mirror in detail or specificity the evidentiary nuances of a two-hour Press Conference or 200-page filing, and some differences in language are inevitable.  Nonetheless, all three "reports" on the proceedings in the Echols case, the Letter, Press Release, and the Press Conference, are accurate and fair abridgments of the new evidence in the Echols case that capture the gist of the Habeas Petition and evidence contained therein.

[14]    Interestingly, Fedor's first response in this quoted comment was to acknowledge that innocent transfer of Jacoby's hair could very well indicate Hobbs' guilt, a statement consistent with this omitted sentence in the Press Release.  Response at 18.

of her cited evidence was in fact a part of the new evidence in Echols' case, Pasdar's report on the new evidence was accurate and a fair abridgment of the highlights of that new evidence.

## IV.
### HOBBS IS LIBEL-PROOF AND INCAPABLE OF PROVING DAMAGES RESULTING FROM PASDAR'S STATEMENTS

Under Tennessee law, this case must be dismissed because Hobbs is a libel-proof plaintiff. *Davis v. Tennessean*, 83 S.W.3d 125, 130 (Tenn. Ct. App. 2001). "To suffer injury to one's standing in the community or damage to one's public reputation, one must possess good standing and reputation for good character in the first place." *Id.*

Under Arkansas law, this case must be dismissed because Hobbs cannot prove actual injury to his reputation. *United Ins. Co. of Am. v. Murphy*, 961 S.W.2d 752, 756 (Ark. 1998). Although Arkansas has not expressly adopted the 'libel-proof plaintiff' doctrine, the preclusion of presumed damages and requirement of a causal connection (which is totally missing from the record) between a statement and the alleged reputational harm inherently presumes that a plaintiff's reputation must be capable of being harmed. *Murphy*, 961 S.W.2d at 755-56.

Hobbs, as appears to be his chosen method, fails to state why he is not a libel-proof plaintiff or to refute any of the evidence Pasdar presents of his horrific reputation. In fact, the closest Hobbs gets to refuting the evidence presented by Pasdar of Hobbs' terrible reputation is to say that "Hobbs denies virtually all of these allegations." Response at 21. Hobbs of course, presents no evidence to support his denials.

While the showing of harm is slight and out-of-pocket expenses are not required, Arkansas law clearly requires defamation plaintiffs to present *some* evidence proving actual injury to reputation. *Murphy*, 961 S.W.2d at 756. In fact, after the *Hogue v. Ameron, Inc.*, 695 S.W.2d 373, 374 (Ark. 1985) decision cited by Hobbs, the Arkansas Supreme Court held "that a

plaintiff in a defamation case must prove reputational injury in order to recover damages," and it expressly "overrule[d] all prior decisions inconsistent with this opinion." *Murphy*, 961 S.W.2d at 756. Moreover, even if the holding in *Hogue* were still good law, its facts are considerably different than the facts before the Court.

In *Hogue*, the only evidence of reputation – good or bad – was Hogue's testimony *and that of another witness* who testified that Hogue's reputation changed for the worse following the defendant's false accusations. *Hogue*, 695 S.W.2d at 374. First, Hobbs is the only person who has claimed that his reputation has been damaged.[15] Also, unlike the defendant in *Hogue*, Pasdar has not made any false accusation against Hobbs.

In stark contrast to *Hogue*, there is a mountain of uncontroverted summary judgment evidence before the Court conclusively establishing that Hobbs has a reputation incapable of being damaged. Pasdar SF 314-26. The plaintiff in *Hogue* was a police officer with no apparent devious history. *Hogue*, 695 S.W.2d at 374. The issue was not whether the defendant proved that Hogue had a *bad* reputation, it was merely that Hogue had little tangible proof that his *good* reputation had been harmed. *Id.* Perhaps plaintiffs with at least some reputational integrity can get to the jury with minimal evidence of damages; however, a plaintiff such as Hobbs, with a horrifying reputation of sexual and physical child abuse, drug use, spousal abuse and assault, (not to mention his "reputation" with regard to the Murders *prior* to Pasdar's statements), should not be afforded such unbridled opportunity to reach a jury. Pasdar SF 314-26.

---

[15] Despite the obvious ease of doing so, Hobbs has not submitted a single declaration, affidavit or other statement from a single friend, coworker, family member, employer or other person stating that Hobbs' reputation changed for the worse as a result of the Letters and/or Rally.

Hobbs also cannot demonstrate that it was Pasdar (as opposed to those who came before her) who caused him any emotional or reputational injury. Indeed, the cases relating to proving injury relied upon by Hobbs are factually distinguishable from this case because in each, only one event could have caused the alleged injury.[16] Here, countless events could have caused Hobbs' alleged injury, and there is no causal connection between Pasdar's statements and Hobbs' alleged injury. In fact, months before Pasdar entered the picture, newspapers, internet blogs, websites, television reports, numerous other media outlets and most importantly, Hobbs himself had already said exactly what Pasdar stated in her Letters and at the Rally. Hobbs candidly agrees:

> Q: (PASDAR'S COUNSEL): [Regarding reputational injury] Add injury to injury. Because Ms. Pasdar certainly wasn't saying anything new, was she?
>
> A: (HOBBS): No.

Ex. 1, Hobbs Dep. 260:7-260:9. Hobbs has not demonstrated (nor can he demonstrate) that Pasdar's statements, as opposed to the literally thousands of statements by others, caused him any harm.

Even if Hobbs could somehow show that Pasdar's statements caused some injury (which he cannot), he cannot separate any injury he allegedly suffered as a result of Pasdar's statements from any injury he allegedly suffered as a result of other people's statements. This issue was addressed at length in Hobbs' deposition:

---

[16] In *Hogue*, the only possible injury-causing event was the defendant's letter to Hogue's boss stating that Hogue had driven an unregistered vehicle. *Hogue*, 695 S.W.2d at 374. In *Ellis v. Price*, the only injury-causing event was the defendant's phone call to the plaintiff's husband accusing the plaintiff of adultery. 990 S.W.2d 543, 545 (Ark. 1999). In *Mitchell v. Globe International Publishing, Inc.*, the only injury-causing event was an allegedly defamatory newspaper article. 773 F. Supp. 1235, 1236 (W. D. Ark. 1991). Here, everything Pasdar said in the Letters and at the Rally had already been said by others literally thousands of times.

Q:      (PASDAR'S COUNSEL):  My question is, sir, are you able to separate any injury -- the emotional injury --

A:      (HOBBS):  No.

Q:      -- between the ongoing appeals and what Ms. Pasdar said?

A:      No.  Because they had been going on before she came along.

                . . .

Q:      Can you separate out the emotional injury that you have suffered as a result of the countless newspaper, media, television articles, about the murder, the appeals, and quite frankly, the recent connection of your DNA to the crime scene, separate and apart from that -- Ms. Pasdar's letter or statement at the rally?

A:      No.

Ex. 1, Hobbs Dep. 258:2-258:8, 259:11-18.  Not only is Hobbs' reputation incapable of being damaged, Hobbs has no evidence whatsoever that it was Pasdar who caused any alleged injury to his reputation.[17]

## V.
### HOBBS' FALSE LIGHT INVASION OF PRIVACY CLAIMS STILL FAILS AS A MATTER OF LAW

Hobbs has wholly failed to respond to Pasdar's Motion for Summary Judgment argument that the false light invasion of privacy claim fails as a matter of law

## VI.
### HOBBS' OUTRAGE CLAIM STILL FAILS AS A MATTER OF LAW

Hobbs has also failed to respond to Pasdar's Motion for Summary Judgment argument that his outrage claim fails as a matter of law.

---

[17]    In his Response, Hobbs refers to a former friend whose opinion of Hobbs is less as a result of Pasdar.  Response at 20.  However, once again Hobbs' own deposition testimony belies his lawyer's argument, and he admits that he cannot say it was Pasdar who caused his friend to think less of him.  Ex. 1, Hobbs Dep. 217:1-220:12.

## CONCLUSION

For the reasons set forth in the original motion and this Reply, all of Hobbs' causes of action fail as a matter of law. Accordingly, Defendant Natalie Pasdar respectfully requests that this Court enter a final judgment that Terry Hobbs take nothing on his claims asserted herein, dismiss this case with prejudice and award Pasdar her costs and all other and further relief to which she may be justly entitled.

Dated: October 5, 2009

Respectfully submitted,

/s/ Dan D. Davison
_____
Dan D. Davison
Lead Attorney
Pro Hac Vice
ddavison@fulbright.com
D'Lesli Davis
Pro Hac Vice
ddavis@fulbright.com

FULBRIGHT & JAWORSKI L.L.P.
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201-2784
Telephone: (214) 855-8000
Facsimile: (214) 855-8200

John E. Moore
State Bar No. 82111
john.moore@hmrmlaw.com

HUCKABAY MUNSON, ROWLETT & MOORE P.A.
Regions Center
400 W. Capital, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 374-6535
Facsimile: (501) 374-5906

COUNSEL FOR DEFENDANT,
NATALIE PASDAR, Individually, and
NATALIE PASDAR d/b/a DIXIE CHICKS.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served upon

the following counsel of record in accordance with the Federal Rules of Civil Procedure on this

5th day of October, 2009.

J. Cody Hiland                                Bob Wellenberger
HILAND, DAVIES & THOMAS, PLLC                 THOMPSON, COE, COUSINS & IRONS, L.L.P.
609 Locust Avenue                             700 North Pearl Street
Conway, Arkansas 72034                        Plaza of the Americas, Twenty-Fifth Floor
                                              Dallas, Texas 75201-2832


/s/ Dan D. Davison
Dan D. Davison