## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

**TERRY HOBBS**                                                                          **PLAINTIFF**

**v.**                           **CASE NO. 4:09-CV-0008 BSM**

**NATALIE PASDAR, individually, and**
**NATALIE PASDAR, EMILY ROBISON,**
**and MARTHA SEIDEL d/b/a DIXIE CHICKS**                       **DEFENDANTS**

## ORDER

Plaintiff Terry Hobbs's moves for partial summary judgment as to the fair report privilege and opinion (Doc. No. 26) and moves for partial summary judgment as to his status as a public figure (Doc. No. 31). Defendant Natalie Pasdar moves for summary judgment on all claims against her (Doc. No. 38). Defendants Martha Seidel (now Martha Maguire), Emily Robison, and the Dixie Chicks move for summary judgement on all claims against them (Doc. No. 41) and adopt the arguments set forth in Pasdar's motion for summary judgment. Having reviewed the statements of undisputed facts and responses; the arguments set forth in the briefs; and the entire record in this cause, it is clear that there are no issues of material fact in dispute as to Hobbs's claims against the defendants and that summary judgment is appropriate on those claims. Summary judgment is therefore granted for the defendants and Hobbs's claims are dismissed with prejudice.

## I. FACTUAL BACKGROUND

The following facts are undisputed:

On June 3, 1993, the West Memphis Police Department ("WMPD") arrested teenagers Damien Echols ("Echols"), Jason Baldwin ("Baldwin"), and Jessie Misskelley ("Misskelley"), whom the press would dub the West Memphis 3 (the "WM3"), and they were ultimately charged with the murders of three eight-year-old boys, Michael Moore, Christopher Byers, and Steven ("Stevie") Branch, in the Robin Hood Hills area of West Memphis, Arkansas on May 5, 1993. Plaintiff's response to defendants' statement of facts (Doc. No. 57-2) ("Stmt. of facts 1"), ¶¶ 6, 14. In 1994, Misskelley was convicted of murder and sentenced to life in prison plus forty years. *Id*. at ¶ 15. Also in 1994, Baldwin and Echols were convicted in a joint trial; Baldwin was sentenced to life in prison without the possibility of parole and Echols was sentenced to death by lethal injection. *Id*. at ¶ 16. The WM3 are currently in prison and each is seeking post-conviction relief. *Id*. at ¶ 17.

On November 25, 2008, Terry Hobbs ("Hobbs") filed this lawsuit against recording artists Natalie Pasdar ("Pasdar") and the Dixie Chicks in the Circuit Court of Pulaski County, Arkansas. *Id*. at ¶ 1; Complaint (Doc. No. 1). The complaint states that Hobbs is a citizen and resident of Memphis, Tennessee. Complaint (Doc. No. 1). Pasdar is a citizen and resident of California, and Robison and Maguire are citizens of Texas. Stmt. of facts, ¶ 328-30. On January 1, 2007, defendants removed the case to this court on the basis of diversity jurisdiction. *Id*. at ¶ 2. In his complaint, Hobbs asserts against Pasdar causes of action for: (1) defamation; (2) false light invasion of privacy; and (3) outrage. *Id*. at ¶ 3. Hobbs seeks compensatory and punitive damages for injuries to his person, business, reputation, and for embarrassment, humiliation, mental trauma, and loss of income. *Id*. at ¶ 8.

The complaint references a November 26, 2007, letter posted on the Dixie Chicks' website ("website letter"), and a December 19, 2007, "Free the West Memphis Three" rally (the "rally") at which Pasdar made remarks. Complaint (Doc. No. 1). In his complaint, Hobbs claims that, in the letters and at the rally, Pasdar accused him of murdering Michael Moore, Christopher Byers, and his step-son, Steven ("Stevie") Branch, in the Robin Hood Hills area of West Memphis, Arkansas on May 5, 1993. Stmt. of facts, ¶ 6. At the time of the murders, Hobbs was married to Stevie Branch's mother, Pam Hobbs. *Id*. at ¶ 13.

The substance of the website letter is identical to a letter posted on the Dixie Chicks' MySpace blog ("MySpace letter"), and Hobbs's complaints about each letter are the same. Stmt. of facts, ¶ 5. The letters were posted on the internet from California. *Id*. at ¶ 332. The website letter states:

> November 26, 2007
> Letter from Natalie Maines: WM3 Call to Action
>
> I'm writing this letter today because I believe that three men have spent the past 13 years in prison for crimes they didn't commit.
>
> On May 5th, 1993 in West Memphis, Arkansas three 8 eight-year-old boys, Steve Branch, Christopher Byers, and Michael Moore were murdered.
>
> Three teenage boys, Damien Echols, Jesse Misskelley, and Jason Baldwin were convicted of the murders in 1994. Jason Baldwin and Jesse Misskelley received life sentences without parole, and Damien Echols sits on death row.
>
> I encourage everyone to see the HBO documentaries, Paradise Lost and Paradise Lost 2 for the whole history of the case.
>
> I only discovered the films about 6 months ago, and when I finished Paradise Lost 2 I immediately got online to make sure that these three wrongly convicted boys had been set free since the films were released. My heart sank

when I learned that the boys were now men and were still in prison. I couldn't believe it.

I searched for answers as to what had been done and what was being done to correct this injustice. I donated to the defense fund and received a letter from Damien Echols wife, Lorri. She is a lovely woman who has dedicated her time and heart to her husband. I was glad to hear that after so many years of fighting for justice it looked like things were finally happening. Below, I have written what the DNA and forensics evidence shows. I hope after reading it and looking at the WM3.org website, you will know that the wrong guys are sitting in jail right now, and feel compelled to help.

Inspired and determined to see the justice system work, many people have worked on this case pro bono for the past 13 years. However, there are still costs that go along with the struggle to freeing these three men.

There has been a wonderful resurgence of interest by the media for this case, but nobody mentions the need for funds. Donations to the defense fund are desperately needed. DNA and forensics tests are expensive. They are also what will finally set these men free. Due to so many people's passion and generosity, what would normally be a case that costs millions is costing a fraction of that. I know around the holidays we all get inundated with deserving causes and charities that are in need of donations, but this can't wait!

With all of the new evidence things are finally moving, and fast!

Any money that you can donate is desperately needed to pay for the experts and the federal court hearing that is just weeks away. There is also a letter campaign that has been started by a new and energized group of people in Arkansas. Click here to download the sample letter. Signing and sending this letter makes it very difficult for this case to be ignored. Please mail the letters to the following address:

Arkansas Take Action
Capi Peck, Coordinator
P.O. Box 17788
Little Rock, AR 72222-7788

After so many years it literally all comes down to this hearing.

The evidence is so strong that at the very least the judge will grant a new trial, but hopefully he will overturn the verdict and these guys will finally be sent home to their lives and families.  I know that this is a hard thing to just take my word on, so please look at the case and the evidence for yourself.  I am confident that you will see the DNA evidence is irrefutable and that these three men did not get the kind of trial that is promised to us - as Americans.

The system hasn't only failed Damien, Jesse, and Jason, but it has failed the three little boys that were murdered.  Their killer(s) is still out there, and justice has yet to be served.  Please know that your generosity will make a difference.

Please know that your generosity will make a difference.

Sincerely,
Natalie Maines Pasdar

The following is just some of the DNA and forensic evidence that will be presented in the federal court hearing:

In late October, legal papers were filed in federal court in Arkansas showing that Damien Echols was wrongfully convicted.  The 200-page court filing includes DNA evidence that fail to link any of the three boys to the crime scene.  This is very important because the prosecution claimed that Echols had sodomized the victims.

- DNA tests also show that a hair belonging to Terry Hobbs, the step-father of one of the victims, was found in the ligature of one of the victims.

- DNA tests also match a hair at the crime scene to a friend of Hobbs that was with him that day.

- DNA test results show foreign DNA-from someone other than Echols, Misskelly [sic], or Baldwin-on the penises of two of the victims.

- Scientific analysis from some of the nation's leading forensic experts, stating that wounds on the victims' bodies were caused by animals at the crime scene-not by knives used by the perpetrators, as the prosecution claimed. These wounds were the centerpiece of the prosecution's case, and evidence was presented that a knife recovered from a lake near one defendant's home caused the wounds.

- Sworn affidavits outlining new evidence uncovered by Pam Hobbs (the ex-wife of Terry Hobbs) who found a knife in Terry Hobbs'[s] drawer that her son (one of the victims) had carried with him at all times. After her son was killed, the knife was not among his personal effects that police gave to the Hobbs family, and Pam always assumed that her son's murderer had taken it during the crime.

- New information implicating Terry Hobbs-including his own statements made to police in recent interviews where he acknowledged that several of his relatives suspect him in the crime. The fling also includes a chronology of Hobbs'[s] activities on the night of the crimes, when he washed his clothes and sheets at odd hours for no reason other than to hide evidence from the crimes.

- A sworn affidavit that refutes hearsay evidence from Echols' trial. The mother of one of two girls who testified that they overhead Echols admit to the crime at a softball game now says that Echols' statement was not serious and that neither she nor her daughter believes he committed the crime.

Ex. A, complaint.

At the rally, Pasdar made the following remarks:

Thank you. I have papers will help better. I just wanted to say thanks for being here today and I think every face and person does make a difference and I think these letters will matter. I think it's important for our elected officials don't know about but all elected officials to know that we are watching them and we care about the decisions that they make and what they pay attention to so I think it does matter that each one of you is here today and that people sign these petitions. You know people ask me all the time why I am interested in this and why I'm involved and I think looking around at these postcards and letters is exactly why I'm here. When you see the films and when you go to the website and you learn about the case and all the evidence that is there now you just feel like what can I do? Any little thing and everyone you know these people from around the world wrote a postcard and I went on the website and

learned more and donated to the defense fund and got a respond from Laurie and started a dialog and relationship with her and I'm here because she asked me to be here and you just want to do anything you can to right this wrong and I remember just feeling - I'm just amazed that these guys are still in prison and that they turn into men in prison. It's not about opinion any more. It's not about debate. It's about science and I've tried to find negative comments and it's hard to find - it's hard for people to open their mouths or debate something that has now been scientifically proven, something I knew in my gut after I watched the films that these three guys did not do these crimes. So I just wanted to say I'm honored to be here. Laurie is a wonderful wonderful person and she's what has kept this going for 14 years and made people not to forget about the West Memphis Three so I'm just happy to be here and I urge you to go to WM3.org and donate to the defense fund. These donations is what has paid for the forensic tests and the DNA testing that's going to set these men free so thank you very much.

Stip. No. 5 (Doc. No. 61).

On December 3, 2008, J. Cody Hiland ("Hiland"), Hobbs's attorney, issued a press release about the case in which he said, "While all Americans have the right of free speech, that right does not extend to falsely accusing someone of a triple homicide. . . . Terry Hobbs had absolutely nothing to do with these murders." Stmt. of facts, ¶ 10.

In the *Memphis Commercial Appeal* alone, there have been at least ninety-four (94) articles regarding the WM3, the murders, the trials, the convictions of the WM3, the WM3's post-conviction relief efforts, the victims, the victims' families, whether the WM3 were wrongfully convicted, and if so, who the real killer(s) is/are (collectively, the "events"). *Id.* at ¶ 23. Numerous stories about the events have appeared in newspapers across the country and around the globe, including the *New York Times*, the *Chicago Tribune*, and the *Los Angeles Times*. *Id.* at ¶ 25. The Associated Press has run nearly eighty (80) stories on the events since 1993, which have been made available for re-print to papers all over the country.

*Id*. at ¶ 26.  Even *America's Most Wanted* ran a story about the murders on May 14, 1993. *Id*. at ¶ 28.

Two nationally distributed documentary films, *Paradise Lost: The Child Murders at Robin Hood Hills* and *Paradise Lost 2: Revelations*, aired on the national cable channel, HBO, on January 18, 1996, and July 28, 2000, respectively.  *Id*. at ¶ 31.  The documentary films focused a great deal of attention on questions surrounding the convictions of the WM3 for the murders, the trials, the victims, the victims' families, and the search for the murderers. *Id*.  The HBO films contain actual footage of the trials, interviews with the WM3 and interviews with parents of the victims.  *Id*. at ¶ 32.

Particularly, in *Paradise Lost: The Child Murders at Robin Hood Hills* filmed in part in 1994, released in 1996, Hobbs is interviewed and voluntarily appears on screen.  *Id*. at ¶ 33.  In the interview, Hobbs discusses the WM3 and acknowledges that he believes they committed the murders.  Indeed, he states: "I don't feel it is fair for someone right now to ask me to forgive the ones who caused [Hobbs'[s] home to be] torn apart."  *Id*. at ¶ 54.  The film has been available for viewing since that time through DVD and VHS rentals and purchases. *Id*. at ¶ 62.

On March 16, 1994, less than one year after the murders, Hobbs also voluntarily appeared on the nationally syndicated television show, *The Geraldo Rivera Show*, in an episode entitled: "Kids Who Kill: Did the Devil Make Them Do It?"  *Id*. at ¶ 56.  On August 2, 1994, Hobbs voluntarily appeared on an episode of *The Maury Povich Show* to discuss the events.  *Id*. at ¶ 59.  On that show, Hobbs again discussed the guilt of the WM3, the

Misskelley confession and a grove dedicated to the victims in West Memphis. *Id*. at ¶ 60. Hobbs also told the public that the events "hurt," and that it hurts to watch his wife go through the events. *Id*.

Several nonfiction books about the murders, the trials, whether the WM3 were wrongfully convicted, the victims, and their families have been written and nationally distributed, including the 1995 book, *Blood of Innocents: The True Story of Multiple Murder in West Memphis, Arkansas*; the October 2002 book, *The Devil's Knot: The True Story of the West Memphis 3*; and Echols' own June 3, 2003 book, *Almost Home: My Life Story Vol. 1*. *Id*. at ¶ 37. These books are currently available for purchase at local bookstores and on websites. *Id*. at ¶ 38. Additionally, a collection of essays and fiction writings, *The Last Pentacle of the Sun: Writings in Support of the West Memphis 3*, was published as a fundraiser for the Damien Echols Defense Fund in October 2004. *Id*. at ¶ 39. Even a musical album entitled "Free the West Memphis 3" has been nationally released with songs by Eddie Vedder, Tom Waits, Steve Earle, and L7. *Id*. at ¶ 40.

Local and community charity efforts have also focused on the victims' families. *Id*. at ¶ 41. There has been an outpouring of public generosity through financial support and sympathy to the victims' families. *Id*. at ¶ 42. Even President Bill Clinton sent a letter to Pam and Terry Hobbs expressing his sympathy for their loss. *Id*. at ¶ 43. Fundraisers have been held for families of the victims. *Id*. at ¶ 44. The WM3.org website, which is devoted to raising both awareness of the plight of the WM3 and the funds necessary to overturn the allegedly wrongful convictions, receives an average of 70,000 "hits" per month. *Id*. at ¶ 48.

Lorri Davis, Echols' wife, estimates that she has fielded more than 10,000 emails and letters regarding the case since 1996. *Id.* at ¶ 49. Hobbs recognizes that people have been saying the WM3 got a "raw deal" and need a new trial for sixteen (16) years. *Id.* at ¶ 256.

Hobbs admits that he has told people that he has a book deal and/or that he would like to have one. *Id.* at ¶ 67. Following the sale of the rights to his life story, Hobbs voluntarily sat down at least twice with his ex-wife, Pam, and Dimension Films for an interview to be used in the creation of the film. *Id.* at ¶ 83. Hobbs also sold the rights to the life story of Stevie Branch. *Id.* at ¶ 86.

On May 19, 2007, Hobbs met with Ron Lax ("Lax"), at which time Lax informed Hobbs that his DNA was consistent with the DNA of a hair found in the ligature that was used to bind murder victim Michael Moore. *Id.* at ¶ 91. The DNA testing was performed by the Bode Lab in Arkansas, which has been approved by the State of Arkansas for use in criminal proceedings. *Id.* at ¶ 100. Hobbs subsequently met with Lax on one or two more occasions, WM3 investigator Rachel Geiser once or twice, and WM3 criminal profiler John Douglas twice. *Id.* at ¶ 92. During Hobbs's meetings with WM3 investigators, Hobbs was the person providing information. *Id.* at ¶ 93. Hobbs knew that the investigators with whom he met were working for the WM3 and their legal defense team and were working to collect evidence which would free the WM3. *Id.* Hobbs also knew the discussions during the meetings with the WM3 investigators were not confidential. *Id.* at ¶ 94.

On June 21, 2007, the WMPD formally interviewed Hobbs and interrogated him regarding his whereabouts on May 5 and 6, 1993 and his recollection of those days. *Id.* at

¶ 101. Hobbs was the first person to disclose to the press the details surrounding his WMPD interview. *Id*. at ¶ 104. Hobbs told the WMPD about his plans to publish the book, stating "I have writers wanting to put it in a book form for me. . . . I'm gonna put it on the market." *Id*. at ¶ 106.

At least forty (40) articles published between July 2007 and November 2007, specifically mentioned that the hair at the crime scene potentially belonged to Hobbs. *Id*. at ¶ 121. Below, by way of example only, are numerous excerpts from articles in which Hobbs was interviewed:

- Hobbs believes the DNA results are the work of "crooked defense attorneys trying to get their killer SOBs out of jail. . . . It ain't gonna work, said Hobbs. . . . He said a private detective working for defense lawyers told him one of his hairs was found on a shoelace used to tie up one of the murdered boys. . . . "That's understandable," said Hobbs. "All three of them boys used to come play at my house." Court's File, Stip. No. 1 (Ex. 4, *Arkansas Times* article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article).

- "Ron [Lax] claims that a piece of my hair is in the knots that tied up [victim] Michael Moore. Does that bother me? . . . No ma'am, it does not . . . because I don't believe a thing he has to say because he's working for the defense team." Court's File, Stip. No. 1 (Ex. 4, *Arkansas Times* article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article).

- Terry Hobbs dismissed the knives as having "nothing to do with anything. . . . I'd bought some, and found some and Pam bought me some. I just threw them in a drawer, and that's where they'd been for years." . . . Asked whether one of the knives was a pocket knife given to Stevie by his grandfather, Terry Hobbs responded, "I don't know. It could have been. And it could have been it was in the drawer because we didn't want him to have it. I didn't want a kid of mine to go around with a pocket knife – not a kid who was 8 years old. Would you?" Court's File, Stip. No. 1 (Ex. 4, *Arkansas Times* article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article).

- As for his ex-wife, he [Hobbs] said "Pam's got some problems. This thing has taken a toll on her. It's really hurt her. I don't think she really supports the idea [the WM3] are innocent. I think she's doing it out of anger. . . . It's kind of sad. And I'm really sorry that people think she supports that theory." Court's File, Stip. No. 1 (Ex. 4, *Arkansas Times* article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article).

- Another element of her anger, Pam Hobbs said, relates to her brother, whom Terry Hobbs shot in the abdomen during an altercation 10 years ago. That brother died last year. Terry Hobbs dismisses the episode. "The truth is," he said, "when a man is trying to kill you, you have a right under the United States Constitution to defend and protect yourself." Nevertheless, he acknowledged that he was charged with aggravated assault, fined and placed on probation. Court's File, Stip. No. 1 (Ex. 4, *Arkansas Times* article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article).

- For his part, Terry Hobbs said he's not worried and that he has nothing to hide. With regard to the retested DNA, he said, "I've been told that nothing that's going on right now is going to change a thing." Asked who'd given him that assurance, he replied, "Brent Davis," the prosecuting attorney. Court's File, Stip. No. 1 (Ex. 4, *Arkansas Times* article, "New Evidence in West Memphis Murders," 7/19/07); Ex. 20 (same article).

- In a telephone interview on Monday, Stevie's stepfather, Terry Hobbs, confirmed that West Memphis Police had videotaped an interview with him within the last three weeks. Court's File, Stip. No. 1 (Ex. 3, *Memphis Flyer* article, "New Evidence in West Memphis 3 Case," 7/19/07).

- Terry Hobbs said Thursday that West Memphis Police detectives interviewed him three weeks ago, asking his whereabouts on the night of the 1993 murders. . . . "I have nothing to hide," Hobbs, 49 told The Commercial Appeal. "I still didn't have nothing to do with them boys dying." Court's File, Stip. No. 4 (Ex. 253, *Commercial Appeal* article, "Stepdad Queried in Boys' Slayings," 7/19/07); Ex. 21 (same article).

- Reporter: "Did you murder the little boys?" "I'd have to laugh and say there's something wrong with someone who would think that," Terry Hobbs said. "It's sad to see that there are some people out here trying to get some killers out of prison that deserve to be hung by a rope," Hobbs added. Court's File, Stip. No. 1 (Ex. 7, Arkansas Matters article, "DNA Status Report Released," 7/19/07); Ex. 22 (same article).

- Hobbs claimed a private investigator from the defense team told him one of his hairs was discovered in a knot in one of the shoe laces used to tie up the three eight-year-olds. . . . "If Michael Moore or Christopher Byers had a piece of my hair on shoe strings, these little boys came to my home and played with our little boy pretty regularly." Court's File, Stip. No. 1 (Ex. 9, Action News 5 article, "Court Documents Reveal New Evidence," 7/20/07); Ex. 23 (same article).

- "I don't know what to think about it," Hobbs said. "It's their job to do what they do." Hobbs, now divorced from Steve Branch's, (sic) mother said he's not worried because he knows he has done nothing wrong. Court's File, Stip. No. 1 (Ex. 9, Action News 5 article, "Court Documents Reveal New Evidence," 7/20/07); Ex. 23 (same article).

- "I sat in a room the other day and was filmed, videoed, and audioed," Hobbs said. "It kind of aggravated me." Court's File, Stip. No. 1 (Ex. 8, MaraLeveritt.com blog post, "Terry Hobbs Reports Being Told His DNA Was Found At The Crime Scene," 7/20/07).

- "I went and talked to the police in West Memphis for a follow-up." Ex. 24; Court's File, Stip. No. 1 (Ex. 13, *Crittenden County Times* article, "Hobbs: This Isn't How," 7/24/07); Ex. 24 (same article).

- Hobbs said he believes in their [the WM3's] guilt. "I'm more than convinced because [the police are] more than convinced," Hobbs said. "Mike Allen's a good man, and I believe what I know, and I only know what they tell me. I think it's just a sad, desperate attempt for the defense to be doing what they're doing." Ex. 24; Court's File, Stip. No. 1 (Ex. 13, *Crittenden County Times* article, "Hobbs: This Isn't How," 7/24/07); Ex. 24 (same article).

- But the recent attention does take its toll, Hobbs said. "I try to go on the best I can, then something like this comes up, you know, and Hawaii looks pretty good sometimes, just to get away. This isn't how things could have been or should have been for all of us." Ex. 24; Court's File, Stip. No. 1 (Ex. 13, *Crittenden County Times* article, "Hobbs: This Isn't How," 7/24/07); Ex. 24 (same article); and

- Hobbs has said the hair on the shoelaces must have been innocently transferred from himself to one of the victims, who "played with our boy regularly." Court's File, Stip. No. 1 (Ex. 17, Arkansas Online article, "Defense Presents New Evidence," 10/30/07).

*Id*. at ¶ 131. Hobbs admits that he wanted the public to know that if the victims had his hair on them, it was because the boys played with Stevie pretty regularly, not because Hobbs

committed the murders or because the WM3 were innocent. *Id.* at ¶ 108. Hobbs believes that Janice Broach, a reporter at WMC-TV in Memphis, takes his calls because the question of whether the WM3 were wrongfully convicted is an ongoing story. *Id.* at ¶ 111. He states that she returns his calls if he needs her to do so.

The WM3 cases are ongoing in the Arkansas court system, where Echols is currently represented by San Francisco attorney Dennis Riordan. *Id.* at ¶ 133. Since their convictions in 1994, the WM3, including Damien Echols, have filed numerous motions for post-conviction relief in state and federal courts, including but not limited to motions to dismiss, motions for new trial, and Rule 37 petitions. *Id.* at ¶ 134. In 2002, Echols filed a motion for forensic DNA testing, and the Arkansas Supreme Court granted and extended a motion for stay of proceedings (pending outcome of DNA petition) in the lower court. *Id.* at ¶ 135. In 2004, an order for DNA testing was issued pursuant to Arkansas Code Sections 16-112-201, et seq. *Id.* at ¶ 136. The Arkansas Supreme Court requested and received DNA status reports while the motions filed by Echols's were stayed. *Id.* at ¶ 138. During the entire post-conviction relief process, Echols and his attorneys have had to communicate and cooperate frequently with Arkansas state officials, including prosecuting attorney Brent Davis, in order to obtain DNA testing and preserve his post-conviction remedies. *Id.* at ¶ 139. The State of Arkansas moved to dismiss Echols' first amended habeas petition filed in federal court, and the court denied the motion. Id. at ¶ 141.

Echols' second amended petition for habeas corpus ("habeas petition"), memorandum in support ("habeas memo"), and exhibits ("habeas evidence") were filed on October 29,

2007.  Stip. No. 2 (Doc. No. 24).  The entire habeas petition is a public record available to anyone by request and is publically accessible online through PACER.  *Id*. at ¶ 144.  Echols's lawyers plan to present the evidence filed in support of the habeas filing at the federal habeas hearing, which has not yet occurred.  *Id*. at ¶ 145.  It is obvious that the proceedings were and are public: the trials were held publically, the post-conviction filings have been filed publically, and the habeas hearing will be a public hearing.  *Id*. at ¶ 271.

On October 30, 2007, Echols's defense team distributed to the press a release originally drafted by Echols's publicist, Alice Leeds, summarizing the new evidence (the "press release").  *Id*. at ¶ 146.  Prior to distributing the press release, it was approved and its accuracy verified by three of Echols's lawyers, Riordan, Donald Horgan, and Gerald Skahan.  *Id*. at ¶ 147.  The press release sets forth the following evidentiary bullet points:

> The filing includes dozens of expert reports, witness affidavits, scientific reports and other submissions.  The highlights include:
>
> • DNA test results show that a hair found in the ligature of one of the victims matches Terry Hobbs, the step-father of another one of the victims.
>
> • DNA test results showing foreign DNA - on the penises of two of the victims - from someone other than Echols or the other two men who were convicted.
>
> • DNA test results matching a hair at the crime scene to a man who was with Terry Hobbs on the day of the crimes.  This places Hobbs at the scene of the crime, since it refutes any theory that the Hobbs'[s] hair (found in the ligature of one of the victims) was there before the crime.
>
> • Scientific analysis from some of the nation's leading forensics experts, stating that wounds on the victims' bodies were caused by animals at the crime scene - not knives used by the perpetrators, as the prosecution

15

claimed. These wounds were the centerpiece of the prosecution's case, and evidence was presented that a knife recovered from a lake near one defendant's home caused the wounds. The conclusive expert analysis showing that animals caused the wounds after the victims died also completely undercuts the testimony of a jailhouse informant (who testified about Echols using a knife to cause the wounds) and a discredited "expert" who testified that the knife wounds were part of a satanic ritual.

• Sworn affidavits outlining new evidence uncovered by Pam Hobbs (the ex-wife of Terry Hobbs) who found a knife in Terry Hobbs'[s] drawer that her son (one of the victims) had carried with him at all times. After her son was killed, the knife was not among his personal effects that the police gave to the Hobbs family, and Pam Hobbs always assumed that her son's murderer had taken it during the crime.

• New information implicating Terry Hobbs – including his own statements made to police in recent interviews where he acknowledged that several of his relatives suspect him in the crime. The filing also includes a chronology of Hobbs'[s] activities on the night of the crimes, when he washed his clothes and sheets at odd hours for no reason other than to hide evidence from the crimes.

• A sworn affidavit that refutes hearsay evidence from Echols's trial. The mother of one of two girls who testified that they overhead Echols admit to the crime at a softball game now says that Echols' statement was not serious and that neither she nor her daughter believes he committed the crime.

*Id*. at ¶ 149. Hobbs acknowledges that these press release bullet points contain the same information that would later be included almost word-for-word in the letters that form the basis of his current claims. *Id*. at ¶ 150.

Echols' attorney received over 300 interview requests from media outlets around the world in response to their filing of the habeas petition and the distribution of the press

release.  *Id*. at ¶ 151.  The following are merely a few of the mentions the speakers at the

press conference made of Hobbs:

- [Tom Fedor, serologist expert] Good morning everyone.  My name is Tom Fedor.  I work for the Serological Research Institute in Richland, California. . . . What I learned from the cigarette butt that was thought to have been smoked by Terry Hobbs and I'll say "thought to have been" because one of them was recovered from the front yard of his residence.  Another cigarette butt was recovered from an ashtray in his house.  The DNA that I recovered from those cigarette butts does not exclude the person who smoked them from being the source of a particular hair found at the crime scene.  That hair was associated with a ligature that bound the victim Moore.  Approximately .12% of the population could also be the source of that cigarette butt but DNA in case there are any doubts about whether it is Hobbs'[s] DNA on that cigarette butt or not.  Very few other people could have provided that particular DNA sample.  In respect to the hair that was associated with the ligature, approximately 1.5% of the population at large could be the source of that hair. . . . Terry Hobbs could be the source of that hair on the ligature.

- [Ex-FBI profiler John Douglas] So, I did this detailed analysis and went to the inquisitor private investigators in Memphis and what they said was "Douglas is describing some people here that we ought to take a look at" and low and behold David Jacoby was never interviewed by law enforcement.  He waited for the cops to come knocking on his door.  Terry Hobbs was never interviewed by the police until we conducted interviews of Terry Hobbs.  I interviewed him two times and had one interview where he was very, very credible because I didn't have any background information on him, but then five days later when we got this more detailed information, specific information, I talked to a total liar on a Monday night.  He is a total liar.  The guy I'm talking to now is being confronted with his lies and it is totally a different type of bird.  The person responsible for the crime can look at you right in the eye, can look at a camera and say that I didn't do it.  Because of the psychopathic personality, there is no remorse.  Anyone who perpetrates a crime like this and leaves the victims like this in this condition is only concerned about himself.  You can put them on the polygraph, he will pass the polygraph particularly if it is 14 years later.

*Id*. at ¶ 157.

Soon after the press conference, a video of it was posted on the WM3.org website

where it has remained available for public viewing ever since.  *Id*. at ¶ 164.  Additionally,

the video of the press conference is available to the general public on YouTube or through a simple Google search of "West Memphis 3 Press Conference." *Id*. at ¶ 165. The question of whether the WM3 had been wrongfully convicted received even more national media attention during November of 2007 because of the press conference, the press release, and the new evidence. *Id*. at ¶ 166. At least two media outlets quoted the press release bullet points verbatim and specifically referred to Hobbs by name in articles and blog posts about the habeas petition. *Id*. at ¶ 168. In addition to the local coverage, many national and international news outlets, including the *New York Times*, the *Los Angeles Times*, the *Guardian*, the *Observer*, and CNN.com published articles discussing the new DNA evidence, other habeas petition evidence and whether the WM3 had been wrongfully convicted. *Id*. at ¶ 169.

Below are various excerpts from articles in which Hobbs and his spokesperson, Ross Sampson, were interviewed:

- "It's sad to see that there are people out here trying to get killers out of prison, that deserve, every one of them, to be hung by a rope," said Terry Hobbs. Court's File, Stip. No. 1 (Ex. 30, KAIT-TV article, "Continuing Coverage: Pam Hobbs Speaks Out," 11/7/07);

- "They (defense lawyers) have nothing better to do than try to get some killers out of prison. And they have to point the finger at somebody," Hobbs said again Monday in a phone interview. Ex. 1, Hobbs Dep. 351:7-352:19 (Hobbs Dep. Ex. 10); Court's File, Stip. No. 1 (Ex. 38, *Commercial Appeal* article, "Familiar Face," 11/27/07); Ex. 26 (same article);

- "When the circus left town they left a clown behind," Hobbs said Monday of [John Mark] Byers and his allegations. "For whatever reason he's doing this [accusing Hobbs], and I think I know, he's on the wrong page." Court's File, Stip. No. 1 (Ex. 38, *Commercial Appeal* article, "Familiar Face," 11/27/07); Ex. 26 (same article);

- "I want people to know I haven't done nothing wrong, [Hobbs] said in a Friday night interview at a Memphis barbecue restaurant. "I want them to hear it from me." Ex. 1, Hobbs Dep. 209:14-213:24; Court's File, Stip. No. 1, (Ex. 39, *Arkansas Democrat-Gazette* article, "Reputation is Ruined," 2/3/08); Ex. 27 (same article);

- "Hobbs, 49, is angry, saying that in the past year, defense investigators have ruined his reputation and caused him to have a nervous breakdown." Ex. 1, Hobbs Dep., 209:14-213:24; Court's File, Stip. No. 1, (Ex. 39, *Arkansas Democrat-Gazette* article, "Reputation is Ruined," 2/3/08); Ex. 27 (same article);

- "That's so crazy," Hobbs said Friday when asked about her [Sharon Nelson's] claims that he was the first to find the boys' bodies, but didn't tell the police or his wife about his discovery. "Some people will say anything to get their 15 seconds of fame, and that, to me, sounds like one of those people. The woman, he said, wasn't a girlfriend. She was interested in him, but he didn't reciprocate. "And no," he added, "I didn't find the boys' bodies." Ex. 1, Hobbs Dep. 457:9-11, 458:10-21 (Dep. Ex. 20); Ex. 28, *Arkansas Democrat-Gazette* news article, "Retrial Sought," 5/31/08); Ex. 28 (same article);

- "I am not a child killer. . . . I haven't done anything wrong and everybody knows that." Ex. 1, Hobbs Dep. 345:12-348:2; Court's File, Stip No. 1 (Ex. 43, WMCTV Action 5 News article, "Step-father of a West Memphis Three Victim Writing Book," 8/8/08); Ex. 29 (same article);

- Hobbs also said he has kept a journal that began the day in May the bodies of the three boys were discovered. "Part of it is in the hands of a publisher or book writer . . . not a publisher, a writer. I think we are going to write a pretty good story about this," Hobbs said. Hobbs also said it is about 300-400 pages and someone in Hollywood wants the first rights to the book. Ex. 1, Hobbs Dep. 345:12-348:2; Court's File, Stip. No. 1 (Ex. 43, WMCTV Action 5 News article, "Step-father of a West Memphis Three Victim Writing Book," 8/8/08); Ex. 29 (same article);

- Terry Hobbs'[s] attorney Ross Sampson says Hobbs denies having anything to do with the murders of the three 8-year-old boys. Court's File, Stip. No. 1 (Ex. 22, WMCTV Action 5 News article, "Father Outraged," 10/30/07);

- "This really doesn't affect us at all," said Sampson. . . . "The perception is that this is somehow an accusation against Mr. Hobbs and we don't perceive that as such," said Sampson. . . . "Mr. Hobbs believes justice has been served," said Sampson. Ex. 7, Sampson Dep. 27:16-28:20 (Sampson Dep. Ex. 10); Court's File, Stip. No. 1 (Ex.

24, My Fox Memphis article, "Hobbs' Attorney Unconcerned," 10/31/07); Ex. 30 (same article); and

- Hobbs'[s] attorney, Ross Sampson, wasn't worried about the new evidence. "The allegation itself is ridiculous," he said. . . . Terry Hobbs has not been charged with anything and his attorney does not expect that to happen. "We really don't expect any type of legal action taken by the state of Arkansas against Mr. Hobbs," Sampson said. Ex. 7, Sampson Dep. 35:4-35:11 (Sampson Dep. Ex. 11); Ex. 31, WM3.vox.com blog post citing WMCTV Action News 5 article, "New West Memphis 3 Evidence to be Outlined at News Conference," 11/1/07.

*Id.* at ¶ 181.

During an interview on CNN's *Larry King Live* television show on December 19, 2007, Hobbs's daughter, Amanda Hobbs, responded to the DNA evidence and claims by John Mark Byers that Terry Hobbs was responsible for the murders, saying: "It makes me sick, it really does." *Id.* at ¶ 184. Hobbs gave an interview in August 2008 to Janice Broach in which he discussed his efforts to sell his story as a book and movie. *Id.* at ¶ 188.

Pasdar first became aware of the West Memphis 3, the Robin Hood Hills murders and Terry Hobbs in approximately May, 2007, when she watched the two *Paradise Lost* documentaries. *Id.* at ¶ 197. After watching the films, Pasdar decided to donate money to the Damien Echols Legal Defense Fund. *Id.* at ¶ 198. Following Pasdar's donation, Lorri Davis, contacted Pasdar to thank her for the donation. *Id.* at ¶ 199. Davis's outreach to Pasdar began a lengthy correspondence between the two about the WM3 case. *Id.* at ¶ 200. From that time to present, Pasdar and Davis communicated informally through email and phone calls, with Davis educating Pasdar about the murders, the evidence, the convictions,

the WM3 efforts to obtain release from incarceration and relief from their convictions, and the publicity surrounding the WM3. *Id.* at ¶ 201.

In early November 2007, Davis sent Pasdar a link to the Echols legal defense team press conference, where the defense team spoke specifically about the new evidence contained in the habeas filing, including the evidence which potentially implicates Hobbs. *Id.* at ¶ 204. On November 12, 2007, Pasdar emailed Davis about Hobbs's appearance on *Anderson Cooper 360*. *Id.* at ¶ 207. Pasdar told Davis that she was thinking of ideas for raising money for the Echols defense team. *Id.* at ¶ 208. Soon thereafter, Pasdar, with the help of her managers at Strategic Artist Management ("SAM"), began trying to organize a screening of the *Paradise Lost* films in Los Angles to raise awareness of and money for the WM3. *Id.* at ¶ 209.

On November 16, 2007, Pasdar informed Davis that she was "putting a letter together . . . with a link to find out more information and donate." *Id.* at ¶ 210. At that time, Pasdar again donated to the defense fund. *Id.* at ¶ 211. On November 17, 2007, Davis emailed Pasdar a document titled "Summary of New Evidence in Damien Echols (and the "West Memphis 3") Case" ("summary"). *Id.* at ¶ 212. The summary sent to Pasdar attached the press release prepared by WM3 publicist Alice Leeds, which was approved by Echols' defense attorneys Riordan, Donald Horgan, and Gerald Skahan. *Id.* at ¶ 213. Davis offered the summary to Pasdar as a list of possible "talking points" for the fundraising letter Pasdar was putting together. *Id.* at ¶ 214.

In addition to her conversations with Davis and review of the press conference, the *Anderson Cooper 360* show and other various news reports, Pasdar relied heavily on the language from the summary and press release in drafting her letters to seek donations, particularly in the letters' post-script, which is nearly identical to the evidence highlights in the summary and in the press release. *Id*. at ¶ 216. On November 20, 2007, Pasdar forwarded a draft of the letter to her management team for review and posting on the Dixie Chicks' website and the Dixie Chicks' MySpace blog. *Id*. at ¶ 218. On November 20, 2007, Pasdar also emailed Davis a draft of the letter and asked for feedback. *Id*. at ¶ 219.

On November 21, 2007, Simon Renshaw ("Renshaw"), Pasdar's manager, emailed Pasdar some suggested changes to the letter. *Id*. at ¶ 221. On November 22, 2007, Pasdar rejected Renshaw's suggestions:

> Overall, I don't mind grammar corrections or wording that states things more clearly, but all of the legal stuff is copied directly from the court filing and legal papers that were written by the defense team. I don't want to put any of that in my own words. The DNA evidence is not 'what I think', but what has been proven in the testing and id (sic) just being presented in the federal court hearing.

*Id*. at ¶ 222. A few minutes later, on November 22, 2007, to ensure no substantive changes were made to the letter, Pasdar also send a similar email to Morgan Zeuhlke, an employee at SAM responsible for arranging the posting of the letters on the website:

> Morgan, Please know that other than grammatical corrections, I don't want any of Simon's changes to be made to the letter. He doesn't realize that I took all of the legal talk directly from the documents written by the defense team. I am talking to him in the AM to go over all of it, but I just wanted to save you some work if I could.

*Id*. at ¶ 223.  Consequently, no substantive changes were made to the draft of the letter before posting it on the website.  *Id*. at ¶ 224.

On or about November 26, 2007, the website letter was posted on the Dixie Chicks' website.  *Id*. at ¶ 225.  A few days earlier, the MySpace letter had been posted on the Dixie Chicks' MySpace blog.  *Id*. at ¶ 226.  The bodies of the MySpace letter and the website letter are identical except that when linking to the sample letters for a letter writing campaign, the website letter says, "Click here to download the sample letter" whereas the MySpace letter says, "By clicking on this link, you can download the sample letter."  *Id*. at ¶ 227.  Pasdar mentions that many of the people working on the case have worked pro bono for thirteen (13) years, and that the costs associated with freeing those wrongfully convicted are high.  *Id*. at ¶ 273.  She encourages people to engage in a letter-writing campaign to the Governor of Arkansas.  *Id*. at ¶ 274.

Natalie Pasdar did not read the habeas petition or the habeas memo filed by Echols on October 29, 2007, before she posted her letter on the Dixie Chicks' webpage and MySpace page.  Pasdar's response to plaintiff's statement of facts ("Pasdar's resp. to stmt. of facts"), ¶ 2.  When Hobbs learned of the letters, he took no action to contact Pasdar or the Dixie Chicks and/or to seek a retraction.  Stmt. of facts, ¶ 324.

Pasdar delivered her remarks at the rally on December 19, 2007, more than six months before Hobbs filed this lawsuit on November 25, 2008.  *Id*. at ¶ 331.  To help Pasdar prepare her remarks at a WM3 rally in Little Rock, publicist Alice Leeds prepared a "Summary Message Points for Little Rock Rally."  *Id*. at ¶ 229.  Aware that Pasdar did not speak his

name at the rally, Hobbs purports to complain about the following comments Pasdar allegedly made at the rally: "When you see the films and when you go to the website you'll learn all the evidence that is there, and this there now, you just feel like what can I do" and "Well I feel like she saying her scientifically proven statement is what they came up with the stuff about me." *Id*. at ¶ 235. In his interrogatory response, Hobbs complaints that Pasdar says, "It's not a debate about opinion. It's science and its overwhelming." *Id*. at ¶ 236.

For summary judgment purposes, Pasdar admits the following: The fingerprint referenced on page 46 and pages 106-07 of the habeas memo on October 29, 2007, by Damien Echols is not the fingerprint of Terry Hobbs. Pasdar's resp. to stmt. of facts, ¶ 4. Thomas Fedor, the DNA expert on the Echols legal team, stated that the mitochondrial sequence recovered from cigarette butt items 8 and 10 differs at one nucleotide position from the sequence Bode obtained from hair 2S04-114-03 Aa, described as a hair from ligature (Moore). *Id*. at ¶ 5. Fedor, in a presentation to the press on November 2, 2007, stated that 1.5% of the population could be the source of the hair from which Terry Hobbs could not be excluded, and that 7% of the population could be the source of the hair from which David Jacoby could not be excluded. *Id*. at ¶¶ 6-7. He stated that because of passive transfer, someone else could have delivered the hair linked to Hobbs to the scene even if it is assumed that the hair did come from Hobbs, and that there was no way to be sure whether the hair was carried to the scene by Hobbs or by passive transfer. *Id*. at ¶¶ 9-10. Exhibits V and W to the habeas memo refer to a "Hair from C. Byers ligature" and that Terry Hobbs is excluded as the donor of such "Hair from C. Byers ligature." *Id*. at ¶ 8. On page 65, the habeas memo

states, "Do the mitochondrial results in themselves establish the guilt of Hobbs or Jacoby. No. Mitochondrial DNA is held commonly by those in a maternal line, as opposed to being unique to an individual, as is true of nuclear DNA." *Id*. at ¶ 11.

Pasdar caused the letters to be posted on the Dixie Chicks' website and on a MySpace page, which stated, "The filing also includes a chronology of Hobbs'[s] activities on the night of the crimes, when he washed his clothes and sheets at odd hours for no reason other than to hide evidence from the crimes." *Id*. at ¶ 13. The only reference to the time of death of the victims in the habeas memo appears on page 37: "Doctor Perettis' best estimate of the time of the victims' death was between 1:00 a.m. and 7:00 a.m. on May 6th." *Id*. at ¶ 12. The time of death of Steve Branch, Chris Byers, and Michael Moore was between 1:00 a.m. and 7:00 p.m. on May 6, 1993. *Id*. at ¶ 14.

## II. SUMMARY JUDGMENT STANDARD

"Summary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law." *Nelson v. Corr. Med. Servs.*, 533 F.3d 958, 961 (8th Cir. 2008) (citing Fed. R. Civ. P. 56; *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008)).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party is not required to

support its motion with affidavits or other similar materials negating the opponent's claim. *Id*.

Once the moving party demonstrates that the record does not disclose a genuine dispute on a material fact, the non-moving party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The plain language of Rule 56(c) mandates the entry of summary judgment against a non-moving party which, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## III. DISCUSSION

A.      Choice of Law

Hobbs asserts that Arkansas law applies in this case, while defendants assert that Tennessee law applies. This issue, however, need not be resolved because under either Arkansas or Tennessee law, summary judgment is appropriate.

B.      Defamation

In *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964), the Supreme Court held that the constitutional guarantees of freedom of speech and of the press require "a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'–that

is, with knowledge that it was false or with reckless disregard of whether it was false or not." Subsequently, "the Court equated reckless disregard of the truth with subjective awareness of probable falsity: 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Gertz v. Robert Welch, Inc*., 418 U.S. 323, 334 n.6 (1974) (citing *St. Amant v. Thompson*, 390 U.S. 727 (1968)).

"Three years after *New York Times*, a majority of the Court agreed to extend the constitutional privilege to defamatory criticism of 'public figures.'" *Id*. at 335 (citing *Curtis Publishing v. Butts* and its companion, *Associated Press v. Walker*, 388 U.S. 130, 162 (1967)). "[T]he rationale for extending the *New York Times* rule to public figures was two-fold." *Wolston v. Reader's Digest Ass'n, Inc*., 443 U.S. 157, 164 (1979). First, "public figures are less vulnerable to injury from defamatory statements because of their ability to resort to effective 'self-help'" because "[t]hey usually enjoy significantly greater access than private individuals to channels of effective communication, which enable them through discussion to counter criticism and expose the falsehood and fallacies of defamatory statements." *Id*. "Second, and more importantly, was a normative consideration that public figures are less deserving of protection than private persons because public figures, like public officials, have 'voluntarily exposed themselves to increased risk of injury from defamatory falsehood concerning them.'" *Id*.

In *Gertz*, the Court set forth two categories of public figures: general purpose public

figures and limited purpose public figures.  418 U.S. at 345.

> In some instances an individual may achieve such pervasive fame or notoriety
> that he becomes a public figure for all purposes and in all contexts.  More
> commonly, an individual voluntarily injects himself or is drawn into a
> particular public controversy and thereby becomes a public figure for a limited
> range of issues.  In either case such persons assume special prominence in the
> resolution of public questions.

*Id*. at 351.  In other words, "those classed as public figures have thrust themselves to the

forefront of particular public controversies in order to influence the resolution of issues

involved."  *Id*.  at 345.

In *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255-56 (1986), the Supreme Court

held that "where the factual dispute concerns actual malice . . . the appropriate summary

judgment question will be whether the evidence in the record could support a reasonable jury

finding either that the plaintiff has shown actual malice by clear and convincing evidence or

that the plaintiff has not."  *See also Southall v. Little Rock Newspapers, Inc*., 332 Ark. 123,

129, 964 S.W.2d 187, 191 (1998) (stating that whether a person is a public official or a

public figure is a mixed question of fact and law to be determined by the trial court and

whether the evidence in the record is sufficient to support a finding of actual malice is a

question of law); *Lewis v. NewsChannel 5 Network, L.P.*, 238 S.W.3d 270, 283 (Tenn. Ct.

App. 2007) (stating that whether the plaintiff is a public figure and whether a public figure

has come forward with clear and convincing evidence that the defendant was acting with actual malice are questions of law).

Defendants contend that Hobbs is a limited purpose public figure, and in order to prevail, he must prove actual malice by clear and convincing evidence. Defendants assert that Hobbs cannot meet his burden.

### 1. Issue of Public Concern and Limited Purpose Public Figure

Hobbs is a limited purpose public figure because he voluntarily injected himself into the forefront of this public controversy. Moreover, he did so to influence the resolution of the issues involved.

To determine whether Hobbs is a limited purpose public figure, the court must first identify the particular public controversy giving rise to the alleged defamation and then look to the nature and extent of the individual's participation in the controversy. *Gertz*, 418 U.S. at 352 ("It is preferable to reduce the public-figure question to a more meaningful context by looking to the nature and extent of an individual's participation in the particular controversy giving rise to the defamation.").

Hobbs asserts that the defendants have failed to identify a dimension of this case that impacts persons other than direct participants, and thus, there is no public controversy. The Eighth Circuit has noted that the Supreme Court, "in identifying a *Gertz* public controversy, has focused its attention on those controversies involving questions of 'public concern,' . . . or, in other words, those controversies raising issues that might reasonably be expected to

have an impact beyond the parties directly enmeshed in the particular controversy." *In re IBP Confidential Business Documents Litigation*, 797 F.2d 632, 645 (8th Cir. 1986) (citing *Dunn & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) and *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287 (D.C. Cir. 1980)).

Hobbs also asserts that this case is analogous to *Time, Inc. v. Firestone*, 424 U.S. 448 (1976). In *Firestone*, the Supreme Court held that the wife of a the "scion of one of America's wealthier industrial families" was not a public figure, despite "a few press conferences . . . in an attempt to satisfy inquiring reporters," and that her civil divorce proceedings were not the sort of "public controversy" referred to in *Gertz*. *Id*. at 450, 454. The Court noted that the plaintiff was "compelled to go to court by the State in order to obtain legal release from the bonds of matrimony," rather than freely choosing to publicize issues as to the propriety of her married life, and rejected the proposal to equate "public controversy" with all controversies of interest to the public. *Id*. at 454. The Court also rejected an automatic extension of the *New York Times* privilege to all reports of judicial proceedings, but noted that it had "recently accepted a significantly more confined version of this argument by holding that the Constitution precludes States from imposing civil liability based upon the publication of truthful information contained in official court records open to public inspection." *Id*. at 455.

The facts in this case are clearly distinguishable from those in *Firestone*. "The commission of crime, prosecutions resulting from it, and judicial proceedings arising from

the prosecutions . . . are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 492 (1975). For example, in *Street v. Nat'l Broad. Co.*, 645 F.2d 1227, 1234 (6th Cir. 1981), the Sixth Circuit held that the Scottsboro Nine case involving the trials of black youths accused of raping two young white women was a public controversy. There, the trials were the focus of major public debate over the ability of the "courts to render even-handed justice," "generated widespread press and attracted public attention for several years," and was "a contributing factor in changing public attitudes about the right of black citizens to equal treatment under law and in changing constitutional principles governing the right to counsel and the exclusion of blacks from the jury." *Id.* *See also Ramsey v. Fox News Network, L.L.C.*, 351 F. Supp. 2d 1145, 1150 (D. Colo. 2005) (finding that JonBenet Ramsey's murder investigation was an issue of public concern); *Friedgood v. Peters Pub. Co.*, 521 So.2d 236, 241-42 (Fla. Dist. Ct. App. 1988) (finding an issue of public concern in an initially highly publicized criminal prosecution "out of which other political and/or legal issues arose").

The record is replete with evidence of media coverage regarding the WM3, the murders, the trials, the convictions of the WM3, the WM3's post-conviction relief efforts, the victims, the victims' families, whether the WM3 were wrongfully convicted, and if so, who the real killer(s) is/are. Furthermore, it is undisputed that films, books and music concerning these events have been widely distributed. Whether the WM3 were appropriately

31

convicted of the murders of Stevie Branch, Michael Moore, and Christopher Byers is clearly a matter of public concern or controversy.

Because there is no question that the issues involved herein are matters of public concern, the issue then becomes the nature and extent of Hobbs's participation in the controversy. In *Street*, the Sixth Circuit held that the plaintiff, the alleged victim of rape in the Scottsboro Nine case, was a public figure. 645 F.2d at 1234-35. There, two women initially accused the defendants of rape. *Id*. The second young woman, however, recanted her incriminating testimony, leaving the plaintiff as the sole prosecutrix. *Id*. Thus, the court found that the plaintiff played a prominent role in the public controversy. *Id*. at 1234. Also, the plaintiff had access to the channels of effective communication and a realistic opportunity to counteract false statements as the press "clamored to interview her." *Id*. Finally, the court found that the plaintiff voluntarily thrust herself into the forefront of the public controversy, noting that she gave press interviews and aggressively promoted her version of the case outside of her actual courtroom testimony. *Id*. at 1235. *See also Nichols v. Moore*, 396 F. Supp. 2d 783, 794 (E.D. Mich. 2005) (holding plaintiff was a limited public figure with regard to the public controversy surrounding the Oklahoma City bombing as he voluntarily gave dozens of interviews after his release and he co-authored a book discussing the bombing).

In *Southall*, the Arkansas Supreme Court held that the plaintiff was a limited purpose public figure on the subject of environmental issues. 332 Ark. at 131. There, the plaintiff

"stated in his deposition that he had conducted interviews with the media, had talked to radio and television reporters, had been a lobbyist at the state legislature, and had been fairly prominent in the public debate over the regulation of hazardous waste." *Id*. at 132. The court concluded that the plaintiff demonstrated by his own statements that "he had thrust himself into the vortex of public controversy surrounding the subject of hazardous waste." *Id*.

Here, the record demonstrates that well before the defendants made the statements that Hobbs claims are defamatory, Hobbs publically advocated his lack of involvement in the murders, expressed his belief that the WM3 are guilty, provided explanations for the DNA allegedly found at the murder scene, and provided explanations for the allegations regarding the pocket knife. In fact, Hobbs was the first to disclose to the press the details surrounding his WMPD interview. Hobbs admits that he wanted the public to know that if the victims had his hair on them, it was because the boys played with Stevie pretty regularly, not because Hobbs committed the murders or because the WM3 did not.

Additionally, Hobbs voluntarily appeared in an HBO documentary, as well as on *The Geraldo Rivera Show* and *The Maury Povich Show*. More recently, he appeared on *Anderson Cooper 360*. He admits that at least one specific reporter takes and returns his phone calls. Hobbs testified that he signed a contract selling his life story to Dimension Films and anticipated that a movie with a national release would be made. Ex. 1, Hobbs dep. p. 52-54, Pasdar's motion for summary judgment ("Pasdar's motion"). The record indicates that the

contract was entered into in July 2006.  Exs. 16 and 42, Pasdar's motion.  Following the sale of the rights to his life story, Hobbs voluntarily sat down at least twice with his ex-wife, Pam, and Dimension Films for an interview to be used in the creation of the film.  Hobbs admits that he has told people that he has a book deal and/or that he would like to have one.

The record is clear that Hobbs previously had, and presently has, full access to the media, notwithstanding his assertion that he has a lack of access.  Hobbs attempts to demonstrate his lack of access to the media by noting the lack of media coverage regarding facts that are consistent with his innocence, including a fingerprint not matching him and another hair not matching him.  Hobbs, however, has presented no evidence that he has attempted to publicize these facts consistent with his innocence during his numerous encounters with the media.  Although Hobbs asserts that his failure to convey these facts more effectively due to his tenth grade education reinforces that he is not a public figure, his argument is unconvincing.  Thus, the court finds that Hobbs is a limited purpose public figure because he voluntarily injected himself into the forefront of the public controversy at issue in order to influence the resolution of issues involved.

Hobbs asserts that he is not a public figure because he was only defending himself against false charges that he is responsible for the murders and statements regarding the personal impact of this crime on himself and his family.  He states that even assuming that the public controversy started the day the crimes were committed, his role was diminished to the point that he is not a public figure because he was silent from 1996 until 2007 and his

media contacts 2007 and after constitute self-defense against false implications that he was involved in the murders.

"[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire*, 443 U.S. 111, 134 (1979). For example, in *Hutchinson*, the plaintiff's writings became a matter of controversy as a consequence of receiving the Golden Fleece Award, which publicized what Senator William Proxmire perceived to be the most egregious examples of wasteful governmental spending. *Id*. at 114, 135. The Court found that the plaintiff did not thrust himself or his views into public controversy to influence others and that no particular public controversy was identified. *Id*. at 135. Hutchinson had not assumed a role of public prominence in the broad question of concern about general public expenditures, concerns that were shared by most, as the mere application for and receipt of public grants and publications in professional journals did not invite the "degree of public attention and comment essential to meet the public figure level." *Id*. Furthermore, the Court found that the reporting of the plaintiff's response to the announcement of the Golden Fleece Award by some newspapers and wire services failed to support limited purpose public figure status due to media access because his access came after the alleged libel. *Id*. at 134-45.

This case is distinguishable from Hutchinson, however, because the record demonstrates that Hobbs had access to the media prior to the alleged defamation and his role was not limited to defending himself. In fact, he has clearly taken advantage of his role in

the controversy by selling the rights to the life stories of himself and Stevie Branch to a film company in 2006 and by attempting to sell his journal as a book. Even assuming that Hobbs lost his status as a public figure for some period of time, he was clearly a public figure at the time of the alleged defamation.

Hobbs also asserts that it cannot be said that he has attempted to influence the resolution of issues involved, as has not had a major impact on the resolution of questions surrounding the death penalty and there has been no public policy response to the issues raised by the murders. In his deposition, however, Hobbs agreed that one of the things he was trying to accomplish in talking to the press and in agreeing to sell his life story to Dimension Films was to convey his position to the public and the authorities that the actual killers had been prosecuted and convicted, that they should stay in jail, and that there was no further need for investigation. Ex. 1, Hobbs dep. p. 459-61, Pasdar's motion. Regardless of whether Hobbs's advocacy can actually have an impact on the official legal proceedings relating to the controversy at issue, Hobbs has, at the very least, attempted to influence the court of public opinion and the authorities on the controversy. *See Wolston*, 443 U.S. at 167 (finding that plaintiff was not a public figure where he "did not in any way seek to arouse public sentiment in his favor and against the investigation" in failing to respond to a grand jury's subpoena due to his poor health). As noted above, the record clearly demonstrates that Hobbs has publically advocated his position that he was not involved in the murders and that the WM3 are guilty. Thus, Hobbs is a limited purpose public figure.

## 2. *Actual Malice*

Because Hobbs is a limited purpose public figure, the question becomes whether the evidence in the record could support a reasonable jury finding that Hobbs has shown actual malice by clear and convincing evidence. "The [constitutional] question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Harte-Hanks Communs., Inc. v. Connaughton*, 491 U.S. 657, 685-86 (1989).

As discussed above, to establish actual malice, Hobbs must present evidence that could support a reasonable jury finding that defendants made the statements at issue with knowledge that the statements were false or with reckless disregard of whether the statements were false or not. To establish a reckless disregard of the truth, or a subjective awareness of probable falsity, Hobbs must present sufficient evidence to permit the conclusion that the defendants in fact entertained serious doubts as to the truth of the publications. *Gertz*, 418 U.S. at 334 n.6. "[M]ere proof of failure to investigate, without more, cannot establish reckless disregard for the truth." *Id.* at 332. "Rather, the publisher must act with a 'high degree of awareness of . . . probable falsity." *Id.*

In *St. Amant*, the Supreme Court held that the plaintiff failed to establish actual malice when the defendant had no personal knowledge of the plaintiff's activities, relied solely upon an affidavit from a union leader, failed to verify the information with those in the union office who might have known the facts, and mistakenly believed he had no responsibility for the broadcast because he was merely quoting the affidavit. 390 U.S. at 730. Similarly, in

*Secrist v. Harkin*, 874 F.2d 1244, 1253 (8th Cir. 1989), the Eighth Circuit upheld the district court's grant of summary judgment due to plaintiff's failure to submit sufficient evidence of actual malice. There, the plaintiff asserted that the defendants' statements implied that the plaintiff, a Lieutenant Colonel in the Untied States Marine Corps, was appointed to Senator Jepsen's personal office staff to increase campaign contributions from defense contractors. *Id*. The court found that plaintiff failed to demonstrate actual malice because the defendants relied upon public reports filed by Senator Jepsen's campaign committee and issued by the Department of Defense, as well as the observation of a staff member whose credibility had not been questioned. *Id*.

Hobbs asserts that Pasdar's statements amount to an accusation that he is responsible for the murders despite her admission that she does not know who is responsible for the murders. Ex. 2, Pasdar declaration ¶ 26, Pasdar's motion. Hobbs also dismisses Pasdar's attempt to differentiate between the body of the letters and the post-script, which contains the press release bullet points, and her contention that she copied the summary language. He notes that although Pasdar claims that she did not change the meaning of the summary, she did not include the following statement in the letters, although it was contained in the summary: "This places Hobbs at the scene of the crime, since it refutes any theory that the Hobbs'[s] hair (found in the ligature of one of the victims) was there before the crime." He contends that this statement, which was omitted by Pasdar, contradicts statements made by Echols's expert regarding passive transfer.

Here, although Pasdar admittedly did not read the habeas filings, it is undisputed that she watched the two *Paradise Lost* documentaries, has had lengthy correspondence with Lorri Davis about the WM3 case, watched the Echols legal defense team press conference, and that she emailed Davis about Hobbs's appearance on *Anderson Cooper 360*. More importantly, however, it is undisputed that the press release bullet points contain the same information that would later be included almost word-for-word in the letters, and that the press release was approved by Echols' defense attorneys. Hobbs admits that Pasdar relied heavily on the language from the summary and press release in drafting her letters to seek donations, particularly in the letters' post-script, which is nearly identical to the evidence highlights in the summary and in the press release. Furthermore, Pasdar's email to her manager, and follow-up to Morgan Zeuhlke, demonstrates her desire to make sure "all of the legal stuff is copied directly from the court filing and legal papers that were written by the defense team" because she didn't "want to put any of that in [her] own words." It is also undisputed that to help Pasdar prepare her remarks for the rally, publicist Alice Leeds prepared a "Summary Message Points for Little Rock Rally." Finally, Hobbs admits that at least two media outlets quoted the press release bullet points verbatim and specifically referred to Hobbs by name in articles and blog posts about the habeas petition.

Based upon the record, no reasonable jury could find that defendants made the statements at issue with knowledge that the statements were false or with reckless disregard of whether the statements were false or not. Because Hobbs cannot establish actual malice,

summary judgment is appropriate on Hobbs's defamation claims. The court need not address the additional issues raised regarding the defamation claims.

C.    False Light

Under both Arkansas and Tennessee law, to recover for false light invasion of privacy, the plaintiff must demonstrate actual malice. *Dodrill v. Arkansas Democrat Co*., 265 Ark. 628, 638-39, 590 S.W.2d 840, 845 (1979) ("[A]ctual malice must be demonstrated by one seeking to recover for invasion of privacy. . . . There must be sufficient evidence to permit the conclusion that the Defendant, in fact, entertained serious doubts as to the truth of his publication."); *Lewis v. NewsChannel 5 Network, L.P*., 238 S.W.3d 270, 303 (Tenn. Ct. App. 2007) ("In Tennessee, the actual malice standard applies to 'false light claims when the plaintiff is a public official or public figure, or when the claim is asserted by a private individual about a matter of public concern.'"). As discussed above, Hobbs cannot establish actual malice. Further, Hobbs does not address this claim specifically in his response. Thus, summary judgment is appropriate as to his false light claims.

D.    Outrage

In *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988), the Supreme Court held that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress" without showing that the false statement of fact was made with actual malice, as set forth in *New York Times*. Hobbs does not address this claim specifically in his response. Because Hobbs cannot establish actual malice, summary judgment is appropriate as to his outrage claim.

## IV.  CONCLUSION

For the reasons set forth herein, there are no issues of material fact in dispute as to Hobbs's claims against the defendants and summary judgment is appropriate on those claims.

Accordingly, defendants' motions for summary judgment (Doc. Nos. 38 and 41) are granted; plaintiff's motion for partial summary judgment (Doc. No. 26) is denied as moot; and plaintiff's motion for partial summary judgment (Doc. No. 31) is denied.  Plaintiff Terry Hobbs's complaint is dismissed with prejudice and an appropriate judgment will be entered.

IT IS SO ORDERED THIS 1st day of December, 2009.

_____
UNITED STATES DISTRICT JUDGE